## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

ESTATE OF DEREK WILLIAMS JR.,
by SHARDAY ROSE, Special Administrator; and
TANIJAH WILLIAMS, DEREK WILLIAMS III, and
TALIYAH S. WILLIAMS, minors by their mother
and guardian SHARDAY ROSE,

                          Plaintiffs,

v.                                                Case No. 16-C-869

CITY OF MILWAUKEE, and Milwaukee Police
Officers JEFFREY CLINE, RICHARD TICCIONI,
PATRICK COE, JASON BLEICHWEHL,
ROBERT THIEL, TODD KAUL,
ZACHARY THOMS, GREGORY KUSPA,
CRAIG THIMM, CHAD BOYACK, and
DAVID LETTEER,

                          Defendants.

## BRIEF OF DEFENDANTS IN SUPPORT OF
## THEIR MOTION FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

On July 6, 2011, Derek Williams, Jr. died as a result of sickle cell crisis, while he was in the custody of Milwaukee police officers. Mr. Williams was taken into custody after officers observed him on a City street corner, engaged in an armed robbery of a young couple. Upon observing the approach of police officers, Mr. Williams jumped out of his unlaced athletic shoes and ran more than 250 yards from his victims – jumping over at least one chain-link fence in the process. He was found minutes later, hiding behind a small card table in a dark yard, which was overgrown with vegetation. Mr. Williams refused to provide his arresting officers with his name. Officers perceived that he was being resistive and a flight risk, and did not believe him

when he said multiple times he could not breathe. Within 15 minutes of his arrest, Mr. Williams lost consciousness in the back seat of a squad car. After observing that Mr. Williams was unresponsive, an officer immediately engaged in First Responder measures. He 1) checked on Mr. Williams' breathing and pulse, 2) found that he was not breathing and had no pulse, 3) sought help, and 4) he then pulled Mr. Williams from the squad, and began providing Mr. Williams with unprotected mouth-to-mouth CPR rescue breaths. Other officers quickly responded to the call for help, and assisted with providing CPR. Emergency medical caregivers subsequently arrived and took over life saving measures, but to no avail. Mr. Williams died at the scene.

Mr. Williams' estate and three of his children (alleged) now bring suit, claiming that 1) two officers used excessive force against him; 2) eleven officers failed to provide him with necessary medical care; 3) the City failed to properly train its officers and maintained certain unlawful policies and customs; and 4) that each of these things caused Mr. Williams to die. The defendants maintain that no officer used excessive force; no officer was indifferent to Mr. Williams' medical needs; the related training and policies of the City were not unconstitutional; and regardless, no action or inaction of any officer, or any MPD policy or practice, caused Mr. Williams' death. Rather, he was the victim of a sickle cell crisis, caused by his genetic sickle cell trait, and therefore, this case should be dismissed.

## II.     STATEMENT OF THE CASE

This case was initially filed with the United States District Court for the Eastern District of Wisconsin on July 6, 2016. Plaintiffs claim that 1) Officers Ticcioni and Coe used excessive force against Mr. Williams; 2) Officers Ticcioni (now detective), Coe, Bleichwehl, Thoms, Kuspa, Thimm (now detective), Boyack, Letteer, and Cline, and Sergeants Kaul and Thiel

2

"failed to attend to his medical needs;" and 3) that these alleged constitutional violations were caused by policy, training, and supervision failures on the part of the City. Plaintiffs also bring a state law wrongful death claim. As described above, the defendants believe that all claims should be dismissed as a matter of law at this time.

## III. PROPOSED FINDINGS OF FACT

1. All defendants were employed as either Milwaukee Police Department officers or sergeants on July 6, 2001. (Cline Aff., ¶ 2; Ticcioni Aff., ¶ 2; Coe Aff., ¶ 2; Bleichwehl Aff., ¶ 2; Thiel Aff., ¶ 2; Kaul Aff., ¶ 2; Thoms Aff., ¶ 2; Kuspa Aff., ¶ 2; Thimm Aff., ¶ 2; Boyack Aff., ¶ 2; Letteer Aff., ¶ 2)

2. All defendant officers successfully completed all of their Milwaukee police training, including their recruit training and annual in-service training, and have maintained their certifications to act as law enforcement officers in the State of Wisconsin throughout the course of their careers. (Cline Aff., ¶ 3; Ticcioni Aff., ¶ 3; Coe Aff., ¶ 3; Bleichwehl Aff., ¶ 3; Thiel Aff., ¶ 3; Kaul Aff., ¶ 3; Thoms Aff., ¶ 3; Kuspa Aff., ¶ 3; Thimm Aff., ¶ 3; Boyack Aff., ¶ 3; Letteer Aff., ¶ 3)

3. All defendant officers were trained to be First Responders, and received First Aid training, American Heart Association (AHA) Cardio Pulmonary Resuscitation (CPR) training and defibrillator (AED) training. (Groszczyk Aff., ¶ 30; Cline Aff., ¶ 4; Ticcioni Aff., ¶ 4; Coe Aff., ¶ 4; Bleichwehl Aff., ¶ 4; Thiel Aff., ¶ 4; Kaul Aff., ¶ 4; Thoms Aff., ¶ 4; Kuspa Aff., ¶ 4; Thimm Aff., ¶ 4; Boyack Aff., ¶ 4; Letteer Aff., ¶ 4)

4. Officers learned that they could not provide medications to any subject, and that they could not provide medical care (except for minor first aid) to any subject, unless he was experiencing a medical emergency. (Groszczyk Aff., ¶ 29; Cline Aff., ¶ 4; Ticcioni Aff., ¶ 4;

3

Coe Aff., ¶ 4; Bleichwehl Aff., ¶ 4; Thiel Aff., ¶ 4; Kaul Aff., ¶ 4; Thoms Aff., ¶ 4; Kuspa Aff., ¶ 4; Thimm Aff., ¶ 4; Boyack Aff., ¶ 4; Letteer Aff., ¶ 4)

5.      Included among the types of medical emergencies which would require an officer to provide emergency medical care to a prisoner are stroke, seizure, diabetic emergency, poisoning, and an allergic reaction. (Groszczyk Aff., ¶ 25; Cline Aff., ¶ 4; Ticcioni Aff., ¶ 4; Coe Aff., ¶ 4; Bleichwehl Aff., ¶ 4; Thiel Aff., ¶ 4; Kaul Aff., ¶ 4; Thoms Aff., ¶ 4; Kuspa Aff., ¶ 4; Thimm Aff., ¶ 4; Boyack Aff., ¶ 4; Letteer Aff., ¶ 4)

6.      Regardless of the type of symptoms involved, MPD officers are taught that should an individual become unresponsive or unconscious, they should immediately take First Responder action, which might include providing the person with chest compressions and/or rescue breathing. (Groszczyk Aff., ¶ 46; Cline Aff., ¶ 4; Ticcioni Aff., ¶ 4; Coe Aff., ¶ 4; Bleichwehl Aff., ¶ 4; Thiel Aff., ¶ 4; Kaul Aff., ¶ 4; Thoms Aff., ¶ 4; Kuspa Aff., ¶ 4; Thimm Aff., ¶ 4; Boyack Aff., ¶ 4; Letteer Aff., ¶ 4)

7.      As part of their First Responder training, officers were taught that should a person become unresponsive, they should check his ABCs, which means his airway, breathing and circulation.  (Groszczyk Aff., ¶ 16; Cline Aff., ¶ 5; Ticcioni Aff., ¶ 5; Coe Aff., ¶ 5; Bleichwehl Aff., ¶ 5; Thiel Aff., ¶ 5; Kaul Aff., ¶ 5; Thoms Aff., ¶ 5; Kuspa Aff., ¶ 5; Thimm Aff., ¶ 5; Boyack Aff., ¶ 5; Letteer Aff., ¶ 5)

8.      Officers are taught that when checking on the status of a subject's airway and breathing, officers should listen in the area of a subject's nose and mouth, to determine if air is passing in and out of the person's lungs, or they could also feel for breath, by placing their hands or fingers in front of the unresponsive person's nose and mouth area.  (Groszczyk Aff., ¶ 39;

4

Cline Aff., ¶ 5; Ticcioni Aff., ¶ 5; Coe Aff., ¶ 5; Bleichwehl Aff., ¶ 5; Thiel Aff., ¶ 5; Kaul Aff., ¶ 5; Thoms Aff., ¶ 5; Kuspa Aff., ¶ 5; Thimm Aff., ¶ 5; Boyack Aff., ¶ 5; Letteer Aff., ¶ 5)

9.       In the context of learning about the ABC's of being a First Responder, officers are also told that if a subject is talking, therefore they are breathing, so officers need not provide that person with resuscitative breathing or chest compressions.  (Groszczyk Aff., ¶ 39; Cline Aff., ¶ 5; Ticcioni Aff., ¶ 5; Coe Aff., ¶ 5; Bleichwehl Aff., ¶ 5; Thiel Aff., ¶ 5; Kaul Aff., ¶ 5; Thoms Aff., ¶ 5; Kuspa Aff., ¶ 5; Thimm Aff., ¶ 5; Boyack Aff., ¶ 5; Letteer Aff., ¶ 5)

10.     This anecdote that "if a person is talking, they are breathing," is something all defendant officers have heard stated by EMTs and hospital personnel over the course of their MPD careers.  (Groszczyk Aff., ¶ 18; Cline Aff., ¶ 6; Ticcioni Aff., ¶ 6; Coe Aff., ¶ 6; Bleichwehl Aff., ¶ 6; Thiel Aff., ¶ 6; Kaul Aff., ¶ 6; Thoms Aff., ¶ 6; Kuspa Aff., ¶ 6; Thimm Aff., ¶ 6; Boyack Aff., ¶ 6; Letteer Aff., ¶ 6)

11.     However, all defendant officers fully understood that being able to talk does not indicate the degree to which a person is able to breathe.  (Cline Aff., ¶ 7; Ticcioni Aff., ¶ 7; Coe Aff., ¶ 7; Bleichwehl Aff., ¶ 7; Thiel Aff., ¶ 7; Aff., Kaul Aff., ¶ 7; Thoms Aff., ¶ 7; Kuspa Aff., ¶ 7; Thimm Aff., ¶ 7; Boyack Aff., ¶ 7; Letteer Aff., ¶ 7)

12.     The defendant officers' First Responder training instructed that should a person appear to become unresponsive and/or stop breathing, officers should then attempt to obtain help from fellow officers and/or citizens, before beginning CPR efforts.  (Groszczyk Aff., ¶ 41; Cline Aff., ¶ 8; Ticcioni Aff., ¶ 8; Coe Aff., ¶ 8; Bleichwehl Aff., ¶ 8; Thiel Aff., ¶ 8; Kaul Aff., ¶ 8; Thoms Aff., ¶ 8; Kuspa Aff., ¶ 8; Thimm Aff., ¶ 8; Boyack Aff., ¶ 8; Letteer Aff., ¶ 8)

13.     Officers were also trained that after they have called for help, and then engaged in CPR procedures, they should do so until emergency medical technicians, or any other person

5

with more advanced medical training, arrives on scene, and takes over their CPR activities. (Groszczyk Aff., ¶ 42; Cline Aff., ¶ 9; Ticcioni Aff., ¶ 9; Coe Aff., ¶ 9; Bleichwehl Aff., ¶ 9; Thiel Aff., ¶ 9; Kaul Aff., ¶ 9; Thoms Aff., ¶ 9; Kuspa Aff., ¶ 9; Thimm Aff., ¶ 9; Boyack Aff., ¶ 9; Letteer Aff., ¶ 9)

14.     All of the defendant officers have experienced, in the context of their work prior to July 6, 2001, many people who ran from them or other officers, and who stated words to the effect of "I can't breathe," and/or appeared to be out of breath, after they were apprehended. (Cline Aff., ¶ 10; Ticcioni Aff., ¶ 10; Coe Aff., ¶ 10; Bleichwehl Aff., ¶ 10; Thiel Aff., ¶ 10; Kaul Aff., ¶ 10; Thoms Aff., ¶ 10; Kuspa Aff., ¶ 10; Thimm Aff., ¶ 10; Boyack Aff., ¶ 10; Letteer Aff., ¶ 10)

15.     However, the defendant officers attributed such statements to the fact that the individual had just run from the police, and were out of breath due to the effects of the physical exertion involved with their flight and/or stress associated with being in police custody and about to go to jail.  (Cline Aff., ¶ 10; Ticcioni Aff., ¶ 10; Coe Aff., ¶ 10; Bleichwehl Aff., ¶ 10; Thiel Aff., ¶ 10; Kaul Aff., ¶ 10; Thoms Aff., ¶ 10; Kuspa Aff., ¶ 10; Thimm Aff., ¶ 10; Boyack Aff., ¶ 10; Letteer Aff., ¶ 10)

16.     None of the officers concluded that any of these people were experiencing a medical emergency, and did not call for emergency medical assistance or engage in First Responder activity.  (Cline Aff., ¶ 10; Ticcioni Aff., ¶ 10; Coe Aff. ¶ 10; Bleichwehl Aff., ¶ 10; Thiel Aff., ¶ 10; Kaul Aff., ¶ 10; Thoms Aff., ¶ 10; Kuspa Aff., ¶ 10; Thimm Aff., ¶ 10; Boyack Aff., ¶ 10; Letteer Aff., ¶ 10)

17.     No defendant officer had ever heard of a subject in police custody dying from sickle cell crisis.  (Cline Aff., ¶¶ 10-11; Ticcioni Aff., ¶¶ 10-11; Coe Aff. ¶¶ 10-11; Bleichwehl

Aff., ¶¶ 10-11; Thiel Aff., ¶¶ 10-11; Kaul Aff., ¶¶ 10-11; Thoms Aff., ¶¶ 10-11; Kuspa Aff., ¶¶ 10-11; Thimm Aff., ¶¶ 10-11; Boyack Aff., ¶¶ 10-11; Letteer Aff., ¶¶ 10-11)

18.     Since July 6, 2011, MPD policy has been changed, with regard to officer response and discretion in situations where a subject complains of having any difficulty with his breathing. Prior to that date, officers could use their discretion in deciding whether such a subject was in need of more advanced medical care. Now, if a subject makes such a statement, officers have no discretion, and must always call for fire department EMTs or a private ambulance service to respond, to determine if the subject is in need of medical treatment. (Flynn Aff., ¶ 12; Groszczyk Aff., ¶ 34; Cline Aff., ¶ 12; Ticcioni Aff., ¶ 12; Coe Aff., ¶ 12; Bleichwehl Aff., ¶ 12; Thiel Aff., ¶ 12; Kaul Aff., ¶ 12; Thoms Aff., ¶ 12; Kuspa Aff., ¶ 12; Thimm Aff., ¶ 12; Boyack Aff., ¶ 12; Letteer Aff., ¶ 12)

19.     In addition to First Responder training, MPD officers also receive training relative to the use of force during both recruit training, and throughout their in-service training. (Groszczyk Aff., ¶ 52; Cline Aff., ¶ 13; Ticcioni Aff., ¶ 13; Coe Aff., ¶ 13; Bleichwehl Aff., ¶ 13; Thiel Aff., ¶ 13; Kaul Aff., ¶ 13; Thoms Aff., ¶ 13; Kuspa Aff., ¶ 13; Thimm Aff., ¶ 13; Boyack Aff., ¶ 13; Letteer Aff., ¶ 13)

20.     The primary MPD standard operating procedure (SOP) that is presented to officers in the context of their use of force training is Milwaukee Police Department SOP 460. That SOP provides as follows: "Police members making an arrest are entitled to use whatever force is reasonably necessary. Whether the force used is reasonable depends upon the totality of facts and circumstances in each case." (Groszczyk Aff., ¶ 52; Cline Aff., ¶ 14; Ticcioni Aff., ¶ 14; Coe Aff., ¶ 14; Bleichwehl Aff., ¶ 14; Thiel Aff., ¶ 14; Kaul Aff., ¶ 14; Thoms Aff., ¶ 14; Kuspa Aff., ¶ 14; Thimm Aff., ¶ 14; Boyack Aff., ¶ 14; Letteer Aff., ¶ 14)

7

21.     MPD use of force training provides that officers can use force to take a person into custody, and that if that person resists efforts to take him into custody, officers can use a level of force that is greater than that presented to them by the resistive subject.  For instance, if a subject begins to punch an officer, the officer can punch that person back, but the officer can also increase his use of force level to the use of an intermediate weapon, like his pepper spray or his baton.  (Cline Aff., ¶ 15; Ticcioni Aff., ¶ 15; Coe Aff., ¶ 15; Bleichwehl Aff., ¶ 15; Thiel Aff., ¶ 15; Kaul Aff., ¶ 15; Thoms Aff., ¶ 15; Kuspa Aff., ¶ 15; Thimm Aff., ¶ 15; Boyack Aff., ¶ 15; Letteer Aff., ¶ 15)

22.     All of the defendant officers are aware that according to MPD policy and the MPD Code of Conduct, officer misconduct must be reported to supervisory personnel.  (Flynn Aff., ¶¶ 3-6; Cline Aff., ¶ 16; Ticcioni Aff., ¶ 16; Coe Aff., ¶ 16; Bleichwehl Aff., ¶ 16; Thiel Aff., ¶ 16; Kaul Aff., ¶ 16; Thoms Aff., ¶ 16; Kuspa Aff., ¶ 16; Thimm Aff., ¶ 16; Boyack Aff., ¶ 16; Letteer Aff., ¶ 16)

23.     All defendant officers would report any such misconduct if they observed it, and they believe that their fellow officers would do the same.  (Cline Aff., ¶ 17; Ticcioni Aff., ¶ 17; Coe Aff., ¶ 17; Bleichwehl Aff., ¶ 17; Thiel Aff., ¶ 17; Kaul Aff., ¶ 17; Thoms Aff., ¶ 17; Kuspa Aff., ¶ 17; Thimm Aff., ¶ 17; Boyack Aff., ¶ 17; Letteer Aff., ¶ 17)

24.     No defendant officer is aware of any other defendant officer in this case failing to report any misconduct.  (Cline Aff., ¶ 18; Ticcioni Aff., ¶ 18; Coe Aff., ¶ 18; Bleichwehl Aff., ¶ 18; Thiel Aff., ¶ 18; Kaul Aff., ¶ 18; Thoms Aff., ¶ 18; Kuspa Aff., ¶ 18; Thimm Aff., ¶ 18; Boyack Aff., ¶ 18; Letteer Aff., ¶ 18)

25.     No officer observed any misconduct on the part of any officer, with reference to the events of July 6, 2011 involving Derek Williams.  (Cline Aff., ¶ 19; Ticcioni Aff., ¶ 19; Coe

8

Aff., ¶ 19; Bleichwehl Aff., ¶ 19; Thiel Aff., ¶ 19, Kaul Aff., ¶ 19; Thoms Aff., ¶ 19; Kuspa Aff., ¶ 19; Thimm Aff., ¶ 19; Boyack Aff., ¶ 19; Letteer Aff., ¶ 19)

26.     On July 6, 2011, at approximately 12:30 a.m., all defendants were on duty as MPD officers or sergeants, and engaged in their general duties.  (Cline Aff., ¶ 20; Ticcioni Aff., ¶ 20; Coe Aff., ¶ 20; Bleichwehl Aff., ¶ 20; Thiel Aff., ¶ 20; Kaul Aff., ¶ 20; Thoms Aff., ¶ 20; Kuspa Aff., ¶ 20; Thimm Aff., ¶ 20; Boyack Aff., ¶ 20; Letteer Aff., ¶ 20)

27.     Officers Cline and Thoms were partnered, and driving in a marked squad car, heading northbound on North Holton Street, when they observed a black male, wearing a white t-shirt, jean shorts, and a white neoprene mask with a sinister smile printed on it, which looked much like the smile of the "Joker" character from the old Batman series.  (Cline Aff., ¶¶ 22-23; Thoms Aff., ¶¶ 22-24; Bleichwehl Aff., ¶ 21)

28.     This man, who was later identified as Derek Williams, moved rapidly toward a young couple who were walking northbound on Holton Street, and Mr. Williams appeared to be holding a gun in his hand and hiding it under his clothing.  (Cline Aff., ¶¶ 23-24; Thoms Aff., ¶¶ 23-24)

29.     Officers Cline and Thoms observed that the couple appeared to be surprised and afraid, and the officers concluded that they were watching an armed robbery in progress.  (Cline Aff., ¶¶ 24-26; Thoms Aff., ¶¶ 25-27)

30.     Mr. Williams turned and faced the officers and their squad car, had a surprised expression on his face, jumped out of his athletic shoes, and took off running.  (Cline Aff., ¶ 27; Thoms Aff., ¶ 27)

31.     Officer Cline ran after Mr. Williams, engaging in a foot pursuit which proceeded northbound on Holton Street, and into the yards along the alley running between Holton and Buffum Streets, in the 2700 block.  (Cline Aff., ¶ 28; Thoms Aff., ¶ 28)

32.     Officer Thoms moved his squad car, to engage in containment activities, to watch for Mr. Williams, should he attempt to leave the area.  (Thoms Aff., ¶¶ 28-30)

33.     Officers Cline and Thoms reported their foot pursuit, gave a description of Mr. Williams, indicated where they were located, and requested assistance from other officers.  (Cline Aff., ¶¶ 29 -30; Thoms Aff., ¶ 29)

34.     Officers Ticcioni, Coe, Bleichwehl, Kuspa, Thimm, Boyack and Letteer, and Sergeants Thiel and Kaul responded to assist Officers Cline and Thoms.  (Ticcioni Aff., ¶ 21; Coe Aff., ¶¶ 21-22; Bleichwehl Aff., ¶¶ 21-22; Thiel Aff., ¶¶ 21-22; Kaul Aff., ¶¶ 21-24; Kuspa Aff., ¶ 20; Thimm Aff., ¶¶ 20; Boyack Aff., ¶¶ 20; Letteer Aff., ¶ 20)

35.     After a few minutes, Mr. Williams was found in the backyard of 2752 North Buffum Street, hiding behind a small, square card table, which was lying on its side.  (Cline Aff., ¶¶ 31 -32; Ticcioni Aff., ¶¶ 24-31; Coe Aff., ¶¶ 24-29)

36.     Officers Ticcioni and Coe located Mr. Williams, and they placed handcuffs on him, after experiencing some resistance and a brief struggle with Mr. Williams.  (Ticcioni Aff., ¶¶ 32-36; Coe ¶¶ 30-35)

37.     To assist in getting handcuffs on Mr. Williams, and in conducting a search of his person, Officer Ticcioni elected to use a three point ground stabilization technique, to keep him under control, but employed that technique for no more than 15 seconds.  (Ticcioni Aff., ¶¶ 34-35; Thiel Aff., ¶¶ 26-27; Coe Aff., ¶¶ 34-35)

38. The three point ground stabilization technique involves an officer kneeling on the ground near the torso of the subject, with his weight on that knee, and with the other knee placed across the subject's shoulder blade area. (Ticcioni Aff., ¶¶ 34-35; Coe Aff., ¶¶ 34-35)

39. This technique is trained to all Milwaukee police officers, and it generally does not result in injury to the arrestee. (Groszczyk Aff., ¶¶ 58-59)

40. No officer hit or kicked Mr. Williams, or otherwise used excessive force against him, and no officer used a Taser on him. (Coe Aff., ¶¶ 37-38; Bleichwehl Aff., ¶ 51 Ticcioni Aff., ¶ 37; Thiel Aff., ¶ 48; Cline Aff., ¶ 19; Thoms Aff., ¶ 36; Kuspa Aff., ¶ 28.)

41. By the time Officers Cline, Kuspa, Bleichwehl, and Letteer and Sergeant Kaul arrived in the yard, Mr. Williams had already been handcuffed. (Cline Aff., ¶ 33; Kuspa Aff., ¶ 26; Bleichwehl Aff., ¶ 27; Kaul ¶¶ 25-26; Letteer Aff., ¶¶ 24-28)

42. Mr. Williams had run approximately 250 to 300 yards from the site of his attempted armed robbery, and had jumped fences in the process. (Cline Aff., ¶ 34)

43. The night of July 6, 2011 was a warm, humid night, and Officer Cline found himself to be breathing heavily and sweating as a result of running after Mr. Williams. (Cline Aff., ¶¶ 35–36)

44. Mr. Williams was a young man in his early 20's, and of a tall, thin build, and he was athletic and appeared to be strong and in good physical shape. (Cline Aff., ¶ 37; Coe Aff., ¶ 39)

45. Officers Cline, Kuspa, Thoms, Thimm, Letteer and Sergeant Kaul were focused on the work that had to be done regarding their investigation of the armed robbery that was stopped in progress, including locating 1) a gun that they believed to have been discarded by Mr. Williams during his flight, 2) any other evidence found along his flight path, and 3) any

witnesses, including the two people who were the purported victims of the attempted armed robbery. (Cline Aff., ¶ 38; Kuspa Aff., ¶¶ 29-31; Thoms Aff., ¶¶ 44-45; Kaul Aff., ¶ 28; Letteer Aff., ¶¶ 31-33)

46.     While in the yard, Officers Kuspa, Coe, Bleichwehl and Ticcioni did observe that Mr. Williams was breathing heavy, and/or appeared to be out of breath, and/or heard Mr. Williams say "I can't breathe," but they did not believe that this indicated that Mr. Williams was having any type of emergency medical issue, because it was within their experience that suspects often appeared to be out of breath, or make statements like "I can't breathe," after they ran from the police and were apprehended. (Kuspa Aff., ¶ 27; Coe Aff., ¶¶ 38-39; Bleichwehl Aff., ¶¶ 30-32; Ticcioni Aff., ¶¶ 37-39)

47.     Officers Cline, Thoms, Letteer and Sergeants Thiel and Kaul did not hear Mr. Williams state that he had any difficulty breathing, while they were in the backyard at 2752 North Buffum. (Cline Aff., ¶ 39; Thoms Aff., ¶ 44; Kaul Aff., ¶30; Letteer Aff., ¶ 29; Thimm Aff., ¶ 28; Thiel Aff., ¶42)

48.     Officers Thimm, Letteer and Kuspa and Sergeant Kaul responded to the backyard at 2752 North Buffum, but after they confirmed that Mr. Williams had been taken into custody, and that he was under the control of other officers, they refocused on their search for evidence and witnesses. (Kuspa Aff., ¶¶ 29-30; Thimm Aff., ¶¶ 26-34; Letteer Aff., ¶¶ 23-32; Kaul Aff., ¶¶ 25-32)

49.     Officer Kuspa had no physical contact with Mr. Williams in the yard at 2752 North Buffum, and did not come within 10 feet of him. (Kuspa Aff., ¶ 28)

50.     Officer Boyack did not observe Mr. Williams at all while he was in the yard behind 2752 North Buffum, and only briefly saw him while he was seated in the squad car later, while he was searching for evidence.  (Boyack Aff., ¶¶ 23-27)

51.     Officer Thimm only responded to the yard briefly, and as soon as he confirmed that Mr. Williams had been apprehended, he left the yard to continue to search for evidence and witnesses.  (Thimm Aff., ¶¶ 26-33)

52.     Officer Thimm did not return to the yard that night, because he was involved with detaining witnesses who were being held for potential questioning.  (Thimm Aff., ¶¶ 33-36)

53.     Mr. Williams was stood up, and he was walked to the front of 2752 North Buffum, where he was placed in the backseat of the squad car that had been driven by Officers Cline and Thoms.  (Cline Aff., ¶¶ 41-43; Ticcioni Aff., ¶¶ 40-43; Coe Aff., ¶ 43; Bleichwehl Aff., ¶¶ 33-34)

54.     Officers did observe that Mr. Williams was dragging his feet at times during the walk to the front yard, and that in so doing, he appeared to be resisting their efforts to bring him to the squad car.  (Ticcioni Aff., ¶¶ 40-43; Coe Aff., ¶¶ 40-41; Thiel Aff., ¶¶ 29-43; Bleichwehl Aff., ¶ 33; Kaul Aff., ¶¶ 28-30)

55.     At one point shortly after Mr. Williams was brought to a standing position, his legs went limp and he closed his eyes while still holding his head upright.  (Ticcioni Aff., ¶ 40; Thiel Aff., ¶¶ 30-38; Bleichwehl Aff., ¶ 33)

56.     Sergeant Thiel inquired of Mr. Williams as to what was going on, and receiving no reply, he rubbed his knuckles on Mr. Williams' sternum.  (Ticcioni Aff., ¶ 40; Thiel Aff., ¶¶ 30-38)

57. In response, Mr. Williams opened his eyes, and indicated that he was just playing, and that his intended victims were his friends. (Ticcioni Aff., ¶ 40; Thiel Aff., ¶¶ 30-38)

58. Sergeant Thiel concluded that Mr. Williams was just playing games with the officers, in an effort to resist being brought to the squad car, and ultimately, being brought to jail. (Thiel Aff., ¶ 39)

59. Other officers concluded that Mr. Williams was engaging in behaviors and/or making statements to be resistive, and also so that officers would take him to a hospital, where he would have a greater opportunity for escape. (Coe Aff., ¶¶ 40-41)

60. According to Ricardo Fernandez, a neighbor who witnessed some of the events involving Mr. Williams that night, he saw that officers "just led him to the police car, and placed him in there," and that the officers "were just escorting him" and had "no difficulty" in getting him into the squad. (Fernandez Depo., pp. 14, 16, 18, 26.)

61. After being placed in the squad car, Mr. Williams stated several times that he could not breathe. (Cline Aff., ¶ 49)

62. Officer Cline was located in the driver's seat of the squad at that time, and while he heard Mr. Williams make those statements, he perceived that Mr. Williams was making those statements as a ruse to obstruct his efforts to determine his identity, and prevent himself from going to jail. (Cline Aff., ¶ 49)

63. Officer Cline had just chased Mr. Williams, as he ran 250-300 yards and jumped fences in the process, and he observed that Mr. Williams appeared to be agitated at the thought of going to jail. (Cline Aff., ¶¶ 48 - 49)

64. Officer Cline also observed that Mr. Williams was a young man, and appeared to be very physically fit and athletic. (Cline Aff., ¶ 49)

65.    Mr. Williams did not state that he had asthma, or any other medical condition. (Cline Aff., ¶ 49)

66.    Officer Cline determined that while Mr. Williams appeared to be breathing heavy, that in and of itself did not suggest to Officer Cline that Mr. Williams was in need of medical attention, or experiencing a medical emergency.  (Cline Aff., ¶ 49)

67.    Officer Cline opened the rear passenger window, to allow some fresh air into the squad, and the air conditioning was running, so he thought that the cool air would help Mr. Williams calm down and catch his breath.  (Cline Aff., ¶ 50; Fernandez Depo., p. 18 – (confirming that the rear driver's side window was down.))

68.    Officer Cline told Mr. Williams that he thought Mr. Williams was breathing just fine, that he was talking with Officer Cline, and that Officer Cline believed that he was playing games with the officer.  (Cline Aff., ¶ 50)

69.    Also, the first time that Officer Cline heard Mr. Williams state that he could not breathe was after he asked Mr. Williams about providing his last name.  In fact, with regard to the first four times that Mr. Williams stated that he could not breathe, his statement was made in direct response to the question "what's your last name?" posed by Officer Cline.  Therefore, Officer Cline was reinforced in his belief that Mr. Williams was being obstructive, and resisting the process of being brought to jail.  (Cline Aff., ¶ 50)

70.    About two minutes after Officer Cline sat in the squad, a young woman named Sharday Rose came to his window, and identified herself as Mr. Williams' girlfriend.  (Cline Aff., ¶ 51)

71.    Officer Cline got out of his squad and spoke with her along the driver's side of the squad, while remaining within an arm's reach of the squad.  (Cline Aff., ¶ 51)

72.     The rear window was still open, and Officer Cline could hear Mr. Williams talking, but he was focused on speaking with Ms. Rose, who provided Officer Cline with Mr. Williams' name.  (Cline Aff., ¶¶ 51 - 52)

73.     After Officer Cline re-entered the squad, Mr. Williams again stated that he could not breathe, and Officer Cline responded that he thought that Mr. Williams was playing games, and that he had to get Mr. Williams' name from his girlfriend, because Mr. Williams would not give the officer the courtesy of at least providing the officer with his name.  (Cline Aff., ¶ 54)

74.     Within two minutes of this exchange, Officer Cline was asked to retrace Mr. Williams' flight path, because he was most familiar with it, and it was thought that this would help in locating discarded evidence more quickly.  (Cline Aff., ¶ 55)

75.     Officer Bleichwehl was asked to sit in the squad with Mr. Williams, while Officer Cline retraced the flight path with other officers.  (Cline Aff., ¶ 56; Bleichwehl Aff., ¶ 36)

76.     As they were changing places, Officer Bleichwehl and Officer Cline engaged in a 30-40 second conversation outside the squad car, during which Officer Cline explained that Ms. Rose was nearby, that she was Mr. Williams' girlfriend, and that she had told Officer Cline that the subject's name was Derek Williams.  (Cline Aff., ¶ 57; Bleichwehl Aff., ¶ 37)

77.     Officer Cline then proceeded to retrace the flight path with other officers, as Officer Bleichwehl entered the squad, and sat down in the driver's seat.  (Cline Aff., ¶ 58; Bleichwehl Aff., ¶ 39)

78.     As Officer Bleichwehl was engaged in the above-described conversation with Officer Cline, he could hear that Mr. Williams was moving around in the squad car and making statements, but he was not able to make out the words that were being said, because he was focused on his conversation with Officer Cline.  (Bleichwehl Aff., ¶ 39)

79.     After Officer Bleichwehl entered the squad car and sat down, he asked Mr. Williams about his name. (Bleichwehl Aff., ¶ 39)

80.     Mr. Williams did not respond to the question, and Officer Bleichwehl concluded that he was choosing to not cooperate with him.  (Bleichwehl Aff., ¶ 40)

81.     Officer Bleichwehl continued to do his work, by running Mr. Williams' name, using the squad computer that was in front of him.  (Bleichwehl Aff., ¶ 40)

82.     After approximately 1 – 1 ½ minutes had passed, and Officer Bleichwehl did not hear any noise from behind, he turned to check on at Mr. Williams, but could not see into the backseat, due to the reflection of his computer screen on the plexi-glass divider that was located between the front and back seats. (Bleichwehl Aff., ¶¶ 41-42)

83.     Therefore, Officer Bleichwehl got out of the driver's seat, and went around to the rear driver's side door, and opened it, to better assess the situation.  (Bleichwehl Aff., ¶ 42)

84.     Officer Bleichwehl found Mr. Williams lying on the seat, and he attempted to check for Mr. Williams' pulse and breathing.  (Bleichwehl Aff., ¶¶ 42-43)

85.     Officer Bleichwehl observed Ms. Rose coming up behind him, and he did not know if there were other people with her, and behind him, therefore he was concerned for his safety, and so he closed the door and went to the rear passenger side door.  (Bleichwehl Aff., ¶ 43)

86.     Officer Bleichwehl had also moved to the other door because he felt that should something bad be happening with Mr. Williams, he wanted to be sensitive to Ms. Rose, and keep her from seeing that.  (Bleichwehl Aff., ¶ 43)

87.     Officer Bleichwehl engaged in First Responder activities, and attempted to rouse Mr. Williams, by rubbing his knuckles on his sternum, and he again checked for a pulse and breathing.  (Bleichwehl Aff., ¶ 44-48)

88.     Officer Bleichwehl then proceeded to the sergeant's squad that was located to the front of the car which contained Mr. Williams, to get help from another officer, but found that no one was in that squad car.  (Bleichwehl Aff., ¶ 45)

89.     Officer Bleichwehl then called for the assistance of other officers, using his portable radio.  (Bleichwehl Aff., ¶ 46)

90.     Officer Bleichwehl then began to perform mouth-to-mouth rescue breathing, without the protection of a safety guard.  (Bleichwehl Aff., ¶ 48)

91.     Other officers responded to the scene, and joined in CPR activities.  (Bleichwehl Aff., ¶ 49; Coe Aff., ¶¶ 44-46; Boyack Aff., ¶¶ 28-30; Kuspa Aff., ¶¶ 32-32; Thoms Aff., ¶¶ 46-49; Ticcioni Aff., ¶¶ 44-46; Cline Aff., ¶¶ 60-61; Letteer Aff.,  ¶¶ 33-34)

92.     Officers continued to provide rescue breathing and chest compressions until Fire Department EMTs arrived approximately seven minutes later.  (Bleichwehl Aff., ¶ 50; Cline Aff., ¶ 62;Coe Aff., ¶ 47; Boyack Aff., ¶ 30; Kuspa Aff., ¶ 33; Thoms Aff., ¶ 50; Ticcioni Aff., ¶ 46; Kaul Aff., ¶ 35; Letteer Aff., ¶ 34)

93.     Derek Williams was aware that he had been diagnosed with sickle trait. (Rose Inquest Test., p. 29; Rose Depo., pp. 15-16))

94.     Derek Williams was a daily marijuana user.  (Rose Inquest Test., p. 29)

95.     His autopsy-related toxicological tests revealed that Mr. Williams had ingested marijuana during the hours before his death.  (Peterson Depo., pg. 25)

96.     Derek Williams was taken into police custody on the evening July 3, 2011, and he was released at approximately 7:00 p.m. on July 5, 2011.  (Rose Inquest Test., pp. 29-31)

97.     Ms. Rose testified that the officer at the squad car was asking her about Derek's name, and she confirmed for him that his name was Derek Williams.  (Rose Inquest Test., pp. 45, 48)

98.     Ms. Rose indicates that from the street corner at the intersection of Buffum and Hadley Streets, she could hear Derek Williams yelling that he could not breathe.  (Rose Inquest Test., pp. 48-49)

99.     Ms. Rose testified at the inquest that she had asked Mr. Williams what had happened, while he was sitting in the back seat of the squad car, and that Mr. Williams replied that he was trying to rob a house.  (Rose Inquest Test., p. 49)

100.    Ms. Rose confirmed that police officers were continuing to do chest compressions for 25-30 minutes.  (Rose Inquest Test., pp. 52-54)

101.    Tyrone Mathis was like a step-father to Sharday Rose.  (Mathis Inquest Tes., pp. 60-61)

102.    Mr. Mathis testified at the inquest that Mr. Williams came to his home after being released from jail, and that he was "very hyper."  (Mathis Inquest Test., p. 62)

103.    Mr. Mathis testified that it was his understanding that Mr. Williams was hyper with anger, relative to "some money coming up missing from Sharday," and that Mr. Williams was sweaty.  (Mathis Inquest Test., pp. 63-64)

104.    Mr. Mathis testified at the inquest that Mr. Williams drank a can of beer at that time.  (Mathis Inquest Test., p. 65)

105.     Mr. Mathis confirmed that he saw Mr. Williams put his arm around a girl, the police turned around and then Derek was "out of his shoes," and Mr. Mathis "seen him no more."  (Mathis Inquest Test., p. 73)

106.     Mr. Mathis confirmed that Mr. Williams had just gotten out of jail that evening, and he had no laces on his shoes.  (Mathis Inquest Test., p. 79)

107.     Brian Peterson is the medical examiner for Milwaukee County, and his office conducted the autopsy of Mr. Williams.  (Peterson Inquest Test., p. 52; Peterson Depo., pp. 1-6)

108.     Mr. Williams' autopsy determined that his body showed no lethal trauma. (Peterson Depo. p. 18)

109.     Dr. Peterson concluded that there were significant sickled thrombi throughout Mr. Williams' body, (Peterson Inquest Test., pp. 75-76) and that fundamentally, Mr. Williams suffered asphyxia at the blood vessel level as his blood vessels plugged.  (Id., pp. 98-99)

110.     Dr. Peterson determined that the immediate cause of Mr. Williams' death was sickle cell crisis.  (Peterson Depo. pp. 26; 123-126)

111.     While Derek Williams' death was ruled a homicide, as opposed to a death by natural causes, the use of that word simply implies that another person was involved -- it does not imply wrongdoing or culpability.  (Peterson Depo. p. 32; Peter Inquest Test., pp. 92-95)

112.     Dr. Peterson confirmed that the injuries that were sustained by Mr. Williams were minor injuries, and they did not indicate that anything untoward occurred.  (Peterson Depo. p. 34)

113.     Dr. Peterson testified that a sickling crisis can be triggered in a person having sickle cell trait by physiological strain, which can include exercise stress, thermal stress (more often from warm weather conditions than cold), hypoxemic stress (reduced oxygen availability,

such as breathing being restrained by a mask), dehydration, drugs, and situational stress (like running from the police). (Peterson Inquest Test., pp. 100-103, 105-106; Peterson Depo., pp. 74-75)

114.    Dr. Peterson confirmed that wearing the neoprene joker mask while running would have likely restricted Mr. Williams' breathing, and that hypoxemia is one of the stressors that can cause sickling. Hypoxemia is low oxygen in the blood. (Peterson Depo. p. 35; Peterson Inquest Test., pp. 105-107)

115.    Dr. Peterson testified that in addition to hypoxemia, the warmth and humidity of the night could have been a factor which triggered the sickling of Mr. Williams' blood cells. (Peterson Depo. pp. 35-36)

116.    Dr. Peterson confirmed that Mr. Williams did not have petechial hemorrhages on the sclera, and that such hemorrhages would have suggested that the decedent had been manually strangled.

117.    Dr. Peterson testified that because Mr. Williams' body did not have petechial hemorrhages, there was no implication of asphyxia during the arrest, so there was no corotid hold, no choke hold, nothing like that. (Peterson Depo. p. 39)

118.    Dr. Peterson also indicated that there was no evidence of Mr. Williams being smothered. (Peterson Depo. pp. 39-40)

119.    Dr. Peterson took a look at the hyoid bone that had been recovered during Mr. Williams' autopsy, and determined that he would send it for radiologic study at UW-Madison, and after the bone was subjected to a CT scan, he determined that it was not fractured. (Peterson Depo. p. 6; Peterson Inquest Test., pp. 84-91)

120.    Dr. Peterson confirmed that with regard to the examination of Mr. Williams' head, eyes, nose, mouth, ears, and face, there was nothing which indicated any type of fatal injury.  (Peterson Depo. p. 41)

121.    In fact, Dr. Peterson testified that the autopsy of Mr. Williams revealed no fatal injury to any part of his body.  (Peterson Depo. pp. 41-70)

122.    Mr. Williams' autopsy did not reveal of any evidence of airway swelling.  (Peterson Depo. pp. 68-69)

123.    The autopsy revealed that Mr. Williams had sickle cell thrombi in this lungs, heart, coronary arties, liver, spleen, kidneys and central nervous system.  (Peterson Depo. pp. 70-74)

124.    In Dr. Peterson's review of the literature in the area of sickle cell crisis research, he found that with individuals who have sickle cell trait, they can have no history of sickle cell symptomology at all, until they suddenly collapse and die from it.  (Peterson Depo. pp. 76-77)

125.    Dr. Peterson testified that he did consider a number of other causes of Mr. Williams' death, but at the end of his investigation, the only cause of death that was left was sickle cell crisis.  (Peterson Depo. pp. 80-81)

126.    Dr. Peterson concluded that the minor trauma to Mr. Williams' body was not a triggering factor for his sickle cell crisis.  (Peterson Inquest Test., pp. 109-11)

127.    The autopsy revealed that there was nothing grossly anatomic that would have been a cause of death or contributed to it, and Dr. Peterson's determination of the cause of death all hinged on the microscopic slides of the blood and tissue taken from Mr. Williams' body.  (Peterson Depo. pp. 85-89)

128. Dr. Peterson testified that the video images he saw of Mr. Williams before he died were consistent with his conclusion that he died of sickle cell crisis, because Mr. Williams complained repeatedly of being unable to breathe, yet there was nothing obstructing his breathing. (Peterson Depo. pp. 88-90)

129. Dr. Peterson testified that the autopsy photographs revealed no evidence of any type of injury to Mr. Williams which was consistent with him being punched, dropped on his face, struck by any object, choked in any way, kicked or Tasered. (Peterson Depo. pp. 97-98, 103-106)

130. Dr. Peterson also testified that there was no physical evidence that showed that Mr. Williams was punched in the back or knelt on by an adult male. (Peterson Depo. p. 105)

131. Dr. Harry Jacob is a hematologist and oncologist, who is a professor of medicine at the University of Minnesota in Minneapolis. (Jacob Inquest Test., pp. 48-54)

132. Dr. Jacob has conducted research on sickle cell disease and treated hundreds of patients with the disease. (Id., pp. 53-55)

133. Dr. Jacob testified at the inquest that individuals who have sickle cell trait have been known to die from an unexpected onset of sickle cell crisis. (Jacob Inquest Test., pp. 68-69)

134. In such cases, the cause of the onset of sickle cell crisis is usually attributed to severe exertion and severe dehydration (Jacob Inquest Test., pp. 68-70; 85-86), and Dr. Jacob agreed that wearing the neoprene mask could have been a significant factor in Mr. Williams' suffering from hypoxia (having too little oxygen). (Id., pp. 87-90)

135. Dr. Jacob testified that these patients "can go downhill fairly rapidly. (Id., pp. 76-77)

136.     Patients who die from sickle trait crisis show at autopsy no evidence of organ damage, whereas patients who had sickle cell disease would show organ damage.  (Id., pp. 77-78.)

137.     Dr. Jacob testified that it takes minutes to hours for blood cells to sickle.  (Id., pp. 79, 92-94)

138.     According to Dr. Jacob, even if trained medical practitioners could recognize that an individual is in fact suffering from a sickle cell crisis, in order for the person to survive, they would need to be provided with a full body blood transfusion, which can take between two and three hours, in addition to the time it would take to obtain both the transfusion machine and the new blood.  (Jacob Inquest Test., pp. 94-96)

139.     It is the policy and practice of the MPD, consistent with the MPD Code of Conduct, that officer misconduct must be reported to supervisory personnel.  (Flynn Aff., ¶ 3)

140.     Should officers either engage in misconduct, or fail to report misconduct, they would be subject to discipline, including discharge from service.  (Flynn Aff., ¶ 5)

141.     Prior to July 6, 2011, no person died in Milwaukee police custody due to the effects of sickle cell crisis.  (Flynn Aff., ¶ 9)

142.     The in-custody deaths of Ernest Lacy (1981), Mario Mallett (2001), Tony Bean (2010), and James Perry (2010) did not involve sickle cell crisis.  (Flynn Aff., ¶¶ 14-17)

143.     Frank Jude did not die, much less in police custody.  (Id., ¶ 15)

144.     Since Chief Flynn began his tenure as Chief of the Milwaukee Police Department, citizens can bring complaints about officers to either the MPD Internal Affairs Division or the Milwaukee Fire and Police Commission.  (Id., ¶ 20)

145.     Such complaints are thoroughly investigated.  (Id., ¶ 20)

24

146.    If misconduct is substantiated, then discipline is rendered accordingly.  (Id., ¶ 20)

## IV.    STATEMENT OF THE ISSUES

The following issues are presented for review by this Court:

1.    Did either Officer Coe or Officer Ticcioni use excessive force against Mr. Williams?

2.    Were any of the defendant officers and/or sergeants unreasonable with regard to any medical need of Mr. Williams?

3.    Are the defendant officers and sergeants each entitled to qualified immunity from the excessive force and/or failure-to-provide-medical-care claims raised against them?

4.    Was any action or inaction of any officer the cause of Mr. Williams' death?

5.    Did the City of Milwaukee fail to 1) train its police officers regarding providing medical care to persons in their custody, or 2) supervise officers, and if so, did any such failure cause Mr. Williams' death?

6.    Can plaintiffs maintain a state law wrongful death cause of action?

## V.    STANDARD OF REVIEW

### A.    Summary Judgment Generally

Defendants seek summary judgment, pursuant to Rule 56, which states that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A party seeking summary judgment must demonstrate that no genuine issue of material fact exists for trial and that the movant is entitled to judgment as a matter of law. *Hannon v. Turnage*, 892 F.2d 653, 656 (7th Cir. 1990).  If that showing is made and the motion's opponent would bear the burden at trial on the matter that forms the basis of the motion, the opponent must come forth with evidence to show what facts are in actual dispute. *Whetstine v. Gates Rubber Co.*, 895 F.2d 388, 392 (7th Cir. 1990).

25

The parties cannot rest on mere allegations in the pleadings, *Koclanakis v. Merrimac Mut. Fire Ins. Co.*, 899 F.2d 673, 675 (7th Cir. 1990), or upon conclusory allegations in affidavits, *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir. 1989). The court must draw any permissible inferences from the materials before it in favor of the non-moving party, *Johnson v. Pelker*, 891 F.2d 136, 138 (7th Cir. 1989), as long as the inferences are reasonable, *Spring v. Sheboygan Area School District*, 865 F.2d 883, 886 (7th Cir. 1989). The non-moving party must show that the disputed fact is material, or outcome-determinative, under applicable law. *Local 1545, United Mine Workers v. Inland Steel Coal Co.*, 876 F.2d 1288, 1293 (7th Cir. 1989). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Issues need only be submitted to a jury where the evidence is sufficient to warrant a jury verdict in favor of the party in question, and this mandate requires more than a scintilla of evidence. Rather, it requires an inquiry by the court before submitting matters to juries as to whether there is sufficient evidence upon which a jury could properly proceed to find a verdict for the party bearing the burden of proof. *Anderson*, 477 U.S. at 248. Therefore, summary judgment must be granted in favor of the defendants if there is no genuine issue as to any material fact and if they are entitled to judgment as a matter of law.

### B. Qualified Immunity

The threshold question of qualified immunity is properly resolved on summary judgment because its analysis is ostensibly objective. *See Rakovich v. Wade*, 850 F.2d 1180, 1203-04 (7th Cir. 1988), *cert. denied,* 488 U.S. 968 (1988). Although intertwined with facts of a case, the

qualified immunity issue is a question of law for the court. *Alvarado v. Picur*, 859 F.2d 448, 452

(7th Cir. 1988).

In *Hunter v. Bryant*, 502 U.S. 224 (1991), the United States Supreme Court "stressed the

importance of resolving immunity questions at the earliest possible stage of litigation." *Id.* at

227. The Supreme Court reversed the Ninth Circuit's denial of summary judgment, holding that

> [t]he decision of the Ninth Circuit ignores the import of these decisions. The Court of Appeals' confusion is evident from its statement that "whether a reasonable officer could have believed he had probable cause is a question for the trier of fact, and summary judgment . . . based on lack of probable cause is proper only if there is only one reasonable conclusion a jury could reach." This statement of law is wrong for two reasons. First, it routinely places the question of immunity in the hands of the jury. Immunity ordinarily should be decided by the court long before trial. Second, the court should ask whether the agents acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed five years after the fact.

*Id.* at 227-28 (citations omitted).

## VI.     ARGUMENT

### A.     Officers Kuspa, Thoms, Thimm, Boyack and Letteer and Sergeant Kaul Did Not See Or Hear Any Indicators Suggesting That Mr. Williams Was Experiencing a Medical Emergency; Therefore The Failure-To-Provide-Medical-Care Claim Raised Against Each Of Them Should be Dismissed, And They Should Be Dismissed As Parties In This Case.

"[I]ndividual liability under § 1983 can only be based on a finding that the defendant

caused the deprivation at issue." *Kelly v. Mun. Courts of Marion County, Inc.*, 97 F.3d 902, 909

(7th Cir. 1996). A viable § 1983 claim against individuals must be supported by evidence of

personal involvement in the alleged constitutional deprivation. *Zentmyer v. Kendall County, Ill.*,

220 F.3d 805, 811 (7th Cir. 2000). "A causal connection, or an affirmative link, between the

misconduct complained of and the official sued is necessary." *Wolf-Lillie v. Sonquest*, 699 F.2d

864, 869 (7th Cir. 1983). Officers Kuspa, Thimm, Boyack, Thoms and Letteer and Sergeant Kaul did not touch Mr. Williams while he was located in the yard where he was taken into custody, or while he was in the squad car. (DPFOF Nos. 41-52) Defendants Thimm, Boyack, Thoms, Letteer and Kaul did not hear Mr. Williams state "I can't breathe." (DPFOF Nos. 47-52) Officer Kuspa did hear Mr. Williams make that statement, but given that Mr. Williams had just been apprehended after fleeing from the police, he had no reason to believe that those words indicated that Mr. Williams was experiencing a medical emergency and required medical care. (DPFOF No. 46) Officer Boyack never entered the yard and only briefly saw Mr. Williams while he was in the squad car. (DPFOF No. 50) Officer Thimm was only in the yard for a short time, and after he confirmed that Mr. Williams had been apprehended, he left to continue to search for evidence and witnesses. (DPFOF Nos. 51-52) Similarly, Officers Kuspa, Thoms and Letteer responded to the yard, but after they confirmed that the suspect was in custody, they left to search for evidence and witnesses. (DPFOF Nos. 45; 48) None of these six defendants saw anything about Mr. Williams that night, prior ot the point in time when he was being given CPR, which indicated to them that Mr. Williams was experiencing a medical emergency. (DPFOF Nos. 47-51) All of Mr. Williams' claimed damages and injuries stem from plaintiffs' allegations that Officers Coe and Ticcioni used excessive force against Mr. Williams while they were effecting his arrest, and that MPD personnel failed to provide proper medical assistance to Mr. Williams. However, Officers Kuspa, Thimm, Boyack, Thoms, Letteer and Sergeant Kaul were not personally involved with anything that happened during the course of events which occurred in the yard or in the squad on July 6, 2011, which directly involved Mr. Williams. (DPFOF Nos. 47-52) There is no evidence that any of these defendants touched Mr. Williams, came into close proximity with him, or saw or heard anything which suggested to them that Mr. Williams was

experiencing a medical emergency. Therefore, the claim that Officers Kuspa, Thoms, Thimm, Boyack and Letteer and Sergeant Kaul failed to provide medical care to Mr. Williams must be dismissed, because they were not personally involved with taking Mr. Williams into custody, or with detaining him in the squad car, and thus they lack the requisite personal involvement in the alleged constitutional deprivations.

**B.** **Any Use of Force by Either Officer Coe or Officer Ticcioni was Reasonable as a Matter of Law**

The plaintiffs claim that Officers Coe and Ticcioni used excessive force against Mr. Williams. All excessive force claims against law enforcement officers are analyzed under the Fourth Amendment's "objective reasonableness" standard. *McDonald v. Haskins*, 966 F.2d 292, 293 (7th Cir. 1992). Furthermore, "[t]he fact-specific nature of whether an officer used excessive force depends on the totality of the circumstances surrounding the encounter." *Scott v. Edinberg*, 346 F.3d 752, 756 (7th Cir. 2003) (citing *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 592 (7th Cir. 1997)).

To establish a Fourth Amendment violation of § 1983, plaintiffs must show 1) that there was a seizure, and if so, 2) whether that seizure was objectively unreasonable. *Campbell v. White*, 916 F.2d 421, 423 (7th Cir. 1990). The Fourth Amendment does not require officers to use the least intrusive or even less intrusive alternative in search and seizure cases; the only test is whether what the police did was reasonable. *Plakas v. Drinski*, 19 F.3d 1143, 1149 (7th Cir. 1994).

In this case, Officers Ticcioni and Coe put their hands on Mr. Williams to take him into custody. (DPFOF Nos. 36-37) They found Mr. Williams hiding behind a card table that was lying on its side. (DPFOF No. 35) Mr. Williams struggled and resisted being handcuffed. (DPFOF No. 36) Officer Ticcioni employed the three point ground stabilization technique, to

Case 2:16-cv-00869-JPS   Filed 04/24/17   Page 29 of 53   Document 36

better control Mr. Williams. (DPFOF No. 37) No officer struck or kicked Mr. Williams, or used a Taser against him. (DPFOF No. 40) Autopsy revealed that there was no physical evidence, including bruising in the skin or under the skin, consistent with Mr. Williams being punched, kicked, or Tased. (DPFOF No. 129) There was no physical evidence that Mr. Williams had been strangled or smothered. (DPFOF Nos. 116-118) Therefore, the claim that Officers Coe and Ticcioni used excessive force against Mr. Williams while he was in their custody must be dismissed.

### C. No Defendant Was Indifferent to Mr. Williams' Objective Medical Needs

Plaintiff claims that each of the eleven individual defendants failed to provide access to necessary medical care to Mr. Williams. At the time of his death, Mr. Williams was an arrestee, and not a prisoner or pretrial detainee. Accordingly, plaintiffs' Section 1983 claims are governed by the Fourth Amendment. *See Lopez v. City of Chi*., 464 F.3d 711, 719 (7th Cir. 2006) ("the protections of the Fourth Amendment apply at arrest and through the probable cause hearing."); *Currie v. Chhabra*, 728 F.3d 626, 629-30 (7th Cir. 2013 (Fourth Amendment's "objectively unreasonable" standard applies to "conditions of confinement" and "medical care" claims brought by arrestees who have not yet had their Gerstein hearing.)

Under this line of cases, the Court must consider four factors to determine whether the defendants' responses to Mr. Williams' medical needs were objectively reasonable: (1) whether the officer had notice of the detainee's medical needs; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) police interests, including administrative, penological, or investigatory concerns. *Ortiz v. City of Chi*., 656 F.3d 523, 530 (7th Cir. 2011). There is no question that Mr. Williams did not, at any time, state that he had any medical condition. (DPFOF No. 65) It is undisputed that he did make the statement "I can't breathe"

several times after he was apprehended. (DPFOF Nos. 46 and 61) There is no question that MPD policy provides that when faced with a prisoner who is experiencing a medical emergency, an officer must provide emergency medical assistance, by engaging in "First Responder" action and by calling for more advanced medical assistance. However, there is no evidence which establishes the seriousness – or existence – of any medical need of Mr. Williams while he was processed in the yard or in the back seat of the squad car, until he became unresponsive. All officers were aware of the fact that Mr. Williams had just fled from the police, and ran 250-300 yards before hiding behind the overturned card table. (DPFOF Nos. 35; 42-43; 63; 66) It was a warm, humid evening. (DPFOF No. 43) Therefore, it was not unusual for Mr. Williams to be out of breath and sweaty. Mr. Williams was a young man, who was tall and slender. (DPFOF No. 44) Given his flight, which involved jumping over at least one fence, he appeared to be athletic. (DPFOF Nos. 42 and 44) As noted above in Section A, Officers Kuspa, Thoms, Boyack, Thimm and Letteer and Sergeant Kaul did not see or hear any indicators suggesting that Mr. Williams was experiencing a medical emergency, so there was no requirement that they provide him with medical care of any kind. Officers Ticcioni and Coe struggled with him briefly to effect handcuffing, and to them, Mr. Williams seemed physically strong. (DPFOF No. 44) After Mr. Williams was seated in the squad, he refused to give his name, and said "I can't breathe" in response to Officer Cline's request for his name. (DPFOF No. 69) This implied to Officer Cline that Mr. Williams was "playing games" with him. (DPFOF Nos. 62; 68) There is no evidence suggesting that any officer knew that Mr. Williams had sickle cell trait. No officer had ever heard of a prisoner dying in police custody due to sickle cell crisis. (DPFOF No. 17) As noted above, Officers Kuspa, Thimm, Thoms, Boyack, and Letteer and Sergeant Kaul had no direct physical interaction with Mr. Williams. While taking Mr. Williams into custody and

31

handcuffing him, Officers Coe and Ticcioni felt that he was physically strong, and that he was resisting the handcuffing process. (DPFOF Nos. 36-37; 44) They did not witness anything which indicated to them that Mr. Williams was experiencing a medical emergency. (DPFOF No. 46). Sergeant Thiel interacted with Mr. Williams in the backyard by checking on his status and giving him a sternum rub. (DPFOF No. 56) Sergeant Thiel did not hear Mr. Williams state that he could not breathe, but he believed that by going limp as he was being escorted to the squad, Mr. Williams was simply playing games with the officers. (DPFOF Nos. 57-58) Officer Cline did not hear Mr. Williams complain about not being able to breathe while in the yard, but he did hear Mr. Williams make that statement several times in the squad car. (DPFOF Nos. 47; 61-62) Because that statement was made after Officer Cline asked Mr. Williams for his name, and because Officer Cline attributed his heavy breathing to his recent physical exertion and his agitation about going to jail, Officer Cline simply did not believe that Mr. Williams was experiencing a medical emergency, which required emergency medical services. (DPFOF No. 66) Officer Cline thought that with the squad car window cracked open, and the air conditioning running, that Mr. Williams would soon calm down and catch his breath. (DPFOF No. 67) Within 90 seconds of entering the squad, Officer Bleichwehl realized there was no sound or movement in the back seat, and so he got out of the driver's seat to investigate. (DPFOF Nos. 82-83) He then followed his First Responder training to a tee, by 1) checking on Mr. Williams' ABCs; 2) determining that he had no pulse and was not breathing; 3) seeking and calling for help; and 4) ultimately, putting his own health at risk by engaging in unprotected mouth-to-mouth CPR rescue breaths. (DPFOF Nos. 84; 87-90) The defendants respectfully assert that Officers Coe, Ticcioni, Cline, and Bleichwehl and Sergeant Kaul were each reasonable in their interpretation of Mr. Williams' words and actions, and in concluding, prior to Mr. Williams

32

becoming unresponsive, that he was not experiencing a medical emergency which required calling for emergency medical caregivers to respond to the scene. Therefore, the failure-to-provide-medical-care claim must be dismissed as against all officers.

> **D.** **Even if any Use of Force against Mr. Williams and/or The Officers' Response to His Medical Status Were Unlawful, These Actions Were Not Causally Related to His Death.**

The Sixth Circuit Court of Appeals has held that

> "[t]he time-frame is a crucial aspect of excessive force cases. Other than random attacks, all such cases begin with the decision of a police officer to do something, to help, to arrest, to inquire. If the officer had decided to do nothing, then no force would have been used. In this sense, the police officer always causes the trouble. But it is trouble which the police officer is sworn to cause, which society pays him to cause and which, if kept within constitutional limits, society praises the officer for causing." *Plakas v. Drinski,* 19 F.3d 1143, 1150 (7th Cir. 1994); *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996).

Thus, Courts recognize that if a police officer takes action, his action can always, in some metaphysical sense, be linked to an injury or damage that occurs at the end of a sequence of events which occur after the officer takes action. However, Courts have also held that when an intervening event or set of events occur, the defendant officer's actions are not always causally related to the plaintiffs' damages or injuries. See *Miller v. Albright*, 657 F.3d 733, 734-35 (8th Cir. 2011) (plaintiff's claims for warrantless entry and excessive force are "separate and distinct," and damages resulting from the excessive force claim were not sufficient to show that the plaintiff suffered damages as a result of the officer's unlawful entry into his home); *Garay v. Liriano*, 943 F.Supp.2d 1, 16 (D.D.C. 2013) (damages stemming from illegal search are distinct from those damages related to excessive force claims); *Estate of Sowards v. City of Trenton*, 125 F. App'x 31, 35-36 (6th Cir. 2005) (illegal entry and inadequacy of officer training were not the proximate cause of plaintiff's death, and damages were recoverable relative to injuries sustained only as a result of any alleged illegal act.)

In the context of a case involving a medical condition, courts have held that where an officer's failure to provide medical care to a prisoner does not cause the prisoner further injury, the officer cannot be held liable for that failure. See *Gant v. City of Chicago,* No. 13 C 6231, 2017 WL: 590279, at *3 (N.D. Ill. Feb. 14, 2017) Finding for defendants for a lack of causation, the Court held that:

> Of course, Plaintiff had a serious injury – the stab wound to his eye. That is not the issue. The key question is whether he had a serious medical need for the eye drops such that his failure to receive them caused him further significant injury. No reasonable jury could find that the defendants' failure to respond to Plaintiff's request for treatment caused or exacerbated the damage to his eye, there is simply no evidence that Plaintiff's condition worsened after missing his eye drops while in police custody. Plaintiff did not develop an infection during or after his time in custody nor did he suffer inflammation not otherwise attributable to the stab wound or surgery. Despite Plaintiff's serious medical condition, he had no serious need for the prescribed medication during the relatively limited period of time he was in lockup. This is fatal to his claim.

Courts have also held that when a plaintiff's own conduct is a superseding or intervening cause of his injuries, by setting into motion the events that ultimately caused those injuries, the plaintiff cannot recover damages for his resulting injuries. See *Estate of Sowards v. Trenton,* 125 F. App'x 31, 35-36 (6th Cir. 2005) (plaintiff's own conduct in pointing a handgun toward the officers was the intervening or superseding cause that ultimately led to his death, and the district court was correct in limiting damages to only those actual injuries the plaintiff suffered as a result of the warrantless entry.); *Bodine v. Warwick*, 72 F.3d 393 (3rd Cir. 1995) (plaintiff's struggle to resist arrest was the intervening cause of his injuries, and not the alleged illegal entry into his home.) *James v. Chavez*, 511 I. App'x 742, 745 (10th Cir. 2013) (deceased's actions immediately before his death of wielding a knife at officers constituted a superseding cause of his death that defeated liability for the officer.) Courts have held that the proximate cause

analysis applies to constitutional torts, and that "[a] superseding cause, as we traditionally understand it in tort law, relieves a defendant of liability." *James, Id*. The Third Circuit has held

> [w]hile there is no precise test for determining when a civilian's intervening acts will constitute a superseding cause of his own injury, relevant considerations include whether the harm actually suffered differs in kind from the harm that would ordinarily have resulted from the officer's initial actions; whether the civilian's intervening acts are a reasonably foreseeable response to the officer's initial actions; whether the civilian's intervening acts are themselves inherently wrongful or illegal; and the culpability of the civilian's intervening acts.

*Johnson v. City of Philadelphia*, 837 F. 3d 343, 352 (3rd Civ. 2016)

In this case, Mr. Williams died from the effects of a sickle cell crisis. (DPFOF No. 110) Mr. Williams had preexisting sickle cell trait. (DPFOF No. 93). Dehydration, exertion, hypoxia, stress, warm weather, and humidity are all factors which can trigger a sickle cell crisis in people with sickle cell trait. (DPFOF Nos. 113-115; 134-135) The night in question was warm and humid. (DPFOF Nos. 43; 115) Mr. Williams got out of jail at approximately 7 p.m., after approximately two days of incarceration. (DPFOF Nos. 96; 106) He drank alcohol that night. (DPFOF No. 104) He smoked marijuana that night. (DPFOF Nos. 94-95) He was wearing a neoprene mask over his nose and mouth. (DPFOF No. 27) He attempted an armed robbery of a young couple on a city street corner, and jumped out of his shoes and ran when he saw police officers arrive at his location. (DPFOF No. 30) Mr. Williams ran from police for 250-300 yards, and jumped at least one fence in the process. (DPFOF No. 42) According to Dr. Peterson, the autopsy revealed that 1.) Mr. Williams died from sickle cell crisis, 2.) there was no physical evidence of any fatal injury to his body, and 3.) there was no physical evidence that Mr. Williams was choked, strangled, or smothered. (DPFOF Nos. 108-110; 112; 116-118) According to Dr. Jacob, the hematologist professor from the University of Minnesota, sickling takes minutes to hours to occur. (DPFOF No. 137) Therefore, the sickling likely began even before

35

the arrival of police that night. Once started, people in crisis "go downhill fairly rapidly." (DPFOF No. 135) Also, only a full body blood transfusion offered hope of recovery, and even if Mr. Williams had been transported to a hospital the first time he said "I can't breathe," and a transfusion machine and new blood were ready for him, it would have taken 2-3 hours for that process to be completed. (DPFOF No. 138) If officers had called for an ambulance any sooner than they did, it would not have not led to a different outcome for Mr. Williams – he would have still died that night. Mr. Williams experienced a sickle cell crisis due to a preexisting condition and his own actions. Mr. Williams' death was not caused by any act – or failure to act – by any defendant, and the constitutional claims against them must be dismissed.

### E. The Defendant Officers are Entitled to Qualified Immunity

The defense of qualified immunity shields "government officials performing discretionary functions … from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. at ____ at ___ (Slip op., at 4-5); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations and footnote omitted). The principle behind the doctrine is that if the law at the time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he or she fairly be said to know that the law forbade conduct not previously identified as unlawful. *Id*. The Seventh Circuit has noted that "[w]hat is important, in the final analysis, is 'whether the legal norms governing [the government official's] behavior were clearly established at the time of the challenged actions.'" *Upton v. Thompson*, 930 F.2d 1209, 1212 (7th Cir. 1991) (citations omitted). In fact, existing precedent must have placed the statutory or constitutional question beyond debate. (*Mullenix*, Slip op. at 5.)

Accordingly, the question of whether qualified immunity applies is made up of three analytic components:   (1) the identification of the specific right allegedly violated, (2) the determination of whether that right was so "clearly established" as to alert a reasonable official to its constitutional parameters, and (3) the ultimate determination of whether a reasonable official could have believed lawful the particular conduct at issue.  *See Gooden v. Howard County*, 917 F.2d 1355, 1361 (4th Cir. 1990); *Burns v. Loranger*, 907 F.2d 233, 235-36 (1st Cir. 1990); *Robison v. Via*, 821 F.2d 913, 920-21 (2d Cir. 1987). Courts have the discretion to resolve a qualified immunity challenge at the outset by utilizing the "clearly established" prong without first having to decide whether there was any underlying constitutional violation. *Camreta v. Greene*, 563 U.S. 692, 707, 131 S. Ct. 2020, 2032, 179 L. Ed. 2d 1118 (2011). In fact, the court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit. Id, 563 U.S. at 705-706.

In revisiting the defense of qualified immunity, the United States Supreme Court has held that, even assuming that a constitutional right may have been violated, a lower court must review the second question – whether the right was clearly established – in a case-specific manner. *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 148 L.Ed. 2d 454 (2001).  The Court held that this inquiry,

> must be undertaken in light of the specific context of the case, not as a broad general proposition; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable…The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was lawful in the situation he confronted…If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate (*Id.*, 121 S.Ct. at 2156-57) (citations omitted.)

Furthermore, the Court also held that even if the officer's mistake as to what the law requires is reasonable, the officer is entitled to the immunity defense. (*Id.* at 2158.) When considering the defense of qualified immunity, the Court must consider only the facts that were knowable to the defendant officer. *White v. Pauly*, 580 U.S. ___ (2017) (Slip op., at 3); See also *Kingsley v. Hendrickson,* 576 U.S. ____, ____ (2015) (Slip op., at 9.)

The Seventh Circuit has stated with respect to qualified immunity that it is "designed to shield from civil liability 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix*, slip. op. at 5; *Hughes v. Meyer*, 880 F.2d 967, 971 (7th Cir. 1989). It should be applied unless "it has been authoritatively decided that certain conduct is forbidden." *Upton*, 930 F.2d at 1212 (quoting *Alliance to End Repression v. City of Chicago*, 820 F.2d 873, 875 (7th Cir. 1987)). Courts have maintained the longstanding principle that "clearly established law" should not be defined "at a high level of generality." *White v. Pauly*, 580 U.S. ___ at ___ (Slip op. at 6, citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). Qualified immunity thus provides officers with an additional layer of protection against civil liability. *Hughes*, 880 F.2d at 970. In the specific context of a law enforcement officer's use of force, the injured party must demonstrate "that the right to be free from the particular use of force under the relevant circumstances was "clearly established." *Williams v. Indiana State Police Dept.*, 797 F. 3d 468, 479 (7th Cir. 2015) (reviewing the reasonableness of a use of force when an officer confronted a dangerous, obviously unstable person in possession of a weapon and making threats.)

As discussed above, Defendants assert that, in accordance with established caselaw, any use of force against Mr. Williams, along with the officers' response to his statements that he could not breathe, were well within constitutional parameters. Courts have held that an officer responded reasonably to a person's complaint of chest pains and request for an ambulance by

calling an ambulance, even if the officer did not administer CPR. See *Florek v. Vill. Of Mundelein, Ill.,* 649 F.3d 594, 600-01 (7th Cir. 2011). In *Florek*, the 7th Circuit considered the steps that officers took regarding providing medical care to a prisoner. The Court held that:

> [f]inally, and although we did not explicitly say as much in *Williams* or in *Sides,* the Fourth Amendment reasonableness inquiry necessarily takes into account the sufficiency of the steps that officers did take. 'Just as the Fourth Amendment does not require a police officer to use the least intrusive method of arrest, neither does it require an officer to provide what hindsight reveals to be the most effective medical care for an arrested suspect.' *Tatum v. City and County of San Francisco,* 441 F.3d 1090, 1098 (9th Cir.2006) (citations omitted); see also *Jackson v. Kotter,* 541 F.3d 688, 697 (7th Cir.2008) (the Constitution is not a medical code requiring officers to administer or allow specific treatments); *Forbes v. Edgar,* 112 F.3d 262, 267 (7th Cir.1997) (contrasting a reasonable response with a plaintiff's preferred response, in the context of an Eighth Amendment claim). Here we have assumed that an ambulance was called promptly after officers were notified that Florek was experiencing chest pains and wanted an ambulance. That action will typically qualify as reasonable. *See Tatum,* 441 F.3d at 1099 (police acted reasonably when they promptly summoned necessary medical assistance, even if they did not administer CPR); *see also Sallenger v. City of Springfield Illinois,* 630 F.3d 499, 504 (7th Cir.2010)(police acted reasonably when they promptly summoned necessary medical assistance and administered CPR).

In the case at hand, as soon as Officer Bleichwehl recognized that Mr. Williams was experiencing a medical emergency, he engaged in First Responder activities, called for assistance in providing CPR, and then began providing CPR rescue breaths. A call was also made for an ambulance. The officers thus took reasonable steps in responding to Mr. Williams' medical emergency.

Courts have also held that officers cannot be held liable for not providing medical attention to a prisoner with a broken hand, when that injury was not visually apparent and the prisoner's complaint of pain or request for medical treatment was too vague to put the officers on

notice that the prisoner needed medical care. See *Mock v. Castro,* No. 14 C 3274, 2016 WL 7324563, at *6 (N.D. Ill. Dec. 16, 2016)  The Court in that case found plaintiff's obvious injuries to be minor following the officer's use of force to effectuate arrest, and that plaintiff's serious injury, a broken hand, was not apparent to officers, which is similar to the instant case, where sickle cell crisis was not apparent to officers.  The *Mock* Court held that

> [c]onstruing the facts in Mock's favor, record evidence shows that Mock's only obvious injuries at the time of his encounter with Defendants were a slightly swollen jaw, a mildly swollen hand, and abrasions to his knee and elbow.  In other words, Mock exhibited the types of superficial bumps, bruises, and scrapes one would expect after having been in an altercation and for which a non-incarcerated person likely would not seek immediate medical care.  The fracture to Mock's hand was not apparent without an x-ray, and he never told Castro or Chatman that he thought his hand might be broken.  Any complaint of pain or request for medical treatment was too vague to put Defendants on notice that Mock needed medical care, and the mere fact that he might have exhibited some discomfort is insufficient to proceed at this stage, absent evidence that Defendants knew Mock had an injury requiring medical intervention, Defendants' failure to provide medical care was not unreasonable on the record before the Court.

In the instant case, Mr. Williams' statements that he could not breathe, while he was talking to officers, and thus demonstrating that he was breathing, did not put the officers on notice that he was experiencing a physical ailment which required medical intervention. Defendants respectfully refer the Court to the factual propositions presented in the above argument sections, and reassert that with respect to law enforcement officers, no case law precludes the use of a three point ground stabilization maneuver in effecting handcuffing and searching an arrested subject, and no caselaw requires officers to provide access to emergency medical care for a prisoner, when they do not perceive that the prisoner is experiencing a medical emergency.  Thus, the relevant jurisprudence appears to validate that it was not "authoritatively decided" that the actions of any defendant were forbidden.  *See Upton*, 930 F.2d at 1212.

40

Therefore the defendants in this case are entitled to the defense of qualified immunity and dismissal of all claims raised against them.

> **F.**     **The City of Milwaukee Is/Was Not Deliberately Indifferent, Regarding Training or Supervising its Police Officers; Therefore, the Plaintiffs Cannot Support Their *Monell* Claims.**

Pursuant to the above argument, defendants assert that they did not injure Mr. Williams, much less cause his death. The imposition of *Monell* liability usually requires "a finding that [an] individual officer is liable on the underlying substantive claim." *Treece v. Hostetler*, 213 F.3d 360, 364 (7th Cir. 2000) (citing *City of L.A. v. Heller*, 475 U.S. 796 (1986).) Dismissal of the direct claims against the officers therefore precludes *Monell* liability in this case. Additionally, the alleged policies and practices must have caused the constitutional violation. *Thomas v. Cook Cnty. Sheriff's Dept.*, 604 F.3d 293, 305 (7th Cir. 2009). In this case, Mr. Williams' death was caused by sickle cell crisis, which was likely accelerated by his decision to run from the police while wearing a neoprene mask over his mouth and nose. Officers received First Responder training, which included American Heart Association First Aid, CPR, and AED training. They did not call for EMTs, because no officer who heard Mr. Williams and saw him, concluded that he was experiencing a medical emergency. The facts of this case do not reflect any problem with training or policy. At best, they reflect mistakes made in the context of exercising their discretionary judgment, which does not make the City taxpayers liable under *Monell*. The plaintiffs claim that the City failed to properly train its police officers regarding "how to monitor and communicate to other officers the medical condition of a person in their custody." (Complaint, ¶ 113(a). The plaintiffs also claim that the City failed to promulgate policies, practices or procedures "that require MPD officers to obtain immediate attention when a person in custody complaints about, or otherwise displays difficulty in breathing," (Complaint,

¶ 113(b)) and "to provide timely medical attention to persons in MPD custody." (Complaint ¶ 113(c)). The plaintiff also claims that the City failed to "adequately discipline, monitor, transfer, counsel and control its police officers who had histories of citizen abuse and/or serious mental problems." (Complaint, ¶ 113 (d)). Plaintiffs allege that the City maintains a "police code of silence," and that all of these alleged failures "institutionalize police lying and immunize police officers from discipline." (Complaint, ¶ 114). Plaintiffs maintain that these training and policy failures "acted as a moving force and were, separately and together, direct and proximate causes" of Mr. Williams' alleged constitutional injuries.

To state a § 1983 claim against a municipality, the complaint must allege that the constitutional deprivation was caused by an official municipal policy, custom, or practice. *Oklahoma City v. Tuttle*, 471 U.S. 808, 810, 105 S.Ct. 2427, 2429, 85 L.Ed.2d 791, 796 (1985); *Monell v. Dept. of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611, 638 (1978); *Henry v. Farmer City State Bank*, 808 F.2d 1228, 1237 (7th Cir. 1986). Moreover, the plaintiff must show a 'direct causal link between the municipal policy and the constitutional deprivation.'" *McNabola v. Chicago Transit Authority*, 10 F.3d 501, 509-10 (7th Cir. 1993).

Recovery from a municipal entity is "limited to acts that are, properly speaking, acts 'of the municipality'--that is, acts which the municipality has officially sanctioned or ordered." *Pembauer v. City of Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986); *see also Fiorenzo v. Nolan*, 965 F.2d 348, 350 (7th Cir. 1992). It is the plaintiff's burden to establish the municipality's imprimatur on the unconstitutional conduct. *McNabola v. Chicago Transit Authority*, 10 F.3d at 509 (7th Cir. 1993). The plaintiff may attempt to meet that burden by looking to "the official pronouncements of [the] municipality or legislative bod[y], agency action in accordance with delegated authority, actions by individuals with final

decision making authority, inaction or custom." *Cornfield v. Consolidated High School Dist. No. 230*, 991 F.2d 1316, 1324 (7th Cir. 1993).

The decisions of an employee without authority to set official policy provide an insufficient basis for the imposition of liability against the governmental entity under section 1983. *Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S.Ct. 915, 924, 99 L.Ed. 107 (1988); *Pembaur*, 475 U.S. at 483, 106 S.Ct. at 1300. "Municipal liability attaches only where the decision maker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur*, 475 U.S. at 481, 106 S.Ct. at 1299; *see also Fiorenzo*, 965 F.2d at 350; *Woods v. City of Michigan City, Indiana*, 940 F.2d 275, 278 (7th Cir. 1991). Courts must look to state law in ascertaining the identity of policy-making officials. *Praprotnik*, 485 U.S. at 124-25, 108 S.Ct. at 924-25; *McNabola*, 10 F.3d at 510; *Cornfield*, 991 F.2d at 1325; *Fiorenzo*, 965 F.2d at 350.

To demonstrate that a municipality "is liable for a harmful custom or practice, the plaintiff must show that [municipal] policymakers were deliberately indifferent as to the known or obvious consequences." *Thomas*, 604 F.3d at 303. "In other words, they must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff." *Id.* Under this stringent standard, "it is not enough to demonstrate that policymakers could, or even should, have been aware of the unlawful activity because it occurred more than once." *Phelan v. Cook Cnty.*, 463 F.3d 773, 790 (7th Cir. 2006). Rather, there must be "evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Id.*

According to Wis. Stat. sec. 62.50(lm), the Milwaukee Board of Fire and Police Commissioners is the policymaker for the Milwaukee Police Department, although the

43

Commission can delegate authority to the police chief. Also, pursuant to Section 312-03.1 of the Milwaukee Code of Ordinances (copied and attached to the Lappen Aff., as Exhibit SL-8), the Chief of Police is a policymaker with regard to the general good conduct of the police department.

The United States Supreme Court, addressing the issue of use of force in the context of a substantive due process claim, has held "there are limited circumstances in which an allegation of 'failure to train' can be the basis for liability under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 387, 109 S.Ct. 1197, 1204, 106 L.Ed.2d 412, 426 (1989). However,

> "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.*, 489 U.S. at 388. "Only where a municipality's failure to train its employees in a relevant respect evidences 'deliberate indifference' and only to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983. *Id.* at 389.

In resolving the issue of a city's liability regarding training its police officers, the focus must be on the adequacy of the training program in relation to the task the particular officers must perform. *Id.* at 390. In fact, for liability to attach in this circumstance, the identified deficiency in a city's training program must be closely related to the ultimate injury. *Id.* at 391. The Seventh Circuit Court of Appeals has defined the meaning of "deliberate indifference" in the due process context, and it has held that in this circuit, deliberate indifference is merely a synonym for intentional or criminally reckless conduct. *Salazar v. City of Chicago*, 940 F.2d 233, 237 (7th Cir. 1991). Thus, to maintain their cause of action on the issue of training, plaintiffs must overcome this difficult burden. Furthermore, it is not sufficient to prove the existence of an illicit policy to establish liability, unless the policy is the "moving force" behind the constitutional violation. *Tuttle*, 471 U.S. at 824; *Monell*, 436 U.S. at 694. Thus, even if

44

plaintiffs could establish that the City, via the Milwaukee Police Department, was criminally reckless in its training of police officers regarding "how to monitor and communicate to other officers the medical condition of a person in their custody" they must also establish that such deliberate indifference was the moving force behind the alleged unconstitutional actions of the defendant officers.

The training of Milwaukee Police Department officers, as well as all other police officers in the state, is governed by § 165.85, Wis. Stats., which establishes the Law Enforcement Standards Board, and empowers it to establish minimum curriculum requirements for police officer training, ranging from traditional subjects, such as techniques of arrest and firearms, to complex problems, such as human relations, civil rights, and constitutional law. § 165.85(3)(d). (Lappen Aff., Exh. SL-1.) The Board has issued regulations governing police officer training standards. LES. 3.03, Wis. Adm. Code. (Lappen Aff., Exh. SL-2.)

As clearly established by the affidavit of Sergeant Groszczyk, Milwaukee police officers are provided with First Responder training in the context of their recruit training, and also in the context of their in-service training. (DPFOF Nos. 2-3) In the context of First Responder training, officers are provided with First Aid training, CPR training, and AED training, as established by the American Heart Association. (DPFOF No. 3) In the context of their First Responder training, officers are trained that they must provide emergency medical care for individuals who are experiencing a medical emergency. (DPFOF Nos. 4-5) Additionally, officers are trained that while they cannot give medication to prisoners, or provide medical care, other than minor first aid, to prisoners, they can engage in CPR procedures if they are presented with a person who is non-responsive. (DPFOF Nos. 6-7) All of the officers who are defendants in this case were properly trained to be First Responders. They knew that should they encounter

45

a person who is experiencing a medical emergency, they should obtain medical care for him from someone who has more advanced medical training. However, in this case, the officers who heard Mr. Williams state that he could not breathe, and/or observed that he was breathing heavily, simply did not recognize that he was experiencing a medical emergency. As discussed above, they knew that he had just run from the police, for approximately 250-300 yards. It was a warm humid night. Therefore, being out of breath or sweating did not appear to be out of the ordinary. Additionally, Mr. Williams was a young man, and had a tall and thin build. He had just engaged in flight which involved jumping over fences. He was not complaining of chest pain, paralysis, or indicating that he suffered from asthma. He simply said he could not breathe, and officers were not unreasonable in concluding that once he calmed down, and relaxed, he would eventually catch his breath. No officer was aware of any person dying from sickle cell crisis while in police custody. MPD officers are not trained to be EMTs or doctors. They are only First Responders. It was not unreasonable for them to not recognize that Mr. Williams was experiencing a sickle cell crisis. Therefore, the City was not deliberately indifferent, with regard to training officers about monitoring prisoners in police custody, and providing them with appropriate medical care. At best, this case represents a situation where officers simply did not recognize that an emergency medical situation was occurring.

The plaintiff's *Monell* "failure-to-supervise" claim fails as well. Very generally, the plaintiffs appear to assert that the City failed to supervise MPD officers regarding the implementation of policies and training regarding the screening and monitoring of prisoners, and the provision of first responder services to individuals experiencing life-threatening conditions or medical emergencies. In limited circumstances, failure-to-investigate/discipline/supervise can give rise to municipal liability under § 1983 because a policy of condoning abuse may embolden

a municipal employee and facilitate further abusive acts. *Sigle v. City of Chicago*, 2013 WL 1787579 (N.D. Ill. Apr. 25, 2013). However, the mere fact that a policymaker failed to investigate, discipline or supervise its employees is insufficient for establishing municipal liability. *Monfils v. Taylor*, 165 F.3d 511, 517 (7th Cir. 1998). A plaintiff must show that the governmental body caused the deprivation and must satisfy the deliberate indifference standard adopted in *Canton*. *See Abraham*, 12 F. Supp. 2d at 881; *Sigle*, 2013 WL 1787579, *2.

The deliberate indifference standard is "a high threshold," and "[e]ven where significant evidence has been presented indicating flawed investigatory, [disciplinary or supervisory] procedures courts still reject [such a theory] where plaintiffs cannot demonstrate 'tacit authorization by city policymakers.'" *Id.* Courts have explained that:

> A custom of failing to discipline, [investigate or supervise] police officers can be shown to be deliberately indifferent if the need for further discipline, [investigation or supervision] is so obvious and [established] procedures so inadequate as to be likely to result in the violation of constitutional rights such that a jury could attribute to the policymakers a deliberate indifference to the need to discipline, [investigate or supervise].

*Id.*, *3 (emphasis added). Evidence of statistics and complainants registering allegations alone are insufficient to support a *Monell* claim. *Strauss v. City of Chicago*, 760 F.2d 765, 769 (7th Cir. 1985) (dismissing *Monell* claim where the record was devoid of any evidence other than statistical summaries of complaints filed with the police department and stating that the number of complaints alone "does not indicate that the policies that [plaintiff] alleges do in fact exist and did contribute to his injury."); *Bryant v. Whalen* 759 F. Supp. 410, 412 (N.D. Ill. 1991) (granting summary judgment for City because "the fact that a low percentage of cases are ultimately sustained cannot in and of itself be read to establish a policy of indifference.").

For example, in *J.G. ex rel. Koss v. Lingle*, 2014WL 4273269 (W.D. Wis. Aug 28, 2014), the court dismissed a § 1983 municipal liability claim premised on a failure-to-investigate and

47

failure-to-discipline theory. Plaintiff in that case brought an excessive force claim under the Fourth and Fourteenth Amendment against a police officer, and a *Monell* claim against the City for failing to investigate and discipline. *Id.*, *1. The court explained:

> In support of his claim, [plaintiff] generally contends that defendants do not have very much experience dealing with children with developmental delays, failed to conduct a thorough investigation of [defendant officer's] use of force against [plaintiff] (by not interviewing other students), failed to investigate [defendant officer's] three previous takedown of middle-schoolers in one month to examine whether there was a pattern of excessive use of force and determined that only one out of 30 to 50 uses of force by the Sun Prairie police was excessive.

*Id.*, * 9.

> As defendants point out, [plaintiff] has not provided any context with respect to the 30 to 50 incidents involving a use of force or [defendant officer's] previous three takedowns. The undisputed facts show that the Sun Prairie Police Department investigated all instances involving an officer's use of force, including the incident [at issue], and the department found no excessive force. Apart from criticizing the investigation of the incident in the instant case, [plaintiff] has presented no facts from which a jury could conclude that any of the department's previous investigations were lacking or that the investigated incidents actually involved use of excessive force. . . . Without such evidence, a reasonable jury could not conclude that there was an <u>obvious problem</u> with excessive force investigations of which city officials like defendants . . . should have been aware.

*Id.*, * 10 (emphasis added).

As noted above, the MPD did not fail to promulgate policies and provide training to guide its officers regarding the proper methods for monitoring prisoners or providing First Responder care. Additionally, Plaintiffs cannot demonstrate that the MPD had an established practice of failing to investigate the in-custody deaths of prisoners. Plaintiff cannot demonstrate on this record that an "obvious," "pervasive" and "apparent" deficiency existed such that it placed municipal policymakers on notice that the in-custody death of Mr. Williams would likely result. In their complaint, plaintiffs apparently attempt to illustrate their unlawful policy and/or failure-to-supervise claim by identifying four people who purportedly died in police custody.

48

Those people are Ernest Lacy (1981), Mario Mallett (2001), Tony Bean (2010), and James Perry (2010). Plaintiffs also identify Frank Jude, who is alive today, but suffered a beating at the hands of off-duty police officers in 2004. However, the plaintiff fails to provide any information which establishes the link between the occurrence of those incidents, and the alleged use of force against Mr. Williams and any alleged failure to provide Mr. Williams with timely medical care in July, 2011. From their complaint, the plaintiffs do not establish that any of those five individuals suffered from sickle cell trait. As noted by Chief Flynn in his affidavit, the Ernest Lacy matter occurred in 1981, more than 25 years before his tenure began. (DPFOF No. 142) The deaths of Mario Mallett, Tony Bean and James Perry did not involve sickle cell crisis (DPFOF No. 142) and Mr. Jude is not dead (DPFOF No. 143) None of these incidents suggest that any police officer failed to respond to a medical emergency, because the officer did not believe that the person was, in fact, experiencing a medical emergency. Again, none of these deaths involved a sickle cell crisis. Therefore, the plaintiffs have not supported their *Monell* claim, relative to their allegation that the City failed to supervise officers, with reference to situations involving deaths in-custody, and that such failure caused Mr. Williams' death.

The plaintiff also claims that the City failed to adequately discipline, monitor, transfer, counsel and control its police officers who had histories of citizen abuse and/or serious mental problems. As to the defendants in this case, the plaintiffs point to Officers Bleichwehl, Cline, Thoms, and Kuspa. However, the plaintiffs' complaint leaves the reader to guess as to what about these officers specifically suggests that they have any history of "serious citizen abuse" or "serious mental problems," much less such a problem which caused them to not recognize that Mr. Williams was suffering from a sickle cell crisis, and was in need of emergency medical services. Therefore, plaintiffs *Monell* claim fails in this respect.

Finally, the plaintiffs claim that a "police code of silence" exists within the Milwaukee Police Department, that officers fail to report misconduct, and that they perjure themselves and cover up instances of police misconduct of which they are aware. (Complaint, ¶ 113 (e)) However, plaintiffs utterly fail to establish how any defendant officer in this case failed to report misconduct, or engaged in misconduct. All of the officers in this case have been trained that it is the policy of the Milwaukee Police Department that officers are expected to report their own misconduct, and report any misconduct observed of other officers. (DPFOF Nos. 22-24) If officers engage in misconduct, or fail to report misconduct, they can be subject to discipline, including discharge from service. (DPFOF Nos. 139-140) The Chief of the Milwaukee Police Department does not approve of misconduct, or failing to report misconduct. In this case, there is no causal connection between any alleged "code of silence," and the alleged failure to provide medical help to Mr. Williams, or ultimately, his death. As noted above, this is a case which simply reflects officers who did not recognize that Mr. Williams was suffering from sickle cell crisis, or for that matter, any condition which was life threatening. They did observe that he was sweaty, and that he was breathing heavy, and that he complained of not being able to breathe. However, his flight from police, his overall physical appearance, his refusal to cooperate with officers and provide his name, all led officers to believe that once he had calmed down, he would catch his breath, and that his complaints of not being able to breathe were part of his plan to avoid either going to the squad car, or ultimately, going to jail. Unfortunately, officers experience many people who lie about their medical status to avoid going to jail, and who attempt to otherwise avoid the consequences of their illegal actions. The defendant officers were not deliberately indifferent to Mr. Williams. Rather, they simply believed that he was a prisoner who was attempting to avoid the consequences of his attempt to commit an armed robbery of two

50

citizens on a city street corner earlier that evening. Plaintiffs' *Monell* claims must be dismissed at this time.

### G.    Plaintiffs' Wrongful Death Claim under State Law Cannot Survive

Plaintiffs wrongful death claim raised under Wis. Stat. § 895.03 fails, because consistent with the above argument, even if Mr. Williams had survived, he would not have been successful in maintaining any action against any defendant. Furthermore, none of the defendants breached their duty to treat Mr. Williams with ordinary care. *Hocking v. City of Dodgeville*, 768 N.W.2d 552, 556 (Wis. 2009). Even if the defendants were negligent, they are entitled to discretionary immunity under Wisconsin law. Section 893.80(4), Wis. Stats., provides that a political subdivision and its employees are immune from any suit for "acts done in the exercise of legislative, quasi-legislative, judicial, or quasi-judicial functions.' *Brown v. Acuity*, 833 N.W.2d 96, 106 (Wis. 2013). Such activities involve the exercise of discretion. *Scott v. Savers Prop. & Cas. Ins. Co*., 663 N.W.2d 715, 721 (Wis. 2003). A duty is ministerial rather than discretionary "only when it is absolute, certain and imperative," involves the "performance of a specific task" that the law imposes, and defines the "time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion." *Lister v. Bd of Regents of the Univ. of Wis. Sys.*, 240 N.W.2d 610, 622 (Wis. 1976).

The manner in which medical care is administered to an inmate/arrestee is discretionary, not ministerial. *See Swatek v. Cnty. of Dane*, 531 N.W.2d 45, 50 (Wis. 1995) ("the sheriff has discretion in deciding how best to attend to the needs of those inmates within their custody"). More generally, the nature of law enforcement involves the use of discretion in response to evolving circumstances. "For these reasons, it is clear that law enforcement officials must retain the discretion to determine, at all times, how best to carry out their responsibilities. *Barillari v.*

51

*City of Milwaukee,* 533 N.W.2d 759, 764 (Wis. 1995). The defendants exercised that discretion in deciding how to deal with Mr. Williams and his medical issues as they developed after his arrest. Therefore, plaintiffs' state law wrongful death claim must be dismissed.

## VII. CONCLUSION

Consistent with the above argument and all matters of record, defendants Jeffrey Cline, Richard Ticcioni, Patrick Coe, Jason Bleichwehl, Robert Thiel, Todd Kaul, Zachary Thoms, Gregory Kuspa, Craig Thimm, Chad Boyack, and David Letteer respectfully request that this Court rule, as a matter of law, that their actions were lawful, or, in the alternative, that they are entitled to qualified immunity. Defendants also assert that no action or inaction of any defendant was causally related to Mr. Williams' death, and therefore any claims related to his death must be dismissed. Defendants also assert that plaintiffs cannot support their claim that the City of Milwaukee was deliberately indifferent regarding training its police officers or regarding the supervision of its police officers, which were in any way causally related to Mr. Williams' injuries. Finally, plaintiffs' state law wrongful death claim fails as well. Defendants therefore respectfully request an order granting summary judgment in their favor on all claims, and dismissal of this lawsuit.

Dated at the City of Milwaukee, this 24th day of April, 2017.

GRANT F. LANGLEY
Milwaukee City Attorney


/s/ Susan E. Lappen
SUSAN E. LAPPEN
Assistant City Attorney
State Bar No. 01003567
800 City Hall
200 East Wells Street
Milwaukee, WI 53202

52

(414) 286-2601
Email:  slappe@milwaukee.gov
Attorneys for the Defendants

1032-2016-1482/238203