## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

ESTATE OF DEREK WILLIAMS JR.,
by SHARDAY ROSE, Special Administrator; and
TANIJAH WILLIAMS, DEREK WILLIAMS III, and
TALIYAH S. WILLIAMS, minors by their mother
and guardian SHARDAY ROSE,

                  Plaintiffs,

v.                                           Case No. 16-C-869

CITY OF MILWAUKEE, and Milwaukee Police
Officers JEFFREY CLINE, RICHARD TICCIONI,
PATRICK COE, JASON BLEICHWEHL,
ROBERT THIEL, TODD KAUL,
ZACHARY THOMS, GREGORY KUSPA,
CRAIG THIMM, CHAD BOYACK, and
DAVID LETTEER,

                  Defendants.

---

## AFFIDAVIT OF ZACHARY E. THOMS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

STATE OF WISCONSIN  )
                        ) ss:
MILWAUKEE COUNTY  )

      ZACHARY E. THOMS, being first duly sworn upon oath, does depose and state as follows:

      1.     I have personal knowledge of the information averred to herein.

2.      I am currently employed as a Milwaukee police officer, and was so employed on July 6, 2011. I was sworn in as a Milwaukee police officer on December 3, 2007.

3.      I successfully completed all of my Milwaukee police training, including my recruit training and my annual in-service training. I am currently certified to act as a law enforcement officer in the State of Wisconsin, and I have continuously maintained that certification throughout my career.

4.      Part of my training included First Responder training. In the context of that training, I was provided with American Heart Association (AHA) Cardio Pulmonary Resuscitation (CPR) training and defibrillator (AED) training. In the context of my First Responder training, I learned that I cannot provide medication to prisoners, and I cannot provide any medical care to any subject, unless he is experiencing a medical emergency. Included among the types of medical emergencies which would necessitate my providing emergency medical care (other than minor first aid) are the following: stroke, seizure, diabetic emergency, poisoning, and an allergic reaction. Regardless of the type of symptoms involved, should an individual become unresponsive or unconscious, my training provided that I should immediately take First Responder action. Included within those activities is providing the person with chest compressions and/or rescue breathing, if necessary.

5.      As part of my First Responder training, I learned that should a person become unresponsive, I should check his ABCs, which means airway, breathing and circulation. As part of the training provided to me relative to checking on the status of a

2

subject's airway and breathing, instructors indicated that I should listen in the area of the subjects' nose and mouth, to determine if air is passing in and out of the person's lungs. I was also told I could feel for breath by placing my hand or fingers in front of the nose and mouth area. In the context of learning about the ABCs of being a first responder, I was also told that if a subject is talking, then therefore they are breathing, so I need not provide resuscitative breathing or chest compressions.

6. The anecdote that "if a person is talking, they are breathing," is something I have also heard stated by emergency medical technicians (EMTs) and hospital personnel over the course of my tenure as a police officer.

7. While I had heard the term "if you are talking, you are breathing" in training and in the course of my general law enforcement experiences, I fully understood that being able to talk does not indicate the degree to which a person is able to breathe.

8. My First Responder training instructed me that should I determine that a subject appears to have become unresponsive and/or stopped breathing, I should attempt to obtain help from fellow officers and/or citizens, before beginning CPR efforts.

9. My training further provided that should a person become unresponsive, and/or appear to have stopped breathing, and after I have called for help, I should then engage in CPR procedures, and continue to do so until emergency medical technicians, or any other person with more advance medical training, arrives on scene, and takes over my CPR activities.

10. In the context of my work prior to July 6, 2011, I had observed dozens, if not hundreds of people who ran from me or other officers, and who stated words to the

3

effect of "I can't breathe" after they were apprehended. In those situations, I attributed their statements to the fact that they had just run from the police, and were out of breath due to the effects of the physical exertion involved with their flight and/or the stress of being in police custody and about to go to jail. In my opinion, their statements did not indicate that any of those people were experiencing a medical emergency, and so I did not call for emergency medical assistance or engage in First Responder activities. None of those people ultimately required any medical care.

11.    Prior to July 6, 2011, I had never heard of a subject in police custody dying from sickle cell crisis.

12.    Since July 6, 2011, MPD policy has been changed, with regard to officer response and discretion in situations where a subject complains of having any difficulty with breathing. Prior to that date, officers could use their discretion in deciding whether such a subject was in need of more advanced medical care. Now, if a subject makes such a statement, officers have no discretion, and must always call for fire department EMTs or a private ambulance service to respond, to determine if the subject is in need of medical treatment.

13.    In addition to First Responder training, I have also received training relative to the use of force during both my recruit training, and throughout my in-service training over the course of my tenure with the Milwaukee Police Department. That training established that I am allowed to use force in effecting an arrest and/or taking a person into custody.

4

14.     The primary standard operating procedure (SOP) that was presented to me, in the context of my use of force training, is Milwaukee Police Department SOP 460 – Use of Force.  That SOP provides as follows:  Police members making an arrest are entitled to use whatever force is reasonably necessary.  Whether the force used is reasonable depends upon the totality of facts and circumstances in each case.

15.     My use of force training provided that I can use force to take a person into custody, and that if that person resists my efforts to take him into custody, I can use a level of force that is greater than that presented to me by the resistive subject.  For instance, if a subject begins to punch me, I can punch that person back, but I can also increase my use of force level to the use of an intermediate weapon, like my pepper spray or my baton.

16.     I am aware that according to MPD policy and the MPD Code of Conduct, officer misconduct must be reported to supervisory personnel.

17.     I myself would report any such misconduct if I observed it, and I believe that my fellow officers would do the same.

18.     I am not aware of any officer who is named as a defendant in this case failing to report any misconduct.

19.     I myself did not observe any misconduct on the part of any officer, with reference to the events of July 6, 2011 involving Derek Williams.

20.     On July 6, 2011, at approximately 12:30am, I was on duty as an MPD officer.

21.     I was assigned to patrol duties with my partner that night, Officer Cline.

22. Officer Cline was the driver, and I was the passenger in a marked squad car, and we were heading northbound on Holton Street.

23. We were about to pull over a vehicle which had been driving recklessly, when I observed a black male, wearing a white t-shirt and a white neoprene mask. The mask had a sinister smile printed on it, like that of the "Joker" character from the Batman series, and it covered his nose and the lower part of his face. The man crossed over Center Street. I saw this man, who I later learned was Derek Williams, then run toward a young couple who were walking northbound on Holton Street.

24. It appeared to me that Mr. Williams was holding a gun in his hand and hiding it under his clothing. As he approached the couple, he swung his other hand around the couple, while moving rapidly close to them.

25. The couple both appeared to be surprised by these actions.

26. I concluded that I was watching an armed robbery in progress.

27. At about this time, Mr. Williams turned and faced our squad car, and he looked straight at us. He had a surprised expression in his eyes, and then took off running. I learned later that he jumped out of his unlaced athletic shoes before he ran from us.

28. Officer Cline was closer to Mr. Williams than I, so he jumped out of the squad and engaged in a foot pursuit. I got into the driver's seat of the squad, and drove it westbound on Center Street, then north on Buffum Street.

29. I parked the squad about mid-block on Buffum Street, to potentially intercept Mr. Williams. By this time, I had called out over my radio that we were

6

engaged in a foot pursuit of an armed robbery suspect, and requested the assistance of other officers.

30. I observed other officers respond to the scene, and assist us in searching for the suspect and containing the area.

31. Eventually, I heard what I believed were police commands being yelled by an officer, and I concluded that the subject had been found.

32. I drove my squad closer to that location, and parked on Buffum Street, near 2744 North Buffum, and walked to the rear yard of 2752 North Buffum, where the subject was being taken into custody.

33. While walking there, I heard officers saying words consistent with taking someone into custody, like "Get on the ground" and "Show me your hands," but I do not recall the exact words at this time.

34. When I entered the yard, I observed that Mr. Williams' body was sweaty, and he was breathing heavily, like someone who had just run for a long distance.

35. I estimate that Mr. Williams had run approximately 250-300 yards to get to that yard from the site of his attempted armed robbery.

36. I saw Officer Ticcioni handcuff Mr. Williams, using the three-point ground stabilization technique, and then stand him up shortly thereafter. I did not see Officer Ticcioni, or any other officer, strike, kick or otherwise use force against Mr. Williams, and no officer present on scene that night either possessed or used a Taser.

37.     I asked Mr. Williams where his gun was located, because it is of utmost importance in such situations to recover a gun, to preserve it as evidence of a crime and to prevent it from being found by citizens, including children.

38.     Mr. Williams denied possessing a gun. His speaking voice was strong and clear and did not suggest to me that Mr. Williams was having difficulty breathing.

39.     I saw that the neoprene mask that I had seen Mr. Williams wearing earlier was located on the ground in the area where he had been handcuffed.

40.     I also saw a Blackberry cell phone on the ground near the neoprene mask.

41.     I later saw the white t-shirt that Mr. Williams had worn at the time of the attempted armed robbery. The t-shirt was snagged along the top edge of a chain link fence, which was located along Mr. Williams' flight path, about two yards away from the yard in which he was found. That fence was located between the back yards of 2744 and 2748 North Buffum Street.

42.     I later learned that Mr. Williams had jumped out of his shoes before he fled from us, and the shoes were left at the beginning of his flight path, on the northeast corner of the intersection of North Holton and East Center Streets.

43.     Attached as Exhibit ZT-1 is a map of the 2700 Block of North Holton and North Buffum Streets, between East Center Street and East Hadley Street. Next to the letter A are two red dots, which indicate the location at which Mr. Williams' shoes were found. The two dots next to the letter B reflect the location of where the neoprene joker mask and the blackberry phone were found, in the yard behind 2752 North Buffum Street. The one dot next to the letter C represents the location at which Mr. Williams'

8

white t-shirt was found snagged on the top of a chain link fence between the backyard of 2744 and 2748 North Buffum. Finally, the red dot next to the letter D is the location at which CPR was performed on Mr. Williams, roughly in front of 2744 North Buffum Street. Exhibit ZT-2 is a copy of a photograph of Mr. Williams' shoes, at the location where he jumped out of them before running from the police. Exhibit ZT-3 is a photograph of Mr. Williams' white t-shirt, where it was found on the chain link fence. Exhibit ZT-4 is a photograph of Mr. Williams' blackberry phone and "Joker" mask, where they were found behind 2752 North Buffum. Exhibit ZT-5 is a close up photograph of the "Joker" mask.

44. I did not observe Mr. Williams drag his feet, fall down, or go limp as he was escorted to the front yard. I did not observe anything which suggested to me that he was experiencing any type of medical emergency. I did not hear him say anything about not being able to breathe.

45. After I walked back to the front of the house, I returned to the work of retracing Mr. Williams' flight path, to locate the gun and any other evidence.

46. A few minutes later, I heard Officer Bleichwehl call for assistance at the location of the squad.

47. When I returned to the location of the squad, I observed that Mr. Williams was lying on his back in the grassy area between the street and the sidewalk, and that Officer Bleichwehl was providing Mr. Williams with CPR. Specifically, he was giving Mr. Williams rescue breaths, and doing so without the protection of a safety mask.

48.     I then went to the trunk of my squad to retrieve a safety mask, and gave it to Officer Bleichwehl.

49.     I did not participate in performing CPR on Mr. Williams, because at least four other officers were taking turns with providing chest compressions and rescue breathing.

50.     I observed officers continuously performing CPR on Mr. Williams until fire department EMTs arrived several minutes later, and then they took over the CPR activities.

_____

ZACHARY E. THOMS
Milwaukee Police Department

Subscribed and sworn to before me
this 20ᵗʰ day of April, 2017.

_____

State of Wisconsin, Notary Public
My Commission is permanent.

1032-2016-1482/238190