UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

ESTATE OF DEREK WILLIAMS JR.,
by SHARDAY ROSE, Special Administrator; and
TANIJAH WILLIAMS, DEREK WILLIAMS III, and
TALIYAH S. WILLIAMS, minors by their mother
and guardian SHARDAY ROSE,

       Plaintiffs,

v.                     Case No. 16-C-869

CITY OF MILWAUKEE, and Milwaukee Police
Officers JEFFREY CLINE, RICHARD TICCIONI,
PATRICK COE, JASON BLEICHWEHL,
ROBERT THIEL, TODD KAUL,
ZACHARY THOMS, GREGORY KUSPA,
CRAIG THIMM, CHAD BOYACK, and
DAVID LETTEER,

       Defendants.

---

### AFFIDAVIT OF JASON P. BLEICHWEHL IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

STATE OF WISCONSIN )
          ) ss:
MILWAUKEE COUNTY )

  JASON P. BLEICHWEHL, being first duly sworn upon oath, does depose and state as follows:

  1.  I have personal knowledge of the information averred to herein.

  2.  I was employed as a Milwaukee police officer on July 6, 2011. I was initially sworn in as a Milwaukee police officer on December 3, 2007.

3. I successfully completed all of my Milwaukee police training, including my recruit training and my annual in-service training. I continuously maintained my certification to act as a law enforcement officer in the State of Wisconsin throughout my career with the MPD.

4. Part of my training included First Responder training. In the context of that training, I was provided with American Heart Association (AHA) Cardio Pulmonary Resuscitation (CPR) training and defibrillator (AED) training. In the context of my First Responder training, I learned that I cannot provide medication to prisoners, and I cannot provide any medical care (other than minor first aid) to any subject, unless he is experiencing a medical emergency. Included among the types of medical emergencies which would necessitate my providing emergency medical care are the following: stroke, seizure, diabetic emergency, poisoning, and an allergic reaction. Regardless of the type of symptoms involved, should an individual become unresponsive or unconscious, my training provided that I should immediately take First Responder action. Included within those activities is providing the person with chest compressions and/or rescue breathing, if necessary.

5. As part of my First Responder training, I learned that should a person become unresponsive, I should check his ABCs, which means airway, breathing and circulation. As part of the training provided to me relative to checking on the status of a subject's airway and breathing, instructors indicated that I should listen in the area of the subjects' nose and mouth, to determine if air is passing in and out of the person's lungs. I was also told I could feel for breath by placing my hand or fingers in front of the nose and mouth area. In the

context of learning about the ABCs of being a First Responder, I was also told that if a subject is talking, then therefore he is breathing, so I need not provide resuscitative breathing or chest compressions.

6. The anecdote that "if a person is talking, they are breathing," is something I also heard stated by emergency medical technicians (EMTs) and hospital personnel over the course of my tenure as an MPD police officer.

7. While I heard the term "if you are talking, you are breathing" in the course of my training and my general law enforcement experiences, I fully understood that being able to talk does not indicate the degree to which a person is able to breathe.

8. My First Responder training instructed me that should I determine that a subject appeared to have become unresponsive and/or stopped breathing, I should attempt to obtain help from fellow officers and/or citizens, before beginning CPR efforts

9. My training further provided that should a person become unresponsive, and appear to have stopped breathing, and after I have called for help, I should then engage in CPR procedures, and continue to do so until emergency medical technicians, or any other person with more advance medical training, arrives on scene, and takes over my CPR activities.

10. In the context of my work prior to July 6, 2011, I had observed a plethora of people who ran from me or other officers, and who stated words to the effect of "I can't breathe" after they were apprehended. In those situations, I attributed their statements to the fact that they had just run from the police, and were out of breath due to the effects of the physical exertion involved with their flight, and/or the stress of being in police custody and about to go to jail. In my opinion, their statements did not indicate that any of those people

were experiencing a medical emergency, and so I did not call for emergency medical assistance or engage in First Responder activities. None of these people ultimately required any medical care.

11. Prior to July 6, 2011, I had never heard of sickle cell crisis, much less a subject in police custody dying from sickle cell crisis.

12. After July 6, 2011, MPD policy was changed, with regard to officer response and discretion in situations where a subject complains of having any difficulty with breathing. Prior to that date, officers could use their discretion in deciding whether such a subject was in need of more advanced medical care. Now, if a subject makes such a statement, officers have no discretion, and must always call for fire department EMTs or a private ambulance service to respond, to determine if the subject is in need of medical treatment.

13. In addition to First Responder training, I also received training relative to the use of force during both my recruit training, and throughout my in-service training over the course of my tenure with the Milwaukee Police Department. That training established that I was allowed to use force in effecting an arrest and/or taking a person into custody.

14. The primary standard operating procedure (SOP) that was presented to me, in the context of my use of force training, is Milwaukee Police Department SOP 460 – Use of Force. That SOP provides as follows: Police members making an arrest are entitled to use whatever force is reasonably necessary. Whether the force used is reasonable depends upon the totality of facts and circumstances in each case.

15. My use of force training provided that I could use force to take a person into custody, and that if that person resists my efforts to take him into custody, I could use a level of force that was greater than that presented to me by the resistive subject. For instance, if a subject began to punch me, I could have punched that person back, but I could have also increased my use of force level to the use of an intermediate weapon, like my pepper spray or my baton.

16. I am aware that according to MPD policy and the MPD Code of Conduct, officer misconduct must be reported to supervisory personnel.

17. I myself would report any such misconduct if I observed it, and I believe that my fellow officers would do the same.

18. I am not aware of any officer who is named as a defendant in this case failing to report any misconduct.

19. I myself did not observe any misconduct on the part of any officer, with reference to the events of July 6, 2011 involving Derek Williams.

20. On July 6, 2011, at approximately 12:30 am, I was on duty as a Milwaukee police officer, and I was assigned to general patrol duties with Officer Kuspa.

21. We responded to a foot pursuit in progress, which involved fellow officers chasing after a man who was observed engaging in an armed robbery of two citizens on the southeast corner of Hadley and Center Streets, in the City of Milwaukee. The man was wearing a white t-shirt and shorts, and a mask over his face with the smile of the "Joker" character imprinted on it.

5
Case 2:16-cv-00869-JPS   Filed 04/24/17   Page 5 of 10   Document 40

22. My understanding from the radio transmissions that I heard was that the suspect ran from officers who caught him in the act of committing this armed robbery, and that he ran into yards in the 2700 block of North Buffum Street. I had driven by that intersection within seconds of those officers, and I had seen a man wearing a "Joker" mask approaching that intersection, so I concluded that the man in the mask was likely the person we were looking for.

23. I later learned that the name of this armed robbery suspect was Derek Williams.

24. I engaged in search-related activities on foot.

25. While searching a yard that was two or three yards away from the yard behind 2752 N. Buffum Street, I heard officers in that yard ordering someone to put his hands up, and making other statements indicative of taking someone into police custody.

26. I left the yard I was in and proceeded to the yard behind 2752 North Buffum, to provide assistance to those officers.

27. When I entered that yard, I saw that Mr. Williams had been taken into custody. He was handcuffed and standing near Officers Ticcioni and Coe. He was no longer wearing the "Joker" mask, but I saw the mask on the ground near his location. Also, Mr. Williams was no longer wearing the white t-shirt that he had been wearing when I saw him earlier.

28. I did not see the process by which Mr. Williams was handcuffed behind his back.

29. I heard Mr. Williams state that he did not have a gun, as I walked near him, and while I was searching the yard for the gun and any other evidence.

30. Officers Ticcioni and Coe began to escort Mr. Williams to the front of the house, and I heard Mr. Williams state that he could not breathe.

31. Sergeant Thiel was in the yard at that time, and he told the officers to put Mr. Williams down. The sergeant either patted his chest or gave him a sternum rub with his knuckles, and then said to the officers that Mr. Williams was fine.

32. I believed that Mr. Williams was faking a medical situation, in order to avoid going to jail, and possibly go to the hospital, where escape would be easier. He was saying that he could not breathe, yet he was talking, and he was professing his innocence and denying possessing a gun. I had observed suspects engage in this type of activity to avoid going to jail many times during my career as a police officer.

33. I followed Officers Coe and Ticcioni as they escorted Mr. Williams out of the yard, and I noticed that at times he would drag his feet, but then walk cooperatively again. I perceived that he was, once again, being uncooperative in an effort to avoid going to jail.

34. After Mr. Williams was escorted to the front of the house, he was placed into the rear of a squad car.

35. I continued searching for the gun we believed Mr. Williams had used in the attempted armed robbery, along with other evidence.

36. After a few minutes, I was asked to stay with Mr. Williams at the squad, so that Officer Cline (who had been monitoring Mr. Williams at the squad) could retrace Mr. Williams' flight path, to assist in searching for evidence he may have discarded. This made sense, because Officer Cline had been the initial officer to pursue Mr. Williams, and knew the flight path better than officers who arrived later.

37. I spoke with Officer Cline for a few moments outside of the driver's side of the squad. He told me that Mr. Williams' apparent girlfriend, who was standing nearby, had told him Mr. Williams' name, and that was all he knew about him at that time.

38. I knew at that time that Mr. Williams was seated in the back seat of the squad, because I could hear him moving around. I could hear that he was speaking, but I did not focus on his words because I was listening to Officer Cline.

39. I entered the squad and sat in the driver's seat, I asked Mr. Williams about his name, but he did not answer my question, so I concluded that he was choosing to not cooperate with me.

40. I continued to do my work, by running Mr. Williams' name, using the squad computer that was in front of me.

41. After approximately one to one and a half minutes, I did not hear any noise from behind me, so I turned my head to check on Mr. Williams.

42. I could not see him, because of the glare from the squad computer in the plexiglass divider behind me, so I exited the squad and opened the rear driver's side door to better assess the situation, and I found Mr. Williams lying on the seat.

43. I attempted to check for a pulse, but Mr. Williams' girlfriend was approaching me from across the street, so I told her to go back onto the sidewalk, closed the door, and went around to the rear passenger side door. Because I was not sure if other people were with her, and therefore behind me, I was concerned for my safety, but if something bad was occurring with Mr. Williams, I also wanted to be sensitive to her, and did not want her to have to witness that.

44. I opened the passenger side door, and continued to asses Mr. Williams' status. I called out his name several times and Mr. Williams did not respond. I rubbed his sternum with my knuckles, and Mr. Williams did not respond. I checked again for a pulse, and for breathing. I did not hear breaths or get a pulse.

45. I then went to get help from someone in the sergeant's squad, which was parked immediately in front of the squad I was in, but found no one inside.

46. I then called for other officers to help me, using my portable radio.

47. I subsequently pulled Mr. Williams from the squad, to get him on the ground and in a better position for administering CPR.

48. I began giving him unprotected mouth-to-mouth rescue breaths.

49. Other officers came to my assistance, and joined in providing CPR rescue breaths and chest compressions to Mr. Williams.

50. Officers continued to give chest compressions and rescue breaths until fire department EMTs arrived on scene.

51. At no time did I observe any officer punch, kick, or otherwise use force against Mr. Williams, and no officer on scene that night used a Taser on him.

_____
JASON P. BLEICHWEHL


Subscribed and sworn to before me
this 21st day of April, 2017.

_____
State of Wisconsin, Notary Public
My Commission is permanent.


1032-2016-1482/238195