UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

ESTATE OF DEREK WILLIAMS JR.,
by SHARDAY ROSE, Special Administrator; and
TANIJAH WILLIAMS, DEREK WILLIAMS III, and
TALIYAH S. WILLIAMS, minors by their mother
and guardian SHARDAY ROSE,

                    Plaintiffs,

v.                                                    Case No. 16-C-869

CITY OF MILWAUKEE, and Milwaukee Police
Officers JEFFREY CLINE, RICHARD TICCIONI,
PATRICK COE, JASON BLEICHWEHL,
ROBERT THIEL, TODD KAUL,
ZACHARY THOMS, GREGORY KUSPA,
CRAIG THIMM, CHAD BOYACK, and
DAVID LETTEER,

                    Defendants.

---

### AFFIDAVIT OF JEFFREY A. CLINE IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

STATE OF WISCONSIN  )
                            ) ss:
MILWAUKEE COUNTY  )

    JEFFREY A. CLINE, being first duly sworn upon oath, does depose and state as follows:

    1.    I have personal knowledge of the information averred to herein.

2. I am currently employed as a Milwaukee police officer, and was so employed on July 6, 2011. I was sworn in as a Milwaukee police officer on December 6, 2004.

3. I successfully completed all of my Milwaukee police training, including my recruit training and my annual in-service training. I am currently certified to act as a law enforcement officer in the State of Wisconsin, and I have continuously maintained that certification throughout my career.

4. Part of my training included First Responder training. In the context of that training, I was provided with American Heart Association (AHA) Cardio Pulmonary Resuscitation (CPR) training and defibrillator (AED) training. In the context of my First Responder training, I learned that I cannot provide medication to prisoners, and I cannot provide any medical care (other than minor first aid) to any subject, unless he is experiencing a medical emergency. Included among the types of medical emergencies which would necessitate my providing emergency medical care are the following: stroke, seizure, diabetic emergency, poisoning, and an allergic reaction. Regardless of the type of symptoms involved, should an individual become unresponsive or unconscious, my training provided that I should immediately take First Responder action. Included within those activities is providing the person with chest compressions and/or rescue breathing, if necessary.

5. As part of my First Responder training, I learned that should a person become unresponsive, I should check his ABCs, which means airway, breathing and circulation. As part of the training provided to me relative to checking on the status of a

2

subject's airway and breathing, instructors indicated that I should listen in the area of the subjects' nose and mouth, to determine if air is passing in and out of the person's lungs. I was also told I could feel for breath by placing my hand or fingers in front of the nose and mouth area. In the context of learning about the ABCs of being a first responder, I was also told that if a subject is talking, then therefore they are breathing, so I need not provide resuscitative breathing or chest compressions.

6. The anecdote that "if a person is talking, they are breathing," is something I have also heard stated by emergency medical technicians (EMTs) and hospital personnel over the course of my tenure as a police officer.

7. While I had heard the term "if you are talking, you are breathing" in training and in the course of my general law enforcement experiences, I fully understood that being able to talk does not indicate the degree to which a person is able to breathe.

8. My First Responder training instructed me that should I determine that a subject appears to have become unresponsive and/or stopped breathing, I should attempt to obtain help from fellow officers and/or citizens, before beginning CPR efforts.

9. My training further provided that should a person become unresponsive, and/or appear to have stopped breathing, and after I have called for help, I should then engage in CPR procedures, and continue to do so until emergency medical technicians, or any other person with more advance medical training, arrives on scene, and takes over my CPR activities.

10. In the context of my work prior to July 6, 2011, I had observed dozens, if not hundreds of people who ran from me or other officers, and who stated words to the

3

effect of "I can't breathe" after they were apprehended. In those situations, I attributed their statements to the fact that they had just run from the police, and were out of breath due to the effects of the physical exertion involved with their flight and/or the stress of being in police custody and about to go to jail. In my opinion, their statements did not indicate that any of those people were experiencing a medical emergency, and so I did not call for emergency medical assistance or engage in First Responder activities. None of those people ultimately required any medical care.

11. Prior to July 6, 2011, I had never heard of a subject in police custody dying from sickle cell crisis.

12. Since July 6, 2011, MPD policy has been changed, with regard to officer response and discretion in situations where a subject complains of having any difficulty with breathing. Prior to that date, officers could use their discretion in deciding whether such a subject was in need of more advanced medical care. Now, if a subject makes such a statement, officers have no discretion, and must always call for fire department EMTs or a private ambulance service to respond, to determine if the subject is in need of medical treatment.

13. In addition to First Responder training, I have also received training relative to the use of force during both my recruit training, and throughout my in-service training over the course of my tenure with the Milwaukee Police Department. That training established that I am allowed to use force in effecting an arrest and/or taking a person into custody.

14. The primary standard operating procedure (SOP) that was presented to me, in the context of my use of force training, is Milwaukee Police Department SOP 460 – Use of Force. That SOP provides as follows: Police members making an arrest are entitled to use whatever force is reasonably necessary. Whether the force used is reasonable depends upon the totality of facts and circumstances in each case.

15. My use of force training provided that I can use force to take a person into custody, and that if that person resists my efforts to take him into custody, I can use a level of force that is greater than that presented to me by the resistive subject. For instance, if a subject begins to punch me, I can punch that person back, but I can also increase my use of force level to the use of an intermediate weapon, like my pepper spray or my baton.

16. I am aware that according to MPD policy and the MPD Code of Conduct, officer misconduct must be reported to supervisory personnel.

17. I myself would report any such misconduct if I observed it, and I believe that my fellow officers would do the same.

18. I am not aware of any officer who is named as a defendant in this case failing to report any misconduct.

19. I myself did not observe any misconduct on the part of any officer, with reference to the events of July 6, 2011 involving Derek Williams. No officer hit or kicked Mr. Williams, or used a Taser on him.

20. On July 6, 2011, at approximately 12:30am, I was on duty as an MPD officer.

21. I was assigned to patrol duties with my partner that night, Officer Thoms.

22. Officer Thoms was the passenger, and I was the driver in a marked squad car, and we were heading northbound on Holton Street.

23. We were about to pull over a vehicle which had been driving recklessly, when I observed a black male, wearing a white t-shirt, jean shorts, and a white neoprene mask with a sinister smile printed on it, which looked much like the smile of the "Joker" character from the old Batman series. The mask covered the man's nose and the lower part of his face. I saw him cross Center Street. I saw this man, who I later learned was Derek Williams, then move rapidly toward a young couple who were walking northbound on Holton Street.

24. It appeared to me that Mr. Williams was holding a gun in his hand and hiding it under his clothing. As he approached the couple, he swung his other hand around the couple, while moving close, and appeared to be restraining them.

25. The couple both appeared to be nervous and afraid.

26. I concluded that I was watching an armed robbery in progress.

27. At about this time, Mr. Williams turned and faced our squad car, and he looked straight at us. He had a surprised expression on his face, and jumped out of his athletic shoes and took off running.

28. I jumped out of the squad and engaged in a foot pursuit, which proceeded northbound on Holton Street and into the yards along the alley running between Holton and Buffum Streets, in the 2700 block.

29. I called out over my portable radio that I was engaged in a foot pursuit of an armed robbery suspect, and requested the assistance of other officers. I gave a description of the subject, and the direction that he was headed.

30. I observed other officers respond to the scene, and assist in searching for the suspect and containing the area.

31. Eventually, I heard what I believed were police commands, like "show me your hands," being yelled by an officer, and I concluded that another officer found the subject.

32. I proceeded in the direction of the voices, and entered the rear yard of 2752 North Buffum.

33. When I entered the yard, I observed that Mr. Williams was handcuffed and lying on his back.

34. I estimate that Mr. Williams had run approximately 250-300 yards from the site of his attempted armed robbery, and that he had jumped fences in the process.

35. I ran after Mr. Williams, and I was breathing heavily and sweating.

36. It was a warm and humid July night.

37. Mr. Williams appeared to be a young man in his early twenties, and of a tall, thin build. His flight from me suggested that he was athletic and in good physical shape.

38. I began to focus on all of the work that had to be done regarding our investigation of the armed robbery I had stopped in progress, and turned away from Mr. Williams while speaking with other officers.

7

39. I did not hear any conversation between Mr. Williams and other officers, and specifically I did not hear him state that he was having any difficulty breathing.

40. I did not observe Mr. Williams as he was escorted from the back yard.

41. I had already gone out of the yard to Buffum Street, and I saw officers as they were coming out of the yard behind me. I directed them to put Mr. Williams in my squad car, because I considered myself to be the primary officer or arresting officer.

42. I did not observe Mr. Williams having any difficulty in walking to my squad car, but he appeared to be upset.

43. I sat down in the driver's seat at about the same time that Officers Coe and Ticcioni were placing Mr. Williams in the back seat of my squad car.

44. Once seated, I turned on the squad camera and the dome light in the squad, and began to log onto my squad computer.

45. Mr. Williams was moving around in the back seat, and seemed to be very agitated. I concluded that he was upset that he was going to jail, because a few minutes earlier I had caught him in the act of committing an armed robbery.

46. One of my responsibilities was to determine Mr. Williams' identity, so I asked him his name.

47. He ignored my question, and stated that he could not breathe.

48. I asked for his name several times, and he ignored my questions.

49. Mr. Williams stated several times that he could not breathe. I perceived that he was making these statements as a ruse to obstruct my efforts to determine his identity, and keep from going to jail. Mr. Williams had just run from me for more than 250 yards,

8

jumped fences, and was now agitated at the thought of going to jail. He was a young man and seemed to be very physically fit and athletic. He did not state that he had asthma, or any other medical condition. While he was breathing heavy, that in itself did not suggest to me that he was in need of medical attention, or was experiencing a medical emergency.

50. I had opened the rear passenger window, to allow some fresh air into the squad. Also, the air conditioning was running, so I thought the cool air would help Mr. Williams calm down and catch his breath. I told Mr. Williams that I thought he was breathing just fine. I told him that he was talking to me, and that I thought he was playing games with me. In fact, with regard to the first four times that Mr. Williams stated that he could not breathe, his statement was made in direct response to my question "what's your last name?" Therefore, I was reinforced in my belief that Mr. Williams was being obstructive, and resisting the process of being brought to jail.

51. About two minutes after sitting in the squad, a young woman named Sharday Rose came to my window, and identified herself as Mr. Williams' girlfriend. I got out of the squad and spoke with her along the driver's side of the squad, and I remained within arms- reach of the squad. The rear window was still open, and I could hear Mr. Williams talking, but I was focused on what Ms. Rose was saying.

52. After we engaged in conversation for a while, Ms. Rose gave me Mr. Williams' name. I told her that Mr. Williams was in our custody, and I asked her to step back. I spoke with Ms. Rose for about a minute and a half while outside of the squad.

53. I re-entered the squad, and Mr. Williams again stated that he could not breathe.

9

54. I told him that I thought he was playing games, and that I had to get his name from his girlfriend, and that he had not given me the courtesy of at least giving me his name himself.

55. Within two minutes of this exchange, I was asked to retrace Mr. Williams' flight path, because I was most familiar with it. Officers thought that retracing the flight path would help in locating discarded evidence more quickly.

56. Officer Bleichwehl was asked to sit in the squad with Mr. Williams, while I retraced the flight path with other officers, who were still searching for the gun and any other evidence.

57. I had a 30-40 second conversation with Officer Bleichwehl outside of the squad, and explained that Sharday Rose was nearby, that she was Mr. Williams' girlfriend, and that she told me his name was Derek Williams. I told Officer Bleichwehl that was all the information I had at that time about Mr. Williams.

58. I then proceeded to retrace the flight path with other officers, as Officer Bleichwehl entered the squad through the driver's door.

59. A few minutes later, I heard Officer Bleichwehl call for assistance at the location of the squad, and I also heard Officer Boyack call for medical assistance.

60. I quickly returned to the location of the squad, and I observed that Mr. Williams was lying on his back in the grassy area between the street and the sidewalk, and that officers were providing Mr. Williams with CPR. Specifically, they were giving Mr. Williams rescue breaths and chest compressions.

61. I did not participate in performing CPR on Mr. Williams, because at least four other officers were taking turns with providing chest compressions and rescue breathing.

62. I observed officers continuously performing CPR on Mr. Williams until fire department EMTs arrived several minutes later, and then they took over the CPR activities.

*[signature]*
JEFFREY A. CLINE
Milwaukee Police Department

Subscribed and sworn to before me
this 24th day of April, 2017.

_____
State of Wisconsin, Notary Public
My Commission is permanent.

1032-2016-1482/238198

12

Case 2:16-cv-00869-JPS   Filed 04/24/17   Page 12 of 12   Document 42