UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

ESTATE OF DEREK WILLIAMS JR.,
by SHARDAY ROSE, Special Administrator; and
TANIJAH WILLIAMS, DEREK WILLIAMS III, and
TALIYAH S. WILLIAMS, minors by their mother
and guardian SHARDAY ROSE,

        Plaintiffs,

v.                                      Case No. 16-C-869

CITY OF MILWAUKEE, and Milwaukee Police
Officers JEFFREY CLINE, RICHARD TICCIONI,
PATRICK COE, JASON BLEICHWEHL,
ROBERT THIEL, TODD KAUL,
ZACHARY THOMS, GREGORY KUSPA,
CRAIG THIMM, CHAD BOYACK, and
DAVID LETTEER,

        Defendants.

---

## AFFIDAVIT OF PATRICK R. COE IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

STATE OF WISCONSIN  )
                             ) ss:
MILWAUKEE COUNTY  )

      PATRICK R. COE, being first duly sworn upon oath, does depose and state as follows:

      1.    I have personal knowledge of the information averred to herein.

2. I am currently employed as a Milwaukee police officer, and was so employed on July 6, 2011. I was sworn in as a Milwaukee police officer on July 12, 2010.

3. I successfully completed all of my Milwaukee police training, including my recruit training and my annual in-service training. I am currently certified to act as a law enforcement officer in the State of Wisconsin, and I have continuously maintained that certification throughout my career.

4. Part of my training included First Responder training. In the context of that training, I was provided with American Heart Association (AHA) Cardio Pulmonary Resuscitation (CPR) training and defibrillator (AED) training. In the context of my First Responder training, I learned that I cannot provide medication to prisoners, and I cannot provide any medical care (other than minor first aid) to any subject, unless he is experiencing a medical emergency. Included among the types of medical emergencies which would necessitate my providing emergency medical care are the following: stroke, seizure, diabetic emergency, poisoning, and an allergic reaction. Regardless of the type of symptoms involved, should an individual become unresponsive or unconscious, my training provided that I should immediately take First Responder action. Included within those activities is providing the person with chest compressions and/or rescue breathing, if necessary.

5. As part of my First Responder training, I learned that should a person become unresponsive, I should check his ABCs, which means airway, breathing and circulation. As part of the training provided to me relative to checking on the status of a

2

subject's airway and breathing, instructors indicated that I should listen in the area of the subjects' nose and mouth, to determine if air is passing in and out of the person's lungs. I was also told I could feel for breath by placing my hand or fingers in front of the nose and mouth area. In the context of learning about the ABCs of being a First Responder, I was also told that if a subject is talking, then therefore they are breathing, so I need not provide resuscitative breathing or chest compressions.

6. This anecdote that "if a person is talking, they are breathing," is something I have also heard stated by emergency medical technicians (EMTs) and hospital personnel over the course of my tenure as a police officer.

7. While I had heard the term "if you are talking, you are breathing" in the course of my general law enforcement experiences, I fully understood that being able to talk does not indicate the degree to which a person is able to breathe.

8. My First Responder training instructed me that should I determine that a subject appears to have become unresponsive and/or stopped breathing, I should attempt to obtain help from fellow officers and/or citizens, before beginning CPR efforts

9. My training further provided that should a person become unresponsive, and appear to have stopped breathing, and after I have called for help, I should then engage in CPR procedures, and continue to do so until emergency medical technicians, or any other person with more advance medical training, arrives on scene, and takes over my CPR activities.

10. In the context of my work prior to July 6, 2011, I had observed several people who ran from me or other officers, and who stated words to the effect of "I can't

breathe" after they were apprehended. In those situations, I attributed their statements to the fact that they had just run from the police, and were out of breath due to the effects of the physical exertion involved with their flight, and/or the stress of being in police custody and about to go to jail. In my opinion, their statements did not indicate that any of those people were experiencing a medical emergency, and so I did not call for emergency medical assistance or engage in First Responder activities. None of these people ultimately required any medical care.

11. Prior to July 6, 2011, I had never heard of a subject in police custody dying from sickle cell crisis.

12. Since July 6, 2011, MPD policy has been changed, with regard to officer response and discretion in situations where a subject complains of having any difficulty with breathing. Prior to that date, officers could use their discretion in deciding whether such a subject was in need of more advanced medical care. Now, if a subject makes such a statement, officers have no discretion, and must always call for fire department EMTs or a private ambulance service to respond, to determine if the subject is in need of medical treatment.

13. In addition to First Responder training, I have also received training relative to the use of force during both my recruit training, and throughout my in-service training over the course of my tenure with the Milwaukee Police Department. That training established that I am allowed to use force in effecting an arrest and/or taking a person into custody.

14. The primary standard operating procedure (SOP) that was presented to me, in the context of my use of force training, is Milwaukee Police Department SOP 460 – Use of Force. That SOP provides as follows: Police members making an arrest are entitled to use whatever force is reasonably necessary. Whether the force used is reasonable depends upon the totality of facts and circumstances in each case.

15. My use of force training provided that I can use force to take a person into custody, and that if that person resists my efforts to take him into custody, I can use a level of force that is greater than that presented to me by the resistive subject. For instance, if a subject begins to punch me, I can punch that person back, but I can also increase my use of force level to the use of an intermediate weapon, like my pepper spray or my baton.

16. I am aware that according to MPD policy and the MPD Code of Conduct, officer misconduct must be reported to supervisory personnel.

17. I myself would report any such misconduct if I observed it, and I believe that my fellow officers would do the same.

18. I am not aware of any officer who is named as a defendant in this case failing to report any misconduct.

19. I myself did not observe any misconduct on the part of any officer, with reference to the events of July 6, 2011 involving Derek Williams.

20. On July 6, 2011, at approximately 12:30 am, I was on duty as a Milwaukee police officer, and I was assigned to general patrol duties.

21. I responded to a foot pursuit in progress, which involved fellow officers chasing after a man who was observed engaging in an armed robbery of two citizens on the southeast corner of Hadley and Center Streets, in the City of Milwaukee.

22. My understanding from the radio transmissions that I heard was that the suspect ran from officers who caught him in the act of committing this armed robbery, and that he ran into yards in the 2700 block of North Buffum Street.

23. I later learned that the name of this armed robbery suspect was Derek Williams.

24. I engaged in search-related activities on foot.

25. I came into contact with Officer Ticcioni, while he was also engaged in search activities on foot, and we ended up in the alley behind the back yard at 2752 North Buffum Street.

26. We both entered that yard, after climbing over a tall fence and moving through some thick shrubbery.

27. The yard contained much overgrown vegetation. The lawn was more than a foot high in most areas, and shrubbery along the edges of the yard were thick and overgrown. There was an abandoned car in the yard. The lighting was poor, and I had to use my flashlight to be able to see well.

28. As I was searching in the area of the abandoned car, Officer Ticcioni caught my attention and gestured, indicating that he saw something of significance near the corner of the house, under a small, square card table.

29. I observed an individual who fit the description of the suspect we were searching for.

30. Officer Ticcioni loudly gave this person commands like "Let me see your hands."

31. We both approached the suspect, who I later learned was Derek Williams.

32. Mr. Williams complied, and was handcuffed while lying face-down on the ground.

33. Mr. Williams struggled somewhat as we attempted to conduct a custodial search for weapons.

34. Officer Ticcioni used a standard three-point ground stabilization technique to keep Mr. Williams under control.

35. This technique involves the officer placing his body weight on one knee, which is on the ground and close to the subject's torso. The other knee is then placed across the subject's shoulder blade area.

36. After we were able to handcuff and search Mr. Williams, he was placed on his side, and ultimately, stood up and escorted to the front of the house, where he was placed into the rear of the squad driven by Officers Cline and Thoms.

37. No officer struck or kicked Mr. Williams, or used any more force than that described above. No officer used a Taser against Mr. Williams.

38. Mr. Williams was wearing only jean shorts, so his chest was exposed and I could see that he was really sweaty and slippery. It was a warm, humid summer night, and I knew that Mr. Williams had just run from the police for quite a distance, and that he

had jumped over at least one fence in the process. He was found hiding from the police, after he was caught committing an armed robbery, so the fact that he was sweaty did not alarm me.

39. Prior to being stood up, Mr. Williams stated that he could not breathe. I did not believe that Mr. Williams was experiencing any sort of medical crisis. He was able to talk, which confirmed that he was, in fact, breathing. He was a young and thin, and appeared to be physically fit. When he struggled with us, I could tell that he was a strong man, and that he had energy and strength to his actions.

40. As we escorted Mr. Williams to the squad parked in front of the house, Mr. Williams appeared to be resistive, in that his knees would seem to go limp, but then he would regain his footing and walk with us. I did not believe that Mr. Williams was losing control of his legs, or otherwise experiencing any medical problem. When Mr. Williams was at the door of the squad car, he stated that he did not want to get into the squad, and he physically resisted getting into the squad, again suggesting to me that he was physically resisting arrest and going to jail.

41. I concluded that Mr. Williams was short of breath due to his recent physical exertion. I also thought that he might be trying to get us to take him to a hospital, where he would have a greater opportunity for escape.

42. Regardless, I did not believe that Mr. Williams required First Responder care from me, or the assistance of a person having more advanced medical training.

43. Mr. Williams was placed in the back seat of the squad car, and I returned to the yard to continue searching for the weapon we believed Mr. Williams had used in the attempted armed robbery.

44. Several minutes later, I heard Officer Bleichwehl call for assistance at the squad car.

45. I immediately ran to the squad car, and found Officer Bleichwehl in the process of beginning CPR on Mr. Williams, while Mr. Williams was lying face up on the grassy area between the sidewalk and the street.

46. I assisted with those efforts.

47. Other officers assisted with CPR as well, and we continued to give chest compression and rescue breaths until fire department EMTs arrived on scene.

*(signature)*
PATRICK R. COE
Milwaukee Police Department


Subscribed and sworn to before me
this 21st day of April, 2017.

*(signature)*
State of Wisconsin, Notary Public
My Commission is permanent.

1032-2016-1482/238196