ESTATE OF DEREK WILLIAMS JR., et al.,

               Plaintiffs,                                 Judge J.P. Stadtmueller

v.                                            Case No.: 16-cv-869

CITY OF MILWAUKEE, et al.,

               Defendants.

## PLAINTIFFS' STATEMENT OF ADDITIONAL FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs, Estate of Derek Williams by Administrator Sharday Rose, Tanijah Williams, Derek Williams III, and Taliyah S. Williams, by and through their attorneys, submit this Statement of Additional Facts in Opposition to Defendants' Motion for Summary Judgment.

1.      In July of 2011, Derek Williams was 22 years old. He and his girlfriend Sharday Rose had three children together—Tanijah Williams, who was 2 ½ years old; Derek Williams III, who was 1 ½ years old; and Taliyah S. Williams, who was 3 months old. (Elson Dec. Ex. 1 – Sharday Rose Declaration).

**Events Preceding Derek Williams' Arrest**

2.      On the night of July 3, 2011, Derek Williams ("Williams") was arrested based on unpaid tickets and taken to Milwaukee County Jail. Williams was released from Milwaukee County Jail on the evening of July 5, 2011. (Elson Dec. Ex. 2 – Rose Inquest Testimony, pp. 29-31).

3.      Later that evening, Williams went to Sharday Rose's house at 2366 N. Holton Street to visit Sharday and their three children. Ms. Rose gave Williams twenty dollars so that

Williams could go to a convenience store to buy some snacks and Williams left Ms. Rose's house with Ms. Rose's stepfather Tyrone Mathis. (Elson Dec. Ex. 2 – Rose Inquest Testimony, pp. 34-38; Elson Dec. Ex. 3 – Rose Dep., p. 54).

4.      At about 12:35 a.m., Williams skipped across the intersection of Holton and Center and approached a white couple—Samuel Tooke and Zhanna Godkin—who were walking home from Summerfest and were very intoxicated. (Elson Dec. Ex. 4 – Thoms Dep., pp.74-75; Elson Dec. Ex. 5 – Thimm Inquest Testimony, pp. 30-31).

5.      At the same time, Defendants Jason Bleichwehl and Gregory Kuspa and Defendants Jeffrey Cline and Zachary Thoms were driving in two separate cars, one behind the other in a "train" formation, north on Holton Street. They were in the process of conducting a traffic stop of two vehicles. (Elson Dec. Ex. 6 – Cline Dep., pp. 90, 93; Elson Dec. Ex. 4 – Thoms Dep., pp. 72-73).

6.      Defendants Bleichwehl, Kuspa, Cline and Thoms were all fellow members of the District 5 Late Power Shift Unit together with the four officers who were convicted of official body cavity and strip search crimes—Michael Vagnini, Jacob Knight, Jeffrey Dollhopf and Brian Kozelek. (Elson Dec. Ex. 7 – Bleichwehl Dep., pp. 80, 87-88, 99; Elson Dec. Ex. 6 – Cline Dep. pp. 68-69).

7.      As Defendants Cline and Thoms turned right onto Center Street, they observed Williams approaching Mr. Tooke and Ms. Godkin. (Elson Dec. Ex. 4 – Thoms Dep., pp. 73-74).

8.      At approximately 12:36 a.m., Defendants Cline and Thoms, believing Williams was attempting to rob Mr. Tooke and Ms. Godkin, stopped their squad car at the intersection. Williams did not have a gun, no gun was ever found, and apparently what Williams had in his pocket was a cellphone. (Elson Dec. Ex. 6 – Cline Dep., p. 109, 115).

9.    According to Tyrone Mathis, he and Williams saw the white couple earlier and Williams indicated that he knew the woman; Mathis did not observe that Williams had a mask with him; Mathis and Williams did not have any discussion of doing a robbery or any kind of crime; and Mathis had no indication that Williams was going to rob the white couple when he approached them. (Elson Dec. Ex. 8 – Mathis Inquest Testimony, p. 71, 83-84, 86).

10.    When Defendants Cline and Thoms stopped their squad car, Williams ran down Holton Street toward the alley between Holton and Buffum and Defendant Cline exited the squad car and chased after him toward the alley. (Elson Dec. Ex. 6 – Cline Dep., pp. 117-118).

11.    As Cline began running, he radioed in to dispatch via the emergency channel giving the direction that Williams was running. (Elson Dec. Ex. 6 – Cline Dep., p. 122; 133-134).

12.    Cline lost sight of Williams in the alley and began searching for him in the yards on either side of the alley. (Elson Dec. Ex. 6 – Cline Dep., 123-124, 130-131).

13.    Defendant Thoms drove his squad car westbound on East Center Street, turned right onto North Buffum Street and parked in the middle of the block. (Elson Dec. Ex. 4 – Thoms Dep., p. 88, 90).

14.    Defendants Bleichwehl and Kuspa followed Thoms' squad car and parked behind it on Buffum Street. (Elson Dec. Ex. 7 – Bleichwehl Dep., pp. 146-148).

15.    Bleichwehl exited the car and began searching for Williams in the yards adjacent to the alley between Holton and Buffum. (Elson Dec. Ex. 7 – Bleichwehl Dep., p. 148).

16.    Defendants Ticcioni, Coe, Thiel, Kaul, Boyack, Thimm and Letteer responded to the scene to set up containment and assist in locating Williams. (Elson Dec. Ex. 9 – Ticcioni Dep., pp. 113, 115; Elson Dec. Ex. 10 – Coe Dep., pp. 59-60; Elson Dec. Ex. 11 – Thiel Dep.,

pp. 58-60; Elson Dec. Ex. 12 – Kaul Dep., p. 75, 84-86; Elson Dec. Ex. 13 – Thimm Dep., pp. 66-67).

17.     Defendants Ticcioni and Coe exited their squad cars, met up at the north end of the alley, and proceeded down the alley checking the yards for Williams. (Elson Dec. Ex. 9 – Ticcioni Dep., pp. 120-121).

### Williams' Arrest

18.     At about 12:44 a.m., Defendants Ticcioni and Coe located Williams in the backyard of 2752 North Buffum. Williams was hiding behind a card table, in a seated position, curled up in a ball. (Elson Dec. Ex. 9 – Ticcioni Dep., pp. 139-140).

19.     Approximately 8 minutes elapsed from the time that Williams began running until the time he was located in the backyard. (Elson Dec. Ex. 6 – Cline Dep., pp. 115-118, 136-138).

20.     The foot chase had ended and Williams had stopped running at least 5 minutes before he was located by Ticcioni and Coe. (Elson Dec. Ex. 6 – Cline Dep., pp. 127-138).

21.     Williams had run about 200 to 300 yards and jumped a fence. (Elson Dec. Ex. 10 – Coe Dep., p. 102).

22.     Defendant Ticcioni yelled "Hands, hands. Let me see your hands." He yelled it loud enough so that the other officers who were in the vicinity could respond as backup. (Elson Dec. Ex. 9 – Ticcioni Dep., p. 141).

23.     Williams put his hands forward. (Elson Dec. Ex. 14 – O'Day Interview of Ticcioni).

24.     Defendants Bleichwehl, Cline, Thoms, Kuspa Thiel, Thimm and Letteer were nearby and ran into the backyard of 2752 North Buffum when they heard Ticcioni yelling. (Elson Dec. Ex. 13 – Thimm Dep., pp. 77-78, 83-85; Elson Dec. Ex. 11 – Thiel Dep., pp. 64-65; Elson

Dec. Ex. 6 – Cline Dep, p. 140; Elson Dec. Ex. 7 – Bleichwehl Dep., pp. 152-153; Elson Dec. Ex. 15 – Letteer Dep., pp. 61-62).

25. Defendants Thiel and Kaul arrived at around this time and ran into the backyard as well. (Elson Dec. Ex. 11 – Thiel Dep., pp. 64-66; Elson Dec. Ex. 12 – Kaul Dep., pp. 89-90).

26. Defendant Ticcioni grabbed Williams' elbow, but his hand slid off because Williams was soaked with sweat. (Elson Dec. Ex. 9 – Ticcioni Dep., p. 143).

27. Defendants Ticcioni and Coe pulled Williams from the seated position onto his back face-up and Ticcioni ended up on top of Williams. (Elson Dec. Ex. 9 – Ticcioni Dep., p. 146; Elson Dec. Ex. 16 – O'Day Inquest Testimony, pp. 42-44; Elson Dec. Ex. 14 – O'Day Interview of Ticcioni).

28. Defendant Ticcioni then used his foot to roll Williams onto his stomach and put his knee in the middle of Williams' back as Defendant Coe handcuffed Williams' wrists behind his back. (Elson Dec. Ex. 17 – Thiel Memo Book; Elson Dec. Ex. 13 – Thimm Dep., pp. 86-87).

29. Defendants Thoms, Kuspa, Cline and Thimm were present in the backyard when Ticcioni and Coe were in the process of handcuffing Williams. (Elson Dec. Ex. 13 – Thimm Dep., pp. 76-78, 81-85; Elson Dec. Ex. 4 – Thoms Dep., pp. 94, 96-97, 124; Elson Dec. Ex. 18 – McLin Interview of Thoms).

30. Defendants Bleichwehl, Thiel, Kaul and Letteer were present in the backyard immediately after Williams was handcuffed. (Elson Dec. Ex. 12 – Kaul Dep., pp. 96-97).

31. After Williams was handcuffed, Defendant Ticcioni continued to kneel on Williams' back, and Williams complained that he could not breathe. Ticcioni (Elson Dec. Ex. 9 – Dep., p. 157; Elson Dec. Ex. 14 – O'Day Interview of Ticcioni).

32.     Defendant Ticcioni radioed in to dispatch at approximately 12:44:19 stating that Williams was in custody. Williams can be heard in the background of the audio recording of Ticcioni's dispatch call stating three separate times that he cannot breathe. (Elson Dec. Ex. 19 – KSA Audio Recordings at 4:51-5:00; Elson Dec. Ex. 20 – 9/28/12 Memo From Sgt. Kelly to Captain Rowe; Elson Dec. Ex. 9 – Ticcioni Dep., pp. 195-196).

33.     Defendants Ticcioni, Coe, Bleichwehl, Thoms, Kuspa, Cline, Thimm, Thiel and Kaul were all in close proximity to Williams at the time he made these statements. (Elson Dec. Ex. 13 – Thimm Dep., pp. 76-78, 81-85; Elson Dec. Ex. 11 – Thiel Dep., pp. 71, 75; Elson Dec. Ex. 4 – Thoms Dep., pp. 94, 96-97, 124; Elson Dec. Ex. 12 – Kaul Dep., pp. 95-97; Elson Dec. Ex. 18 – McLin Interview of Thoms).

34.     Defendants Coe and Ticcioni then searched Williams' pockets as he was still face down on the ground. (Elson Dec. Ex. 10 – Coe Dep., p. 95).

35.     After Coe and Ticcioni finished searching Williams, he again stated that he could not breathe. (Elson Dec. Ex. 10 – Coe Dep., pp. 95-96; Elson Dec. Ex. 21 – Terrance Giles Inquest Testimony, pp. 88-89).

36.     Defendants Ticcioni and Coe pulled Williams up to a seated position and then pulled him up to his feet. (Elson Dec. Ex. 7 – Bleichwehl Dep., pp. 155, 164; Elson Dec. Ex. 12 – Kaul Dep., p. 102).

37.     While Defendants Ticcioni and Coe took Williams from a seated position to his feet, Williams again said, "I can't breathe" and Williams was breathing heavily. (Elson Dec. Ex. 7 – Bleichwehl Dep., p. 166; Elson Dec. Ex. 21 – Terrance Giles Inquest Testimony, pp. 88-89; Elson Dec. Ex. 9 – Ticcioni Dep., pp. 160-161).

38.     Williams made this statement in the presence of Defendants Ticcioni, Coe, Bleichwehl, Thoms, Kuspa, Cline, Thimm, Thiel, Letteer and Kaul. (Elson Dec. Ex. 13 – Thimm Dep., pp. 77-78, 83-85; Elson Dec. Ex. 11 – Thiel Dep., pp. 71, 75; Elson Dec. Ex. 12 – Kaul Dep., pp. 91-92, 95, 97, 103-104; Elson Dec. Ex. 7 – Bleichwehl Dep., p. 166).

39.     Williams immediately went limp after he was stood up onto his feet and Defendant Thiel told Ticcioni and Coe to put him on the ground. (Elson Dec. Ex. 14 – O'Day Interview of Ticcioni; Elson Dec. Ex. 11 – Thiel Dep., pp. 88-89; Elson Dec. Ex. 7 – Bleichwehl Dep., p. 166).

40.     One of the reasons Sergeant Thiel instructed Ticcioni and Coe to put Williams on the ground was because he didn't want his "officers hurting their back holding dead weight." (Elson Dec. Ex. 11 – Thiel Dep., p. 89).

41.     After Ticcioni and Coe laid Williams down on the ground, Thiel claims that he repeatedly asked Williams, "What's going on?" Williams' eyes were closed, he was breathing hard, he was still sweating profusely, and he was unresponsive. (Elson Dec. Ex. 11 – Thiel Dep., pp. 91-92; Elson Dec. Ex. 4 – Thoms Dep., pp. 98-99; Elson Dec. Ex. 14 – O'Day Interview of Ticcioni).

42.     Ticcioni told Williams to "stop messing around." (Elson Dec. Ex. 14 – O'Day Interview of Ticcioni).

43.     Thiel then claims to have performed a sternum rub on Williams. A sternum rub is a technique which consists of rubbing your knuckles over the person's sternum to determine whether they are conscious or unconscious. A sternum rub does not tell you anything more than whether the person is conscious or unconscious—it is not a method for determining whether someone is experiencing a medical problem. (Elson Dec. Ex. 11 – Thiel Dep., pp. 32-34, 92).

44.     Although Coe was either holding onto Williams or standing next to him from the time Williams was arrested to the time he was placed in the squad car, Coe testified that he did not see anyone perform a sternum rub on Williams during this time period.  (Elson Dec. Ex. 10 – Coe Dep., pp. 154-55; Elson Dec. Ex. 22 – Coe Inquest Testimony, p. 47).

45.     After Thiel performed a sternum rub on Williams, Ticcioni and Coe lifted Williams to his feet and began to take him out of the backyard. (Elson Dec. Ex. 9 – Ticcioni Dep., p. 172; Elson Dec. Ex. 7 – Bleichwehl Dep., p. 178).

46.     Williams again said he could not breathe. (Elson Dec. Ex. 23 – Kuspa Dep., pp. 77-80).

47.     According to Kuspa, Thiel stopped Ticcioni and Coe from taking Williams out of the backyard and performed another sternum rub on Williams, this time while Williams was standing. (Elson Dec. Ex. 23 – Kuspa Dep., pp. 82-83).

48.     After Thiel purportedly performed the second sternum rub on Williams, he told Ticcioni and Coe to "just take him to the front." (Elson Dec. Ex. 23 – Kuspa Dep., p. 83).

49.     There is a clear difference between being out of breath and being unable to breathe. (Elson Dec. Ex. 11 – Thiel Dep., p. 35).

50.     Terri Giles, who resided at 2766 North Buffum, which is separated from 2752 North Buffum by an empty lot, saw Williams in the backyard of 2752 North Buffum from her top porch after he was arrested and could hear Williams saying "I can't breathe" "more than once" and he "was doing it for a long time." (Elson Dec. Ex. 78 – Terri Giles Inquest Testimony, pp. 98, 113-114, 120).

51.     Terri Giles' son, Terrance Giles, also saw Williams in the backyard after he was arrested and heard Williams repeatedly say he couldn't breathe while he was on the ground and

after he was stood up. According to Terrance Giles, Williams "was saying it loud, all of the officers heard him" and the officers "kept telling him to shut up." (Elson Dec. Ex. 21 – Terrance Giles Inquest Testimony, pp. 65-75, 86-90).

52.     Terri Giles' boyfriend, Chauncey Wright, called 911 and told the operator that the police were "killing somebody," and that the man "could not breathe" and "might be dead." (Elson Dec. Ex. 24 – Teirra Giles Declaration; Elson Dec. Ex. 25 – Sharon Austin Declaration).

53.     From the time that Williams was located and handcuffed to the time that Thiel purportedly performed the second sternum rub on Williams, none of the defendants requested medical help for Williams in response to his repeated complaints that he could not breathe and his physical signs of distress. (Elson Dec. Ex. 26 – See generally CAD Report).

54.     Although Letteer claims to have left the backyard after only a short period of time to go help with the victims, Letteer acknowledges that five minutes elapsed between the time Williams was taken into custody and the time that he was dispatched to help with the victims. (Elson Dec. Ex. 15 – Letteer Dep., pp. 76-79).

**Williams Dragged From Backyard to Squad Car**

55.     Defendants Ticcioni and Coe led Mr. Williams out of the backyard along the side of the house toward North Buffum Street while Defendant Cline walked ahead of them and Defendants Bleichwehl and Thoms walked behind them. (Elson Dec. Ex. 7 – Bleichwehl Dep., pp. 178-79; Elson Dec. Ex. 6 – Cline Dep., pp. 151-156; Elson Dec. Ex. 4 – Thoms Dep., pp. 102-104).

56.     The distance from the backyard to the front of the house was about 50 feet. (Elson Dec. Ex. 9 – Ticcioni Dep., p. 172).

57.     As Ticcioni, Coe, Bleichwehl, Cline and Thoms took Williams from the backyard toward North Buffum Street, Williams repeatedly went limp and he would periodically drag his feet. When Williams went limp, Ticcioni and Coe would drag Williams and told him to "Quit playing games. Walk. Keep walking." (Elson Dec. Ex. 10 – Coe Dep., p. 103; Elson Dec. Ex. 7 – Bleichwehl Dep., pp. 178-179, 183).

58.     Williams said he could not breathe while he was being dragged out of the yard. (Elson Dec. Ex. 24 – Teirra Giles Declaration).

59.     As Ticcioni and Coe walked and dragged Williams to the front of 2752 North Buffum, a for-sale sign in the front yard of the house blocked their path to the street. (Elson Dec. Ex. 9 – Ticcioni Dep., p. 175).

60.     Coe let go of Williams' arm to move the for-sale sign. When he did so, Williams fell face forward onto the ground. (Elson Dec. Ex. 9 – Ticcioni Dep., pp. 179-180).

61.     Ticcioni and Coe pulled Williams back onto his feet by his arms and dragged him through the gate in front of the house and down the sidewalk toward the squad car. As the officers were dragging Williams through the gate, his body was limp, his head was drooping down and "he looked like he was already dead," according to Sharon Austin, one of the neighborhood residents who witnessed the events. (Elson Dec. Ex. 9 – Ticcioni Dep., p. 182; Elson Dec. Ex. 25 – Sharon Austin Declaration).

62.     As Ticcioni and Coe dragged Williams through the gate and the rest of the way to the squad car, Williams "kept saying, I swear to God I can't breathe" in "a loud voice" and the officers responded by "cursing at him." (Elson Dec. Ex. 21 – Terrance Giles Inquest Testimony, p. 82; Elson Dec. Ex. 27 – Lachelle Brown Inquest Testimony, pp. 13, 18-19).

63. Citizen witness Lachelle Brown, who lived at 2736 North Buffum, called 911 when she saw and heard Williams "hollering" that "he couldn't breathe" and "asking for help" but was told that since there was an officer on the scene, they could not come out until the officer called them for assistance. (Elson Dec. Ex. 27 – Lachelle Brown Inquest Testimony, pp. 9, 13-14).

64. Defendants Ticcioni, Coe and Bleichwehl claim that they "don't remember" if Williams said he couldn't breathe during the walk from the backyard to the squad car. (Elson Dec. Ex. 9 – Ticcioni Dep., pp. 174-175, 181; Elson Dec. Ex. 10 – Coe Dep., p. 110; Elson Dec. Ex. 7 – Bleichwehl Dep., p. 184).

65. Williams did not respond to Ticcioni's commands to get in the squad car, so the officers threw him in. (Elson Dec. Ex. 14 – O'Day Interview of Ticcioni; Elson Dec. Ex. 28 – O'Day Memo Book; Elson Dec. Ex. 9 – Ticcioni Dep., pp. 188-189; Elson Dec. Ex. 21 – Terrance Giles Inquest Testimony, pp. 84-85; Elson Dec. Ex. 27 – Lachelle Brown Inquest Testimony, pp. 13, 19).

66. There were seven to ten other officers, including Defendants Cline and Kaul, near the squad car when Williams was thrown inside. (Elson Dec. Ex. 10 – Coe Dep., p. 123; Elson Dec. Ex. 6 – Cline Dep., pp. 157-158. 160-161; Elson Dec. Ex. 29 – Squad Car Video (Front View)).

67. None of the officers who had heard and seen Williams' condition communicated what they saw or heard to Cline. (Elson Dec. Ex. 9 – Ticcioni Dep., p. 191; Elson Dec. Ex. 10 – Coe Dep., p. 142; Elson Dec. Ex. 6 – Cline Dep., p. 178).

**In The Squad Car**

68.     Defendant Cline was seated in the driver's seat of the squad car and activated the in-squad video at about 12:47:40 a.m., almost immediately after Williams was secured in the back of the squad car. (Elson Dec. Ex. 6 – Cline Dep., pp. 167-169; Elson Dec. Ex. 30 – 10/4/12 Memo From Lt. Morales to Captain Rowe; Elson Dec. Ex. 29 – Squad Car Video).

69.     As soon as Williams entered the squad car, he began to rock back and forth and side to side and was moving his mouth as if he is talking or crying out. (Elson Dec. Ex. 6 – Cline Dep., pp. 173-174; Elson Dec. Ex. 29 – Squad Car Video).

70.     Defendant Cline was aware that Williams was squirming around and moving. (Elson Dec. Ex. 6 – Cline Dep., p. 173).

71.     The audio does not start until 30 seconds after the video was activated. However Plaintiffs' expert Consuelo Gonzalez, a professional lip reader, has opined that at 12:47:49, Williams said, "I'm gonna die..." (Elson Dec. Ex. 6 – Cline Dep., pp. 168-169; Elson Dec. Ex. 31 – Gonzalez Expert Report).

72.     When the audio starts at 12:48:21 a.m., Williams can be heard saying, "I'm not playing." Ten seconds later, at 12:48:31 a.m., Defendant Cline asked Williams, "What's your last name?" and, at 12:48:32 a.m., Williams responded, "I can't breathe." Cline then dismissively told Williams, "You're breathing just fine." Williams made the statement – "I can't breathe" – 52 seconds after the video starts and 11 seconds after the audio starts. (Elson Dec. Ex. 29 – Squad Car Video; Elson Dec. Ex. 30 – 10/4/12 Memo From Lt. Morales to Captain Rowe).

73.     Defendant Cline denies that Williams complained of not being able to breathe during the first 30 seconds of the video when there is no audio. (Elson Dec. Ex. 6 – Cline Dep., p. 175).

74.     Over the next minute, Williams continued to repeatedly state that he could not breathe and Defendant Cline continued to ask for Williams' last name and told Williams that he was "just playing games." (Elson Dec. Ex. 29 – Squad Car Video; Elson Dec. Ex. 30 – 10/4/12 Memo From Lt. Morales to Captain Rowe).

75.     At 12:49:18, Williams said "I'm dying." (Elson Dec. Ex. 31 – Squad Car Video).

76.     Directly thereafter, for the next two minutes, Williams continued to rock back and forth and side to side and was moaning. (Elson Dec. Ex. 29 – Squad Car Video; Elson Dec. Ex. 30 – 10/4/12 Memo From Lt. Morales to Captain Rowe).

77.     At 12:51:53 a.m., Williams stated, "Put the window down. Please sir, I can't breathe." Defendant Cline responded "I've already asked, I've already done what you asked, and you won't even give me the common courtesy in cooperating with me and giving me your current information. I had to get it from somebody else." (Elson Dec. Ex. 29 – Squad Car Video; Elson Dec. Ex. 30 – 10/4/12 Memo From Lt. Morales to Captain Rowe).

78.     Over the subsequent two minutes, Williams continued to repeatedly state that he could not breathe, begged for help, and rocked back and forth and side to side. (Elson Dec. Ex. 29 – Squad Car Video; Elson Dec. Ex. 30 – 10/4/12 Memo From Lt. Morales to Captain Rowe).

79.     Sharon Austin, who was standing outside her house at 2769 North Buffum Street, could hear Mr. Williams "yelling that he could not breathe" while he was in the squad car. (Elson Dec. Ex. 25 – Sharon Austin Declaration).

80.     At 12:53:07, Mr. Williams again said "I'm dying." (Elson Dec. Ex. 29 – Squad Car Video; Elson Dec. Ex. 12 – Kaul Dep., p. 165).

81.     During this time period, Defendants Ticcioni and Bleichwehl were standing beside the squad car and Ticcioni observed Williams in the back seat rocking back and forth and

side to side and heard Williams say that he could not breathe. (Elson Dec. Ex. 9 – Ticcioni Dep., pp. 222-223; 228-233; Elson Dec. Ex. 29 – Squad Car Video).

82.    At 12:53:30 a.m., in the presence of Cline, Ticcioni and Bleichwehl, Williams stated, "Please, I want an ambulance." (Elson Dec. Ex. 29 – Squad Car Video; Elson Dec. Ex. 30 – 10/4/12 Memo From Lt. Morales to Captain Rowe; Elson Dec. Ex. 6 – Cline Dep., p. 213-214).

83.    While Cline was in the car, Williams' girlfriend, Sharday Rose, walked down Buffum Street to the squad car, heard Williams' voice saying he could not breathe and approached the squad car. Cline got out of the squad and talked to her briefly. (Elson Dec. Ex. 3 – Rose Dep., pp. 64, 71, 79; Elson Dec. Ex. 32 – 6/9/15 Cline Dep., p. 133).

84.    During the entire time that Defendant Cline was in the squad car with Williams listening to him repeatedly state he could not breathe, he did not request medical help for, or provide or procure any assistance to, Williams. He did not turn around to look at Williams, or push a button on the computer in front of him so that he could observe how Williams was acting. (Elson Dec. Ex. 29 – Squad Car Video; Elson Dec. Ex. 6 – Cline Dep., pp. 189-190).

85.    At approximately 12:54 a.m., Defendant Cline exited the squad car and Defendant Bleichwehl entered and sat in the driver seat. Defendant Cline told Defendant Bleichwehl certain basic information about Williams. Ticcioni was also at the squad car at this time and participated in this conversation. (Elson Dec. Ex. 29 – Squad Car Video; Elson Dec. Ex. 6 – Cline Dep., pp. 215-216).

86.    At this time, Williams was rocking back and forth and making incoherent statements, but Bleichwehl did not ask, and Cline did not offer, any information about Williams' medical condition or his numerous complaints that he could not breathe. (Elson Dec. Ex. 29 –

Squad Car Video; Elson Dec. Ex. 6 – Cline Dep., pp. 215-216; Elson Dec. Ex. 7 – Bleichwehl Dep., pp. 224-225, 232-234).

87.     At 12:54:18 a.m., Defendant Bleichwehl asked Williams, "Sir, what's your name?" (Elson Dec. Ex. 29 – Squad Car Video; Elson Dec. Ex. 30 – 10/4/12 Memo From Lt. Morales to Captain Rowe).

88.     By this point, Williams had slumped over onto the seat and did not respond. (Elson Dec. Ex. 29 – Squad Car Video; Elson Dec. Ex. 30 – 10/4/12 Memo From Lt. Morales to Captain Rowe).

89.     Williams' last movement was a slight motion of his right arm at 12:55:27 a.m. (Elson Dec. Ex. 29 – Squad Car Video; Elson Dec. Ex. 30 – 10/4/12 Memo From Lt. Morales to Captain Rowe).

90.     Defendant Bleichwehl sat in the driver's seat for at least thirty seconds after Williams' last movement before he looked over his shoulder for the first time and saw Williams lying motionless in the backseat. Like Cline, he never activated the computer to observe Williams in real time. (Elson Dec. Ex. 7 – Bleichwehl Dep., pp. 257-260, 264; Elson Dec. Ex. 29 – Squad Car Video; Elson Dec. Ex. 30 – 10/4/12 Memo From Lt. Morales to Captain Rowe).

91.     Defendant Bleichwehl then exited the squad car, opened the rear driver's side door, checked Williams' neck for a pulse, and was unable to feel one, and checked if Williams was breathing and he was not. (Elson Dec. Ex. 7 – Bleichwehl Dep., pp. 269, 272-273; Elson Dec. Ex. 29 – Squad Car Video).

92.     Defendant Bleichwehl says that he did not conclude that Williams was in a very serious medical condition at that point. He thought he might still be acting uncooperative. (Elson Dec. Ex. 7 – Bleichwehl Dep., p. 279).

93.     Defendant Bleichwehl then closed the driver's side door, walked to the passenger side door, pulled Williams up by his shoulder to a seated position, and again checked for a pulse and was again unable to feel one. (Elson Dec. Ex. 7 – Bleichwehl Dep., p. 280; Elson Dec. Ex. 29 – Squad Car Video; Elson Dec. Ex. 30 – 10/4/12 Memo From Lt. Morales to Captain Rowe).

94.     Despite Defendant Bleichwehl's observations that Williams was motionless, non-responsive and without a pulse, he did not call for medical assistance. (Elson Dec. Ex. 29 – Squad Car Video; Elson Dec. Ex. 7 – Bleichwehl Dep., pp. 269, 274, 278-280).

95.     Instead, he left Williams in a seated position, walked to another police car, and tapped on the window. (Elson Dec. Ex. 7 – Bleichwehl Dep., p. 281; Elson Dec. Ex. 29 – Squad Car Video; Elson Dec. Ex. 30 – 10/4/12 Memo From Lt. Morales to Captain Rowe).

96.     Defendant Bleichwehl then walked back to Defendant Cline's squad car, removed Williams from the squad car and called over the radio for assistance from other officers. (Elson Dec. Ex. 7 – Bleichwehl Dep., pp. 280-283; Elson Dec. Ex. 29 – Squad Car Video; Elson Dec. Ex. 30 – 10/4/12 Memo From Lt. Morales to Captain Rowe).

97.     Officer Chad Boyack responded and requested medical help over his radio at 12:59 a.m., approximately fifteen minutes after Williams was taken into custody and first complained that he could not breathe, twelve minutes after Williams was placed in the squad car and approximately three minutes after Defendant Bleichwehl observed Williams motionless in the backseat. (Elson Dec. Ex. 33 – Boyack Dep., pp. 118, 120; Elson Dec. Ex. 7 – Bleichwehl Dep., pp. 260, 269; Elson Dec. Ex. 29 – Squad Car Video; Elson Dec. Ex. 30 – 10/4/12 Memo From Lt. Morales to Captain Rowe).

98.     Bleichwehl did not start CPR right away because he could not find a mask, but he eventually found some type of plastic bag which he used as a barrier in between his mouth and Williams' mouth and began CPR. (Elson Dec. Ex. 33 – Boyack Dep., pp. 118-119).

99.     When Milwaukee Fire Department paramedics arrived at approximately 1:08 a.m., Williams did not have a pulse and was not breathing. At 1:41 a.m., Williams was pronounced dead, and life-saving efforts were discontinued. (Elson Dec. Ex. 34 – Arps Inquest Testimony, pp. 25, 39-40).

### Autopsy and Medical Evidence

100.    The first Autopsy Protocol, signed on August 30, 2011 by Milwaukee County Assistant Medical Examiner Dr. Christopher Poulos, reported the cause of death to be sickle cell crisis due to sickle cell trait, and the manner of death to be natural. (Elson Dec. Ex. 35 – Poulos Inquest Testimony, pp. 34-35; Elson Dec. Ex. 36 – 8/30/11 Autopsy Protocol).

101.    The second Autopsy Protocol, signed on September 17 and 18 of 2012, respectively, by Milwaukee County Medical Examiner Dr. Brian Peterson and Milwaukee County Assistant Medical Examiner Dr. Christopher Poulos, reported the cause of death to be sickle cell crisis due to flight from, and altercation with, police, and the manner of death to be homicide. (Elson Dec. Ex. 35 – Poulos Inquest Testimony, pp. 20-21; Elson Dec. Ex. 37 – Peterson Inquest Testimony, pp. 82, 93-94, 99; Elson Dec. Ex. 38 – 9/17/12 Autopsy Protocol).

102.    The only changes from the first Autopsy Protocol to the second were the organization (such as putting all of the blunt force trauma into a section so titled) and the manner of death (from natural to homicide). (Elson Dec. Ex. 37 – Peterson Inquest Testimony, pp. 81-82, 95-96; Elson Dec. Ex. 39 – Peterson Dep., pp. 31-32).

103.    Marijuana usage has no impact or significance relative to triggering sickle cell

crisis. (Elson Dec. Ex. 39 – Peterson Dep., p. 29).

104. Williams appeared normal prior to leaving Sharday Rose's house on the night of July 5. He did not appear to be tired or ill or on any kind of drugs. (Elson Dec. Ex. 3 – Rose Dep., pp. 52-53, 120-121).

105. Both Autopsy Protocols report the same evidence of blunt force injuries to Derek Williams' head, neck, torso and extremities, which were photographed during the autopsy. (Elson Dec. Ex. 35 – Poulos Inquest Testimony, pp. 30-31, 87-101; Elson Dec. Ex. 38 – 9/17/12 Autopsy Protocol, pp. 1, 4-5; Elson Dec. Ex. 39 – Peterson Dep., pp. 44-62).

106. The injuries Dr. Poulos noted on internal examination included bruises on Williams' back which were consistent with a police officer putting his knee on that part of Williams' back while Williams lay face down. (Elson Dec. Ex. 35 – Poulos Inquest Testimony, pp. 99-101; Elson Dec. Ex. 39 – Peterson Dep., p. 105).

107. Drs. Poulos and Peterson opined that the cause of death was sickle cell crisis based on their examination of microscopic slides created from Williams' tissue harvested during the autopsy, their assertion that they saw numerous vessels in the lungs and other areas of body that were distended by clumps or thrombi of sickled cells, and their determination that the sickling was an ante-mortem process. (Elson Dec. Ex. 35 – Poulos Inquest Testimony, pp. 110-111, following day 39-43; Elson Dec. Ex. 37 – Peterson Inquest Testimony, pp. 72-73, 76, 126, 128; Elson Dec. Ex. 39 – Peterson Dep., pp. 71-73, 85-86).

108. Dr. Alice Briones, a deputy medical examiner with the U.S. Armed Forces Medical Examiner System, reviewed the Milwaukee County Medical Examiner's autopsy reports of Derek Williams at the request of the FBI, including the microscopic slides, the squad car video and other materials, and, after conferring with nine or ten of her fellow USAF medical

examiners, disagreed with the Milwaukee County Medical examiners' opinions regarding cause and manner of death, concluding rather, that, while sickle cell trait should be considered as a contributing factor, the cause and manner of death were undetermined, based in part on the inability to pinpoint the exact cause of the dysmorphic (sickled) cells, the lack of thrombi with fibrin strands, and the inability to determine whether the sickling is an ante-mortem process. (Elson Dec. Ex. 40 – Briones Inquest Testimony, pp. 5, 9, 12-13, 15-18, 25-33, 38-41, 43-44; Elson Dec. Ex. 41 – Briones Case Consultation Report; Elson Dec. Ex. 42 – Dr. Trevonne Thompson Expert Report).

109.    The paramedics' initial contact with Williams was at 1:08 a.m., at which time they found he had no pulse and was not breathing. (Elson Dec. Ex. 34 – Arps Inquest Testimony, p. 25).

110.    While paramedics attended to Mr. Williams at the scene, he never had a pulse, there was never any indication his heart was beating, and there was never any improvement in his condition. (Elson Dec. Ex. 34 – Arps Inquest Testimony, p. 36).

111.    If the paramedics had been called in time to treat Mr. Williams when he was in the condition he was in about two minutes into the video of him in the back of the squad car, they would have had a lot of treatment options that were not available to them once he had no pulse and was not breathing, including asking him what was wrong, if it was just the breathing that was a problem; if he was in pain; getting his vital signs; checking the oxygen level in his blood; checking his breathing sounds; and transporting him to the hospital. (Elson Dec. Ex. 34 – Arps Inquest Testimony, pp. 50, 52-54).

112.    Paramedical professionals are trained to assess prehospital medical emergencies and to rapidly assess and initially treat a broad range of emergency conditions, with a practice

that includes: obtaining a focused history of events leading to an incident requiring medical intervention; performing a focused physical examination; providing life-saving interventions in critical illnesses and injuries before and during transport to an emergency department; providing temporizing interventions before and during transport to an emergency department; conferring via telephone or radio with an emergency physician while on the scene or during transport; and providing a report of the prehospital care to the emergency physicians and the emergency department team during the transition of care. (Elson Dec. Ex. 42 – Dr. Thompson Expert Report).

113.    If the paramedics had known Williams had sickle cell trait, it would have made no difference in the treatment. (Elson Dec. Ex. 34 – Arps Inquest Testimony, pp. 46-47).

114.    Regardless of the actual cause of Williams' death, had medical attention been provided to him prior to his loss of consciousness while in police custody, it is highly likely that he would not have died. (Elson Dec. Ex. 42 – Dr. Thompson Expert Report).

115.    Patients who present to the emergency department alive tend to stay alive, regardless of the condition that resulted in the emergency, given that one of the hallmarks of care delivered in the emergency department is attention to the stabilization of life-threatening conditions, even when the exact cause of the condition is unknown, thus expanding time to allow for further intervention, diagnostic testing, and definitive management, resulting in an overall mortality rate (of patients with medical emergencies who present to the emergency department alive (i.e., with measurable vital signs such as respiratory rate, blood pressure, and heart rate)) of less than 1%. (Elson Dec. Ex. 42 – Dr. Thompson Expert Report).

116.    Had Williams arrived to the emergency department alive, he would have likely survived the emergency department visit. (Elson Dec. Ex. 42 – Dr. Thompson Expert Report).

## Policies and Practices of the Milwaukee Police Department

117.    One of the reasons that the Defendants did not seek immediate medical treatment for Derek Williams  despite his repeated pleas that he could not breathe, and his obvious physical distress, was in conformance with MPD training at the time, both in the academy and on the job, that "if you can talk you can breathe." (Elson Dec. Ex. 7 – Bleichwehl Dep., p. 54; Elson Dec. Ex. 33 – Boyack Dep., p. 25; Elson Dec. Ex. 6 – Cline Dep., p. 50; Elson Dec. Ex. 12 – Kaul Dep., pp. 17, 156, 159, 166; Elson Dec. Ex. 11 – Thiel Dep., pp. 23-24; Elson Dec. Ex. 4 – Thoms Dep., p. 14, 99; Elson Dec. Ex. 9 – Ticcioni Dep., pp. 29-30, 214; Elson Dec. Ex. 43 – Rupert Reilly Inquest Testimony, pp. 117-118).

118.    Beyond CPR training and "if you can talk you can breathe" training, there was no additional training concerning recognizing or dealing with medical emergencies that were connected to breathing complaints made by persons in MPD custody. (Elson Dec. Ex. 9 – Ticcioni Dep., p. 27; Elson Dec. Ex. 6 – Cline Dep., p. 26; (Elson Dec. Ex. 7 – Bleichwehl Dep., p. 52; Elson Dec. Ex. 12 – Kaul Dep., p. 16; Elson Dec. Ex. 10 – Coe Dep., p. 39).

119.    According to MPD Sergeant Rupert Reilly, an instructor in the police academy and a certified EMT, the phrase "if you can talk you can breathe" is "not correct" because "it's all in the quality of breathing. Just because I can produce a sound doesn't mean that I have good function of breathing." (Elson Dec. Ex. 43 – Reilly Inquest Testimony, pp. 115, 117-119).

120.    At least by 2009, the Milwaukee Fire Department had determined that "if you can talk you can breathe" was "not correct" and Sergeant Reilly was aware of this change in approach because the MFD taught it in its EMT basic training. (Elson Dec. Ex. 43 – Reilly Inquest Testimony, p. 119).

121.    Prior to the death of Derek Williams, the MPD provided no training on how to

evaluate the credibility of a medical complaint where there was not an obvious trauma or injury. (Elson Dec. Ex. 43 – Reilly Inquest Testimony, pp. 111-112, 114-115).

122.    Prior to the death of Derek Williams, the MPD had no rules, regulations, or Standard Operating Procedures that set forth under what circumstances an officer should seek immediate medical assistance for a suspect who was complaining of, or experiencing breathing problems. (Elson Dec. Ex. 9 – Ticcioni Dep., p. 27; Elson Dec. Ex. 23 – Kuspa Dep., p. 48).

123.    On September 13, 2010, a suspect named James Perry died in MPD custody. After being arrested by Milwaukee police officers, Perry, who was an epileptic, had a seizure in a police holding cell and struck his head on the concrete floor. Police took Perry to the hospital, where he suffered at least two more seizures. After receiving anti-seizure medication, Perry was discharged from the hospital and brought back to the police lockup. His condition deteriorated in the police lockup, he lost control of his bladder and bowels, began spitting into his own lap and became uncooperative. Officers covered Perry's head with a spit mask. On a surveillance video, Perry can be heard moaning and begging for help and complaining that he cannot breathe. An officer replies, "Yes, you can. You're talking, you're breathing." Officers carried Perry, who was handcuffed and shackled, to a holding cell and left him there with the spit mask still covering his face. Perry was then transported to the County Jail in a police wagon. After he arrived, a nurse removed the spit mask, frothy blood was coming from Perry's nose and he had no pulse. (Elson Dec. Ex. 44 – MPD Police Reports Incident Number 102560219; video and audio of James Perry in custody (https://www.youtube.com/watch?v=hGga1pb0UhA0); Elson Dec. Ex. 45 – Meghan Dwyer and Stephen Davis, "'Well, they sure screwed up here:' Appeals judges grill Milwaukee police, sheriff about inmate death", https://www.fox6now.com.).

124. Chief Flynn and his senior staff were informed of the facts of the Perry case shortly after his death, and discussed the facts of the case, yet did not alter or amend the MPD's training, orders, rules, or regulations during the subsequent 10 months after Perry's death and before Derek Williams' death. (Elson Dec. Ex. 46 – Flynn Dep., pp. 18-21, 22-26).

125. The PPD of the MPD investigated the Perry death in custody, found there to be no misconduct or rule violations, and, after being briefed on that investigation and findings, Chief Flynn concurred. (Elson Dec. Ex. 46 – Flynn Dep., pp. 23-24).

126. Chief Flynn was briefed on the facts surrounding the death of Derek Williams on the morning of July 6, 2011, approved of a press release that went out that stated that there was a police video of the incident,  Chief Flynn viewed the Williams video "in the next few days," and "certainly discussed it with senior command staff.  (Elson Dec. Ex. 46 – Flynn Dep., pp. 29-34; Elson Dec. Ex. 47 – Flynn Dep. Exhibit 1 (7/11/15 "Robbery Suspect dies in police custody", Milwaukee Journal Sentinel)).

127. Flynn and his staff determined that, although the video was "disturbing," and Flynn later said it was "horrifying," and "clearly distressing," the officers "did not perceive [Derek Williams] to be in medical distress," because, "although anyone viewing the video, i.e., seeing him, would draw a different conclusion than anyone who simply heard him," the officers "were not seeing what we saw, they were hearing him." (Elson Dec. Ex. 46 – Flynn Dep., pp. 33-35, 37-38; 80; Elson Dec. Ex. 47 – Flynn Dep. Exhibit 1 (7/11/15 "Robbery Suspect dies in police custody", Milwaukee Journal Sentinel)).

128. In fact, the video could have been watched in real time by the officers in the front of the squad car by simply pushing a button to switch computer screens, but Flynn professed at

his deposition not to know that basic fact then or now. (Elson Dec. Ex. 6 – Cline Dep., pp. 189-190; Elson Dec. Ex. 46 – Flynn Dep., pp. 37-38).

129. MPD Standard Operating Procedure 090.10 Physical Restraint of Prisoners, which was in effect at the time of the incident, included the following provisions:

(1) Anyone in custody and not confined to a cell shall be constantly monitored.

(2) Members shall remain cognizant of any changes in the condition of an arrestee that would require medical treatment. If medical treatment becomes necessary, members shall immediately request medical assistance by telephone or radio. It cannot be overemphasized that members shall continuously monitor and remain cognizant of a person in custody, especially when he/she is in restraints. The arrestee may encounter immediate or delayed physical reactions that may be triggered by the change in physical or environmental factors. Therefore caution and awareness on the part of the officer is constantly required.

(Elson Dec. Ex. 12 – Kaul Dep., pp. 30-34; Elson Dec. Ex. 48 – Kaul Dep. Exhibit 2 (MPD SOP 090-Prisoners)).

130. According to MPD Sergeant Rupert Reilly, an instructor in the training academy, officers are taught that if a suspect is in custody "they need to be consistently monitored," and that if someone is in the back of a squad car in handcuffs, an officer must have "visual and audible contact with the subject" to "satisfy the need for monitoring." (Elson Dec. Ex. 43 – Reilly Inquest Testimony, pp. 120-121).

131. Chief Flynn, while admitting that no officer looked at Derek Williams for the entire eight minutes he was in the squad car, concluded, and continues to maintain, that the requirement of SOP 090.10 to constantly monitor was not violated in the Derek Williams case. (Elson Dec. Ex. 46 – Flynn Dep., pp. 41-44).

132. As the two supervisors on the scene, Sergeants Thiel and Kaul had authority over, and were responsible for, all of the other officers on the scene and were ultimately responsible

for Williams' well-being while in custody, including while he was in Cline's squad car. (Elson Dec. Ex. 12 – Kaul Dep., pp. 59, 145, 154-55).

133.    Defendant Kaul claims that he did not closely monitor the handcuffing of Williams because Ticcioni and Coe were "handling him." Because Williams was "already being dealt with," Kaul claims that his focus was trying to find a weapon. Defendant Thiel claims that after he knew Williams was in handcuffs, his attention was not really focused on him and instead he was trying to determine Williams' flight path and to think about scene management. (Elson Dec. Ex. 12 – Kaul Dep., pp. 95, 97; Elson Dec. Ex. 11 – Thiel Dep., pp. 67, 76).

134.    Defendant Kaul claims that he stayed in the backyard looking for evidence instead of monitoring Williams as he was taken out of the yard to the squad car, and that he lost sight and stopped paying attention to Williams as he was walked around the corner of the house. Thiel claims that after speaking to Kaul, he walked out of the backyard toward Buffum Street and then left the area to find the victims of the attempted robbery. Defendant Kuspa testified that after he heard Williams say he could not breathe, that it was a supervisor's responsibility to decide whether to seek medical assistance. (Elson Dec. Ex. 12 – Kaul Dep., pp. 103, 105-06; Elson Dec. Ex. 11 – Thiel Dep., pp. 103, 105; Elson Dec. Ex. 23 – Kuspa Dep., p. 118).

135.    Neither Thiel nor Kaul made any attempt to observe Williams while he was in the backseat of Cline's squad car, although the video shows a sergeant, who at least one witness has identified as Kaul, passing directly in front of the squad car while Derek Williams was writhing and crying out for help. (Elson Dec. Ex. 29 – Squad Car Video; Elson Dec. Ex. 12 – Kaul Dep., pp. 138, 149, 167; Elson Dec. Ex. 11 – Thiel Dep., p. 150; Elson Dec. Ex. 6 – Cline Dep., p. 161).

136.     MPD detectives who responded to the scene of the Williams death and took official statements did not interview Thiel or Kaul, neither Thiel nor Kaul made out any police reports concerning the incident, and they were absolved of any responsibility by the MPD's Critical Incident Review Board. (Elson Dec. Ex. 12 – Kaul Dep., pp. 118, 120; Elson Dec. Ex. 11 – Thiel Dep., p. 136; Elson Dec. Ex. 49 – Hensley Incident Report; Elson Dec. Ex. 50 – Flynn Dep., Exhibit 11 (9/23/13 MPD Memo Critical Incident Review 12-01), pp. 1-3).

137.     The detectives who responded to the scene of the Williams death and took official statements never asked Defendant Cline, nor did he volunteer, that he was the officer sitting in the squad car for the first six minutes on the video. (Elson Dec. Ex. 49 – Hensley Incident Report; Elson Dec. Ex. 51 – Sarenac Incident Report).

138.     The detective who responded to the scene of the Williams death and interviewed Defendant Ticcioni allowed Ticcioni to review and edit the detective's report of the interview. (Elson Dec. Ex. 52 – O'Day Memo to John Franke).

139.     The MPD's internal PPD investigation of Derek Williams' death did not identify Defendant Cline as one of the subjects of the investigation, and much later one of its investigators conducted a very brief interview of Cline during which he was only asked three questions about what happened in the squad car while he was present; additionally the PPD did not interview the supervising sergeants who were on the scene. (Elson Dec. Ex. 46 – Flynn Dep., pp. 178-188).

140.     Chief Flynn concluded that the investigation was "thorough and complete," a conclusion that he repeated in an affidavit that was drafted by his lawyer and submitted in support of the Defendants' Motion for Summary Judgment. (Elson Dec. Ex. 46 – Flynn Dep., pp. 175-177, 180-188).

141.    Chief Flynn and the MPD did not publicly release the video until September of 2012—14 ½ months after Derek Williams' death—despite repeated formal requests from the Williams' family lawyer and the Milwaukee Journal Sentinel to do so. (Elson Dec. Ex. 46 – Flynn Dep., pp. 45-48).

142.    By April of 2012 the PPD had closed its criminal and administrative investigations into the death of Derek Williams with findings that no misconduct or rule violations occurred, and Chief Flynn, concurred in those decisions. (Elson Dec. Ex. 46 – Flynn Dep., pp. 57-58; 76-77; Elson Dec. Ex. 53 – PPD Investigative Memo).

143.    At the time he concurred, Chief Flynn had viewed the video on at least one occasion, knew that there was an audio police tape that revealed that Williams had previously said at the time of his arrest on at least two occasions that he could not breathe, had again said he could not breathe on the way to the squad car, that he had also gone limp, and that a sergeant had performed a sternum rub. (Elson Dec. Ex. 46 – Flynn Dep., pp. 57-60, 69-70).

144.    Chief Flynn also concluded that the failure of the Defendant officers at the scene to communicate to the officers at the squad car what they heard and observed about Derek Williams' condition was not a violation of the MPD's SOP. (Elson Dec. Ex. 46 – Flynn Dep., pp. 71-72).

145.    Chief Flynn also concluded that the failure of Defendant Cline to communicate to Defendant Bleichwehl what he had heard Derek Williams saying and doing in the squad car was not a violation of the MPD's SOP. (Elson Dec. Ex. 46 – Flynn Dep., pp. 73-74).

146.    In July of 2012, the Milwaukee Fire and Police Commission, after evaluating the Williams case, recommended, *inter alia,* that "the MPD should examine whether changes in

officer training could be implemented." (Elson Dec. Ex. 46 – Flynn Dep., p. 82; Elson Dec. Ex. 54 – Flynn Dep. Exhibit 2 (6/27/12 FPC Public Statement Regarding Williams Death)).

147.    On September 18, 2012, the MPD released the Derek Williams video to the Milwaukee Journal Sentinel, which posted it online on September 22, 2012. (Elson Dec. Ex. 46 – Flynn Dep., pp. 84-85; Elson Dec. Ex. 55 – Flynn Dep. Exhibit 3 (9/22/12 "Medical examiner revises suspect's death ruling to homicide", Milwaukee Journal Sentinel)).

148.    On September 26, 2012, Chief Flynn, in what was billed as an "exclusive," told Fox News that the officers "made an error in judgment" and that "we . . . take responsibility for not reacting more rapidly to [Derek Williams'] medical crisis." (Elson Dec. Ex. 46 – Flynn Dep., pp. 86-88; Elson Dec. Ex. 56 – Flynn Dep. Exhibit 4 (9/26/12 "EXCLUSIVE: Chief Ed Flynn discusses Derek Williams' investigation Fox 6 Now)).

149.    Also on September 26, 2012, more than a year after Derek Williams' death, Chief Flynn issued a memorandum to all MPD Department members directing, in response to the Derek Williams case, an interim change in policy saying that "effective immediately, any Department personnel having contact with a person in medical distress shall immediately activate the Emergency Medical System (EMS) which includes calling for an ambulance and rendering first aid until relieved by responding medical personnel. Medical distress will include, but not be limited to, situations where a person is unconscious, has no pulse, *has difficulty breathing*, complains of moderate to severe pain, has moderate to severe bleeding, or is incoherent." (Elson Dec. Ex. 46 – Flynn Dep., pp. 89-91; Elson Dec. Ex. 57 – Flynn Dep. Exhibit 5 (9/26/12 MPD Memo Re: Medical Aid)).

150.    Contemporaneously, a training video was shown at all MPD roll calls on which an MPD Lieutenant of the Training Academy instructed, inter alia, as follows:

> We have also been taught the concept that if they are talking they are breathing. This concept should not be used to determine if an individual is breathing properly and it does not relieve you from your responsibility to continuously monitor a prisoner who appears to be having difficulty in breathing. In other words, just because someone is talking and breathing does not mean that they are breathing properly. . . Whenever a prisoner appears to be having difficulty in breathing or complains of having difficulty in breathing, officers shall call for emergency medical services, continue to monitor the prisoner, and render first aid if the need arises.

(Elson Dec. Ex. 58 – MPD Training Video; Elson Dec. Ex. 47 – Flynn Dep., pp. 92-95, 119-120; Elson Dec. Ex. 59 – Flynn Dep. Exhibit 6 (9/26/12 Email from Pamela Holmes)).

151.     On October 9, 2012, Chief Flynn appeared at a press conference dealing with the announcement of charges in the strip search and body cavity search cases and made, *inter alia*, the following statement concerning the District Five Later Power shift officers that included Defendants Cline, Bleichwehl, Kuspa and Thoms:

> I'm disgusted by the willful actions of some of the officers in our police department and I'm appalled by the willful inaction of some other officers in our department for failing to stop egregious conduct.

(Elson Dec. Ex. 46 – Flynn Dep., pp. 96-99; Elson Dec. Ex. 60 – Flynn Dep. Exhibit 7 (Transcript of 10/9/12 Press Conference Held by Chisholm and Flynn)).

152.     In March of 2012, when the strip search scandal first came to public light, Chief Flynn stated that the issue of conducting illegal strip searches and body cavity searches was "a serious, serious, training issue" and that fact was reaffirmed by several District Five Power Shift officers. (Elson Dec. Group Ex. 61 – *State v. Vagnini*, 2012 CF 004984, Sentencing Hearing Transcript; *State v. Knight*, 12 CF 4987, Sentencing Hearing Transcript; 6/13/13 Letter from Paul Martinez to Judge Jeffrey Wagner).

153.     On October 9, 2012, Chief Flynn told Bruce Murphy of Urban Milwaukee, *inter alia*, the following related to the death of Derek Williams:

- "And what the public sees they're understandably horrified by what happened to him and how he was allowed to suffer."
- "Certainly it looks callous and uncaring."
- "You look at the tape and a strong case can be made for quicker action by the officers."
- The officers made an "error in judgment."
- "From now on," "police must call for an ambulance anytime a suspect complains he can't breathe."

(Elson Dec. Ex. 46 – Flynn Dep., pp. 100-103; Elson Dec. Ex. 62 – Flynn Dep. Exhibit 8

(10/9/12 "The public is 'understandably horrified'", Urban Milwaukee)).

154.    At an October 18, 2012 Fire and Police Commission hearing, Chief Flynn made the following statements:

- It's clear to us that having examined what was brought to our attention, the officers did not appropriately respond to or diagnose what was a pre-existing medical condition. They responded conventionally to someone who they perceived as complaining but was otherwise in good health.
- This was an event clearly they did not recognize and clearly did not believe what they were being told,  therefore what we have done in the short-term is create a policy that says removing the discretion of the officer in determining whether someone is having difficulty breathing or not.
- We weren't prepared. We didn't get it right. So our first step is to remove the discretion. Don't assume, call an ambulance. So it's in writing now.
- I've also changed the training specifically to recognize this particular possibility of this particular medical condition. The recruits that are currently in service are receiving a medical training to recognize respiratory distress, that's now been added. It's a separate stand-below component of the CPR training. We're also adding into our in-service training as well, that officers recognize that respiratory distress can occur in their custody, that it's not going to necessarily present as someone who has stopped breathing or passed out, and may well present as somebody who's talking in a normal tone of voice but is nonetheless having difficulty, in fact, breathing.  Don't wait for them to collapse.
- And the challenge is to intervene more quickly and to recognize that, like I said, respiratory distress can present itself in several guises and that we need to err on the side of caution going forward. So in any rate, you know, we are recognizing the shortcomings of this incident in terms of the department's obligation to learn from incidents and do the best it can in terms of policy,

procedure, and training to make sure that a similar incident doesn't arise again in the future.

(Elson Dec. Ex. 46 – Flynn Dep., pp. 121-124, 125; Elson Dec. Ex. 63 – Flynn Dep. Exhibit 10 (Transcription of 10/18/12 FPC Board Audio Recording)).

155.    According to Chief Flynn, until this change in policy and training, "If he can talk he can breathe" was "conventional wisdom for many, many years" and the "common practice" in the Milwaukee police department, as well as other departments. (Elson Dec. Ex. 46 – Flynn Dep., pp. 123-124).

156.    Chief Flynn had no concern when Defendants Cline, Bleichwehl, Coe and Ticcioni took the Fifth Amendment at the Inquest in February 2013. (Elson Dec. Ex. 46 – Flynn Dep., pp. 129-130).

157.    On February 21, 2013, the Coroner's Inquest jury returned a verdict which recommended that Ticcioni, Cline and Bleichwehl be charged criminally with Failure to Render Aid by a Law Enforcement Officer contrary to Wis. Stat. § 940.291(1). Wisconsin Court System Circuit Court Access (CCAP) *In Re Inquest Into the Death Of Derek Williams*, Case Number 2012JD000027.

158.    After the Inquest concluded, the Internal Affairs Division concluded that the internal investigation should not be reopened and the exonerated findings should stand. Chief Flynn concurred in this decision as well. (Elson Dec. Ex. 46 – Flynn Dep., pp. 134-137).

159.    On September 6, 2013, the MPD issued a formal revision to SOP 090 Prisoners to incorporate the changes established on an interim basis in September of 2012. (Elson Dec. Ex. 64 – SOP 090 Prisoners, General Order 2013-19, Effective September 6, 2013; Elson Dec. Ex. 50 – Flynn Dep. Exhibit 11 (9/23/13 MPD Memo Critical Incident Review)).

160.     According to Chief Flynn, as of the date of Derek Williams' death, absent a clear inability to breathe or some clear undeniable evidence of medical distress, it was "not outside our [MPD] policy to not call for emergency medical assistance." (Elson Dec. Ex. 46 – Flynn Dep., pp. 157-158).

161.     In June of 2006, Richard Jerome of the Police Assessment Resource Center issued a report titled "Promoting Police Accountability in Milwaukee: Strengthening the Fire and Police Commission," ("The Jerome Report") which made the following findings:

- "The FPC citizen complaint process is broken beyond repair." (Jerome Report, p. 46)

- "The FPC complaint process is structurally flawed in ways that make it very difficult for a citizen to establish a claim of misconduct, even if meritorious." (*Id.*

- The results of the FPC citizen complaint process "are troubling, and demonstrate the FPC's structural defects." (*Id.* p. 49)

- Out of the 550 complaints filed from 1992 to 1999 with the FPC, only six cases resulted in sustained charges against only 8 MPD officers. (*Id.* p. 49)

- Out of the 437 complaints filed from 2000 to 2005 with the FPC, charges were sustained against only 2 MPD officers. (*Id.*)

- There should be significant changes in the procedures for addressing citizen complaints against MPD officers, including an independent monitor; (*Id.* pp. 50-56, 64-66, 75-76)

- "One of the goals of police oversight is to go beyond the review of individual citizen complaints to assess trends or patterns of police misconduct, as well as to address community concerns about police policies and practices." (*Id.* p. 67)

- The FPC has failed to use its power and fulfill its responsibility to conduct policy reviews of the MPD. (*Id.* p. 68)

- "While the [FPC] has responsibility for policy review, it has not established a program of systematic monitoring or auditing of the MPD, analysis and study of MPD policies and procedures, or of trends in complaints or the MPD use of force." (*Id.* p. 73)

- The FPC performed "[n]o audits of FPC citizen complaints, nor any audit or evaluation of complaints received and investigated by MPD." (*Id.* p. 73)

- The FPC performed "[l]imited collection and analysis of MPD use of force information, or evaluation of MPD's efforts to analyze its own use of force statistics." (*Id.* p. 74)

- The FPC performed "[n]o review of civil actions and tort claims relating to MPD actions." (*Id.* p. 74)

- The PPD, which reviewed about 91% of citizens' complaints as of 2005, sustained approximately 5%, whereas the typical sustained rate is about 10%. (*Id.* pp. 22, 46, 55.)

- It is central to the monitoring process to identify and address trends and patterns in police behavior as well as issues that recur in the investigative process. (*Id.* pp. 28, 67, 79.)

(Elson Dec. Ex. 65 – "Promoting Police Accountability in Milwaukee: Strengthening the Fire and Police Commission," (The Jerome Report"), by Richard Jerome, Police Assessment Resource Center, June 2006).

162.    The 1991 Mayor's Commission Report found there to be a code of silence within the MPD. (Elson Dec. Ex. 66 – The Mayor's Citizen Commission on Police Community Relations, "Psychological Screening of Police Candidates: Current Perspectives," Journal of Police Science and Administration, Volume 15, No. 3, 1987).

163.    In 2004, Frank Jude was brutally beaten by MPD officers. In 2006, when MPD officer Nicole Belmore broke the code of silence and testified against her fellow officers who beat Jude, she was retaliated against by MPD officers, including her supervisors, who called her a rat, vandalized her property, slammed doors in her face, walked way around her when she came in a room, cleared the room when she would come into a room, interfered with her radio communications, and refused to provide her backup. (Elson Dec. Ex. 67 – Nicole Belmore-Martinez Dep., pp. 257-263).

164. On January 8, 2009, Chief Flynn told a WUWM reporter that he "was trying to change the police culture and the code of silence that has plagued the department in the past." (Elson Dec. Ex. 46 – Flynn Dep., pp. 142-143; Elson Dec. Ex. 68 – Flynn Dep. Exhibit 15 (1/8/09 "Milwaukee Police Chief Reflects on First Year", WUWM)).

165. During his deposition in this case, Chief Flynn testified that former Chief Nannette Hegerty was "in error" when she said that the MPD had a code of silence, that "it couldn't be more wrong" that "the code of silence reared its head again in the strip search cases," but that the Milwaukee Journal Sentinel did have a code of silence. (Elson Dec. Ex. 46 – Flynn Dep., pp. 140-141, 144, 149-150; Elson Dec. Ex. 69 – 3/31/15 Hegerty Dep., pp. 206-209).

166. In the strip search cases, no officer reported Vagnini or any of his fellow officers for any of the scores of illegal strip and cavity searches, and during the subsequent investigations, no officer voluntarily gave any inculpatory information regarding strip and cavity searches. (Elson Dec. Ex. 70 – Roger Clark Expert Report in *Hoskin v. City of Milwaukee*; *see also Hoskin v. City of Milwaukee*, Case No. 13-cv-920, Dkt. No. 108, Plaintiff's Proposed Findings of Fact ¶ 236).

167. Defendant Thoms, who grudgingly cooperated with the investigation after being granted immunity from prosecution, was called a "snitch motherfucker" by Vagnini, who punched him out, a bullet was anonymously placed in his locker, and he has admitted that his treatment is an example of the MPD's code of silence. (Elson Dec. Ex. 4 – Thoms Dep., pp. 49, 153; Elson Dec. Ex. 71 – 5/8/14 Thoms Dep., pp. 129, 218-219).

168. Besides Vagnini, Knight, Dollhopf and Kozelek, none of the other District 5 officers who participated in, failed to intervene in or report the misconduct in the strip search cases, including Defendants Thoms, Kuspa, Cline, and Bleichwehl, or their direct supervisors

have been disciplined, and all but Bleichwehl either remain on the job or on paid disability. (Elson Dec. Ex. 72 – 6/3/14 Flynn Dep., pp. 137-138, 186-187; Elson Dec. Ex. 7 – Bleichwehl Dep. pp. 203-205).

169.    Chief Flynn has also reviewed some of these investigations and approved at least some of these findings of no discipline as to the officers still on the MPD. (Elson Dec. Ex. 72 – 6/3/14 Flynn Dep., pp. 145-147).

170.    Between 2000 and 2007, District 5 Late Power Shift Sergeant Jason Mucha was involved in dozens of incidents of alleged excessive force, theft and planting of drugs. Mucha was not disciplined for any of these incidents, and received no counseling by his superior officers, but rather these officers encouraged his on the street activities, he was promoted to Sergeant in 2005, and made supervisor of the Late Power Shift Unit at District 5. (Elson Dec. Ex. 73 – Disciplinary History of Jason Mucha; Elson Dec. Ex. 74 – Gina Barton "Forceful Impact," Milwaukee Journal Sentinel, September 9, 2007; Elson Dec. Ex. 75 – Mucha Dep., pp. 175, 215, 219-220; Elson Dec. Ex. 72 – 6/3/14 Flynn Dep., pp. 53-56).

171.    Chief Flynn approved multiple promotions of District 5 supervisors Michael Brunson, and Edith Hudson despite the fact that he acknowledged that they presided over a rogue Unit at District Five that engaged in a pattern of illegal conduct that violated asserted MPD policy. Hudson was promoted first to Deputy Inspector, then to Assistant Chief, while Brunson was promoted to Captain, then to Deputy Inspector. (Elson Dec. Ex. 72 – 6/3/14 Flynn Dep., pp. 85, 88-95, 125, 157; Elson Dec. Ex. 76 – 6/25/14 Brunson Dep., p. 212).

172.    Plaintiffs' police practices expert Roger Clark, who also rendered opinions in the strip and body cavity cases, rendered the following opinions in this case:

> (1) Each officer's failure to seek medical assistance for Mr. Williams by a simple radio call to dispatch despite hearing him repeatedly complain that he could not

breathe and observing physical signs of respiratory and other medical distress deviated from proper police standards and practices.

(2) Each officer's failure to constantly and effectively monitor Mr. Williams' medical condition and respiratory distress while in their custody and to communicate amongst themselves about his condition deviated from proper police standards and practices.

(3) The conduct of the Sergeants Kaul and Thiel demonstrated a fundamental failure to properly supervise the treatment of persons in custody and in restraints and a failure to properly supervise their subordinates.

(4) The failure of the MPD to discipline Officers Cline, Bleichwehl, Ticcioni, and Coe, and their supervising sergeants demonstrates a continuing failure to properly discipline MPD officers, as I previously found in the strip and body cavity search cases.

(5) The MPD's investigations in the Derek Williams case fell well below applicable police standards, as is demonstrated by:

     a. One of the main offending officers, Officer Cline was not even identified as a subject of the PPD's investigation;

     b. The detectives on the scene did not ask him about the squad car;

     c. Months later, the PPD investigators conducted a three minute interview of Officer Cline in which they asked him only three questions concerning his time in the squad car;

     d. The Sergeants on the scene, and several of the officers were not interviewed;

     e. After the coroners' jury rendered its verdict, the MPD decided not to reopen its investigation.

(6) As I found in the strip search cases, and is further demonstrated in the Derek Williams case, there was a long standing and pervasive police code of silence within the MPD that existed at the time of Derek Williams' death.

(7) That this code of silence continues at the highest levels of the MPD is further demonstrated by Chief Flynn's previous admission that the code existed in 2009; Chief Hegerty's admission that it existed during her reign;, the treatment of cooperating officers in the Frank Jude and the strip search cases; Chief Flynn's present ill-founded denials that the code of silence exists in the MPD but does at the Milwaukee Journal Sentinel; Flynn's defense of the officers' and supervisors' conduct in the Derek Williams case; his ratification of  the shoddy police investigations in this case as "thorough and competent;"  and his approval of the

exonerations of the officers and their supervisors for rules violations by the MPD's PPD, even after they asserted the Fifth Amendment at the Inquest.

(8) The conduct of the defendant officers and sergeants was in clear violation of the MPD's March 2011 SOP that requires constant monitoring of prisoners in custody, particularly if they are in restraints.

(9) The MPD's training and supervision with regard to dealing with seeking emergency medical care for persons in respiratory distress fell well below applicable police standards, as is demonstrated by:

    a. The only training in the MPD Training Academy on this issue was the principle "if you can talk you can breathe;"

    b. This training was repeated during in service training and by supervisors on the job;

    c. The relevant SOP gave the officers complete discretion as to when to call for emergency medical services;

    d. The concept that if a suspect was claiming to be out of breath he was "faking it" was reinforced in training and supervision.

(10) That the MPD's training and supervision with regard to dealing with seeking medical care for persons in respiratory and other medical distress fell well below applicable police standards is further demonstrated by the actions and statements of the MPD and its Chief after the death of Derek Williams, including:

    a. The admissions of the Chief concerning the MPD's failures to adequately respond in the Derek Williams case and the necessity of re-training;

    b. The interim directive and later formal amendment to the SOP to make seeking EMS mandatory when respiratory distress is claimed or evidenced;

    c. The training video that instructed officers to no longer follow the "if you can talk you can breathe" principle, and the power point training that defined and discussed respiratory distress in detail.

(Elson Dec. Ex. 77 – Roger Clark Expert Report).

Dated: May 24, 2017                    Respectfully submitted,

        s/ Ben H. Elson
                                       G. Flint Taylor, IL Bar No. 2802058
                                       John L. Stainthorp, IL Bar No. 3128243
                                       Jan Susler, IL Bar No. 277840
                                       Ben H. Elson, IL Bar No. 6286106
                                       PEOPLE'S LAW OFFICE
                                       1180 N. Milwaukee Avenue
                                       Chicago, Illinois  60642
                                       Phone: (773) 235-0070
                                       Fax: (773) 235-6699
                                       ben.elson79@gmail.com

                                       Jonathan Safran, Bar No. 1000881
                                       Jeffrey Patza, Bar No. 1030512
                                       SAMSTER, KONKEL & SAFRAN, S.C.
                                       1110 N. Old World 3rd Street
                                       Suite 405, Riverfront Plaza
                                       Milwaukee, WI  53203
                                       Phone: (414) 224-0400
                                       Fax: (414) 224-0280
                                       jsafran@skslawyers.com
                                       jpatza@skslawyers.com

                                       Attorneys for Plaintiffs