# EXHIBIT 37

Peterson Inquest Testimony

```
       STATE OF WISCONSIN :  CIRCUIT COURT :   MILWAUKEE COUNTY
                            BRANCH 27
_____

In Re Inquest into the Death of
DEREK WILLIAMS,


                              Case No. 12JD0027



_____




                       FEBRUARY 12, 2013

                  HONORABLE KEVIN E. MARTENS
                       Presiding Judge






APPEARANCES:

              ATTORNEY JOHN FRANKE, Assigned as Special
    Prosecutor, appeared on behalf of the State.








              Kelly Janowski – Court Reporter

                              1
```

1     way?

2  A.  I was not trying to cover up anything, sir.

3  Q.  And in anything else you've done in this case, does

4     that motivate bias on your part?

5  A.  I believe I've been very forthright with both my

6     mistakes and my decision making processes in this

7     matter.

8               ATTORNEY FRANKE:  Unless the jury

9     has a question, I'll excuse the witness.

10              THE COURT:  Any hands for questions?

11    All right.  Seeing none.

12              ATTORNEY FRANKE:  You may step

13    down, sir.

14              THE COURT:  Mr. Poulos, thank you

15    very much.  Dr. Poulos, thank you.

16              (The witness is excused.)

17              ATTORNEY FRANKE:  The State will

18    call Dr. Brian Peterson.

19              THE COURT:  Dr. Peterson, if you

20    could come forward, please.

21              BRIAN PETERSON, called as a witness

22    herein, being first duly sworn, was examined and

23    testified as follows:

24              THE CLERK:  Do you solemnly swear

25    that the evidence and testimony you give to this

51

1 inquest concerning the death of the person known as
2 Derek Williams shall be the truth, the whole truth,
3 and nothing but the truth so help you God?
4 　　　　　　　　　　THE WITNESS:  I do.
5 　　　　　　　　　　THE CLERK:  Please, have a seat.  I
6 need you to state your name and then, please, spell
7 your first and last for the record.
8 　　　　　　　　　　THE WITNESS:  My name is Brian
9 Peterson, B-r-i-a-n, P-e-t-e-r-s-o-n.
10 　　　　　　　　　　THE COURT:  Mr. Franke.
11 　　　　　　　　　　EXAMINATION
12 BY ATTORNEY FRANKE:
13 Q. Good morning, Dr. Peterson.
14 A. Good morning.
15 Q. Would you begin by stating your current position?
16 A. I'm the medical examiner for Milwaukee County.
17 Q. How long have you been the medical examiner for
18 Milwaukee County?
19 A. Almost three years now.
20 Q. I'm going to show you what's marked for
21 identification as Exhibit 224.  Can you tell us
22 what that is?
23 A. This is a current copy of my curriculum vitae.
24 Q. Could you summarize for the jury your education and
25 your professional career as it led up to your

52

1    know.  We all get exposure to harder cases and
2    longer cases and whatever.
3              So that morning like any morning we
4    would have had had rounds.  So we are looking at
5    and discussing all the bodies that are there.  The
6    on-call pathologist, Dr. Poulos, said, okay, I'll
7    take this one.  What else the rest of you want to
8    do depending on the number of cases, we divide them
9    up and go to work.
10 Q. I don't know if you checked.  I didn't ask you to.
11    Do you know how many cases may have been in the
12    office on July 6th, 2011?
13 A. Presently I don't.  We could find that number
14    though.  We have paperwork and logs and so forth.
15    We can go back and reconstruct it day-by-day.  I
16    just didn't do it.
17 Q. Is there any different procedure followed for an
18    autopsy when it is a death in police custody?
19 A. There are -- Sometimes other people attend the
20    autopsy.  Sometimes not.  So, for example, on
21    occasion Mr. Chisholm, the district attorney, will
22    attend or one of his deputy district attorneys will
23    attend.
24              As far as the actual physical
25    procedure of the autopsy, sometimes there's extra

72

```
 1            evidence to collect.  You've seen pictures with the
 2            paper bags over the hands, for example.  Most
 3            bodies don't come in that way.
 4                       So when a body does, there's an
 5            extra step to collect those bags to collect
 6            fingernail clippings.  Sometimes swabbing of hands
 7            and so forth for DNA.  It kind of depends on the
 8            needs of the case and the circumstances.
 9                       But in the typical in-custody type
10            death, there will be extra steps like that.
11            Otherwise, the autopsy is pretty much the
12            autopsy.
13      Q.    Dr. Poulos mentioned yesterday examining the
14            testicles of the body in a way that wouldn't
15            normally be done.  Is that your understanding of
16            the procedure that would be followed for a police
17            custody death?
18      A.    That's a common thing to add.  Some of us take the
19            testicles out as a matter of routine.  I don't
20            think he does.  It's not necessarily a part of the
21            autopsy.  So if it's not a part of your normal
22            autopsy, you might do it for a case like this.
23      Q.    Any other differences in how a police custody death
24            case would be handled by your office in July of
25            2011?
```

```
 1       looking at I mean a relatively large piece of
 2       tissue on there.  But a microscopic field can be
 3       small to really small depending on what power you
 4       are using.  So we'll talk about say the number of
 5       low powered fields, the number of high powered
 6       fields.
 7                     Again, there's no magic number
 8       there.  It's a matter of looking at enough of a
 9       slide to make a decision as to what's going on on
10       that slide.
11  Q.   As you sit here today, are you able to recall
12       actually looking at Derek Williams' slides and what
13       you saw?
14  A.   It's hard.  Can I picture that in my head?
15       Probably not.  But now that we are talking about
16       it, I think that I can.  I really don't know.
17  Q.   Did you reach any conclusion in looking at the
18       slides at that time?
19  A.   I did.
20  Q.   What conclusion did you reach?
21  A.   My conclusion was that there were significant
22       sickled thrombi pretty much everywhere I looked.
23  Q.   Did you share that conclusion with Dr. Poulos?
24  A.   I did.
25  Q.   When you're looking at a slide of tissue, what --
```

1  A.  As best I can recall when Dr. Poulos ultimately got
2      his hands on the police report, he thought at that
3      point that perhaps the nature of this case required
4      a higher level of review.
5              So what he did was he brought me his
6      autopsy report, all the glass slides, our internal
7      investigative report, and the police report.
8              I reviewed all of that material and
9      determined at that point that we needed to make
10     some changes both in the way the report was ordered
11     as you heard earlier and in the manner of death,
12     and that happened pretty fast.  I think it was
13     within a just a few days we had the new report
14     issued.
15 Q.  What is the date on the second report?
16 A.  Dr. Poulos and I -- I signed it on the 17th.  He
17     signed it on the 18th.
18 Q.  Of?
19 A.  Of September.
20 Q.  September of 2012?
21 A.  Yes.
22 Q.  So this is approximately a year after the first
23     report?
24 A.  Correct.
25 Q.  Was there any change in the cause of death?

1  A.  No.
2  Q.  Have you been in court for some of the testimony
3      about the hyoid bone?
4  A.  I have.
5  Q.  Was there a change in the report with respect to
6      the hyoid bone?
7  A.  Yes, there was.
8  Q.  Why don't we try to follow that hyoid bone issue
9      through and treat it separately.  What change was
10     made in the report regarding the hyoid bone and
11     why?
12 A.  In the initial report, Dr. Poulos had listed a
13     fracture of the hyoid bone under Evidence of
14     Medical Therapy.  My thinking was was that I could
15     not confidently associate a fractured hyoid with
16     placement of the breathing tube.
17              So I had him move it into the
18     separate section and just called that Evidence of
19     Injury with a certain understanding that medical
20     treatment can be considered injury in some cases.
21              I thought that you couldn't prove
22     that though.  So we just moved it into a separate
23     section.
24 Q.  Did the first report indicate that either a
25     possible cause or the likely cause of the fracture

82

1  A.   In terms of the front page there, I changed the
2       manner of death from natural to homicide.  And it's
3       really more of a technical change, and it relates
4       to the circumstances of death which is where manner
5       normally comes from.
6                    So the way a forensic pathologist
7       thinks if other people were involved or potentially
8       involved in the death, that can have a bearing on
9       manner.
10                   By way of analogy, somebody could
11      have say a heart attack and that would be a natural
12      death.  If they had a heart attack but they are out
13      swimming, that might end up being an accidental
14      death with a component of drowning.  That sort of a
15      thing.
16                   Once I was able to review the police
17      report in this case and realize that there had been
18      a hands-on struggle, realize that Mr. Williams had
19      been talking about being short of breath at the end
20      of that struggle once he was restrained, my
21      thinking was that it was impossible to say that
22      that struggle didn't fuel the sickle crisis.
23                   Because I couldn't say -- sorry
24      about the double negative -- that it didn't fuel a
25      sickle crisis or play a role than the manner of

1      death has to become a homicide.
2  Q.  I'm sorry.  The last part of the answer, the manner
3      of death?
4  A.  It has to become a homicide.
5  Q.  Thank you.  Why do you feel that was a
6      requirement?
7  A.  Well, it's a matter of definition.  If, for
8      example, there had been no police involvement at
9      all and if Mr. Williams had been found dead in bed
10     and then the autopsy results had been the same,
11     then we might be looking at a natural death.
12                    On the other hand, because other
13     people were involved that's where the deaths at the
14     hands of another comes in.  We do know that there
15     were several stresses in the last half hour of
16     Mr. Williams' life beginning with the flight, the
17     armed robbery attempt and the flight, banging into
18     things, struggle with police, restraint, both prone
19     and supine, led to car, et cetera.  So there are a
20     number of stressors there.
21                    I don't have a scientific way of
22     dividing those out.  In other words, I can't say
23     that any one stressor wasn't involved or was more
24     important than the others.
25                    But I have to acknowledge that they

94

1    were all there.  So by calling it a homicide, I'm
2    simply acknowledging that all of those stressors
3    were there.
4  Q. Let me get back to this in a moment and the cause
5    of death.  But did the second report highlight
6    blunt force injuries in a different way?
7  A. Well, maybe highlight is a word.  I asked
8    Dr. Poulos to create a separate category on page 2
9    and list the different blunt force injuries that
10   we talked about separately for the purpose of
11   clarity.
12 Q. This was up for the jury before.  You may have been
13   in court.  Is this the page 2 and the section that
14   you're referring to?
15 A. It is.
16 Q. Was the description of these injuries on page 4 and
17   5 of the report also changed to provide headings
18   identifying the various blunt force injuries?
19 A. Yes.
20 Q. Were any new blunt force injuries identified in the
21   second report that hadn't been identified in the
22   first?
23 A. No.
24 Q. Is it fair to say that the way the blunt force
25   injuries were handled in the second report was

95

| | | |
|---|---|---|
| 1 | | simply a different type of organization and |
| 2 | | different listing of them? |
| 3 | A. | With the one exception of the hyoid bone being |
| 4 | | taken out of medical therapy and moved to injury, |
| 5 | | everything else was about the same. |
| 6 | Q. | Was there any difference in your mind regarding the |
| 7 | | extent to which these things called blunt force |
| 8 | | injuries had contributed to a possible sickle cell |
| 9 | | crisis? |
| 10 | A. | I think I looked at that the same way from the |
| 11 | | first to the second case. Again, the blunt force |
| 12 | | injuries are simply markers of force applied. And |
| 13 | | as is typical of blunt force injury, whether they |
| 14 | | indicate that somebody hit Mr. Williams or |
| 15 | | Mr. Williams hit something, I can't say. |
| 16 | | I can only say that he had the |
| 17 | | injuries, and they are consistent with his history. |
| 18 | | So to that extent, they helped feed into the manner |
| 19 | | of death. But nothing changed there from the first |
| 20 | | to the second autopsy report. |
| 21 | Q. | Did you view the video of Derek Williams in the |
| 22 | | back of the squad car at any time? |
| 23 | A. | I did. |
| 24 | Q. | Do you have a recollection as to when you first |
| 25 | | reviewed it? |

| | | |
|---|---|---|
| 1 | | blood vessel level as the blood vessels plug. I |
| 2 | | think a patient will experience that as difficulty |
| 3 | | breathing. And in that video, Mr. Williams |
| 4 | | expressed that difficulty. So I thought that was |
| 5 | | consistent with the cause of death. |
| 6 | Q. | Was there anything about the video that affected |
| 7 | | your opinion as to the manner of death? |
| 8 | A. | No. |
| 9 | Q. | Did you review the video again at any point? |
| 10 | A. | No. I watched -- I watched the whole thing the one |
| 11 | | time. |
| 12 | Q. | Other than perhaps it being on the news, have you |
| 13 | | sat down and reviewed since that first time? |
| 14 | A. | No. |
| 15 | Q. | Do you have an opinion as to the cause of death in |
| 16 | | this case? |
| 17 | A. | I do. |
| 18 | Q. | Is that independent of Dr. Poulos's conclusion? |
| 19 | A. | I think I worded it a bit differently than he did. |
| 20 | | My, "Due to the flight from and altercation with |
| 21 | | the police," wasn't in his first report. |
| 22 | Q. | What is your opinion as to the cause of death in |
| 23 | | this case? |
| 24 | A. | The cause of death is sickle cell crisis due to |
| 25 | | flight from and altercation with police. |

could be lab tests, whatever.  We go through that
           whole process.
                               And at the end of the day, when
           things work out right, we have an answer and that's
           the cause of death.  Sometimes there's not enough
           to go on.  Think about a skeletonized body, no
           organs, no injuries.  That's kind of tough, but
           there's simply not enough.
                               Sometimes, rarely, we'll have a case
           where we have an intact body and it's a -- maybe
           there's not any history but everything checks out
           normal.  Those are the very puzzling, frustrating
           cases.
                               Those we might call undetermined.
           It doesn't happen real often, but it happens.
                               In a case like this, after
           everything that we went through we have good
           findings.  All right.  These sickled thrombi in a
           lot of organs, the nature of those thrombi, that's
           a good finding.  So as far as I'm concerned, that's
           the cause of death.
                               I'm not sure if that answers your
           questions, but that's how doctors do it at least
           this doctor.
      Q.   Do you agree that there is a dispute within the

                               126

1    ahead and dispute.
2  Q. Do you agree that a pathologist though, a person
3     acting as a pathologist, trying to determine cause
4     of death in a case like this does have to address
5     the question of whether the sickling observed in
6     the microscope evidence occurred as a consequence
7     of death or whether it occurred before death?
8  A. Oh, sure.  I mean we have a lot of issues like
9     that.  Drugs are a big one, you know.  Did somebody
10    die of an overdose?  Or did they die with drugs in
11    their system and died of something else?
12                   In a lot of cases, there is no one
13    right answer, you know.  In the case of somebody
14    with multiple medical disease processes, a heart
15    disease or the cancer or the emphysema, that was
16    the cause of death, you know, maybe they all were.
17    But we have to pick one.
18                   So in terms of the specific issue,
19    discerning whether or not that sickling was before
20    death or after death, I believe based on my
21    experience and training I can do that.
22                   But I would also say that not every
23    pathologist has had the same experience.  I mean
24    doctors have -- they have different cases and
25    experiences and so forth, some more, some less.