# EXHIBIT 54

Flynn Deposition Exhibit 2



**Fire and Police Commission**

Michael G. Tobin
Executive Director

Richard C. Cox
Chair

Carolina M. Stark
Vice-Chair

Kathryn A. Hein
Paoi X. Lor
Sarah W. Morgan
Michael M. O'Hear
Commissioners

June 27, 2012

### PUBLIC STATEMENT OF THE EXECUTIVE DIRECTOR
### REGARDING THE IN-CUSTODY DEATH OF DEREK WILLIAMS
### ON JULY 6, 2011

#### Synopsis

On July 6, 2011, Mr. Derek Williams was observed by Milwaukee Police Officers to be committing a street robbery near the intersection of N. Holton Street and E. Center Street. When officers intervened in the robbery, a foot chase ensued and Mr. Williams was apprehended several minutes later. Mr. Williams was seated in the rear of a squad car at the scene when he became unresponsive and stopped breathing. Resuscitative measures were performed by officers until paramedics arrived at the scene. Attempts to revive Mr. Williams were unsuccessful and he was subsequently pronounced dead.

The tragic death of Mr. Williams has raised questions within Mr. Williams' family as to whether the actions of Milwaukee Police Officers were appropriate, and whether criminal charges or disciplinary sanctions should be imposed upon the involved officers.

The question relating to criminal charges was answered on November 4, 2011 when Milwaukee County District Attorney John Chisholm authored a statement declining to file criminal charges against the officers, indicating in part:

> *"The evidence in this matter makes it clear to me that Mr. Williams' untimely death was caused by a pre-existing medical condition. There is no evidence that any of the officers involved in the arrest and detention of Williams acted in an unprofessional or unlawful manner. Therefore, no further action will be taken by this office in this matter."*

Following the decision of the District Attorney, the case was turned over to Milwaukee Police Chief Ed Flynn for further investigation as to whether the involved officers were in violation of any rules, policies, or procedures which would justify disciplinary sanctions. An investigation was conducted by the Professional Performance Division and on April 30, 2012 Chief Flynn determined that the involved officers did not violate department rules, policies, or procedures.



Upon completion of the Milwaukee Police Department investigation, the Executive Director of the Fire and Police Commission, in accordance with recently adopted internal procedures, initiated a review of the incident and conducted an audit of the police investigation. These procedures are followed regardless of whether a complaint alleging misconduct was filed by family members. In this instance, no complaint has been filed on behalf of Mr. Williams.

In addition, on October 11, 2011 the Milwaukee Common Council adopted Resolution #110427 directing the Fire and Police Commission to report to the Common Council on incidents of officer-involved shootings and deaths of citizens in police custody.

In August, 2011, the Milwaukee Fire and Police Commission instituted a practice of providing a field response to the scene of all incidents involving a death in police custody and all officer-involved firearms discharges involving an injury or death. The purpose of the field response conducted by the Executive Director is to provide an independent monitor of the investigation. The Executive Director then provides an independent report to the community and the citizen board of the Fire and Police Commission regarding the officer's actions, thoroughness of the police investigation, appropriateness of the investigation conclusions, and whether any discipline, training, or other pertinent issues are in need of being addressed by the police department. The practice of the Fire and Police Commission of providing a field response to the scene was initiated after this incident occurred, so the Executive Director is unable to offer personal observations pertaining to this case.

This report is the first independent statement issued for an incident involving the death of a citizen while in police custody under the revised procedures. This report is a summary of the incident based upon witness statements, police reports, district attorney reports, medical examiner reports, squad car video and audio recordings, and police radio and computer-recorded communications.

Among the implicit purposes of issuing this report is to provide an increased level of accountability and public transparency regarding instances in which police actions may be questioned by the community. A police department that is transparent in its operations and accountable for its actions will enjoy the trust and respect of the community. The Fire and Police Commission shares the concerns of the community, especially as it relates to individuals that die while in police custody. An incident that is mishandled, improperly investigated, or concealed from the community only serves to adversely affect the public's trust in and perception of its police officers, as well as their trust in those responsible for selecting, training, and disciplining those officers.

This report necessarily involves a careful and responsible interpretation of the facts, evidence, and witness statements. The actions of Mr. Williams and the involved officers are interpreted with respect to the rules, policies, and procedures of the police department at the time of the incident. The concerns of Mr. Williams' family are certainly acknowledged and addressed by the same evidentiary standards applicable to every member of our community.

### The Incident

On Wednesday, July 6, 2011, at approximately 12:36 a.m., Officer Zachary Thoms and Officer Jeffrey Cline were in full police uniform on patrol in a marked squad car, driving northbound in the 2600 block of N. Holton Street. At the intersection of N. Holton Street and E. Center Street, both officers observed an individual, later identified as Derek Williams, on the sidewalk, wearing a white mask that concealed his face. Mr. Williams was concealing an object under his white tee shirt while physically restraining an individual, later identified as S.T.[1] The girlfriend of S.T., Z.G., was also present. The officers believed Mr. Williams was in the process of robbing the two citizens, S.T. and Z.G.

As the squad approached the individuals, Officer Cline stated that Mr. Williams observed them and immediately began to flee the scene by running in a northwest direction. Mr. Williams ran literally out of his tennis shoes, leaving them behind at the scene. Officer Cline stated that he chased Mr. Williams until he lost sight of him in an alley between N. Buffum Street and N. Holton Street. A white tee shirt that Mr. Williams had been wearing was found snagged atop the chain link fence between the yards of 2744 and 2748A N. Buffum. Several other officers responded to the radio broadcast of a foot pursuit and began to set up a perimeter/containment area to apprehend Mr. Williams.

Officer Patrick Coe and Officer Richard Ticcioni responded to the area and began searching the yards. At approximately 12:44 a.m., Officer Coe and Officer Ticcioni located Mr. Williams attempting to hide behind a table in the rear yard of the residence located at 2752 N. Buffum Street. Officer Ticcioni stated that Mr. Williams was seated on the ground behind a table and rolled up in a ball-type position. He was shirtless and shoeless. Officer Ticcioni stated that Mr. Williams complied with his request to show his hands but did not comply when told to lie down on the ground. Officer Ticcioni stated that Mr. Williams was breathing heavily and sweating profusely. Officer Ticcioni stated that Mr. Williams was passively resistant; i.e., Mr. Williams tensed his muscles when Officer Ticcioni attempted to pull him out from under the table. During a second attempt, Officer Ticcioni was able to pull Mr. Williams out from under the table. However, Mr. Williams continued to passively resist and Officer Ticcioni needed to turn Mr. Williams over onto his stomach while exerting some pressure with a knee on his shoulder, so as to stabilize him. Once stabilized, Mr. Williams stated that he could not breathe. Officer Ticcioni then released pressure from his knee off Mr. Williams' shoulder. Officer Ticcioni stated that when he released the pressure, Mr. Williams immediately began to squirm and reached with his right side toward his waistband area. Fearing that Mr. Williams was reaching for a weapon, Officer Ticcioni immediately reapplied pressure on Mr. Williams' shoulder area and this allowed Officer Coe to handcuff Mr. Williams. Officer Ticcioni began to search Mr. Williams. He stated that he searched Mr. Williams' pants pockets and recovered two $20 bills and an identification card of his girlfriend, S.R.

---

[1] For the purposes of this public statement, civilian witnesses are identified by initials only. The full identities of these witnesses are contained in the Milwaukee Police Department ("MPD") files related to this case.

As other officers arrived on the scene, Mr. Williams was brought to his feet. Officer Ticcioni stated Mr. Williams immediately went limp as if he was attempting to make it difficult for officers to hold him and walk him from the rear yards. Officer Ticcioni stated that when Mr. Williams went limp, he laid Mr. Williams on the ground on his back and observed that he was breathing hard. Officer Ticcioni stated that he felt Mr. Williams was "playing games" and directed him to "stop messing around." Mr. Williams complained that he could not breathe. Officer Ticcioni stated that another officer then rubbed Mr. Williams' sternum, as he was standing at the scene in handcuffs, and Mr. Williams responded appropriately and appeared to be able to take in oxygen normally.

At that time Mr. Williams was asked by officers about whether he had a gun. Mr. Williams responded, "I didn't have a gun." When told he was observed attempting to rob people on the street, Mr. Williams responded, "I didn't do no robbery! I was just hollering at those people! I ain't got nothing of theirs!" Mr. Williams then stated that he would voluntarily walk to a squad car. Officer Ticcioni stated that while he and Officer Coe walked Mr. Williams to a squad car, each officer had a hold of Mr. Williams' arms which remained handcuffed behind his back. Officer Ticcioni stated that Mr. Williams was cooperative most of the time, but periodically would drag his feet in an attempt to make it difficult to get to the squad.

Officer Ticcioni stated that Officer Cline pulled up in a marked squad car and instructed Officer Ticcioni and Officer Coe to put Mr. Williams in the back of the car. Mr. Williams was walked to the rear passenger side door and was directed to enter the squad. He refused to enter the rear of the squad and Officer Ticcioni bent him at the waist and directed him into the rear seat. The squad was parked in front of 2744 N. Buffum Street.

Mr. Williams was initially monitored by Officer Cline who was seated in the front seat of the squad car. Officer Cline began to engage in conversation with Mr. Williams and requested his name. Mr. Williams told Officer Cline that he could not breathe so Officer Cline rolled down the squad's rear passenger window. Mr. Williams continued to talk to Officer Cline and periodically state that he could not breathe, while rocking his body back and forth. A few minutes later Police Officer Jason Bleichwehl relieved Officer Cline. Officer Cline and other officers began to look for additional evidence in the area where Mr. Williams was taken into custody. Officer Bleichwehl stated that as he initially approached the squad to relieve Officer Cline, he heard the sound of Mr. Williams' voice and observed Mr. Williams in the rear seat of the squad rocking his body back and forth.

Officer Bleichwehl entered the squad and sat in the driver's seat where Officer Cline had been seated. Officer Bleichwehl stated that he then began to write information regarding this incident in his memo book. Officer Bleichwehl stated that Mr. Williams had quieted down. Officer Bleichwehl stated that he started to ask Mr. Williams some questions and at first, thought he was being ignored. Officer Bleichwehl then looked back and saw that Mr. Williams had slumped to his side and appeared unconscious. Officer Bleichwehl stated that he called Mr. Williams' name and received no response. Officer Bleichwehl stated that he

then immediately went to the rear driver's side door of the squad to check to see if Mr. Williams was breathing. Officer Bleichwehl stated that he checked Mr. Williams' neck (carotid artery) and was unable to feel a pulse. Officer Bleichwehl stated he then began rubbing Mr. Williams' chest, but again got no response. Officer Bleichwehl stated Mr. Williams' girlfriend, S.R., was standing on the street and began asking him what was going on. Officer Bleichwehl stated he told S.R. to get back, exited the squad, and went around to the rear passenger's side door to further assess Mr. Williams. Officer Bleichwehl stated he pulled Mr. Williams to a seated position, again checked for a pulse in the neck, and was unable to locate one. Officer Bleichwehl stated that he then radioed for additional officers and medical assistance.

Officer Bleichwehl stated that he then removed Mr. Williams from the rear of the squad and started resuscitation efforts by performing CPR. Officer Bleichwehl stated that when he was performing CPR, he was assisted by Officer Coe. Officer Bleichwehl stated that he administered mouth to mouth while Officer Coe performed chest compressions, being later relieved by Officer Gregory Kuspa. Officer Thoms moved the squad backwards a short distance and the squad's forward camera captured the CPR efforts. At approximately 1:07 a.m., Milwaukee Fire Department Paramedic Unit 6 and Engine 21 arrived on scene and took over CPR efforts. At 1:41 a.m., Dr. Joseph Hanson pronounced Mr. Williams deceased at the scene.

### Squad Video and Audio Recording

The squad car that Mr. Williams was seated in was equipped with standard rear seat prisoner containment bars and a sliding Plexiglas window separating the front and rear seating areas. The squad car was also equipped with video and audio recording equipment. The rear-facing passenger camera recorded the entire time that Mr. Williams was seated in the rear of the squad car, in addition to the voices of both Mr. Williams and the officers. The squad car's forward camera recorded the resuscitative measures performed on Mr. Williams once he was removed from the rear seat. The video and audio recordings substantiated and corroborated witness statements pertaining to the subject matter of the recordings.

While in the rear seat of the squad car, Mr. Williams is observed to periodically rock back and forth and from side to side. He would also occasionally bend forward, lean backwards, lie down sideways on the seat, and then return to a seated position. Mr. Williams appears to be in a heightened emotional state and is breathing and speaking with officers, while periodically saying that he cannot breathe. After being seated in the squad for approximately 7 minutes 45 seconds, Mr. Williams lies down sideways on the seat but does not return to the upright position. Less than 30 seconds after Mr. Williams fails to return to the upright position Officer Bleichwehl, still seated in the front seat, attempts to awaken him by calling his name. Approximately 45 seconds after Mr. Williams fails to return to the upright position and does not respond to his name being called, Officer Bleichwehl exits the front seat, opens the rear passenger door, and begins checking Mr. Williams' level of responsiveness by tapping his shoulder, rubbing his chest, lifting his head, and checking his carotid pulse. Approximately two (2) minutes elapse after Officer Bleichwehl opens the rear

passenger door while he checks for responsiveness and breathing. Mr. Williams is then removed from the rear seat while officers continued to call out Mr. Williams' name and check to ascertain the presence of a pulse and breathing. Approximately 30 seconds after being removed from the rear seat, officers initiate cardiopulmonary resuscitation, by performing chest compressions and mouth-to-mouth breathing.

### The Critical Incident In-Custody Death Investigation

A Critical Incident In-Custody Death Investigation was conducted by the Milwaukee Police Department. Milwaukee Police Department Detectives indicated that Mr. Williams had just been released from custody, approximately five and one-half hours prior to this incident, on July 5, 2011 at 7:23 p.m.[2] He was in custody for municipal warrants for loitering, vandalism, and assault. Mr. Williams' girlfriend of five years, S.R. was interviewed along with her stepfather, T.M. T.M. stated that when Mr. Williams was released from custody, he was dropped off at their (T.M., S.R. and Mr. Williams') residence, 2366 N. Holton Street. T.M. stated that Mr. Williams was wearing a white tee shirt, blue jean shorts, and white tennis shoes. T.M. stated that Mr. Williams borrowed S.R.'s car and upon his return approximately one hour later, asked, "Where's my girl at?" T.M. got S.R. and asked her to speak to Mr. Williams. T.M. stated that S.R. told him that she thought Mr. Williams was on "some bullshit" and was going to rob someone or "do something stupid." T.M. stated that S R. asked him to "keep an eye on" Mr. Williams.

T.M. stated that a few minutes later, Mr. Williams left the house and he followed from a distance on foot behind. T.M. stated Mr. Williams was now wearing a white mask on his face. T.M. stated that he observed Mr. Williams approach the intended robbery victims and the initiation of a foot pursuit by officers. T.M. stated that he went back to his house on N. Holton Street and reported to S.R. that he thought Mr. Williams was in police custody. According to T.M., both he and S.R. drove to the scene of Mr. Williams' arrest. T.M. stated that when he presented papers to an officer indicating that Mr. Williams was just released from jail, an officer asked him if he was "T" and when he said he was, placed him in handcuffs. T.M. stated that he believed the officer thought he was also involved in the robbery. S.R. stated that as she approached the scene, she could hear Mr. Williams "going crazy" as he rocked back and forth in the squad car. S.R. stated that she asked an officer what was going on, and the officer stated that Mr. Williams tried to rob some people. S.R. stated that a few seconds later Mr. Williams stopped yelling and a police officer began to yell out, "Derek". S.R. stated that she observed the police officer get out of his squad and pull Mr. Williams from the vehicle and immediately administer CPR. S.R. stated that the Milwaukee Fire Department then arrived on the scene and took over the administration of CPR. S.R. stated that she was present from the time Mr. Williams was placed in the squad and throughout the CPR procedures. T.M. and S.R. had reported to officers at the scene that Mr. Williams had a history of using marijuana and crack cocaine.

---

[2] It is important to understand precipitating events leading up to police intervention in order to determine whether any other circumstances that occurred prior to police contact were contributing factors.

A neighborhood canvas witness,[3] J.F. stated that his attention was drawn to the streets by the lights and sirens. J.F. stated that he believed the police were chasing someone. J.F. stated that he later observed someone arrested and sitting in the back of a squad car. J.F. stated that he saw a police officer talking to a black female in the street. J.F. stated that a little while later he observed a police officer running back and forth from one side of the squad to the other, yelling "Derek". J.F. stated that he observed the officer take the person out of the squad and begin CPR.

A neighborhood canvas witness, J.W. stated that he heard sirens and observed an individual in handcuffs being taken to a squad car. J.W. stated that about five minutes later he observed an officer "hollering" Derek, while pulling him out of the squad and several officers performing CPR.

## Post-Mortem Examination

On July 6, 2011, Milwaukee County Assistant Medical Examiner Christopher Poulous performed an autopsy on Mr. Williams. Dr. Poulous issued a finding that Mr. Williams' death was caused by a pre-existing medical condition (Sickle Cell Crisis) which prevented the flow of oxygen throughout Mr. Williams' body while he was in custody. Observations of Mr. Williams indicated that he sustained scrapes to his feet, consistent with running barefoot and being dragged to the squad car, and minor puncture wounds to the left side of his chest, consistent with the metal barbs protruding from the chain link fence where his shirt was found. There were no other visible signs of trauma to Mr. Williams. Toxicology reports indicated that Mr. Williams tested positive for marijuana metabolites in his system at the time of death. No drug or illegal substances were indicated as contributing factors to his death.

## Milwaukee County District Attorney Investigation

The Milwaukee County District Attorney's Office responded to the scene and conducted an independent in-custody death investigation. On November 4, 2011 Milwaukee County District Attorney John Chisholm concluded that Mr. Williams' death was not the result of wrongdoing by any members of the Milwaukee Police Department. District Attorney Chisholm stated that he believed the conclusion the officers drew upon arrest and monitoring was that Mr. Williams was out of breath due to running from the police. District Attorney Chisholm stated that by the accounts of the officers, this was not a combative arrest situation. While Mr. Williams was initially non-compliant and on occasion would drag his feet while being escorted to the squad car, Mr. Williams did not actively fight with arresting officers and there was no evidence that any officer exerted excessive force against Mr. Williams to subdue him. He stated that there was no distress other than being upset about being arrested. District Attorney Chisholm stated that the squad video revealed that Mr. Williams appeared to be taking in oxygen, was verbally communicating, and did not

---

[3] Officers knocked on doors and approached all persons in the vicinity to obtain outside witness statements.

exhibit other outward signs of distress such as seizures or foaming at the mouth. He continued that the evidence in this matter made it clear that Mr. Williams' untimely death was caused by a pre-existing medical condition.

### The Administrative Review

Following the decision by the District Attorney, this case was turned over to the Milwaukee Police Department Internal Affairs Division (IAD)[4] for a broadened investigation into the tactics and force procedures used by the officers. As part of the investigation, Milwaukee Police Department Academy CPR Instructor Officer Jansen reviewed the squad video and CPR procedures delivered to Mr. Williams by Officer Bleichwehl, Officer Coe, and Officer Kuspa. Officer Jansen stated that all CPR procedures were done properly and to the level of the officers' training. After IAD completed its investigation, on March 30, 2012 Milwaukee Police Chief Ed Flynn determined that there was no indication that any of the officers involved in this incident violated any laws, the Department's Code of Conduct, or Standard Operating Procedures.

### Conclusion

It is important for the Fire and Police Commission to assure the members of Mr. Williams' family and the community that this case has been reviewed and analyzed carefully. No evidence was identified that would substantially support a conclusion that the involved officers failed to act in accordance with the law, department policies or procedures, or their training. No evidence was identified that would justify referring any of the involved officers to a citizen board hearing for potential disciplinary action. The Fire and Police Commission takes its duties seriously and will not hesitate to hold members of the Police Department accountable for misconduct. However, such action is not appropriate in this case.

The death of Mr. Williams is undoubtedly tragic. However, the death of Mr. Williams was not intended by anyone. The facts and circumstances surrounding this event indicate that no excessive force was exercised by the officers and no department policies were violated. This conclusion, while consistent with the findings of the Milwaukee County District Attorney, Milwaukee County Medical Examiner, and Milwaukee Police Department, was reached by an independent review of the facts and circumstances of this case. The death of Mr. Williams was not a natural or probable consequence of the actions of the officers. An unusual and undiagnosed pre-existing medical condition was the precipitating cause of Mr. Williams' death. The officers were carrying out their duties consistent with their training and took actions that were appropriate at the time and under the circumstances that they were presented with.

---

[4] In 2012, the Milwaukee Police Department nomenclature for the "Professional Performance Division" was changed to the "Internal Affairs Division." Thus, during the course of this investigation, the division responsible for the administrative review remained the same, while this report references both titles.

It is a rare occurrence for a death to occur to an individual while in the custody of the Milwaukee Police Department. Mr. Williams' death was the sole incident in the calendar year 2011 in which a person died while in the custody of the Milwaukee Police Department. Although it is a rare occurrence, there is always something to be learned from every tragedy. In this case the Executive Director makes the following specific conclusions:

1. The timeliness of the review process requires improvement. The Milwaukee Police Department should continue to work with the Fire and Police Commission in improving the process used for review of a death in custody, together with its attendant procedures, to develop a timelier program that is responsive to the needs of the community. A realistic initial goal would be to complete the police department review process within 90 days of the completion of the District Attorney's criminal charging decision.

2. The Milwaukee Police Department should examine whether changes in officer training could be implemented to specifically recognize the potential for a life-threatening Sickle Cell Crisis to occur to persons while in custody. As the Medical Examiner observed, this was a pre-existing medical condition. However, the Department should still determine whether any training changes should be considered.

Sincerely,

*[signature]*

Michael Tobin
Executive Director
Milwaukee Fire and Police Commission

MGT:kj