# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

ESTATE OF DEREK WILLIAMS JR.,
by SHARDAY ROSE, Special Administrator; and
TANIJAH WILLIAMS, DEREK WILLIAMS III, and
TALIYAH S. WILLIAMS, minors by their mother
and guardian SHARDAY ROSE,

                    Plaintiffs,

v.                                            Case No. 16-C-869

CITY OF MILWAUKEE, and Milwaukee Police
Officers JEFFREY CLINE, RICHARD TICCIONI,
PATRICK COE, JASON BLEICHWEHL,
ROBERT THIEL, TODD KAUL,
ZACHARY THOMS, GREGORY KUSPA,
CRAIG THIMM, CHAD BOYACK, and
DAVID LETTEER,

                    Defendants.

---

## MOTION OF DEFENDANTS CITY OF MILWAUKEE, JEFFREY CLINE, RICHARD TICCIONI, PATRICK COE, JASON BLEICHWEHL, ROBERT THIEL, TODD KAUL, ZACHARY THOMS, GREGORY KUSPA, CRAIG THIMM, CHAD BOYACK, AND DAVID LETTEER TO STRIKE CERTAIN ASPECTS OF THE REPORTS AND OPINIONS OF PLAINTIFFS' EXPERTS

---

       Defendants City of Milwaukee, Jeffrey Cline, Richard Ticcioni, Patrick Coe, Jason Bleichwehl, Robert Thiel, Todd Kaul, Zachary Thoms, Gregory Kuspa, Craig Thimm, Chad Boyack, and David Letteer ("Defendants"), by their attorney, Grant F. Langley, City Attorney, by Assistant City Attorney Susan E. Lappen, hereby move the court to strike certain aspects of the reports and opinions of plaintiffs' experts. Defendants seek to strike the reports and opinions by plaintiffs' expert Consuelo Gonzalez, Roger A. Clark, and Trevonne M. Thompson, because they lack the requisite competence, relevance, and/or reliability to be considered as evidence by

the Court in resolving defendants' pending motion for summary judgment. The reports of these "experts" reveal that many of their opinions are either irrelevant, unreliable, constitute legal conclusions, or are simply subjective conclusions about the credibility of potential witnesses, which are outside the acceptable parameters for expert witness testimony and/or would not be of assistance in resolving the pending motion for summary judgment.

In order for an expert's report and/or opinion to be used in the context of a summary judgment briefing, it still has to be admissible. Federal rules and caselaw provide parameters to the admissibility of expert opinions.

Federal Rule of Evidence 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the **_expert_**'s scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the **_expert_** has reliably applied the principles and methods to the facts of the case.

This rule adopts the analysis presented by the United States Supreme Court in _Daubert v. Merrell Dow Pharmaceuticals, Inc.,_ 509 U.S. 578, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and is "designed to ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." _United States v. Parra,_ 402 F.3d 752, 758 (7th Cir. 2005) (internal quotation marks omitted.) The Supreme Court held that to the extent applicable, courts may apply certain tests to "expert" testimony offered under Rule 702. These tests are 1) whether a

"theory or technique . . . can be (and has been) tested;" 2) whether it "has been subjected to peer review and publication;" 3) whether, in respect to a particular technique, there is a high "known or potential rate of error" and whether there are "standards controlling the technique's operation;" and 4) whether the theory or technique enjoys "general acceptance" within a "relevant scientific community." *Daubert*, 509 U.S. at 592-594. These tests apply here.

In *Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167 (1999), the Supreme Court clarified that the trial judge has an obligation to act as a "gatekeeper" when "expert" testimony is being offered, and that this gatekeeper function applies not only to testimony based upon "scientific knowledge," but to testimony based on "technical" and "other specialized" knowledge as well.

The importance of the gatekeeping function in a case like this one is well illustrated by *Berry v. City of Detroit*, 25 F.3d 1342 (6th Cir. 1994), where the court reversed a six million dollar judgment against the City of Detroit, finding that the testimony of the plaintiffs "police practices expert" witness (Posthill) should have been excluded. The expert had a college degree in sociology and a Master's Degree in education, and took post-graduate courses in criminal justice. His law enforcement career included employment as 1) a deputy sheriff, where he was certified as an instructor, and 2) an elected sheriff for a period of four years, 3) four years working for the Justice Department developing training criteria to train sheriffs, and 4) over ten years conducting seminars in police management techniques. *Id.* at 1348-49.

In voicing its concern that the testimony of the expert had been admitted at trial, the Sixth Circuit noted:

> Postill's testimony . . . illustrates the problem that courts and juries have with expert testimony, particularly of the type offered here. If an expert has a degree in electrical engineering, there are some assumptions that safely can be made relative to his general training, since all electrical engineers receive similar training. . . . But when a

sociologist [come] sheriff is allowed to testify as to all manner of police practices and procedures, the slopes become slippery indeed. . . .

The fact that some of [Postill's credentials] would sound impressive to a jury is its vice, not its virtue. The fault lies not with Postill but, rather with the system. . . . At least with scientific testimony there is some objective criteria to look to and there is some basis for evaluating a given expert's testimony against the scientific norm on the subject about which an opinion is offered. . . . It would appear obvious, however that evidentiary problems are exacerbated when courts must deal with the even more elusive concept of non-scientific expert testimony, as is the case here.

*Id*. at 1349. The court added to its concerns about the reliability of the witness's testimony that

there is no such 'field' as 'police policies and practices', . . . This term. . . is so broad as to be devoid of meaning. It is like declaring an attorney an expert in the 'law.' A divorce lawyer is no more qualified to opine on patent law questions than anyone else, and it is a mistake for a trial judge to declare anyone to be generically an expert. *Id*. at 1352.

Additionally, many courts have held that expert testimony in the form of legal opinions or conclusions is not admissible, and for two reasons. First, it usurps the role of the judge, whose job it is to instruct the jury on the relevant legal standards. Second, such opinions are not relevant. Because the jury's realm is to determine facts, legal conclusions do not assist the jury and are therefore prohibited. *U.S. v. Sinclair*, 74 F.3d 753, 757-758, n.1 (7th Cir. 1996); *Miksis v. Howard*, 106 F.3d 754, 762 (7th Cir. 1997); *Panter v. Marshall Field & Co.*, 647 F.2d 271, 293, n.6 (7th Cir. 1981). The Seventh Circuit has held that when an expert witness explains the law, he in effect 'instructs the jury," and this impermissibly shifts the balance of power between the parties. *Harbor Insurance Co. v. Continental Bank Corp.*, 922 F.2d 357, 366 (7th Cir. 1990). Where a legal interpretation, as for instance what certain standards mean, is required, this should be resolved for the jury by the judge, not testified to by an expert witness. *Bammerlin v. Navistar International Transcort Corp.*, 30 F.3d 898, 901 (7th Cir. 1994).

In *Specht v. Jensen*, 853 F.2d 805 (10th Cir. 1988), the Tenth Circuit ruled that an expert should not have been allowed to testify as to the legal conclusions he would draw from the

4

evidence in a civil rights case as to whether there had been a "search" of the plaintiffs' residence. The *Specht* court based its analysis on Rule 702, and found that the expert was improperly allowed to instruct the jury on how it should decide the case by testifying to an "array of legal conclusions touching on nearly every element of the plaintiffs' burden of proof under § 1983," which allowed the expert "to supplant both the court's duty to set forth the law and the jury's ability to apply this law to the evidence." *Id*. at 808.

In an ADA case, where a "police expert" testified that other police officers' communications with a deaf suspect were not "as effective" as the means of communication with hearing suspects, the D.C. Circuit ruled that this also was impermissible legal testimony which should have been excluded. The court noted that the phrase "as effective" came directly from the text of the Attorney General's regulations implementing the ADA, and ruled that by invoking this legal term of art, the expert's testimony constituted an impermissible legal conclusion. *Burkhart v. Washington Metropolitan Area Transit Authority*, 112 F.3d 1207, 1213 (D.C. Cir. 1997). The court concluded

> [e]ach courtroom comes equipped with a "legal expert," called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards. *Id*. at 1213.

The First Circuit reviewed a case involving where municipal employees who sued the mayor, alleging that they had been terminated because of their political affiliations. *Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92 (1st Cir. 1997). The court explained that because the jury does not decide questions of law, legal conclusions are not helpful to the jury and therefore do not fall within the terms of Rule 702. The court also noted that

> [q]uestions of law are not to be decided by the trier of fact; rather it is for the judge, not the lawyers or the witnesses, to inform the jury of the law applicable to the case and to decide any purely legal issue.

5

*Id*. at 100.

In *Peterson v. City of Plymouth*, 60 F.3d 469 (8th Cir. 1995), the court reversed a judgment in favor of the defendants in a § 1983 suit which alleged violations of the Fourth Amendment, asserting that the defendant police officers lacked probable cause when they arrested the plaintiff. At trial, the defendants offered the testimony of a "police practice and procedures expert" who testified that the police officers had acted "reasonably" in their encounter with the plaintiff and that their actions were consistent with "nationally accepted standards" and comported with "the standards under the Fourth Amendment." *Id*. at 475. The Eighth Circuit found that the testimony as to the reasonableness of the officers' conduct was a statement of legal conclusion, and that therefore, it had been an abuse of discretion for the trial court to allow the testimony. *Id*.

The Eighth Circuit noted that both probable cause and qualified immunity are ultimately questions of law where the jury's role is "limited to settling disputes as to predicate facts." *Id*. at 475. Noting that the jury was entitled to determine the factual dispute between the parties concerning the events leading up to the arrest, the Court noted that the expert's testimony was of no assistance to the jury in this regard and therefore should have been excluded. *Id*.

Defendants also note that Section 42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not violations of state law, departmental regulations or police practices. *Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006); *Legg v. Agee*, 2009 U.S. Dist. LEXIS 256 [*14-15], 2009 WL 56876 (C.D. Ill.) Therefore, evidence of "police practices" is not admissible in a case involving the reasonableness or unreasonableness of a search or seizure. *Wren v. United States*, 517 U.S. 806, 815, 116 S. Ct. 1769, 135 L.Ed. 2d 89 (1996).

The Defendants also note that experts are forbidden from making judgments about the credibility of witnesses. *United States v. Farrell*, 563 F.3d 364, 377-78 (8th Cir. 2009); *United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991) ("credibility is not a proper subject for expert testimony; the jury does not need an expert to tell it whom to believe, and the expert's "stamp of approval on a particular witness testimony may unduly influence the jury"); Nunez v. BNSF Railway Co., 730 F.3d 681, 684 (7th Cir. 2013) (vouching for the testimony of a witness is not an appropriate topic for expert testimony). Also, "expert" testimony which lacks foundation is unreliable, and is therefore properly excluded. *Obrycka v. City of Chicago*, 792 F. Supp. 2d 1013 (N.D. Ill. 2014); *James v. Harris County*, 577 F.3d 612 (5th Cir. 2009). In *Obrycka*, a bartender who was beaten by an off-duty Chicago police officer claimed that the City had de-facto policies of concealing officer misconduct, treating complaints against off-duty officers differently than complaints against civilians, and that a code of silence existed within the police department. The plaintiff contended that these de-facto policies permitted and encouraged Chicago officers to engage in misconduct without fear of consequences.

To support her *Monell* claim, plaintiff identified as an expert Dr. Peter Manning, a sociologist with nearly 40 years of experience in studying police departments. Although the City did not dispute that Dr. Manning was an expert on policing, it contended that he lacked the foundation to testify about the culture of the Chicago Police Department. His knowledge of the Chicago Police Department was limited to a three-day visit he made to the department a number of years ago to learn about crime mapping. He did not interview any Chicago officers or employees and he relied on materials plaintiff's counsel provided to him without investigating their veracity. Hence, the Court concluded his opinions lacked foundation and were unreliable, and they were excluded.

Similarly, in *James v. Harris County,* the family of a motorist fatally shot by a deputy sheriff, Deputy Wilkinson, brought an action against the county. The court described the family's theory of liability against the county as follows:

> At the outset we need to understand the precise theory of liability asserted against the County. The arguments in the family's brief are wide-ranging and the dots are not always connected, but the following salient points can be gleaned from the allegations: that the Sheriff inadequately investigates officer-involved shootings; that, after a cursory investigation, he then improperly delegates to the Harris County District Attorney's office the responsibility to investigate the conduct of the officers who were involved in shootings, with the tacit understanding that if no criminal indictment issues, the officer would not further be investigated or disciplined; that as a result of this improper "delegation," the sheriff abdicated his responsibility to investigate to conclusion officer-involved shootings; that the Sheriff's hands-off approach created in the department the understanding that officers would be immune from discipline for the use of excessive deadly force; and, finally, that this understanding was the moving force causing Wilkinson's reckless use of deadly force on the night in question.
>
> We understand the family's allegations, although multiple, to be aimed at a focused policy claim: that it was the Sheriff's official policy to forgo a thorough investigation of officer-involved shootings, and concomitantly to ignore whether officer discipline was required in these situations.

577 F.3d at 616 (footnote omitted) The case was tried to a jury, which could not agree on a verdict. However, the trial court granted the County's Rule 50 motion, and the family appealed.

One of the issues on appeal was whether the trial court properly limited the testimony of plaintiffs' expert witness, Dr. David Klinger, a criminologist who testified that of the 36 investigations of Harris County officer-involved shootings he personally reviewed, a "substantial number" fell below investigatory standards. The trial judge allowed Dr. Klinger to testify generally that line workers will break rules if they are not enforced, but refused to allow him to speculate that it was widely known that investigations and discipline resulting from officer-

8

involved shootings were lax, or that Deputy Wilkinson was aware of same. Dr. Klinger had no empirical evidence which supported his opinions. The Rule 50 dismissal was affirmed.

Finally, as noted in *Obrycka*, "[n]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." (792 F. Supp. 2d at 1025, citation omitted). The defendants will now apply the above-described principles to the opinions of plaintiffs' experts.

### A. Consuelo Gonzalez

Consuelo Gonzalez is a lip reading translator. (See Lappen Aff., attached Exhibit CG-1) According to her May 4, 2017 report, she was asked to review the Milwaukee Police Department squad car videotape of Mr. Williams, and to provide a translation of the approximately 37-second portion of the video for which no audio was recorded. (Id.) According to Ms. Gonzalez' CV, which is included as the last two pages at Exhibit CG-1, she is a provider of professional lip-reading translation services, she is a teacher, trainer and evaluator of oral transliteration, and she is a "native" lip reader, utilizing lip reading for all verbal interactions since the age of four. However, Ms. Gonzalez provides no description of her prior experience in reading the lips of a speaker, whose speech is captured on videotape which lacks an audio component. Therefore, neither her report nor her resume establishes her competence to act as an expert witness, with reference to translating the statements made by Mr. Williams during the initial 30-40 seconds of the subject squad videotape, which contains no audio component.

Additionally, Ms. Gonzalez notes in her report, in the "assessment" section, that the camera distance was poor, the lighting was poor, the camera angle was poor, and that the overall

video quality was poor, and it had low resolution and horizontal stripes. Even though the camera distance, the lighting, the camera angle, and the video quality are all poor, Ms. Gonzalez still asserts that at the :08 and :10 second mark, Mr. Williams states the words "I'm gonna die…" before he moves away from the camera. Due to the poor quality of the video images, the defendants assert that Ms. Gonzalez' opinion, regarding the words stated by Mr. Williams at the eight to ten second mark, is simply not reliable.

According to researchers in the Department of Computer Science at the University of Oxford, lip reading "is a notoriously difficult task for humans, especially in the absence of context." (See Lappen Aff., Exh. CG-4, p. 1) The Oxford researchers also noted that "[m]ost lip reading actuations, besides the lips and sometimes tongue and teeth, are latent and difficult to disambiguate without context." (Id.) In addition, the Oxford researchers concluded that "[c]onsequently, human lip reading performance is poor. Hearing-impaired people achieve an accuracy of only 17 +/- 12% even for a limited subset of 30 monosyllabic words, and 21 +/- 11% for 30 compound words." (Id.)

In addition, according to the article "Oxford University researchers partnered with google on a new AL tool that reads lips, and the results were significant", which was reported in Innovation and written by Conner Forrest (November 23, 2016, 8:16 a.m. PST) (attached to the Lappen Aff. as Exh. CG-2), human lip readers, who had roughly ten years of experience in the field, and who deciphered videos for the royal wedding and in court for trials as well, were given a sample of 200 videos, and they were able to clearly decipher less than one-quarter of the words in their sample. (Id.) Furthermore, according to a report from the "New Scientist", as cited on page 3 of the Oxford University article, the human "expert" lipreader deciphered only 12.4% of words in a data set, as opposed to 46.8% that were deciphered by a computerized deciphering

system.  In the article "Forensic Speech Reading" from Wikipedia, which is attached to the Lappen Affidavit as Exhibit CG-3, the authors note that "[n]o test of speech reading has yet been developed in a forensic context:  that is, to bench mark individual skills in speech reading from a video record, including production of a reliable transcript."  In fact, although Ms. Gonzalez was identified in the Wikipedia article, the author of the article warns that "[c]ommissioning agents need to be aware of issues ahead in the unreliability of speech reading, and be prepared to treat such advice with caution."  (Exhibit CG-3, p. 1)  That article goes on to note that [w]hile lipread speech can carry useful speech information, it is inherently less accurate than (clearly) heard speech because many distinctive features of speech are produced by actions of the tongue within the oral cavity and are not visible."  The author continues by noting that this is "a limitation imposed by speech itself, not the expertise of the speechreader.  It is the main reason why the accuracy of a speech reader working on a purely visual record cannot be considered wholly reliable, however skilled they may be and irrespective of hearing status."  (Id., pp. 1-2.)  In conclusion, the defendants respectfully assert that the report and/or opinions of Ms. Gonzalez, relative to her interpretation of words that Mr. Williams may have said during the initial 30-40 seconds of the squad video, is not reliable.  Therefore, her report and the opinions contained therein are not admissible evidence, and such opinions should not be considered by the Court in the context of resolving the defendants' pending motion for summary judgment.

    **B.**    **<u>Roger A. Clark</u>**

    The plaintiffs have identified Roger A. Clark as their "police procedures" expert.  As noted above, there really is no such specialty area as "police procedures".  Mr. Clark's report and opinion should be not be considered by the Court for this reason alone.  (See *Peterson* and *Whren* cases, cited above.)  Mr. Clark's opinion letter is attached to the Second Lappen Affidavit

as Exhibit RC-1, his CV is attached as Exhibit RC-2, his fee schedule is attached as Exhibit RC-3, his updated list of sworn testimony for purposes of Rule 26 is attached as Exhibit RC-4, and finally, a copy of the transcript of his May 30, 2017 deposition is attached as Exhibit RC-5. (Note that Mr. Clark's deposition could not be completed in the time reserved for that deposition, and will be concluded on June 26, 2017. Defendants reserve the right to supplement their filings in this case upon completion of Mr. Clark's deposition.)

Mr. Clark has testified many times as a "police practices" expert (See Exhibit RC-4) He makes a lot of money doing that. (See Exhibit RC-3) In fact, since 2010, Mr. Clark has maintained a six-figure salary, which rose to $160,000 annually in 2016. (See Exhibit RC-5 pp. 6-7) However, Mr. Clark is currently 76 years old. (Id. p. 4) He was last employed as a sworn law enforcement officer in 1993. (Id. pp. 4-5) Mr. Clark has not been employed in any law enforcement capacity since 1993. (Id. p. 5) Since 1993, Mr. Clark has acted as a law enforcement practices consultant. (Id. p. 5) The last time Mr. Clark perform an arrest using his own handcuffs was 1984. (Id. p. 5) Mr. Clark last engaged in a foot pursuit as a law enforcement officer in 1972. (Id. p. 6) Mr. Clark appears to be a graduate of a "California POST-certified academy in 1966." (Id. p. 10) He described that at that time, there was a "learning domain" for first aid. (Id. p. 9) Mr. Clark indicated that he received his first aid training by the time he graduated from his police academy in 1966, and that he was updated on that training throughout his career. (Id. pp. 9-10) POST stands for Peace Officers Standards and Training. (Id. p. 10) Even in 1966, law enforcement officers in California received Red Cross certificates for their CPR training. (Id. p. 10) Mr. Clark's certification in Red Cross First Aid lapsed five years ago. (Id. p. 11). Mr. Clark last received first aid training in 1993. (Id. p. 11) Mr. Clark claims that he maintains the California POST training curriculum in his personal

library, and updates it and refreshes his curriculum every six months. (Id. p. 12) He claims that he engages in his own study to keep updated on changes and post training. (Id. p. 12) In the context of the time that he was employed by the Los Angeles Sheriff's Department, and received his first aid in CPR training, Mr. Clark could not testify as to whether the involved training modules included any instruction regarding sickle cell disease or sickle cell trait. (Id. pp. 12-14) Mr. Clark testified that while he was an active law enforcement officer, one tenet of his First Responder training was "the ABCs," which refers to airway, breathing and circulation. (Id. pp. 14-15) In the context of Mr. Clark's first responder training, he was instructed that when someone with more advanced medical training arrives on scene, that he should defer to those people to continue to provide medical care to the subject. (Id. p. 15) Mr. Clark admitted that in the context of his law enforcement training, he was trained that "[e]verything is done with the safety of the officer. If the officer is not safe, then nothing good happens after that. You can't – so if a crime is in progress, stop it, and then medical need, and then evidence. " (Id. pp. 17-18) Mr. Clark agreed that his training provided that an officer responding alone should make sure that the scene is safe before engaging any type of first aid or CPR activity. (Id. pp. 18-20) Mr. Clark has not had EMT training. (Id. p. 23) Mr. Clark agreed that his first responder training did not involve training relative to diagnosing particular diseases or afflictions. (Id. p. 23) Some of the specific afflictions or medical situations that were presented in context of Mr. Clark's First Responder training back in 1993 were heart attack, stroke, burn, asthma, allergic reactions and diabetic conditions. (Id. p. 24) Mr. Clark admitted that his first responder training provided that with regard to the "ABCs," the first responder begins by checking to see if the airway is blocked, and whether the person can respirate. (Id. p. 24) Mr. Clark indicated that in that context, he was trained regarding the use of the Heimlich maneuver, to clear an obstruction from a person's

13

mouth or throat. (Id. p. 27) Mr. Clark indicated that he was taught that if a person is turning blue they are cyanotic, which is an indication that they are starved for air. (Id. p. 27) In the context of being trained to evaluate a person's circulation, Mr. Clark was trained to check for a pulse using the carotid artery, which runs alongside the neck. (Id. p. 27) Mr. Clark agreed that if a person is talking, they are breathing. (Id. pp. 27-28)

Since retiring in 1993, Mr. Clark has not had occasion to review nor do any research regarding first responder training provided to any other law enforcement agency. (Id. p. 29) However, Mr. Clark is aware that currently, the State of California, Department of Justice designs the First Responder Training Module used in training California law enforcement officers, and it incorporates either American Heart Association or Red Cross standards into that training. (Id. pp. 26-27) Mr. Clark's source for his current understanding State of California First Responder Training is learning Domain No. 34, titled First Aid and CPR, version 5.4. (Id. p. 27) Mr. Clark maintains a copy of the current version of this module in his personal library, but he did not cite it, or review it, when preparing the report he rendered in this case. (Id. pp. 27-28) Mr. Clark has not gathered and/or reviewed any other training materials relative to materials that were used to train law enforcement officers regarding acting as a first responder. (Id. p. 28) Mr. Clark did not review and was not provided with any of the American Heart Association and/or Red Cross materials that were used by Milwaukee Police Academy trainers at and prior to July of 2011 in the context of MPD first responder training. (Id. pp. 28-29) In his 27 years of service with the Los Angeles County Sheriff's Department, Mr. Clark was never made aware of any prisoner or arrestee dying from complications related to either sickle cell trait or sickle cell disease. (Id. pp. 35-36) In his everyday life, Mr. Clark had not been aware of any person dying from sickle cell disease or sickle cell trait. (Id. p. 36) Mr. Clark admitted that he could find

14

nothing in the records that he reviewed which indicated that any officer purposely allowed Mr. Williams to die. (Id. p. 55) Yet Mr. Clark opined that the defendant officers had deviated from proper place standards and practices. (Id. p. 52, Exhibit RC-1 p. 17 opinion no. 1) However, Mr. Clark's only source for "proper place standards and practices" is California Learning Domain No. 31, Custody (Exhibit RC-5 at p. 63). He suggested that a federal law also applied, but he did not site either the California Learning Domain or the federal law that applies in the listing he provided of materials that he reviewed in the context of rendering his expert witness opinions in his expert report. (Id. p. 63 and Exhibit RC-1) Mr. Clark quoted from the federal regulation that he claimed to use in rending his opinions as follows: "failure to uphold the expected level of care under the provisions of state and federal laws or the 'callous disregard' for an arrested person's safety will subject police officers to either department discipline, including termination, state prosecution for violation of penal code statutes, federal prosecution for violation of federal civil rights law and/or civil lawsuits which may include punitive damage levied directly against individual officers." (Id. pp. 64-66) Mr. Clark testified that the above noted quotation was something that he read directly from the California POST Learning Domain No. 31. (Id. p. 66) Mr. Clark admitted that the California POST chapter that he cited from does not contain a specific reference to officers responding to persons in custody who complained that they cannot breathe. (Id. p. 66) In the context of Mr. Clark's review of this case, he did not refer to any standards or models promulgated by the Wisconsin Law Enforcement Standard Board. (Id. p. 67) Mr. Clark's first listed opinion was that each "officer's failure to constantly and effectively monitor Mr. Williams' medical condition and respiratory distress while in their custody and to communicate amongst themselves about his condition deviated from proper police standards and practices." (See Exhibit RC-1, pg. 17) However, Mr. Clark stated that his

15

source for "proper policy and procedure" is the MPD SOP 090, as well the general policy that a prisoner "has to be constantly monitored." (Exhibit RC-5, pp. 67-68) Mr. Clark did not conduct any type of literature review regarding police standards and practices that relate to providing emergency medical care to prisoners. (Id. p. 70) Mr. Clark has never been involved with acting as an expert witness on any case involving a subject or prisoner who suffered from sickle cell disease or sickle cell crisis. (Id. p. 72) Mr. Clark has not published any articles regarding prisoners who complained of having any type of breathing difficulty as it relates to law enforcement response to such complaint. (Id. p. 72) Mr. Clark has not done any type of literature review regarding police standards and practices relating to officers communicating with each other regarding observations they make of a prisoner's medical condition. (Id. pp. 72-73) Mr. Clark has not himself written any type of article relating to that same concept. (Id. p. 73) Mr. Clark has not conducted any type of literature review regarding the above-noted issues for any other case in which he has acted as an expert witness. (Id. p. 73) He testified that he has "always relied on [his] own training and experience. (Id. p. 73) Mr. Clark lacks competence to opine as to whether or not the defendant officers followed "proper procedures," and due to his failure to review the policies of other law enforcement agencies, his opinions lack reliability, and they should be stricken.

Mr. Clark could not point to any specific information presented to either Sergeant Kaul or Sergeant Thiel, or any action of theirs, which supported his opinion that the two sergeants had to failed to supervise officers on the night in question. (Id. pp. 74-83) Mr. Clark has not studied the policies and procedures that relate to a sergeant's supervision of officers as it relates to monitoring people in custody. (Id. pp. 83-86) Mr. Clark has not written any articles regarding policies or standards relative to supervision by supervisors, like sergeants, over officers as it

relates to monitoring persons in their custody. (Id. pp. 85-86) Therefore, his opinions criticizing the supervisory behaviors of Sergeants Kaul and Thiel should also be stricken.

Mr. Clark testified that he is not aware of Chief Flynn having any knowledge that either Officer Cline, Officer Ticcioni, Officer Coe or Officer Bleichwehl engaged in any unlawful conduct in the context of the unlawful search cases, but failed to discipline them in any way. (Id. pp. 87-88) Additionally, Mr. Clark was unaware of any type of situation which involved Chief Flynn being aware of any similar allegation against either Sergeant Kaul or Sergeant Theil, and failing to take disciplinary steps. (Id. pp. 87-88) Mr. Clark defined the term "code of silence" as "officers fail in their duty to intervene and fail in the duty to report malignant conduct, and that this then becomes – and I'll use the term as an illustration – a poison that leaches through the department that gives certain officers a feeling of impunity and opportunity to do things that they have a level of confidence will not be reported and will not be held accountable for it." (Id. p. 90) Mr. Clark admitted, somewhat circuitously, that he had read all the deposition transcripts and inquest testimony that was given by the various defendant officers, but he could not provide any information which indicates that at least one officer felt that another officer was violating procedure, much less failed to report same. (Id. pp. 90-100) Mr. Clark was unable to provide any specific instance of a situation which involved Chief Flynn being aware of an officer who observed inappropriate conduct, but failed to report it, and where Chief Flynn then failed to take some kind of disciplinary action against the person who failed to report. (Id. pp. 100-112) Therefore, Mr. Clark's opinions regarding an alleged "code of silence" are not based upon sufficient facts or data, and they should be stricken because they are not reliable. Like the expert in the *Obrycha* case (discussed above) Mr. Clark has no foundational basis to opine regarding anything having to do with Milwaukee Police Department culture. Also, like the plaintiff in the

*Jones* case (also discussed above) Mr. Clark presents no empirical evidence to support his opinions regarding any conclusion that MPD officers believe they can act with impunity, much less that such a belief was the moving force behind Mr. Williams' injuries.

Clearly, Mr. Clark lacks competence to render the expert opinions presented in his 5/8/17 opinion letter (Exh. RC-1), and his opinions lack reliability. He has not been a law enforcement officer for more than 20 years. He has not conducted any type of literature review regarding the subject matter areas about which he opines, including "proper police standards and practices," and he has not written any type of peer reviewed articles or papers about same. His own California-based First Responder training (although more than 20 years old) instructed him on the same First Responder principles, like the ABCs of evaluating a subject, that were trained to the defendants in this case. Even Mr. Clark was not trained specifically regarding sickle cell disease, trait, or crisis, and he had never heard of anyone dying police custody from sickle cell crisis. Mr. Clark demonstrated in his deposition that he could not present any factual basis for his conclusions regarding the alleged supervisory failures of Sergeant Kaul and Thiel, and or the failure of Chief Flynn to discipline Officers Cline, Bleichwehl, Ticcioni and Coe. Regarding opinion No. 5, Mr. Clark presented no evidence in his report or in his deposition which links any alleged investigatory deficiency to any "applicable police standards," and shows how the alleged deficiencies in the investigation violated any police standard, much less led to officers who were involved in the subject investigation to fail to render medical aid to Mr. Williams on July 6, 2011, which occurred prior to the beginning of the subject investigation. Thus, there can be no causal connection between any alleged investigation deficiency after July 6, 2011 and the events of July 6, 2011.

Additionally, regarding Mr. Clark's opinions regarding code of silence (items 6 and 7 on page 18 of his report), are not supported by any citation to specific examples of individuals who knowingly fail to report misconduct by their fellow officers, and where that failure to report was known by Chief Flynn, and he failed to take any disciplinary action in response thereto. Regarding Mr. Clark's eighth opinion, which focuses the MPD SOP which requires monitoring a prisoner in custody, particularly if they are in restraints, he has not articulated how any defendant officers' actions violated the SOP. Furthermore, he acknowledges that Chief Flynn did not find that the officers violated MPD policy in that respect. Additionally, with regard to Mr. Clark's ninth opinion, regarding MPD training and supervision regarding persons with respiratory distress, he opines that the related training fell "well below applicable police standards" yet he fails to provide any source for determining those "applicable police standards," and has never conducted any type of review or search regarding any police standards, other than those found in California training modules. The related opinions lack a basis found in sufficient facts or data. Furthermore, it is simply not true that the MPD failed to train officers regarding matters related to respiratory distress. Many of those training materials are attached to the Groszczyk Affidavit, and clearly provided officers with standard American Heart Association and Red Cross First Responder Training. (See also Defendants Response to Plaintiffs' Proposed Factual Finding No. 118). Finally, in his tenth opinion, Mr. Clark suggest that the training supervision addressed in his opinion no. 9 "fell well below applicable police standards," and that this conclusion has demonstrated with the actions and statement of Chief Flynn after the death of Derek Williams, including subsequent changes in policy and training. However, as is noted in the defendants' reply brief, submitted with reference to their motion for summary judgment, these actions constitute a post remedial measures, which cannot be used to establish negligence. (See Reply

Brief, Section V, pp. 21-22)  In conclusion, the defendants assert that Mr. Clark's opinions and his report must be stricken, and not be considered by the Court in the context of resolving the pending motion for summary judgment, due to his lack of competence in the subject matter areas, and the unreliability of his opinions.

### C.     Trevonne M. Thompson

The plaintiffs present Dr. Trevonne Thompson as one of their expert witnesses.  Dr. Thompson's May 2, 2017 expert report is attached to the Lappen Affidavit, filed in support of the Defendants' Motion to Strike, as Exhibit TT-1.  Dr. Thompson's fee schedule is attached to that same affidavit as Exhibit TT-2, and a copy of Dr. Thompson's June 1, 2017 deposition in this case is attached to the Lappen Affidavit as Exhibit TT-3.

Dr. Thompson offers several opinions in this case.  First, Dr. Thompson opines that "had medical attention been provided to Mr. Derek Williams prior to his loss of consciousness while in police custody, he would have had a high likelihood of survival."  (Exh. TT-1, p. 2)  Dr. Thompson opines that when the paramedics arrived at the scene on July 6, 2011, "Mr. Williams was already dead."  (Id.)  Additionally, Dr. Thompson opines that

> "based on my review of the materials I was provided, my experience in treating patients with sickle cell disease, and my review of the literature concerning certain death in sickle cell trait, I believe the cause of death remains undetermined."  (Id.)

However, Dr. Thompson appears to contradict this conclusion, by also asserting that "[s]ince Mr. Williams received no medical attention or intervention prior to his death, it is difficult to ascertain the cause of his death."  (Id.)

> Dr. Thompson also opines that "had the police called paramedics in response to Mr. Williams' complaints that he could not breathe immediately after he was arrested or in response to his complaint that he could not breathe while he was in the squad car, an early intervention by medical or paramedic professionals (i.e., paramedics) would more likely than not have stabilized Mr. Williams to allow for transport to a hospital setting where additional assessments and interventions

could have been performed, including diagnostic testing and life saving treatment." (Id.)

Finally, Dr. Thompson opines that

"[r]egardless of the actual cause of Mr. Williams' death, it is highly likely that he would not have died had medical intervention had begun before his loss of consciousness, recognizing that the point when he lost consciousness may indicate the moment he died." (Id.)

On pages 2-3 of his May 2, 2017 report, Dr. Thompson continues to praise paramedic professionals, and his above-noted opinion, regarding Mr. Williams' survivability, appears to rest upon his faith in the early intervention and treatment by paramedics, and his conclusion that "pre-hospital interventions by paramedics can provide life-saving care during life-threatening emergencies." (Id. p. 3) Dr. Thompson's opinions regarding Mr. Williams' survivability are also premised upon his conclusion that "[i]n the United States where we have a mature and well-studied approach to the care of medical emergencies, patients who present to the emergency department alive tend to stay alive, regardless of the condition that resulted in emergency." (Id.)

As described in the defendants' proposed factual findings, which were submitted in the context of their pending motion for summary judgment, they presented the Court with the results relative to the autopsy that was conducted by the Office of the Milwaukee County Medical Examiner on Mr. Williams. The cause of Mr. Williams' death has been officially determined to be sickle cell trait. (DPFOF Nos. 110-111) The medical examiner found no other sign of physical injury or disease which could have been the cause of Mr. Williams' death. (DPFOF Nos. 108, 112) Dr. Thompson is an emergency room doctor. (See Dr. Thompson's CV, which is attached as Appendix 1 to his May 2, 2017 report, which has been submitted at Exhibit TT-1; see also Thompson deposition, Exhibit TT-3, at pp. 19-20) Dr. Thompson has only provided expert testimony on four or five previous occasions. (Id. p. 4) Dr. Thompson has not testified in

Court regarding any of the few cases wherein he has provided expert opinion, and for most of the cases, his opinion was presented in the form of consultation, as opposed to presentation of a written report. (Id. pp. 7-11)  Dr. Thompson confirmed that in his review of the documents presented to him by plaintiffs' counsel, he reviewed information which confirmed that Mr. Williams had tested positive for sickle cell trait in the context of new born screening.  (Id. pp. 12-13)  Dr. Thompson reviewed no information which indicated that Mr. Williams ever sought medical treatment for his sickle cell trait.  (Id. pp. 14-15)  Dr. Thompson gave only one deposition as an expert witness, and gave only one other deposition in the context of a malpractice suit where he is named as a defendant while he was a resident. (Id. pp. 16-18)  Dr. Thompson has only testified in court once, and that was as a fact witness, to provide information regarding his care of an emergency room patient.  (Id. P. 18)

Aside from being an emergency room physician, and specializing in emergency medicine, Dr. Thompson also specializes in toxicology, which deals with the diagnosis, treatment, management, and prevention of all manners of poisoning, whether that is pharmacologic, illicit, environmental, or industrial.  (Exhibit TT-3, pp. 20-21).  Dr. Thompson is not a specialist in the area of hematology.  (Id. pp. 34-35)  Dr. Thompson is not a specialist in the area of oncology.  (Id.)  Dr. Thompson is not a specialist in the area of pathology.  (Id. p. 36)  Dr. Thompson has never acted as a medical examiner.   (Id.)   Dr. Thompson has never been employed as a forensic pathologist.  (Id. p. 36)  Dr. Thompson has never performed an autopsy. (Id. pp. 36-37)  While Dr. Thompson testified that he formally signed-off as to a cause of death approximately a dozen times, he could not answer as to whether or not he signed off on a document as to his opinion regarding a cause of death regarding an individual who presented with sickle cell crisis.  (Id. pp. 38-40).  Dr. Thompson has no way to know as to whether or not

any person with regard to whom he signed off on a death certificate had tested positive for sickle cell trait. (Id. p. 40) Dr. Thompson was not a hematology specialist with regard to the sickle cell program that is associated with the University of Illinois Health Care System. (Id. pp. 43-45) While Dr. Thompson works closely with people who are employed by the sickle cell program, he is not employed by or assigned directly to a sickle cell program. (Id. pp. 45-46) Dr. Thompson testified that it is his understanding that sickle cell disease is a rare disease. (Id. pp. 46-47) In fact, he testified that "with the African-American population being about 12-13% of the United States population overall, we are only talking a few hundred thousand people in the United States who have sickle disease compared to 300-plus-million people in the United States. So this is truly a rare disease." (Id. p. 47) Dr. Thompson also testified that "[m]any physicians in the United States do not routinely encounter patients with sickle cell disease because of the rarity of the disease." (Id. p. 47) Dr. Thompson has not himself conducted any type of research regarding sickle cell disease. (Id. p. 50) Dr. Thompson has not authored any type of papers or articles or publications of any kind relative to sickle cell disease. (Id. p. 50) Dr. Thompson has not conducted any research relative to sickle cell trait. (Id. pp. 50-51) Dr. Thompson has not conducted any research relative to the sudden onset of sickle cell crisis in patients with trait. (Id. p. 51) Consistent with his review of medical literature, Dr. Thompson does agree that there appears to have been cases where patients with sickle cell trait have died suddenly as a result of the sudden onset of sickle cell crisis. (Id., pp. 55-59) Dr. Thompson does concede that there seems to be cases where patients with sickle cell trait, particularly those who experience extreme of exertion or dehydration, who may be at increased risk of sudden death. (Id. pp. 56-57) Dr. Thompson was unable to provide the number of patients, if any, who he had treated who had tested positive for sickle cell trait. (Id. pp. 60-61) With regard to the emergency rooms wherein

Dr. Thompson practices, he indicated that questions regarding sickle cell trait are not included within the triage process of incoming patients. (Id. pp. 61-63) Over the course of Dr. Thompson's career, he estimates that he had treated approximately six people who died as a result of sickle-cell-disease-related complications. (Id. pp. 66-68) The primary death cause and complication with regard to those patients was acute chest syndrome, which the doctor described as involving the lungs, and

> "sort of a combination of a sickled red blood cell and the causing a lack of blood flow to a part of the lung, often in combination with an infection, although there is some controversy in how much an infection plays a role versus the lack of blood flow or what we call infarction. So you have a sickling process with or without infection kind of going on in the lungs and that can ultimately lead to death." (Id. p. 69)

In describing a sickling process, Dr. Thompson testified that "[o]n the basic level, you have impaired oxygen delivery to tissues and you have kind of a physical block aid of blood moving through the small blood vessels." (Id. p. 71) Dr. Thompson testified generally speaking that if a patient present in the emergency room with acute chest syndrome, he could get a chest x-ray within minutes and make a diagnosis of acute chest syndrome within 10 – 15 minutes, but he indicated that more commonly, the diagnostic process would take "30 minutes, an hour or a couple of hours, depending on the severity of how they present, what symptoms they describe in triage and that sort of thing." (Id. p. 78) Dr. Thompson testified that "generally, patients with sickle cell trait do not have sickle cell crisis.

> This is rare, in those rare circumstances where that may happen, and to be fair, out of all of the sickle patients I have taken care of, I do not recall taking care of a patient with sickle cell trait who came in with a sickle cell painful crisis. If you were to have sickled cells, I can't imagine that you would have a similar process of someone with sickle cell disease. But having just sickle trait, in my clinical experience, has not led to someone having a sickle cell painful crisis." (Id. pp. 80-81)

Dr. Thompson admitted that he does not know if patients with sickle cell trait can get acute chest syndrome. (Id. pp. 81-82) Dr. Thompson has not heard of any practitioners who believe that they treated a patient who had sickle cell trait, but who suffered from acute chest syndrome. (Id. p. 82) Dr. Thompson opined that "there are too many questions that remain unanswered to determine a cause of death" for Derek Williams. (Id. p. 83) Dr. Thompson did not review the re- cuts of the slides that were generated from Mr. Williams' autopsy. (Id. p. 83) Dr. Thompson confirmed that he could not testify one way or the other as to Derek Williams' cause of death. (Id. pp. 87-88) Dr. Thompson indicated that because there was no intervention by emergency medical specialists until after Mr. Williams stopped moving, there is no period of time where those professionals could have gotten some sort of information to help "drill things down a little bit." (Id. pp. 88-89) Therefore, the basis for Dr. Thompson's survivability opinions relates to his conclusion that he is

> "stuck with the overall statistics of if you arrive in the emergency department alive, we will keep you alive. That is what our training is for. That is what we are really good at. So I am stuck with a maybe 50,000 foot view on how this case would have proceeded had medical intervention been provided earlier because I am missing specific details." (Id. p. 89) Dr. Thompson continued by noting that he "was not able, no one was able to get a history from Mr. Williams as describing what his symptoms were leading up to his collapse. We have the video that kind of shows him suffering, so to speak, but we don't have a medical professional getting vital signs. We don't have someone asking what symptoms are you experiencing. So without those specific details, I can't drill it down to he would have had a 60 percent chance of living or 98 percent or a two percent chance. It is hard to drill that down without those specifics, but I do know, and this is consistent [sic] my clinical practice, if you show up to the emergency department alive, we can keep you alive." (Id. pp. 89-90)

Dr. Thompson admitted that he could not testify as to what was going on with Mr. Williams medically during the time frame he was in police custody. (Id. p. 90) Dr. Thompson explained

> "[o]ther than looking at him kind of painfully suffering on the video, I can't really, because I could come up with several speculations. But without a history, without vital signs, without that assessment that paramedics could have provided

25

on the scene or what I could have gotten in the emergency department, I'm stuck only guessing because I'm missing those details." (Id. p. 90)

Dr. Thompson admitted that he does not know what caused the stress that Mr. Williams appears to be experiencing, as captured on the video images from the squad car. (Id. pp. 92-94) Dr. Thompson also testified that

> "all I can say from this is that whatever this process was, that natural history was he died in 14 minutes, but I don't know what that process would have been like and, you know, had we been able to intervene and stop whatever it was or if not stop it, temporarily treat it so that we can then later give definitive management. That's the piece that is missing." (Id. p. 102)

Thus, per Dr. Thomas own admission, his opinions regarding Mr. Williams' survivability are speculative, and he cannot provide a guess as to his chances of surviving his medical crisis if EMTs or paramedics had arrived on scene earlier. Dr. Thompson thus also fails to base his survivability-related opinions or sufficient facts or data, and so they should be stricken.

Dr. Thompson agreed that the fact that Mr. Williams lost consciousness does not necessarily indicate that he died at that point in time. (Id. p. 103) Dr. Thompson admits that he himself has not done any paramedic training. (Id. pp. 104-105) Dr. Thomson had provided training to paramedic trainees, and his training has involved reference materials that were produced by either the American Heart Association or the Red Cross. (Id. pp. 105-107) Dr. Thompson himself has written materials for the American Heart Association regarding advanced cardiac life support. (Id. p. 106) Dr. Thompson agrees that American Heart Association's standard for EMS training are standardized to some degree. (Id. pp. 108-109) Dr. Thompson was not provided with any of the training materials that was used to train Milwaukee Police Officers as of July of 2011 or within a couple of years prior to that date. (Id. p. 109) Dr. Thompson provided testimony which establishes that if an emergency medical practitioner arrives on scene when a subject is still conscious, the EMT can take a history and do an

evaluation to assess the situation, but the various actions that can be taken all take time. (Id. pp. 110-116) Dr. Thompson testified that the use of the term "I can't breathe" is an "unsophisticated complaint." (Id. p. 113) He clarified that it is an unsophisticated complaint because it does not present detail as to what the person is experiencing. (Id. p. 117) Dr. Thompson testified that

> "[s]o someone who is having maybe a asthma exacerbation or chest pain or whatever it may be may just say I can't breathe. So clearly, they can breathe. So then it becomes incumbent upon the medical professional to say what do you mean by you can't breathe. Well, it hurts when I take a deep breath or my chest is hurting or it only hurts when I breathe deeply but not when I breathe regularly or I am breathing really fast and I don't know why. It is incumbent upon the medical professional to tease out what do you mean by you can't breathe. That's what I mean by it is unsophisticated and that I probably would not – if I were a patient, I probably would not say that I can't breathe. I have the medical sophistication to describe symptoms in a way that a physician or other health care professional could understand them but a run-of-the-mill lay person may not be able to. And so that's why the medical professional would need to tease out what that complaint means because I can't breathe is not specific. That can mean any host of cardiopulmonary things or skeletal muscle things. Maybe you can't breathe because you have some rib fractures, for example. That's the symptom you're describing, but you have rib fractures. That means it really hurts when you breathe but you're able to breathe or whatever it may be. Just that term in itself is unsophisticated in the sense that there is a lot of nuance lost in that term." (Id. pp. 118-119)

Thus, even Dr. Thompson recognizes the limitations on the defendant officers' understanding as to whether Mr. Williams was suffering from a medical emergency, based upon his "unsophisticated" description of "I can't breathe.

Dr. Thompson did not recall if he heard on the squad car video Mr. Williams complain that he was in pain – the only thing he recalled Mr. Williams' saying was he could not breathe. (Id. p. 120) Dr. Thompson testified that without knowing specifically what critical illness was involved with Mr. Williams,

> "we don't know what the insult was, so it is hard to say. Perhaps he just needed supplemental oxygen or an oxygen mask. Perhaps he was having a cardiac dysrhythmia and needed some pharmacologic intervention. Perhaps, you know, I don't know. I could conjecture a whole bunch of things. The problem is that we

27

don't know because we did not have that intervention. So I don't know which of the potential interventions paramedic could have done would have been the key here because we lost that ability to get that information and there is no intervention before he collapsed." (Id. pp. 122-123)

Thus, Dr. Thompson again reinforces the speculative nature of determining Mr. Williams' survivability.

Dr. Thompson admitted that he could not say definitively as to whether paramedics could have made a difference for Mr. Williams. (Id. p. 142) Dr. Thompson admitted that to be more definitive on the issue as to whether or not paramedics could have made a difference for Mr. Williams, he would have needed to know what Mr. Williams was suffering from. (Id. p. 142) Dr. Thompson is "pretty sure" that he has never "taken care of a case where a patient had sickle trait and had a sickle cell crisis of any kind." (Id. p. 144) Given the admitted speculative nature of Dr. Thompson's opinions regarding Mr. Williams survivability, the defendants assert that they are therefore unreliable, and should be stricken from the record and not be considered by the Court in resolving the defendants' pending motion for summary judgment.

Dated at the City of Milwaukee, this 7th day of June, 2017.

GRANT F. LANGLEY
Milwaukee City Attorney


/s/ Susan E. Lappen
SUSAN E. LAPPEN
Assistant City Attorney
State Bar No. 01003567
800 City Hall
200 East Wells Street
Milwaukee, WI 53202
(414) 286-2601
Email: slappe@milwaukee.gov
Attorneys for the Defendants
City of Milwaukee, Jeffrey Cline, Richard
Ticcioni, Patrick Coe, Jason Bleichwehl,
Robert Thiel, Todd Kaul, Zachary Thoms,
Gregory Kuspa, Craig Thimm, Chad
Boyack, and David Letteer

1032-2016-1482/239518