ESTATE OF DEREK WILLIAMS JR., et al.,

        Plaintiffs,                          Judge J.P. Stadtmueller

v.                                             Case No.: 16-cv-869

CITY OF MILWAUKEE, et al.,

        Defendants.

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO STRIKE THE OPINION OF PLAINTIFFS' EXPERT DR. TREVONNE THOMPSON

Plaintiffs, Estate of Derek Williams by Administrator Sharday Rose, Tanijah Williams, Derek Williams III, and Taliyah S. Williams, by and through their attorneys, and in response to Defendants' Motion to Strike the Opinion of Plaintiffs' Expert Dr. Trevonne Thompson, state as follows:[1]

Plaintiffs have named Dr. Trevonne Thompson as an expert witness to render an opinion as to whether timely medical intervention would have saved Derek Williams' life. Defendants' sole objection to the testimony of Dr. Thompson appears to be based on the assertion that his opinions regarding whether Mr. Williams would have survived are "speculative" and therefore unreliable. Dkt. 67, Motion to Strike at 28. A fair reading of Dr. Thompson's report and deposition transcript demonstrates that his opinions are not speculative in the least and should be considered on summary judgment and at trial.

---

[1] Plaintiffs will be filing separate responses regarding each of the three experts Defendants have moved to strike in their motion to strike.

**Dr. Thompson's Expertise**

Dr. Thompson is an emergency physician and medical toxicologist at the University of Illinois Hospital & Health Sciences System.[2] Dr. Thompson Report at 1. He is a tenured Associate Professor of Emergency Medicine and Medical Toxicology within the Department of Emergency Medicine at the University of Illinois College of Medicine Chicago, with over fifteen years of experience in the practice of emergency medicine. *Id.* He is a diplomate of the American Board of Emergency Medicine with an additional subspecialty certification in Medical Toxicology, and has conducted research in both Emergency Medicine and Medical Toxicology. *Id.* He has authored or co-authored numerous textbook chapters and peer-reviewed journal articles in the area of Emergency Medicine. *Id.* He teaches and supervises medical students, housestaff physicians, and other healthcare professionals in the areas of Emergency Medicine. *Id.*

For approximately ten years Dr. Thompson has worked as an attending emergency physician within the University of Illinois Hospital and Health Sciences System, which maintains the largest sickle cell program in the Midwest. Dr. Thompson deposition at 43. This program deals with all facets of sickle cell care, including outpatient care, psychological care and emergency department care, which includes working with the emergency department sickle cell program so that it can coordinate with the sickle cell program to provide state-of-the-art comprehensive care when patients are having sickle cell emergencies. Since the program is in Chicago, which has a high African-American population (a population that is particularly susceptible to sickle cell disease), the program "take[s] care of an extraordinary amount of sickle cell patients in the emergency department on a regular basis." *Id.* at 44.

---

[2]This case involves emergency medicine, not toxicology, and it is these credentials of Dr. Thompson that will be highlighted in this section.

As part of his emergency medicine training and experience, Dr. Thompson has had extensive exposure to paramedics. In his report, Dr. Thompson explained that:

> As an emergency physician I have broad experience working with paramedics. I routinely receive patients transported by paramedics. I routinely receive medical information about patients from paramedics. I have conferred remotely with paramedics to aid in providing care on the scene or during transport. I routinely witness the consequences of the prehospital care given by paramedics.

Dr. Thompson Report at 3. In his deposition, Dr. Thompson testified that "[p]art of emergency medicine residency, however, does involve training in EMS services from the very simplest things as ride alongs to learning how to be the medical control for EMS personnel, and there are even EMS fellowships within emergency medicine as a subspecialty. So my training as an emergency physician involves a lot of work and understanding of what goes on in the pre-hospital setting with paramedics." Dr. Thompson deposition at 104-05. Dr. Thompson has trained paramedics, has written materials for the American Heart Association concerning provision of advanced life support by paramedics, and has been involved with promulgating guidelines for paramedics who are caring for patients after they have been resuscitated. *Id.* at 105-07.

Defendants have not claimed that Dr. Thompson lacks the expertise to render any of the opinions set forth in his report.

**Materials Reviewed by Dr. Thompson**

In preparation for rendering his opinions in this matter Dr. Thompson reviewed the materials listed in Appendix 2 to his report. These materials include all of the medical information concerning Mr. Williams, including Mr. Williams' medical history prior to the date of his death, the autopsy photos, the original autopsy protocol, the amended autopsy protocol and

3

the critiques of that autopsy. Defendants have not claimed that the materials reviewed by Dr.

Thompson were substantively incomplete.[3]

**Sickle Cell Disease and Sickle Cell Trait**

Sickle cell *disease* (SCD) is a serious illness; Sickle cell *trait* (SCT) is not, and indeed is

not considered a medical disease at all. *Id.* at 49-51, 64-67. Sickle cell disease is a genetic disease

in which the person has inherited a sickle cell gene from both his mother and father. *Id.* at 49,

64-71. Sickle cell trait is a generally harmless condition in which a person has inherited only one

sickle cell gene, from either his father or mother. *Id.* at 40, 49, 59-61, 80-81, 144; *see also*

www.cdc.gov/ncbddd/sicklecell/traits. html ("People who inherit one sickle cell gene and one

normal gene have sickle cell trait (SCT). People with SCT usually do not have any of the

symptoms of sickle cell disease (SCD), but they can pass the trait on to their children."). Mr.

Williams had sickle cell trait, not sickle cell disease. Dr. Thompson deposition at 13-14. A

person with sickle cell disease will experience sickle cell related symptoms very shortly after

birth, since a person is born with the disease. *Id.* at 66-7. Mr. Williams had never needed medical

attention in relation to having sickle cell trait. *Id.* at 15.

It is not generally accepted in the medical community that a person with sickle cell trait

could die from sudden onset of sickle cell crisis. *Id.* at 55-56. While there have been a few

studies that suggest that persons with sickle cell trait may be at an increased risk of sudden death

when they engage in activities that result in "extremes of exertion" in "extremes of heat," these

studies were conducted in the 1980s when "we were not as sophisticated in looking at some of

---

[3]Defendants point out that Dr. Thompson did not review "re-cuts of the slides" that were generated from Mr. Williams' autopsy, Defendants motion to strike at 25, but have not argued that failure to review these slides was relevant, or undermined his opinions in any way.

4

the other cardiovascular causes of sudden death," and currently "there is too much controversy to say that it is a sickle cell crisis causing these deaths." *Id.* at 55-58.

**Dr. Thompson's Opinions**

Dr. Thompson's primary opinion was that "had medical attention been provided to Mr. Derek Williams prior to his loss of consciousness while in police custody, he would have a high likelihood of survival." Dr. Thompson report at 2; *see also id.* at 3. Dr. Thompson explained that

> had the police called paramedics in response to Mr. Williams' complaints that he could not breathe immediately after he was arrested or in response to his complaints that he could not breathe while he was in the squad car, an early intervention by medical or paramedical professionals (i.e. paramedics) would more likely than not have stabilized Mr. Williams to allow for transport to a hospital setting where additional assessments and interventions could have been performed, including diagnostic testing and life-saving treatment. Regardless of the actual cause of Mr. Williams' death, it is highly likely that he would not have died had medical intervention begun before his loss of consciousness, recognizing that the point when he lost consciousness may indicate the moment he died.

*Id.* at 2. The report noted that "[o]ne of the hallmarks of care delivered in the emergency department is attention to the stabilization of life-threatening conditions, even when the exact cause of the condition is unknown. This immediate stabilization creates the situation where there is additional time to allow for further intervention, diagnostic testing, and definitive management." *Id.* at 3. Dr. Thompson supported this opinion with hard data as well as his own experience:

> The overall mortality rate of patients with medical emergencies who present to the emergency department alive (i.e., with measurable vital signs such as respiratory rate, blood pressure, and heart rate) is less than 1% (Kanzaria HK, Probst MA, Hsia RY. Emergency Department Death Rates Dropped By Nearly 50 Percent, 1997–2011. Health Aff. 2016;35(7):1303-1308 and https://www.cdc.gov/nchs/data/ahcd/nhamcs _emergency 2011_ed_web_tables.pdf). This was the case in 2011 when the events surrounding Mr. Williams' death occurred.

5

*Id.*

The report described some of the various medical interventions that could have been performed had paramedics arrived on the scene while Mr. Williams was still alive, including a medical exam, provision of supplemental oxygen, intubation, cardioversion or defibrillation, and administration of life saving medication. *Id.* These interventions would have reduced his likelihood of death regardless of the medical illness or condition he was experiencing, and "had Mr. Williams arrived to the emergency department alive, he would have likely survived the emergency department visit." *Id.*

At his deposition, Dr. Thompson reaffirmed these opinions. He testified that "[s]o in general, and I described this in the report, patients who present to the emergency department alive stay alive. The overall mortality rate of patients who present to the emergency department is less than one percent. So most patients who come to the emergency department stay alive. That's the large majority." Dr. Thompson deposition at 88. When pressed to assign a number or percentage of patients who survive when they are accorded timely intervention by paramedic professionals, Dr. Thompson reiterated that:

> The general concept goes back to what I mentioned earlier, in that if the paramedics show up on the scene and someone is alive, they can generally keep him or her alive to get to the hospital. To know gross numbers, you know, in my experience, I would say that's probably well over 90 percent. . . [M]y experience working with paramedics who come to my emergency department, if the paramedics get to the patient alive, they can transport the patient alive generally to me, that has to be well over 90 percent.

*Id.* at 98-9. This opinion was unaffected by the fact that Dr. Thompson lacked sufficient information to know what was going on with Mr. Williams medically,[4] because:

_____

[4]Dr. Thompson agreed with the opinion of Dr. Briones who testified at the inquest that after examining all of the medical evidence in the case she and a panel of her colleagues were

6

This is where the paradigm of emergency medicine is, at least in my opinion, important to understand. Because my specialty deals with the diagnosis, treatment and management of all manners of emergencies, there are many times when I might not know in the beginning what the actual insult or disease or injury might be, but I am able to stabilize that patient to the point where if I can't figure it out, someone down the road can figure out what is going on.

And so this is where, when I say someone who comes to the emergency department alive, my training which is I am to keep them alive so that we can do that more definitive testing and management and the like. And so when I say it doesn't matter or necessarily what the disease process was, what matters most in this acute instance is had he gotten to an emergency department, had paramedics been able to intervene on the scene, we would have a good chance of him surviving for us to figure out what was going on or determine what the insult was or whatever led to these symptoms. That is part of the paradigm of emergency medicine, in that we can take that unknown, stabilize the patient until we can figure out what the known is or should be.

*Id.* at 99-100.

When questioned about whether he had experienced other patients who died within a 14 minute time-span (the length of time that Defendants' counsel represented Mr. Williams was in the custody of police officers), Dr. Thompson stressed that if there had been medical intervention:

that time clock shifts, and probably dramatically. . . If a paramedic showed up and realized that Mr. Williams was having a cardiac dysrhythmia, meaning his heart was beating in an abnormal rhythm, they could intervene. They could provide him medication or sometimes electricity, meaning defibrilation or cardioversion, to fix whatever would be, and then that time clock changes . . . [W]e can alter that time clock in a way that could give him an indeterminate amount of time to survive. . . It is entirely likely that had the paramedics been able to intervene early, we have a time clock that is much different than these 14 minutes.

*Id.* at 101-02. Dr. Thompson also testified that even if the time period were 14 minutes "I can say with a good degree of medical certainty, that had paramedics intervened earlier in his case, that

unanimous in concluding that the cause of death was "undetermined," and disagreed with the opinion of Drs. Poulos and Peterson that the cause of death was sudden onset sickle cell crisis. *Id.* at 83-4. As noted above, it is not generally accepted in the medical community that a person with sickle cell trait could die from sudden onset of sickle cell crisis. *Id.* at 55-56.

we could have—that he could have survived ." *Id.* at 139. The reason for this is that:

> any time while he was still having vital signs would have been a good time to have a paramedic intervene because, again, that can -- if I use that analogy of re-setting that time clock, if he still has vital signs, the chances of him being able to keep him with vital signs to get to the hospital are much better than at a point in time where he's lost those vital signs and now they're trying to get them back, you know, since you're dealing with a dead patient versus an alive patient. So any time while he was alive would have been an opportune time to have that intervention. . . [A]ny of those times when he was still alive would have been the time that the paramedics could have made a difference. . . . [M]ore likely than not, had the paramedics arrived while he was alive, that we could have kept him alive to figure out what is going on.

*Id.* at 141-2. Dr. Thompson could not recall a single instance in his experience where paramedics showed up while a patient was alive but the patient died while they were on the scene. *Id.* at 143.

When defendants' counsel suggested that it would be "pure speculation" to try to determine what paramedics could have done to save Mr. Williams' life, Dr. Thompson disagreed, testifying, "if we knew that he wasn't breathing well, we can provide some treatment to help him breathe better. If we know that his heart isn't beating properly, we can do something to help it breathe properly. If we know his blood pressure is low, we can provide medication or fluids or whatever it may be to increase the blood pressure. So it was not complete speculation." *Id.* at 123.

## DAUBERT STANDARD

"Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), govern the admission of expert testimony in federal courts." *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015). "The rubric for evaluating the admissibility of expert evidence considers whether the expert was qualified, whether his methodology was scientifically reliable, and whether the testimony would

8

have assisted the trier of fact in understanding the evidence or in determining the fact in issue." *Hartman v. EBSCO Indus., Inc.*, 758 F.3d 810, 817 (7th Cir. 2014); *see also Higgins v. Koch Dev. Corp.*, 794 F.3d 697, 704 (7th Cir. 2015) ("Rule 702 and *Daubert* require the district court to determine whether proposed expert testimony is both relevant and reliable.").

A district court's evaluation of expert testimony under *Daubert* does not "take the place of the jury to decide ultimate issues of credibility and accuracy." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012); *see also Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013) ("the district court's role as gatekeeper does not render the district court the trier of all facts relating to expert testimony"). Once it is determined that "the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Lapsley*, 689 F.3d at 805 (quoting *Daubert*, 509 U.S. at 596). A district court's inquiry under *Daubert* is a flexible one and district courts have wide latitude in performing this gate-keeping function. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999); *Hartman*, 758 F.3d at 818. "'[T]he key to the gate is not the ultimate correctness of the expert's conclusions,'" rather, "'it is the soundness and care with which the expert arrived at her opinion[.]'" *Wood*, 807 F.3d at 834 (citation omitted); *see also Stuhlmacher v. Home Depot U.S.A., Inc.*, 774 F.3d 405, 410 (7th Cir. 2014) ("It is not the trial judge's job to determine whether the expert's opinion is correct."). "[T]he proponent of the evidence must establish that the expert's testimony is reliable (and relevant) by a preponderance of the evidence." *United States v. Saunders*, 826 F.3d 363, 368 (7th Cir. 2016).

9

1.    **Dr. Thompson's Opinions Are Relevant, Reliable and Admissible**

Defendants' only objection to the admissibility of Dr. Thompson's opinions is the claim that they are based on unreliable data. Dkt. 67, Motion to Strike at 28. Presumably, this argument is based on the fact that Dr. Thompson was unable, because of the failure of the Defendants to secure timely medical attention for Mr. Williams, to opine about the underlying medical condition from which Mr. Williams was suffering, that caused his death. Defendants have not challenged Dr. Thompson's credentials or argued that his testimony would not assist the jury in understanding the evidence or in determining the facts in issue.

This argument ignores the substance of Dr. Thompson's opinions. As set forth in both his report and his deposition, it did not matter what condition Mr. Williams was suffering from in relation to the efficacy of medical intervention in preventing his death. Had officers called for medical assistance in a timely manner, and had the paramedics arrived before Mr. Williams died, it is highly likely—indeed the likelihood is over 90%—that Mr. Williams would have survived his medical crisis, and the underlying medical condition that caused that crisis could have then been treated. While Dr. Thompson acknowledged that it would have been preferable to have more information about Mr. Williams' medical condition, he was definite that this lack of information did not prevent him from opining, to a high level of medical certainty, that if the paramedics arrived on the scene while Mr. Williams still had viable vital signs, he would likely have survived.

Defendants do not even attempt to address Dr. Thompson's testimony and report in this regard, and make the utterly unsupported assertion that Dr. Thompson admitted that "his opinions regarding Mr. Williams' survivability are speculative, and he cannot provide a guess as

10

to his chances of surviving his medical crisis if EMTs or paramedics had arrived on the scene earlier." Dkt. 67 at 26. In fact, Dr. Thompson testified to precisely the opposite, that his opinions as to the chances of survival were **not** speculative, and that to a reasonable degree of medical certainty there was a high probability, over 90% at least, of Mr. Williams surviving had he been accorded routine paramedic treatment. While the Defendants' delay in requesting medical attention prevented Dr. Thompson from knowing precisely what this medical intervention would have been, he was clear that if the paramedics had arrived while Mr. Williams was still alive the overwhelming likelihood is that Mr. Williams would have survived.

11

**CONCLUSION**

Dr. Thompson is a supremely qualified emergency medicine doctor who considered all relevant materials and came to the definite and well-supported opinion, based on both his own substantial experience and hard data from studies, that timely medical care would have enabled Mr. Williams to survive. His opinions are highly reliable, are not speculative in the slightest, and should be admissible both at summary judgment and trial.

Dated: June 16, 2017

Respectfully submitted,

s/ John L. Stainthorp
G. Flint Taylor, IL Bar No. 2802058
John L. Stainthorp, IL Bar No. 3128243
Jan Susler, IL Bar No. 277840
Ben H. Elson, IL Bar No. 6286106
PEOPLE'S LAW OFFICE
1180 N. Milwaukee Avenue
Chicago, Illinois 60642
Phone: (773) 235-0070
Fax: (773) 235-6699
stainthorp@gmail.com

Jonathan Safran, Bar No. 1000881
Jeffrey Patza, Bar No. 1030512
SAMSTER, KONKEL & SAFRAN, S.C.
1110 N. Old World 3rd Street
Suite 405, Riverfront Plaza
Milwaukee, WI 53203
Phone: (414) 224-0400
Fax: (414) 224-0280
jsafran@skslawyers.com
jpatza@skslawyers.com

Attorneys for Plaintiffs

12