UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ESTATE OF DEREK WILLIAMS JR.,
by SHARDAY ROSE, Special Administrator; and
TANIJAH WILLIAMS, DEREK WILLIAMS III, and
TALIYAH S. WILLIAMS, minors by their mother
and guardian SHARDAY ROSE,

                Plaintiffs,

v.                                                 Case No. 16-C-869

CITY OF MILWAUKEE, and Milwaukee Police
Officers JEFFREY CLINE, RICHARD TICCIONI,
PATRICK COE, JASON BLEICHWEHL,
ROBERT THIEL, TODD KAUL,
ZACHARY THOMS, GREGORY KUSPA,
CRAIG THIMM, CHAD BOYACK, and
DAVID LETTEER,

                Defendants.

**DEFENDANTS' REPLY, WITH REFERENCE TO THEIR MOTION
TO STRIKE CERTAIN ASPECTS OF THE REPORTS AND OPINIONS OF
PLAINTIFFS' EXPERTS (ECF NO. 67)**

    **A.**      **CONSUELO GONZALEZ**

The defendants asserted that the report and/or opinions of Ms. Gonzalez, relative to her interpretation of words that Mr. Williams may have said during the initial 30 – 40 seconds of the squad video, are not reliable. Therefore, the Gonzalez report and the opinions contained therein are not admissible evidence, and as such should not be considered by the Court in the context of resolving the defendants' pending motion for summary judgment. Most specifically, the defendants moved to strike Ms. Gonzalez'

opinion that, at approximately nine to ten seconds into the squad car video, Mr. Williams said the words "I'm gonna die." The defendants did not file the subject motion because the defendants "do not like this opinion," as asserted by the plaintiffs (Responsive Brief p. 1). "Liking" or "disliking" the opinion by the defense is irrelevant. Rather, the motion to strike is based upon the fact that Ms. Gonzalez lacks competence, with reference to interpreting the words of a speaker, whose speech is captured on poor-quality videotape lacking any audio component, and because of the unreliability associated with the poor accuracy rate of lip reading in general.

In response to the defendants' motion, the plaintiffs argue that Ms. Gonzalez "has been a professional lip reader for 30 years and in that capacity has extensive experience in transcribing video for which there is no audio." (Id., p. 4) However, the plaintiffs utterly fail to provide this Court with any citation to any court case in which Ms. Gonzalez has been certified as an expert, with reference to accurately transcribing the speech of a speaker, which is captured on poor-quality videotape, and for which there is absolutely no audio component.

Furthermore, even the plaintiffs admit, through the declaration of Ms. Gonzalez, that there "is no statistic or percentage regarding comprehension that can be applied to all speech readers in all situations." (Id., p. 5) Additionally, the plaintiffs appear to be critical of the internet articles presented in the context of the defendants' briefing, which establish that lip reading in general lacks reliability and has a very low accuracy rate. However, aside from plaintiffs' assertion that "lip reading is a proper subject of expert testimony," (Id., p. 5) they provide no citation to any peer-reviewed research articles, or

2

professional publications of any nature for that matter, which establish that lip reading has any level of reliability or accuracy, much less a level that is greater than the low accuracy rate (17 +/- 12% for a limited subject of monosyllabic words, and 21 +/- 11% for 30 compound words) reported in the articles cited by the defendants in their Brief-in-Chief at pages 10-11. Even in the context of the Quinn case cited by the plaintiffs on page 6 of their responsive briefing, the Court refused to allow a lip reader to testify regarding the interpretation of conversations that were captured on a video recording, because "any attempt to reproduce the conversation depicted in the video, even by a competent lip reader, yields only scattered, incomplete, and nearly incomprehensible snippets of dialogue." (Id., p. 7) Similarly, in the case at hand, even Ms. Gonzalez admits in her report that the subject videotape is of poor quality. From that videotape, she purportedly is only able to translate three words spoken during the 30 – 40 seconds of captured videotape images. At best, those three words represent only a "snippet" of what may have been said by Mr. Williams, and they certainly do not reflect the context of those words, or anything that might have been said in response by Officer Cline. In fact, the subject 30 – 40 seconds of videotape does not reflect that Officer Cline was in the squad car at that time, and therefore any dialogue captured on that portion of the videotape has no relevance to the claims raised against any defendant, especially Officer Cline.

    Also, contrary to plaintiffs' assertion, the entirety of that 30 – 40 seconds of videotaped dialogue is at issue in this case, and not just the three words Ms. Gonzalez claims to identify. The fact that Ms. Gonzalez is only able to translate three words of Mr.

3

Williams' statements contained within that portion of videotape establishes that this case is very much like that presented in the Quinn case. Ms. Gonzalez, at best, is able to provide a translation of only a "snippet" of the initial 30 – 40 seconds of the recording. Rules 702(c) and (d) require that an expert's testimony must be the product of reliable principles and methods which are reliably applied to the facts of a case. Plaintiffs have provided no evidence establishing that the lip reading performed by Ms. Gonzalez has any predictable percentage of reliability, and the research presented by the defense suggests that it is not more than 30% reliable – which does not even rise to the level of the results being "more-likely-than-not." Thus, Ms. Gonzalez' opinion is not admissible because it is not reliable, and therefore, it should be stricken, and it should not be considered by the Court in the context of the pending motion.

    **B.    ROGER A. CLARK**

The defendants requested that the Court strike the various opinions of Mr. Clark, as presented in his opinion letter, due to his lack of competence in the related subject matter areas, as well as the unreliability of his opinions. As noted in the defendants' Brief-in-Chief, an analysis of expert testimony under both Rule 702 and the tenets of the Daubert case require that the Court tie its gatekeeping inquiry to the particular facts of a case. (See also Kumho Tire Co. v. Carmichael, 119 S. Ct. at 1170.) In fact, the Supreme Court has specifically held that such an analysis requires a valid connection between expert matters and the pertinent inquiry as a precondition to admissibility. (Id. at 1175.) Mr. Clark's opinions fail to make such a valid connection. In short, Mr. Clark has not acted as a law enforcement officer for more than 20 years. He last received First

4

Responder training in 1993. As discussed in defendants' Brief-in-Chief, Mr. Clark has not conducted any research regarding law enforcement policies or procedures that are relevant to this case, nor has he reviewed any State of Wisconsin Law Enforcement Standards Board policies and procedures, or those of any other state in the union. Rather, his sole source for making any statements relative to "standard police procedure" or "standard police policy" are polices that are found in training materials prepared by State of California law enforcement officials, which Mr. Clark independently read. He did not receive any instruction by certified instructors regarding either the interpretation or the application of the California training materials. Therefore, Mr. Clark does not have the requisite personal knowledge of necessary subject matter, nor has he conducted the necessary review of scholarly, reliable materials, to establish his competence to opine regarding whether or not Milwaukee Police Department policies meet any type of "law enforcement standard." Even in the context of the training that was received by Mr. Clark when he was an active law enforcement officer in California dozens of years ago, his training was consistent with that provided to Milwaukee Police Department personnel, relative to identifying specific types of emergency medical situations in the context of their First Responder/First Aid training, as well as the importance of a First Responder's awareness of the "ABCs," in checking to see if a subject has an open airway. Therefore, his own (although stale) training establishes that the MPD training standards are consistent with his own California-based training. Thus, the MPD policies and procedures are not contrary to the only set of accepted standards reviewed or relied upon by Mr. Clark in his analysis.

In addition, Mr. Clark did not present in either his report or his deposition testimony any factual basis for his general conclusions regarding any alleged supervisory failures by Sergeants Kaul and Thiel on July 6, 2011, or for his allegations challenging Chief Flynn's disciplinary practices regarding any of the defendant officers. Mr. Clark presented no facts in either his report or in his deposition testimony which makes any alleged investigatory or supervisory deficiency regarding the application of any "police standards" to any action or inaction, relevant to the response of the defendant officers to Mr. Williams on July 6, 2011, which caused them to not call for emergency medical services any sooner than they did. Mr. Clark's opinions in these areas are connected to this case only by his own ipse dixit. Consistent with the Obrycka case cited in defendants' Brief-in-Chief, the ipse dixit of the "expert" is just not enough to make his opinions either reliable or relevant. (Seealso Kumho Tire at 1179.) Because they are not connected to the facts of this case, Mr. Clark's opinions are not reliable, and so they can provide no assistance to either a jury, or the Court, in resolving any of the issues presented in this case. Therefore, his opinions related to "police standards" and alleged investigatory or supervisory deficiencies are not appropriate for consideration in the context of the Court's review of the defendants' pending motion.

With regard to Mr. Clark's opinions regarding a "code of silence," once again he could not support his opinion with citation to any specific example of an individual who failed to report misconduct by his fellow officers, and where that failure to report was known by Chief Flynn, and yet the Chief failed to take any disciplinary action in response thereto. Additionally, Mr. Clark's opinion that the MPD failed to train officers regarding

6

matters related to respiratory distress just simply is not true. As discussed in the City defendants' reply brief, and as presented in materials attached to the Groszczyk affidavit, Milwaukee police officers are and were provided with nationally recognized and accepted American Heart Association and Red Cross First Responder training, which include(s)(d) a cornucopia of information related to breathing and breathing-related symptomology, designed to assist an officer in determining if a subject is in need of emergency medical services. Therefore, Mr. Clark's opinions again are based solely upon his own ipse dixit, and they are not based upon accurate information. Thus, they are not reliable. As such, they are not admissible regarding resolution of any of the issues presented in this case, and they certainly should not be considered by the Court in the context of reviewing the pending motion for summary judgment.

Plaintiffs assert in their responsive brief that the Seventh Circuit has "specifically recognized the field of police practices as an area of expertise." However, as noted in the defendants Brief-in-Chief, asserting oneself as a "police practices expert" is akin to a lawyer asserting that he is an expert as to all areas of "the law." In order for any person to testify as an "expert" regarding any area related to police practices, that person must be credentialed, such that his credentials establish that he has expertise in a specific subject matter area involved with the underlying case. In this case, Mr. Clark relies upon his own outdated police training and experience, and only policies he read from purportedly current California police training code sections, as the basis for his generalized opinions regarding "police procedures" or "police practices." He purports to be an expert in all things having to do with current police procedures. Mr. Clark has not demonstrated that

7

he has conducted any type of independent research, or a review of police policies and procedures, regarding specific subject matter areas involved with this case, as they pertain to law enforcement agencies across the country. He has not even compared the California training code sections that he relies upon with any other type of training codes in any other state, including Wisconsin. Furthermore, he has not considered peer-reviewed research of this nature conducted by researchers in the specific subject matter areas. Also, he has had no personal contact with members of the Milwaukee Police Department at all, much less contact which would allow for him to have any experientially-based concept of the culture of Milwaukee police officers. Therefore, Mr. Clark lacks the competence necessary to present opinions which critique the policies, procedures, and practices at issue in this case, including those relative to allegations regarding a "code of silence."

> Plaintiffs assert that
>
>> "significantly, within the last three years, [Mr. Clark] has served as an expert in a series of cases against the MPD involving illegal strip and body cavity searches and as such has evaluated and rendered opinions about similar unconstitutional conduct by some of the same District 5 power shift defendants and similar policies and practices, in operation at the very same time as the case at bar." (Responsive Brief, p. 6)

However, the plaintiffs failed to identify exactly what that "similar unconstitutional conduct" is or was, and what those "similar policies and practices" is or was. As the Court is well aware, given the "search" cases that have been litigated before it, those cases generally involved allegations against a specific group of MPD officers for

conducting illegal strip and body cavity searches. Those cases did not involve a death in custody, much less a death in custody which related to officers' evaluations of an arrestee's complaints of having difficulty breathing. Therefore, any work that Mr. Clark did relative to the recent "search" cases litigated in this district is not relevant to the opinions he presents in the context of the instant case before the Court.

In addition, the plaintiffs admit that the inquiry, relative to the reliability of an expert, "must be tied to the facts of a particular case." (Responsive Brief p. 7) While the plaintiffs point out that Mr. Clark reviewed reports and other materials generated by the Derek Williams matter (Responsive Brief, pp. 8-9), plaintiffs attempt to link matters related to the strip and body cavity search cases to the case at hand, and suggest that

> "most of Flynn's admissions after the fact are just that – admissions by the policy maker about the failures of the pre-existing policies and practices are no doubt admissible. After the actual, belated changes to the policies and training itself, well after Williams' death they are also admissible because they go to show the existence of the prior policy and practice, that are continued after the fact for years, and the MPD and its policy makers' prior deliberate difference, rather than to show negligence." (Responsive Brief, p. 9)

However, the plaintiffs never identify the specific policy or practice that they are writing about. Again, the "search" cases involved policies, procedures, and practices relative to conducting searches of persons in custody. The case at hand involves officers' subjective interpretations of statements made by a person in their custody, relative to his ability to breathe, in conjunction with their training and experience regarding acting as First Responders. Plaintiffs are attempting to compare apples to oranges. Regardless of Mr. Clark's opinions in the context of the search cases, his opinions in the case at hand

9

regarding the propriety of any policy or procedure are based only upon his personal, outdated police training and experience, as well as his self-taught understanding of current California policies. His opinions are not based upon his review of a variety of law enforcement agency policies, or his review of research conducted by others regarding same, from which he could reach a competent conclusion as to whether or not MPD policies or procedures are consistent with standard police practices or policies across the country. Additionally, his opinions are not based upon his personal observations of members of the Milwaukee Police Department, or from any study of same. In fact, the information presented in the context of the defendants' Brief-in-Chief establishes that even Mr. Clark was not trained relative to sickle cell disease or sickle cell trait, or relative to the sudden onset of sickle cell crisis in persons who have been diagnosed with sickle cell trait. When he was trained regarding acting as a First Responder, the types of medical conditions that he learned about were things like stroke, seizure, and allergic reaction. Additionally, with regard to his review of the current California police training policies, those policies do not contain any reference to sickle-cell-related conditions. Furthermore, no policy or procedure cited by Mr. Clark, either in his report or in his deposition testimony, indicates that prior to July 6, 2011, any law enforcement agency in this country had a specific requirement that in every case, their officers must call for emergency medical services when a subject in their custody says words to the effect of "I can't breathe," while the person is observed to be breathing, and not evidencing any other symptoms of a life-threatening medical condition. Thus, Mr. Clark's opinions in this regard are not based upon his competence as an expert in the specific subject matter areas

at issue, nor are they based upon facts, which would make them reliable. Given the fact that his opinions would not be admitted into evidence, they should not be considered by the Court in the context of reviewing the defendants' pending motion for summary judgment, and they should be stricken.

Plaintiffs conclude that "Clark will testify about how the individual defendant officers' conduct deviated from proper police standards and practices, as well as the inadequacies of the MPD's policies, practices, training and supervision regarding obtaining emergency medical services for persons in custody who are suffering from obvious respiratory distress, and the existence of the code of silence. There is no question that this testimony will help the jury in focusing on, and better understanding, these issues. Defendants do not argue otherwise." (Responsive Brief p. 10) However, the defendants do argue otherwise, as discussed above and in their Brief-in-Chief. Again, Mr. Clark makes very general statements regarding the adequacy of MPD policies, without specifically articulating what is, in fact, inadequate about any policy or training materials that were reviewed in this case. With regard to supervision, Mr. Clark failed to articulate any specific instance which illustrates either the Chief of Police, or any front line supervisor, failed to supervise any officers, relative to the provision of First Responder services, or obtaining emergency medical services. Finally, Mr. Clark was unable to identify any specific instance where the Chief of Police was made aware of a department member who either engaged in misconduct, or who failed to report misconduct, and where the Chief failed to take any disciplinary action in response to that knowledge. Therefore, Mr. Clark has provided no factual basis for his opinions in these

11

areas, and they thus lack reliability, such they should not be considered by the Court when resolving the defendants' pending motion for summary judgment.

### C. TREVONNE M. THOMPSON

As described in the defendants' Brief-in-Chief, Dr. Thompson is an emergency room physician. The defendants asserted that, while Dr. Thompson is an emergency room physician who specializes in toxicology, and who has treated living patients who suffered from sickle cell disease, he is not a forensic pathologist, and so therefore he is not an expert with reference to determining cause of death. Additionally, he has not conducted any research or examination of patients who suffer from the sudden onset of sickle cell crisis, which was triggered by their sickle cell trait (as opposed to sickle cell disease). Therefore, he is not an expert in these subject matter areas as well. Finally, Dr. Thompson has never determined cause of death regarding patients who were diagnosed with sickle cell trait, and who died as a result of the sudden onset of a sickle cell crisis. Thus, the defendants assert that Dr. Thompson lacks competence, relative to opining about Mr. Williams' cause of death. Additionally, while Dr. Thompson has experience working in an emergency room setting in a Chicago-area hospital, he has no personal experience working in any emergency room in the State of Wisconsin, including in the Milwaukee area. Furthermore, he has not conducted any type of research regarding the training received by emergency medical technicians, or the actions taken by emergency medical technicians, in the context of responding to people who are suffering from the sudden onset of sickle cell crisis, but who have only been diagnosed with sickle cell trait. Therefore, Dr. Thompson also lacks competence to provide opinions relative to the

12

Case 2:16-cv-00869-JPS   Filed 06/30/17   Page 12 of 16   Document 73

potential outcome regarding any hypothetical response by Milwaukee area EMTs to the sickle cell crisis experienced by Derek Williams on July 6, 2011. While Daubert and Federal Rules 702 and 703 grant expert witnesses testimonial latitude, that latitude rests on the assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline, which is connected to the pertinent inquiry at issue. (See Kumho Tire at 1174-1175.) Dr. Thompson may be an expert regarding general emergency medicine principles, but he is not an expert with reference to how they apply to situations involving an individual with sickle cell trait, who experiences a sickle cell crisis. Also, Kumho Tire requires that the Court's gatekeeping inquiry be tied to the facts of this case (p. 1175) With specific regard to the opinions of Dr. Thompson regarding Mr. Williams' potential for surviving his crisis, the relevant issue is whether Dr. Thompson can reliably determine same, given the facts surrounding Mr. Williams' medical crisis, and not substitute opinions about the survivability of EMS patients in general. (See Kumho Tire, p. 1172.) This is especially significant here, given that Dr. Thompson has no personal experience with treating a patient who was diagnosed with sickle cell trait, and who presented in the emergency room with the sudden onset of sickle cell crisis.

     In their responsive brief, the plaintiffs do not dispute that Dr. Thompson is not an expert in the area of pathology. Furthermore, plaintiffs do not dispute that Dr. Thompson has not trained, or worked with, EMS personnel in the Milwaukee area. The plaintiffs do not dispute that Dr. Thompson has not treated people who have been diagnosed with sickle cell trait (a different medical status than sickle cell disease), who have experienced the sudden onset of a sickle cell crisis. Additionally, plaintiffs do not dispute that Dr.

13

Thompson has performed no work, and certainly is no expert, in determining cause of death. Finally, plaintiffs have provided no evidence that Dr. Thompson ever treated a person who had been diagnosed with sickle cell trait, and who presented at an emergency room experiencing the sudden onset of a sickle cell crisis, much less such a person who had been conscious at a different scene, treated by EMS personnel there, and then transported to an emergency room at which he was a treating physician. Thus, Dr. Thompson has no experiential or factual basis from which he can competently and/or reliably opine about Mr. Williams' potential for survivability if Milwaukee EMS personnel had been called to the scene earlier than they were on July 6, 2011.

Contrary to the finding of the Milwaukee County Medical Examiner that autopsy revealed no other cause for Mr. Williams' death other than sudden onset sickle cell crisis, the plaintiffs maintain that the cause of Mr. Williams' death is "undetermined." If that is the case, the defendants assert that it is pure speculation on their part and by Dr. Thompson to assert that Mr. Williams' outcome would have been any different if Milwaukee-area EMS personnel had been called to the scene within the first 14 minutes that he was in police custody. Without knowing what medical condition(s) or event(s) caused Mr. Williams to die, any argument asserting that EMS treatment could have made a difference on his survivability is based solely upon speculation. However, in this case, the Milwaukee County Medical Examiner has determined that the sudden onset of sickle cell crisis, in a person who was diagnosed with sickle cell trait, is the only possible cause of Mr. Williams' death. Plaintiffs fail to identify any other cause of death. It is clear that this sudden onset of sickle cell crisis in persons with sickle cell trait is a rare

phenomenon. Dr. Thompson is no expert, with regard to this phenomenon. However, Dr. Jacob, who is the hematologist who testified at the inquest, is an expert in the area, and he concluded that if Mr. Williams had been experiencing the sudden onset of sickle cell crisis, the only possible means by which he could have survived would have been if he had received a total blood transfusion, which takes hours to perform, assuming that the person who receives the transfusion is already in a hospital, that the appropriate equipment is immediately available, and that enough of the appropriate blood type is available. Plaintiff asserts that Dr. Thompson's opinions regarding Mr. Williams' survivability are competent, because of his general experience working with emergency medical personnel in the Chicago area, regarding undefined medical situations. With specific regard to a patient who has been diagnosed with sickle cell trait, and who is suffering from sudden onset sickle cell crisis, Dr. Thompson has absolutely no experience, much less "expertise." Therefore, he lacks competence to provide opinions regarding Mr. Williams' survivability.

Additionally, Dr. Thompson has not studied individuals who suffer from sickle cell trait, nor has he studied deaths which have occurred in people who were diagnosed with sickle cell trait, and who died in the context of experiencing the sudden onset of a sickle cell crisis. Again, Dr. Thompson lacks the appropriate competence to provide opinions with regard to Mr. Williams' survivability. Therefore, his opinions regarding Mr. Williams' survivability must be stricken, and not be considered by the Court in determining the defendants' pending motion for summary judgment.

## CONCLUSION

Consistent with the above argument, as well as their Brief-in-Chief and all other matters of record, defendants City of Milwaukee, Jeffrey Cline, Richard Ticcioni, Patrick Coe, Jason Bleichwehl, Robert Thiel, Todd Kaul, Zachary Thoms, Gregory Kuspa, Craig Thimm, Chad Boyack, and David Letteer respectfully request that the Court strike the identified aspects of the reports and opinions of plaintiffs' three experts, and not consider them in resolving defendants' pending motion for summary judgment.

Dated at the City of Milwaukee, this 30th day of June, 2017.

GRANT F. LANGLEY
Milwaukee City Attorney


s/Susan E. Lappen
SUSAN E. LAPPEN
Assistant City Attorney
State Bar No. 01003567
800 City Hall
200 East Wells Street
Milwaukee, WI 53202
(414) 286-2601
Email: slappe@milwaukee.gov
Attorneys for the Defendants

1032-2016-1482/240518