# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

|  |  |
|---|---|
| ESTATE OF DEREK WILLIAMS, JR., TANIJAH WILLIAMS, DEREK WILLIAMS III, and TALIYAH S. WILLIAMS, | Case No. 16-CV-869-JPS |
| Plaintiffs, | |
| v. | **ORDER** |
| CITY OF MILWAUKEE, JEFFREY CLINE, RICHARD TICCIONI, PATRICK COE, JASON BLEICHWEHL, ROBERT THIEL, TODD KAUL, ZACHARY THOMS, GREGORY KUSPA, CRAIG THIMM, CHAD BOYACK, and DAVID LETTEER, | |
| Defendants. | |

## 1.    INTRODUCTION

This action arises from the death of Derek Williams, Jr. ("Williams") on July 6, 2011 while in the custody of the City of Milwaukee Police Department ("MPD"). *See* (Docket #1). Plaintiffs, Williams' estate and surviving minor children, have sued the City of Milwaukee (the "City") and various police officers whom they contend violated Williams' constitutional rights in the events leading to his death. *Id.* On April 24, 2017, Defendants filed a motion for summary judgment, seeking dismissal of each of Plaintiffs' claims. (Docket #35 and #36). Plaintiffs responded to the motion on May 24, 2017, and Defendants replied on June 7, 2017. (Response,

Docket #55; Reply, Docket #60).[1] For the reasons explained below, Defendants' motion must be denied in its entirety.

## 2.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides the mechanism for seeking summary judgment. Rule 56 states that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A "genuine" dispute of material fact is created when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court construes all facts and reasonable inferences in a light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). In assessing the parties' proposed facts, the Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). Internal inconsistencies in a witness's testimony "'create an issue of credibility as to which part of the testimony should be given the greatest weight if credited at all.'" *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1170 (7th Cir. 1996) (quoting *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986)). The non-movant "need not match the movant witness for witness, nor persuade the court that [their] case is convincing, [they] need only come forward with appropriate evidence

---

[1]Defendants also filed a motion for leave to submit an oversized reply brief in light of Plaintiffs' own overlong briefing. (Docket #59). That motion will be granted.

demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

## 3.    FACTUAL BACKGROUND

### 3.1    Relevant Facts

Upon review of the parties' factual briefing, the Court finds that the following facts are material to Defendants' motion.[2] The Court presents a timeline of events first, then addresses other relevant topics. As an aside, Defendants have moved to strike certain expert opinions. (Docket #67). That motion will be denied in its entirety. Because it is helpful to understand the background facts prior to analyzing the experts' opinions, the Court will turn to that issue after it discusses the facts.

#### 3.1.1    Timeline

In July 2011, Williams was a 22-year-old African-American man, with a tall, thin build, and in generally good physical shape. He and his girlfriend, Sharday Rose ("Rose"), had three children, Tanijah, Derek III, and Taliyah.[3] On July 3, 2011, Williams was arrested and jailed. He was released two days later. On the evening of July 5, 2011, Williams went to Rose's home to visit her and the children. Late that night, Williams and Rose's stepfather, Tyrone Mathis ("Mathis"), left the home to go buy snacks.

At approximately 12:35 a.m. on July 6, 2011, Williams crossed the intersection of North Holton and East Center Streets, about two miles north

---

[2] All facts are drawn from the parties' factual briefing unless otherwise noted. (Docket #56 and #61).

[3] Defendants dispute Taliyah's paternity. (Docket #61 at 1). However, if Defendants believe that Taliyah is not a proper plaintiff in this action, their summary judgment motion should have raised the point. It does not. The dispute is thus immaterial for present purposes.

of this District's courthouse. In doing so, Williams approached Samuel Tooke ("Tooke") and Zhanna Godkin ("Godkin"), who were walking home from the Summerfest festivities. At the same time, Defendants Jason Bleichwehl ("Bleichwehl"), Gregory Kuspa ("Kuspa"), Jeffrey Cline ("Cline"), and Zachary Thoms ("Thoms") were driving in two police cars near the intersection, proceeding north on Holton Street. Cline and Thoms then turned east onto Center Street, and observed Williams approaching Tooke and Godkin.

Cline and Thoms thought Williams was attempting to rob Tooke and Godkin. They believed that Williams had a gun, though he did not. Williams did have a mask over his mouth "with a sinister smile printed on it, which looked much like the smile of the 'Joker' character from the old Batman series." (Docket #56 at 12). He also held a cell phone under his clothing which suggested that he was armed. Mathis, however, states that he and Williams never discussed a robbery and saw no indication that Williams intended to rob Tooke and Godkin as he approached them. In fact, Williams had told Mathis that he knew Godkin when they first saw the couple.

Cline and Thoms stopped their car in the street. When they did so, Williams ran back across Holton Street towards an alley between Holton and the next street to the west, Buffum. Cline ran after him. Cline lost Williams in the alley and began searching in the adjacent yards. Thoms, meanwhile, moved his car onto Buffum Street, and Bleichwehl and Kuspa followed. Bleichwehl joined Cline's search. Defendants Richard Ticcioni ("Ticcioni"), Patrick Coe ("Coe"), Robert Thiel ("Thiel"), Todd Kaul ("Kaul"), Chad Boyack ("Boyack"), Craig Thimm ("Thimm"), and David Letteer ("Letteer") (all defendant police officers referred to collectively as

the "Officer Defendants") responded to the scene to set up a containment perimeter and assist in locating Williams. Ticcioni and Coe in particular moved south down the alley, checking for Williams in various backyards.

At 12:44 a.m., Ticcioni and Coe found Williams hiding under a table in a backyard, curled up in a ball. This was approximately eight minutes after Williams first ran away from Cline. To reach that position, Williams had run about 200 to 300 yards and jump over a fence. When he saw Williams, Ticcioni yelled for Williams to show his hands. Williams complied. Bleichwehl, Cline, Thoms, Kuspa, Thimm, and Letteer began moving to that area when they heard Ticcioni yell. Thiel and Kaul also did so soon afterward.

When Ticcioni attempted to grab Williams' arm, his hands slid off because Williams was soaked with sweat. It was still over 70 degrees in the early morning hours of July 6, and Cline says he was breathing heavily and sweating from his exertion. Williams was also breathing heavily but Cline attributed this to his flight. Ticcioni and Coe say that Williams briefly struggled with them, so they pulled Williams down such that he was laying on his back. Ticcioni then flipped Williams over and put his knee in Williams' back as Coe applied handcuffs. Thoms, Kuspa, Cline, and Thimm were present as Ticcioni and Coe handcuffed Williams.[4] Bleichwehl, Theil, Kaul, and Letteer arrived shortly after.[5]

---

[4]Defendants attempt to dispute whether Cline was there, but Thimm testified that Cline was in the group. (Docket #54-13 at 78:4-11).

[5]Again, Defendants' dispute of who was present is belied by Kaul's deposition testimony. (Docket #54-12 at 96:21-97:20).

After handcuffing Williams, Ticcioni remained on top of him. Williams complained that he could not breathe, so Ticcioni shifted the majority of his weight off of Williams' back. Ticcioni radioed to dispatch that Williams was in custody, and during that transmission, Williams can be heard stating that he cannot breathe. Ticcioni and Coe searched Williams' pockets while he was on the ground. They then pulled Williams up to his feet. During this time, Williams repeated that he could not breathe. Once standing, Williams went limp, so Thiel told Ticcioni and Coe to put him back on the ground. Thiel gave this instruction so he could evaluate Williams' condition and because "I don't want my officers hurting their back holding dead weight." (Docket #54-11 at 89:15-17).

Cline, Kuspa, Thoms, Thimm, Letteer, and Kaul variously began searching for the gun they believed Williams carried and went back to check on the alleged victims.[6] Plaintiffs claim that this is no excuse for them to ignore Williams or claim that they could not hear his breathing complaints. Kuspa, Coe, Bleichwehl, and Ticcioni admit that they heard Williams, but did not believe that he was having a medical emergency. Cline, Thoms, Letteer, Thiel, and Kaul deny hearing Williams' requests for help.

Once Williams was returned to the ground, Thiel attempted to speak with him. Williams was breathing heavily and sweating, his eyes were closed, and he was unresponsive to Thiel.[7] Ticcioni felt that Williams was

---

[6]Boyack never actually went into the backyard; he was entirely engaged in searching for evidence.

[7]The Officer Defendants differ on the intensity of Williams' breathing; Thiel did not see him breathing heavily. (Docket #54-11 at 91:21-92:6). Thoms and

faking distress in order to make it more difficult for officers to remove him from the backyard, so he told Williams to "stop messing around." (Docket #54-14 at 4). Thiel then performed a "sternum rub" on Williams, which involves rubbing one's knuckles across a person's sternum. This painful procedure is meant to determine whether the person is truly unconscious. Thiel's sternum rub caused Williams to open his eyes and become responsive. Thiel claims that Williams said he was "just playing around" with the alleged victims and that they were his friends. (Docket #48 at 8). Theil and Coe agreed with Ticcioni's conclusion that Williams was simply resisting arrest.

Ticcioni and Coe were then able to bring Williams back to his feet and move out of the backyard. Williams continued to claim that he could not breathe. On the way out of the backyard, Thiel did another sternum rub while Williams was standing. After that, Thiel told Ticcioni and Coe to take Williams "out front." (Docket #69-1 at 83:9-16).

Terri Giles ("Terri") lived in a home near the yard where Williams was hiding. From her porch, she saw Williams after he was arrested. She could hear someone saying "I can't breathe," though she could not identify the source of the statement. She also heard the officers talking and another woman screaming. Her son, Terrance Giles, also saw Williams and heard him complain about being unable to breathe, loudly enough that all of the officers could have heard. He further heard the officers telling Williams to shut up. While observing the scene from the porch, Terri's boyfriend,

---

Ticcioni, however, did observe heavy breathing. (Docket #54-4 at 99:3-7; Docket #54-14 at 4). At this stage, this inconsistency must be interpreted in Plaintiffs' favor.

Chauncey Wright ("Wright"), called someone and told them that the police were killing someone, and that this person said they could not breathe.[8]

From the time Williams was found in the backyard to when Thiel performed the second sternum rub, none of the officers called for medical assistance. Approximately five minutes elapsed between the time Ticcioni called in that Williams was in custody and the time dispatch asked for officers to meet with the victims. Ticcioni and Coe then led Williams out of the backyard towards Buffum Street. Cline, Bleichwehl, and Thoms went with them. The distance to the front of the house was approximately fifty feet. During the journey, Plaintiffs claim that Williams went limp and had to be dragged by officers, who told him to stop "playing games." (Docket #54-7 at 183:11-21). Defendants believe that Williams dragged his feet and went limp intentionally to obstruct the officers' efforts to move him. As Williams was being moved, he repeated that he could not breathe.

The group was blocked by a "for sale" sign on their way to the street. Coe let go of Williams to move the sign, and when he did, Williams fell face first onto the ground. Defendants note that Williams was not intentionally dropped; in their view, Williams himself caused the fall. Ticcioni and Coe picked Williams back up by his arms and dragged him to the front yard. Austin states that Williams' body was limp and he "looked like he was already dead." (Docket #54-25 at 2). Ricardo Fernandez, another neighbor,

---

[8]Wright has not actually offered testimony to this effect. Plaintiffs cite the affidavits of Teirra Giles ("Teirra"), Terri's daughter, and Sharon Austin ("Austin"), another neighbor, to prove that Wright had called 911. Defendants are correct that these statements are inadmissible hearsay to the extent they are used to prove that Wright actually called 911 or as to what the 911 operator said in response. However, the statements are not hearsay when used to show what Teirra and Austin heard Wright say.

indicates the opposite was true; according to him, Williams was taken to the car without difficulty. During this movement, Williams continued to say that he could not breathe, and the officers "cursed" at him (the precise curse words used are not stated). Lachelle Brown ("Brown") saw what was happening and called 911, informing the operator that Williams was yelling about being unable to breathe and calling for help. The operator responded that because police officers were on scene, only they could call for medical assistance. Ticcioni, Coe, and Bleichwehl do not recall Williams saying that he could not breathe during the trip to the squad car.

Once the group reached the squad car, Ticcioni commanded Williams to get in the back seat. Williams did not respond. Defendants assert that Williams was then "bent . . . at the waist and directed . . . into the rear seat"; Plaintiffs contend that Williams was thrown into the vehicle. (Docket #54-14 at 4; Docket #54-21 at 15:24-16:1). There were a number of other officers present when Williams was put in the car, including Cline and Kaul. None of the other officers, however, discussed their prior observations of Williams' condition with Cline, in whose car Williams had been placed.

Cline sat in the driver's seat of his car and activated the recording system therein. The audio recording did not start until thirty seconds after the video recording was activated. As soon as he entered the car, the video shows Williams rocking back and forth and moving his mouth as if he was saying something. Cline admits that he noticed Williams' movements. Cline denies hearing any complaints about being unable to breathe during this time. According to Plaintiff's lip-reading expert Consuelo Gonzalez ("Gonzalez"), Williams at one point said "I'm gonna die."

Once the audio was activated, Williams, Cline, and Bleichwehl spoke at various times, though not in a form that could be described as a dialogue. Cline first asked Williams for his name. Williams did not answer the question, but instead continually repeated that he could not breathe and said "I'm dying."[9] He rocked around in the back seat of the car while moaning, saying "sir" frequently, and begging for help. At one point, Williams specifically asked for an ambulance. Cline told Williams that he was "breathing just fine" and commented that he was "playing games." (Docket #54-30 at 2). Cline nevertheless rolled the rear window down and turned on the air conditioner. Ticcioni and Bleichwehl were standing beside the car while this went on.

Defendants dispute what the officers heard or did not hear Williams say. However, while standing outside her house, Austin could hear Williams' cries. Rose arrived at the scene during this period and spoke briefly with Cline near the car. Cline apparently told her that Williams had tried to rob a house. Rose could hear her boyfriend saying that he could not breathe and saw him rocking around in the back seat.

During the entire time he was seated in the car, Cline did not request medical assistance for Williams or even look at him, either by turning his head or switching on a video feed at the computer by the driver's seat. Cline, like the other officers, thought Williams was engaged in petty obstructionism rather than suffering genuine distress. Cline eventually left the car to assist with evidence gathering, and Bleichwehl took his place in

---

[9]Defendants attempt to dispute that Williams ever said "I'm dying." The Court is confused by this; at 12:49:18 a.m. (1:36-38 of the video file) Williams can be clearly heard making that statement. (Docket #54-29). Admittedly, the second instance of Williams saying "I'm dying," at 12:53:07 a.m. (5:27 of the video file), is rather muddled. *Id.*

the driver's seat. The two had a brief exchange about Williams (with Ticcioni present) but it did not concern Williams' breathing complaints. By the time Bleichwehl asked for Williams' name, Williams was slumped over in the seat and was non-responsive. Williams' final actions were slight jerking movements of his arms. Like Cline, Bleichwehl did not use his computer to view the backseat, and only turned his head about thirty seconds after Williams' final movement.

Upon observing Williams motionless, Bleichwehl got out of the car and opened the rear door. He checked Williams for a pulse and breath, but neither were present. By this point, Bleichwehl had not concluded that Williams' medical situation was serious; he left open the possibility that Williams was continuing to simply be uncooperative. Rose approached the car from that side, but Bleichwehl told her to return to the side of the street. Bleichwehl then went to the other side of the car and lifted Williams to a seated position. He again checked for a pulse but found none.

Bleichwehl did not immediately seek medical assistance. Instead, he went to another police car for help. Apparently, none was forthcoming, as he returned to Cline's car alone. Bleichwehl pulled Williams from the car and called for help from other officers via his radio. Boyack responded and, for the first time, requested medical help. This was approximately fifteen minutes since Williams had been taken into custody, twelve minutes after he was put in the back seat of the car, and three minutes after Bleichwehl first saw him motionless. Bleichwehl did not start applying CPR to Williams until he found a plastic bag or mouth guard to use as a barrier

between their mouths.[10] Many more officers came to help and they rotated giving mouth-to-mouth and chest compressions. Fire department paramedics took over at 1:08 a.m., twenty-four minutes after Williams was found under the table in the backyard. At that point Williams still lacked a pulse or breath. Paramedics were unable to revive Williams and he was pronounced dead at 1:41 a.m.

### 3.1.2 Cause of Death and Related Medical Evidence

On August 30, 2011, Milwaukee County Assistant Medical Examiner Christopher Poulos ("Poulos") signed the first autopsy protocol for Williams, declaring that his death was caused by sickle cell crisis[11] due to

---

[10]By affidavit filed with Defendants' reply materials, Bleichwehl says that he began CPR without mouth protection. (Docket #64 at 3). Boyack, however, states that he did not think CPR was started prior to finding a mouth barrier. (Docket #54-33 at 118:19-119:9). As it favors Plaintiffs, the Court must credit Boyack's account.

[11]The Centers for Disease Control and Prevention describe cell sickling:

> Healthy red blood cells are round, and they move through small blood vessels to carry oxygen to all parts of the body. In someone who has [sickle cell disease], the red blood cells become hard and sticky and look like a C-shaped farm tool called a "sickle". The sickle cells die early, which causes a constant shortage of red blood cells. Also, when they travel through small blood vessels, they get stuck and clog the blood flow. This can cause pain and other serious problems such infection, acute chest syndrome and stroke.

Centers for Disease Control and Prevention, *Facts About Sickle Cell Disease*, https://www.cdc.gov/ncbddd/sicklecell/facts.html. Milwaukee County Medical Examiner Brian Peterson describes death by sickle cell crisis: "fundamentally what's happening is asphyxia at the blood vessel level as the blood vessels plug. I think a patient will experience that as difficulty breathing." (Docket #38-5 at 98:22-99:5).

Williams' sickle cell trait,[12] and that the death was natural. A second autopsy protocol was prepared on September 17 and 18, 2012. In the second protocol, Milwaukee County Medical Examiner Brian Peterson ("Peterson") and Poulos revised the cause of death, stating that the sickle cell crisis was brought about by Williams' flight from and altercation with police. They declared that the manner of death was homicide.[13] They moved mention of Williams' sickle cell trait to the "other significant conditions" section of the form.

The second protocol went on to address other facts relevant to Williams' death. After his death, Williams' blood tested positive for marijuana. Peterson testified that marijuana use alone would not cause sickling and result in death, though smoking it may be one of many bodily stressors which can induce sickling.[14] Peterson said that other stressors could include heat, dehydration, situational stress, and hypoxemia—low blood oxygen—which may have stemmed from Williams wearing the joker mask. Both protocols also reported blunt force injuries to Williams' head,

---

[12]Sickle cell trait is the presence of one sickle cell gene in a person, inherited from either parent, and is generally not considered a serious medical condition. (Docket #68-12 at 48:18-49:25). Sickle cell disease, the existence of sickle cell genes inherited from both parents, is a recognized medical condition which can cause sickling (outside the context of the acute crisis described by Peterson). *Id.* The disease is usually discovered soon after birth, via blood tests, or otherwise in the first year of life. Centers for Disease Control and Prevention, *Facts About Sickle Cell Disease*, https://www.cdc.gov/ncbddd/sicklecell/facts.html.

[13]In the parlance of medical examiners, "homicide" simply means that someone died with another person involved, not that anyone wrongfully caused the death.

[14]Rose reported that Williams seemed normal when he left the house on July 5, 2012, and did not appear to be on any drugs. Defendants note that Mathis thought Williams was "very hyper." (Docket #38-3 at 62:15-18).

neck, torso, and limbs, though the precise cause—whether force applied by the officers or something else—is not stated. None of those injuries were fatal and Peterson opined that they did not trigger the crisis.

Poulos and Peterson's cause of death determination was based on their review of tissue samples showing blood vessels distended with sickled cells (such clumps are known as "thrombi"), their belief that the sickling was an ante-mortem process, and Peterson's review of the squad car video. Alice Briones ("Briones"), a medical examiner with the United States Armed Forces Medical Examiner System, reviewed the autopsy reports at the FBI's request. Briones found that while Williams' sickle cell trait may have contributed to his death, the actual cause of death was indeterminable. She did not see evidence establishing the cause of sickling, whether it occurred before or after death, or explaining why other areas of Williams' body lacked thrombi.

The next medical opinion on Williams' cause of death came from Harry Jacob ("Jacob"), a hematologist and oncologist who was called to testify at the inquest into Williams' death. Jacob, an expert on sickle cell disease, stated that those who bear the sickle cell trait can die of it suddenly in the form of sickle cell crisis. Jacob testified that it can take minutes to hours for the blood cells to sickle. Jacob did not think that Williams would have survived even if Defendants had taken him to the hospital when they reached the street, instead of putting him in the car. Jacob says that Williams would not have lasted long enough for doctors to complete a blood transfusion, the only sure treatment for sickle cell crisis.

Lieutenant James Arps ("Arps"), a Milwaukee Fire Department paramedic, also testified at the Williams inquest. Arps opined that if paramedics had been called earlier, when Williams was responsive and had

a pulse, their treatment options would have been greater. These options would include speaking with Williams about his condition, evaluating his breathing and blood oxygen level, and treating him with oxygen or other medicines. Paramedics are trained to stabilize critical conditions in general and treat patients on the way to a hospital. Thus, Arps concluded, whether or not paramedics had specific knowledge that Williams carried the sickle cell trait, their treatment approach would have remained the same.

Plaintiffs retained emergency room physician Trevonne Thompson ("Thompson") to review Williams' treatment (or lack thereof). Thompson opines that had Williams been provided medical treatment prior to losing consciousness, his chances of survival were high. The rate of survival for patients who present to a hospital's emergency room with some measurable vital signs is over ninety-nine percent. In Thompson's view, the stabilizing care paramedics could have afforded a responsive and breathing Williams would likely have kept him alive long enough to reach an emergency room. Defendants counter with the opinion of Daniel DeBehnke ("DeBehnke"), another emergency room physician, who claims that establishing a likelihood of survival without a definitive cause of death is speculative.

### 3.1.3   MPD Policies Related to Williams' Death

Plaintiffs' policy evidence can be divided into two sets. The first supports their view that the MPD's training is deficient with respect to suspects who report breathing complaints. The second posits that the combination of a recurrent failure to appropriately discipline officers, along with a code of silence among MPD personnel, emboldened Defendants to ignore Williams' complaints and act in concert to cover up their wrongdoing after the fact. The Court discusses each set of evidence in turn.

### 3.1.3.1        Respiratory Distress

Plaintiffs maintain that one of the reasons none of the officers sought timely medical care for Williams was defective training. Specifically, they note that Defendants were trained using the principle that "if you can talk you can breathe." Defendants acknowledge that this principle was part of their training and practice prior to the Williams incident, and that it played a role in their response to Williams' distress. Plaintiffs contend that this principle, as well as general CPR training, was the entire extent of MPD training on dealing with people in custody who have respiratory problems.

Defendants dispute this, pointing to the plethora of topics addressed in officer training regarding medical care for breathing conditions. Officers are trained as first responders, which includes evaluating people in medical distress and, *inter alia*, checking their breathing. Officers are specifically trained to assess strokes, seizures, diabetic emergencies, poisoning, and allergic reactions, all of which involve assessment of, and sensitivity to, breathing problems. Further, the training materials provided to officers provide guidance on evaluating a person's ability to breathe. Defendants maintain that they knew that being able to talk did not indicate the quality of a person's breathing. They further note that prior to Williams, no person had died while in MPD custody due to sickle cell crisis.

Relatedly, Defendants note that in their time as MPD officers, each has encountered someone who ran from them and, when apprehended, stated that they could not breathe. Defendants attributed those statements to the person's recent physical exertion, not a medical issue, and did likewise in Williams' case. Defendants do not dispute, however, that there is a difference between being out of breath and being unable to breathe.

Plaintiffs counter by showing that the MPD knew its breathing-relating training was deficient well before the Williams incident. Police academy instructor Rupert Reilly ("Reilly") knew that the "if you can talk you can breathe" principle was incorrect at least by 2009. The Milwaukee Fire Department updated this aspect of its training at that time, but the MPD did not do so until after Williams' death. Reilly also acknowledged that he could not recall ever training officers on evaluating the authenticity of a breathing complaint. Further, prior to Williams' death, the MPD had no rules or standard operating procedures dictating when officers should seek medical attention for a suspect complaining of breathing issues.

Plaintiffs also point to prior incidents involving the MPD and persons in respiratory distress. In September 2010, James Perry ("Perry") died in MPD custody with, among other things, complaints of being unable to breathe. At one point, an officer related the "if you can talk you can breathe" principle to him. Milwaukee Chief of Police Edward Flynn ("Flynn") was briefed on the Perry incident but made no changes to MPD training or regulations. The MPD investigation into Perry's death found no wrongdoing by any officer. Defendants maintain that the Perry incident is distinguishable from Williams' because it involved many other conditions, including multiple seizures, drooling and spitting from the mouth, and at least some professional medical attention (at a hospital and in jail).

Turning to Williams himself, Flynn was briefed on the matter in the days after July 6, 2011, which included watching the squad car video. At his deposition in this case, Flynn called the video "disturbing." (Docket #54-46 at 33:17-19). However, Flynn did not conclude that the officers had done anything wrong, because their perception of Williams was auditory rather than visual, and "they did not perceive his breathing problems as

authentic[.]" *Id.* at 36:1-8. Of course, Cline or Bleichwehl could have simply switched on the video feed showing Williams in the back of the car. Flynn claims that he did not know this was possible, either in 2011 or at his deposition in April 2017.

MPD Standard Operating Procedure ("SOP") 090.10, titled "Physical Restraint of Prisoners," provides that officers should constantly monitor those in custody, remain cognizant of changes in their medical condition, and if treatment becomes necessary, radio for assistance.[15] Reilly teaches officers that this monitoring must include visual and auditory contact with the suspect. Flynn, nevertheless, claims that although no officer looked at Williams during the entire eight minutes he was in the car, SOP 090.10 was not violated.

Theil and Kaul, as sergeants, were responsible for supervising the Williams incident and were ultimately responsible for Williams' well-being. Neither paid much attention to Williams being handcuffed and were worried about other matters, like finding a weapon and tracing Williams' flight path. Both lost contact with Williams as he was led out to the car, and they did not see Williams in the car. Kaul did not come back to Williams

---

[15]SOP 090.10 specifically states:

> It cannot be overemphasized that [officers] shall continually monitor and remain cognizant of the condition of a person in custody, especially when he/she is in restraints. The arrestee may encounter immediate or delayed physical reactions that may be triggered by the change in physical or environmental factors. Therefore, caution and awareness on the part of the officer is constantly required.

(Docket #54-48 at 3).

until the medical assistance call went out, and Theil did not return until Williams was dead.

In July 2012, in light of the Williams case, the Milwaukee Fire and Police Commission (the "Commission") recommended that the MPD consider changes to officer training. In September 2012, the squad car video was publicly released for the first time.[16] Later that month, Flynn gave an interview with a local news station, wherein he acknowledged that the officers had made an "error in judgment" in responding to Williams, and that the MPD took responsibility for not reacting more rapidly to William's medical needs. *Id.* at 88:5-23. On the same day as the interview, Flynn issued a memorandum to the entire MPD, directing that in response to the Williams incident, officers must seek medical attention for anyone they have contact with who is in medical distress, including breathing problems. This new rule removed officers' discretion to ignore or discount a subject's respiratory complaints. A training video was also shown at all MPD officer roll calls which dispensed with the "if you can talk you can breathe" principle and reiterated the new policy in Flynn's memorandum.[17]

### 3.1.3.2 Code of Silence

The Officer Defendants know that, according to MPD policy, they must report the misconduct of their fellow officers to supervisory personnel. They claim that they would report such misconduct if they saw

---

[16]Flynn claims the delay in releasing the footage was initially due to the ongoing investigation, and later because the MPD was waiting for the Williams family's permission to do so. Plaintiffs counter that the family's lawyer had been requesting public release of the video from the outset.

[17]These changes were formally codified in a revised SOP 090 which was issued a year later.

it and believe that other officers would do the same. The Officer Defendants state that they did not observe any misconduct throughout the Williams incident and none is aware of any of their co-defendants failing to report any such misconduct. Defendants also assert that all citizen complaints received by the MPD are thoroughly investigated and, if substantiated, discipline is imposed accordingly.

Plaintiffs disagree, arguing that the evidence in this case and the recent history of the MPD reveals a "widespread and deeply rooted code of silence within the MPD[.]" (Docket #56 at 11). Plaintiffs describe the code's application here:

> There is compelling evidence . . . that the District 5 Late Power Shift officers were engaged in a pattern and practice of unconstitutional conduct against African American suspects in their District for years before Derek Williams' death, that this conduct was not revealed by these officers and was not subjected to any discipline or supervision until well after Derek Williams' death, that these officers, including several of the main defendants herein, not only did not reveal their knowledge and participation in that pattern and practice before Williams' death, but also participated in a cover-up of the true nature of his death, all against a backdrop of the broader operation of the code of silence in these and other preceding high profile police misconduct cases.

*Id.*

Applying the code to Williams' case, Plaintiffs first question the validity of the MPD's internal investigation into Williams' death. Neither Theil nor Kaul was interviewed by MPD detectives, made any police reports on the incident, or were disciplined in any way for their actions. Detectives did not discuss with Cline the fact that he was sitting in the car during the first portion of the video. In fact, investigators did not initially

identify Cline as a subject of the investigation, and once that changed, they conducted only one brief interview with him. The detective who interviewed Ticcioni allowed him to review the detective's report to "verify its accuracy." (Docket #54-52 at 2). Flynn believes the investigation was "thorough and complete." (Docket #54-46 at 180:15-22). In April 2012, the investigation was closed and found no wrongdoing by any of the officers. Flynn, having reviewed the investigation materials and the squad car video, concurred in that assessment. Further, Flynn found no violations of any MPD SOP in the Williams incident.

Flynn gave an interview to another news outlet in October 2012. There, he made various comments, including that the officers' conduct appeared "callous and uncaring," and that the public was "understandably horrified." (Docket #54-62 at 3). Flynn maintained, however, that the officers were simply negligent; they had not done anything willfully wrong, because they did not believe Williams' complaints. Flynn also made statements at a Commission hearing on the Williams case. In sum, these were that his new September 2012 policy removed officers' discretion in whether or not to believe someone when they claim breathing difficulties. Flynn also emphasized that going forward, the MPD should err on the side of caution in seeking medical help for people in respiratory distress.

In February 2013, the Williams inquest was concluded and the jury's verdict recommended that Ticcioni, Cline, and Bleichwehl be criminally charged for violating Wisconsin law in failing to come to Williams' aid.[18] The MPD, however, did not reopen its investigation and determined that

---

[18]At his deposition, Flynn expressed no concern with the fact that Cline, Bleichwehl, Coe, and Ticcioni invoked the Fifth Amendment to avoid testifying in the inquest proceedings.

its findings of exoneration should stand. Flynn agreed. During his deposition, Flynn maintained that under then-existing policy, it was not a violation of MPD policy to not call for medical assistance absent "bleeding or a clear inability to breathe or some clear undeniable evidence of medical distress." (Docket #54-46 at 157:2-158:15).

In the same timeframe as the Williams case, a strip search scandal arose involving the MPD. In brief, the scandal involved a certain group of MPD officers, also part of the District Five late power shift, who unlawfully searched many citizens for drugs or other illegal contraband by pulling down their pants, or reaching into their underwear, in public places. In October 2012, Flynn spoke at a press conference addressing the scandal. The press conference announced that four of the officers involved were being charged criminally for their conduct. Flynn said he was "disgusted by the willful actions of some of the officers in our police department and I'm appalled by the willful inaction of some other officers . . . for failing to stop egregious conduct." (Docket #54-60 at 2-3). The group of officers in question included Cline, Bleichwehl, Kuspa, and Thoms. Though Flynn's discussion of "egregious conduct" appeared to reference only the strip search issue, not the Williams' incident, he was aware that there was some identity between the officers involved in each. (Docket #54-46 at 98:12-22). When the strip search scandal broke in March 2012, Flynn stated that the matter was a serious training issue, and his belief was echoed by the officers who had been charged.[19]

---

[19]Plaintiffs claim that in the strip search scandal, no officer reported the illegal searches and during the subsequent investigations, no officer voluntarily gave inculpatory information. For this proposition, they cite only to the expert report prepared in one of those cases. The strip search report is hearsay when offered to prove the truth of that proposition and therefore cannot be considered

Thoms cooperated in the strip search investigation after being granted immunity from prosecution. Plaintiffs note that he was later called a "snitch motherfucker" by Vagnini (one of the four officers who were prosecuted) and had a bullet placed in his locker. Defendants minimize the snitch comment, as Thoms claimed it arose from a time when he had "tr[ied] to help Officer Vagnini when he was inebriated." (Docket #54-71 at 129:11-23). Besides the four officers who were criminally charged, no other officers of the District Five power shift or their supervisors were disciplined as a result of the strip search scandal, and all but Bleichwehl remain working as officers or are on paid disability leave. Flynn reviewed at least some of the strip search investigations and approved their findings that no discipline should be imposed. Finally, Flynn approved multiple promotions for Michael Brunson and Edith Hudson, while knowing that each had presided over the District Five power shift during their rash of illegal strip searches.

The remainder of Plaintiffs' evidence on the MPD's failure to discipline and code of silence is best presented in a bulleted timeline:

   i.   In 1991, the City mayor formed a citizen commission to review police-community relations. The citizen commission's investigation led to its determination that a "code of silence" existed within the MPD.

   ii.  Between 2000 and 2007, Jason Mucha ("Mucha") worked on the District Five power shift. He was involved in dozens of

at summary judgment. *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996) ("The evidence relied upon [at summary judgment] must be competent evidence of a type otherwise admissible at trial."). Though Plaintiffs might have supported their assertion with other evidence, they did not do so.

alleged uses of excessive force, theft, and planting of drugs. Mucha was not, however, disciplined for any of this, and was in fact encouraged to continue his street activities by his supervisors. Mucha was promoted to sergeant in 2005 and became the supervisor of the District Five power shift.

iii.     In 2004, Frank Jude ("Jude") was beaten by MPD officers. In 2006, officer Nicole Belmore testified against her fellow officers who did the beating. She was retaliated against severely, including being called a rat, having her property vandalized, making obvious and coordinated attempts to avoid her presence, interfering with her radio communications, and refusing to provide backup in the field.

iv.     In June 2006, Richard Jerome ("Jerome") of the Police Assessment Resource Center issued a report titled "Promoting Police Accountability in Milwaukee: Strengthening the Fire and Police Commission." (Docket #54-65). Jerome found that the Commission's citizen complaint system was "broken beyond repair." *Id.* at 52. One of the goals of the system is to identify trends of police misconduct, but the atypically low complaint sustainment rate revealed that the system was not working. The Commission further failed to audit MPD policies, citizen complaints received by it or the MPD, or civil actions filed against the MPD or its officers.

v.      In January 2009, the local radio station WUWM published an article on an interview with Flynn after his first year as police chief. The article stated:

Flynn says he's trying to change police culture and the code of silence that has plagued the department in the past. He says other big city police departments have experienced similar behavior on the part of officers to cover up misconduct. He says he's working with the International Association of Chiefs of Police on a new leadership code.

(Docket #54-68 at 3).

vi.  Nanette Hegerty ("Hegerty"), former chief of the MPD, gave a deposition in 2015, in the context of one of the civil lawsuits arising from the strip search scandal. Hegerty stated that there was a code of silence in the organization, though with the caveat that many organizations have such codes. Flynn says that her opinion is erroneous. In his deposition in this case, Flynn disagreed with Plaintiffs' counsel's suggestion that the code's effect was apparent in the strip search scandal.[20]

Plaintiffs' final item of evidence comes from Roger Clark ("Clark"), an expert on policing practices. Clark opines that Defendants' conduct in handling the Williams incident fell below the standard of proper police practices. Clark believes, unlike Flynn, that the officers' conduct violated SOP 090.10. He further finds that the MPD failed to conduct a thorough investigation or appropriately discipline those officers who were involved. Clark contends that the MPD's training on respiratory distress was

[20]In fact, Flynn felt the MPD was hard-done by criticism from the local newspaper, the Milwaukee Journal-Sentinel, and accused *them* of having a code of silence (though to what end, the Court does not know).

woefully inadequate. His primary conclusion is that the MPD does indeed have a pervasive code of silence.

### 3.2 Motion to Strike

In opposing summary judgment, Plaintiffs have offered the opinions of a number of experts. Defendants subsequently moved to strike the opinions of three: Gonzalez, Clark, and Thompson. Federal Rule of Evidence ("FRE") 702 controls the admissibility of expert opinions. It provides that

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court set forth a list of factors to aid in assessing the FRE 702 elements. 509 U.S. 579, 593-94. These factors include:

> (1) whether the expert's technique or theory is testable or has been tested;
> (2) whether the technique or theory has been subject to peer review and publication;
> (3) the known or potential rate of error in applying the technique or theory;
> (4) whether standards and controls exist and were maintained; and
> (5) whether the technique or theory is generally accepted in the scientific community.

*United States v. Lewisbey*, 843 F.3d 653, 659 (7th Cir. 2016) (citing *Daubert*, 509 U.S. at 593-94). These factors are "neither exhaustive nor mandatory," and "[u]ltimately, reliability is determined on a case-by-case basis." *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 835 (7th Cir. 2015).

The district court serves as a gatekeeper of expert testimony, determining its admissibility prior to such testimony being presented to the trier of fact. *United States v. Moshiri*, 858 F.3d 1077, 1083 (7th Cir. 2017). This gatekeeping function applies to all forms of expert testimony, not just that based on traditional science (medicine, life and physical sciences, economics, etc.). The focus of this inquiry "is not the ultimate correctness of the expert's conclusions. Instead, it is the soundness and care with which the expert arrived at her opinion[.]" *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013). "So long as the principles and methodology reflect reliable scientific practice," the Seventh Circuit instructs, "'[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Id.* (quoting *Daubert*, 509 U.S. at 596).

Plaintiffs' experts opine on different topics and the parties have addressed them separately. With the above principles in mind, the Court will follow suit.

### 3.2.1   Consuelo Gonzalez

Gonzalez is offered as an expert in lip reading. *See* (Docket #68-1 at 1). She is a "native" lip reader, having utilized that process for all verbal interactions since she was four years old. *Id.* at 3. Gonzalez has taught lip reading since 1982, and has provided professional lip-reading translation services since 1987. *Id.* As to her efforts in this case, Gonzalez was retained

to convey what Williams said during the initial thirty seconds of the squad car footage, which lacks audio. Gonzalez reviewed that segment and could only transcribe one phrase: "I'm gonna die." *Id.* at 2. As to the remainder of the non-audio portion of the recording, Gonzalez states that the poor video quality, lighting, and camera orientation make further transcription impossible. *Id.*

Defendants attack Gonzalez's opinion in two ways. Their first argument is directed at her qualifications. Their position is bizarre and so the Court quotes it precisely: "Ms. Gonzalez provides no description of her prior experience in reading the lips of a speaker, whose speech is captured on videotape which lacks an audio component." (Docket #67 at 9). This is the very purpose of lip reading; if audio had been recorded along with the video, Gonzalez's services would be unnecessary. Defendants nevertheless maintain that Gonzalez is unqualified because "the plaintiffs utterly fail to provide this Court with any citation to any court case in which Ms. Gonzalez has been certified as an expert, with reference to accurately transcribing the speech of a speaker, which is captured on poor-quality videotape, and for which there is absolutely no audio component." (Docket #73 at 2). This is not the standard for expert qualifications, though. Gonzalez need not have been previously accepted as an expert by some other court for this Court to do so. The Court is satisfied that Gonzalez's lifetime of practice and decades of professional lip-reading adequately equip her to opine on the subject.

Defendants' second contention is unreliability, both that the science of lip reading is generally questionable, and that the poor video quality in this case makes Gonzalez's efforts suspect. As to the first proposition, Defendants cite various internet articles, including one from Wikipedia,

which find that the percentage of accurate translation in lip reading is something less than thirty percent. Gonzalez counters, by affidavit, that Defendants' articles misrepresent the accuracy confidence that can be applied to lip-reading. In her view, accuracy can range from zero to one-hundred percent depending on the circumstances. The thirty percent accuracy figure is "an urban myth that has spread with increased use of the Internet . . . and with the relaxed documentation of sources." (Docket #70-1 at 3). The Court finds that this dispute is best left to cross-examination and does not form a basis for outright exclusion of Gonzalez's opinion. As explained by the Supreme Court, recognized science is not the only valid basis for expert testimony; "[i]n [some] cases, the relevant reliability concerns may focus upon personal knowledge or experience." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999). Here, Gonzalez's expertise is more than adequately grounded in her personal experience to warrant admitting her testimony. Defendants are free to challenge her testimony by explaining to the jury their belief that lip reading is unreliable.

As to the reliability of Gonzalez's opinion in this case, it is unlike that of the lip-reading expert in the *Quinn* case cited by the parties. There, the court assumed that lip-reading was a valid area of expertise and that the expert was appropriately qualified. *Quinn v. Pipe & Piling Supplies (U.S.A.) Ltd.*, No. 09-CV-161, 2011 WL 13124629, at *2 (W.D. Mich. Mar. 21, 2011). The court nevertheless excluded the opinion due to the poor quality of the video at issue, the fact that the subjects were not always facing the camera, and distortion in the video due to it being substantially reformatted. *Id.* The expert could only produce "scattered, incomplete, and nearly incomprehensible snippets of dialogue" which would "serve to confuse rather than assist the jury." *Id.* at *3. The transcript of the video confirmed

this, as it was "riddled with omissions due to lack of visibility, time variability, or poor video quality." *Id.*

By contrast, Gonzalez openly acknowledges that the poor video quality in this case prevented her from translating most of the relevant segment. She specifically states that at the time Williams says "I'm gonna die," he is looking directly at the camera. Upon its own review of the footage, the Court agrees that even with generally poor lighting conditions and Williams' erratic movements, this statement can be seen clearly. Thus, while the translation Gonzalez produced is exceedingly brief, it is not so scattered or incomplete such that it must be considered wholly unreliable.

### 3.2.2  Roger Clark

Clark offers opinions on the Officer Defendants' conduct in this case and the MPD's policing practices, namely how each were deficient and how those deficiencies led to Williams' death. Clark worked in the Los Angeles County Sheriff's Department for twenty-seven years and spent most of that time in a supervisory role. (Docket #68-5 at 19). At the time of his retirement, he had certification in California Peace Officer Standards and Training ("POST"), and also graduated from the POST Command College. *Id.* During his service, Clark performed regular duties as a sheriff's deputy, in the field as well as the county jail, and taught at the department's patrol school. *Id.* at 20.

Toward the end of his policing career, Clark commanded a specialized unit called NORSAT, created to investigate career criminals and arrest them. *Id.* at 21. In the first three months of his command of NORSAT, Clark's officers had three instances where they had to fire their weapons, and in the subsequent five years, they arrested more than two thousand hardened criminals without firing a shot. *Id.* Clark attributes this record to

proper training, management, and supervision of officers, as well as adherence to high moral and ethical standards of police practice. *Id.* Clark states that these same principles have been adopted by every state (as far as he knows) and the U.S. Department of Justice. Also during his NORSAT command, Clark was tasked with writing a field operations manual on tactical deployments during arrests and seizures. *Id.* at 22.

Since his retirement from policing in 1993, Clark has worked as a policing practices consultant, having been retained as a consultant or expert in more than 1,500 cases. *Id.* at 21-24. He has testified or offered an expert report in a substantial number of state and federal courts throughout the country. *Id.* at 22. Recently, Clark has evaluated the practices and procedures of the MPD in connection with the strip search scandal and resultant civil lawsuits. *See Chavies Hoskin v. City of Milwaukee, et al.*, 13-CV-920-JPS, (Docket #110-218).

Defendants first claim that "policing practices" is not a recognized subject for expert testimony. Defendants' opening brief rests this argument on questionably relevant caselaw more than two decades old. *Whren v. United States*, 517 U.S. 806, 815 (1996); *Berry v. City of Detroit*, 25 F.3d 1342, 1352 (6th Cir. 1994); *Peterson v. City of Plymouth*, 60 F.3d 469, 475 (8th Cir. 1995). Plaintiffs respond that recent Seventh Circuit authority finds policing practices expert testimony "relevant and helpful" in giving "a jury a baseline to help evaluate whether a defendant's deviations from [policing] standards were merely negligent or were so severe or persistent as to support an inference of intentional or reckless conduct that violated a plaintiff's constitutional rights." *Jimenez v. City of Chicago*, 732 F.3d 710, 721-22 (7th Cir. 2013); *see also Avery v. City of Milwaukee*, No. 11-CV-408-RTR, 2015 WL 247991, at *1-2 (E.D. Wis. Jan. 20, 2015). Defendants, recognizing

the weakness of their position, make no attempt to defend it in their reply. This Court, like many before it, accepts that "policing practices" is a valid area of expertise.

Defendants next question Clark's qualifications, the sufficiency of his data, and the reliability of his methods as applied to the facts of this case, all in an intertwined and difficult to parse argument. As to Clark's qualifications, they are not subject to reasonable dispute. He has decades of experience and training on policing practices and his testimony on that subject has been accepted by numerous courts. Defendants' suggestion that he has been out of law enforcement practice too long goes to the weight of his opinions, not their admissibility. The same is true for the alleged lack of specific experience and expertise in rendering emergency medical care to arrestees or dealing with sickle cell crisis. Defendants further contend that Clark should not be able to criticize Theil or Kaul as supervisors, which is an odd attack considering the bulk of Clark's experience was in a supervisory role. Finally, Defendants fault Clark for not conducting a literature review or having published articles on the subjects of his instant opinions. However, *Kumho Tire* permits expert opinions to be based on experience, and Defendants do not cite any analogous case where a policing practices expert was rejected for failing to do what is usually reserved for academics. *Kumho Tire*, 526 U.S. at 150.

Finally, Defendants believe that Clark lacks data on which to base his opinion that a code of silence exists in the MPD and contributed to the Williams incident. *See* (Docket #68-5 at 18). They do not, however, challenge any of the facts he detailed in his report, but rather claim that he lacks empirical evidence of any particular instance of Flynn or of the Officer Defendants participating in the code's execution. If such evidence existed,

Clark's testimony would be unnecessary and the MPD would have far more serious problems than this lawsuit. Instead, Clark grounds his code of silence opinion on a review of all the evidence detailed above, including the strip search scandal, other prior incidents of police misconduct, studies of MPD practices, and comments by Hegerty and Flynn himself. *See* Part 3.1.3.2. This, in conjunction with Clark's expertise, is an accepted form of data and an accepted method by which to form a policing practices opinion. *See Roberson v. City of Philadelphia*, No. 99-3574, 2001 WL 210294, at *4 (E.D. Pa. Mar. 1, 2001) ("Waters reaches his conclusions by applying his significant experience, training and skills to the facts provided to him. In formulating his opinions and making his report, Waters reviewed numerous materials, including deposition transcripts of all the parties, Pelosi's case file, various Philadelphia Police Department memoranda and directives, bail guidelines, and relevant case law. While not a formal, testable method, it is the one used by police practices experts and accepted by the courts.") (citation omitted).

In sum, Clark's opinions are based on a reliable application of his expertise to the facts he reviewed. Defendants' specific concerns with those facts, Clark's particular areas of experience, and the generality of his opinions are best addressed by cross-examination. The Court will not, therefore, bar Clark's testimony.[21]

---

[21]In their opening brief, Defendants explained that Clark's deposition could not be completed in the time allotted and that it would be finished on June 26, 2017. Defendants stated that they reserved the right to supplement their filing after that time. (Docket #67 at 11-12). No such supplement has been received. This is a further reason to approach Clark's opinions cautiously at this stage. Plaintiffs have not been afforded an opportunity to clarify any of Clark's answers given to Defendants' questions. (Docket #72 at 2 n.1).

### 3.2.3   Trevonne Thompson

Thompson is an emergency room physician with fifteen years' experience in emergency medicine in practice and teaching. (Docket #68-10 at 1). Thompson presents two overarching opinions in this case. His chief opinion is that had medical attention been provided to Williams prior to him losing consciousness (as shown in the squad car video), he would have had a high likelihood of survival. *Id.* at 2. Specifically, Thompson states that if Defendants had called paramedics at any point where Williams was still complaining about respiratory distress, those medical professionals would likely have stabilized Williams' condition so that he could be transported to a hospital. *Id.* Thompson notes that over ninety-nine percent of people who arrive alive at a hospital's emergency department stay alive through medical intervention. *Id.* at 3.

Thompson's secondary opinion is that the cause of death is undetermined. *Id.* at 2. This belief is based on Thompson's experience in treating patients with sickle cell disease, and the fact that the lack of medical attention prior to Williams' death makes it more difficult to establish a definite cause thereof. *Id.* Thompson further states, though equivocally, that Williams may have died at the moment he lost consciousness. *Id.* Regardless of the precise time or cause of death, however, Thompson maintains his opinion that medical intervention prior to Williams' loss of consciousness most likely would have saved his life. *Id.*

Defendants do not question Thompson's credentials as an expert on emergency medicine in an emergency department. They contend, however, that Thompson lacks specific expertise as to his secondary opinion. Defendants note that Thompson is not an expert on determining a cause of death, either generally or with respect to sudden onset sickle cell crisis in

particular. Though it could be more clearly stated in his report or deposition, Thompson appears to agree with Briones that there are too many unresolved variables to definitively state, as Poulos and Peterson have done, that the death was caused by sickle cell crisis. *See* (Docket #68-10 at 2; Docket #68-12 at 55:6-58:6, 82:25-84:22). This is based on his experience, knowledge of medical literature, and the lack of pre-death medical care. *Id.* While certainly not the most forceful opinion, it is at least minimally based on "principles and methodology reflect[ing] reliable scientific practice," such that Defendant's "'[v]igorous cross-examination'" can draw out any faults therein. *Schultz*, 721 F.3d at 431 (quoting *Daubert*, 509 U.S. at 596).

Defendants also attack Thompson's primary opinion in various ways. They assert that he cannot opine about Williams' survival chances because: 1) he is not an expert on paramedic training generally or for paramedics in Milwaukee; 2) he is not an expert on treating sickle cell crisis in persons diagnosed only with sickle cell trait, as opposed to the disease itself; and 3) without knowing why Williams died, Thompson can only speculate as to what could have saved his life. Each of these concerns is defeated by assessing Thompson's opinion on the matter holistically. His report states that "[r]egardless of the the [sic] actual cause of Mr. Williams' death, it is highly likely that he would not have died had medical intervention begun before his loss of consciousness[.]" (Docket #68-10 at 2). Thompson further posits that paramedic attention "would have reduced his likelihood of death, regardless of the medical illness or condition he was experiencing." *Id.* at 3. In Thompson's experience, this is in fact a "hallmark" of emergency care—stabilizing a patient without knowing precisely what is wrong with them. *Id.*

Defendants may not agree with his conclusions, but that is no basis for wholesale exclusion of Thompson's opinion. The Court finds Thompson should be allowed to base his opinion on his understanding of emergency medicine, namely an opinion on the efficacy of emergency treatment which disregards the cause of the medical crisis. Jacob and DeBehnke do not state that such an opinion is totally outside accepted medical practice, only that they disagree with it. The Court will not resolve this battle of the experts by simply striking one competing opinion. The jury is entitled to hear both and decide which is to be believed.

### 3.2.4   Conclusion

Defendants' motion to strike will be denied as to each expert. Their opinions have been fully considered in addressing the facts material to Defendants' request for summary judgment.

## 4.   ANALYSIS

Defendants seek summary judgment on each of Plaintiffs' claims and request dismissal of the entire lawsuit. In the Complaint, the claims are stated in seven counts:

1)   Excessive force, in violation of the Fourth Amendment, against Ticcioni and Coe;

2)   Failure to provide medical attention, in violation of the Fourth Amendment, against the Officer Defendants;

3)   Loss of companionship, in violation of the Fourteenth Amendment, against the Officer Defendants;

4)   Corporate liability pursuant to the *Monell* doctrine, by its adoption and maintenance of unconstitutional *de facto* policies, against the City;

5)      Wrongful death, in violation of Wisconsin law, against the
        Officer Defendants;

6)      Respondeat superior, establishing the City's joint liability
        along with the Officer Defendants for the wrongful death
        claim; and

7)      A right of indemnification, pursuant to Wisconsin law,
        against the City for any damages assessed against the Officer
        Defendants.

(Docket #1 at 15-21). In their opening brief, Defendants state the issues
presented as follows:

> 1. Did either Officer Coe or Officer Ticcioni use
> excessive force against Mr. Williams?
> 2. Were any of the defendant officers and/or sergeants
> unreasonable with regard to any medical need of Mr.
> Williams?
> 3. Are the defendant officers and sergeants each
> entitled to qualified immunity from the excessive force and/or
> failure-to-provide-medical-care claims raised against them?
> 4. Was any action or inaction of any officer the cause of
> Mr. Williams' death?
> 5. Did the City of Milwaukee fail to 1) train its police
> officers regarding providing medical care to persons in their
> custody, or 2) supervise officers, and if so, did any such failure
> cause Mr. Williams' death?
> 6. Can plaintiffs maintain a state law wrongful death
> cause of action?

(Docket #36 at 25). Other than those conceded by Plaintiffs, summary
judgment is not warranted in Defendants' favor on any count of the
Complaint or as to any issue presented in their motion.

### 4.1 Excessive Force

In their response, Plaintiffs agreed to dismiss their excessive force claim. (Docket #55 at 2 n.1). Unrelatedly, Plaintiffs further agreed to dismiss Boyack as a defendant with respect to all of their claims. *Id.* Plaintiffs did not request dismissal without prejudice. *Id.* The Court will, therefore, dismiss Count One of the Complaint and Boyack from this action with prejudice.

### 4.2 Williams' Medical Care

Defendants first seek summary judgment on Plaintiffs' claim pursuant to the Fourth Amendment for their failure to adequately attend to Williams' medical needs. Because Williams was an arrestee, not a prisoner, the Fourth Amendment's reasonableness standard applies to the claim, rather than the Eighth (or Fourteenth) Amendment's more stringent "deliberate indifference" analysis. *Ortiz v. City of Chicago*, 656 F.3d 523, 530 (7th Cir. 2011). In *Williams*, the Court of Appeals announced four factors to guide the Court's determination as to whether Defendants' medical care was unreasonable: "(1) whether the officer has notice of the detainee's medical needs; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) police interests, including administrative, penological, or investigatory concerns." *Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007). Defendants do not expressly address any of these factors. The Court gathers from their arguments that they contest the first and second; the third and fourth are not even arguably mentioned.

The parties expend substantial effort exploring the minutiae of each of the Officer Defendants' conduct to determine whether they had notice of Williams' condition, and whether they believed the condition was sufficiently serious to merit calling for help. Having already labored

through their factual submissions, the Court need not join them in this endeavor. The evidence, viewed in a light most favorable to Plaintiffs and drawing all reasonable inferences in their favor, clearly presents jury questions on each factor and as to each Officer Defendant. In short, the jury could reasonably infer that each Officer Defendant actually heard, or studiously avoided hearing, Williams' complaints of respiratory distress. In many instances, people far away from Williams reported hearing his cries while a nearby officer claimed to have heard nothing. A jury could further conclude that Williams' breathing problems presented so serious a medical need that the Officer Defendants' non-response was unreasonable.[22]

Two recent Seventh Circuit cases provide helpful analogies and address some of Defendants' specific arguments. In *Ortiz*, May Molina ("Molina") died while in Chicago Police Department custody. *Ortiz*, 656 F.3d at 527. Molina was arrested during execution of a search warrant and taken to jail. *Id.* She had a number of severe medical conditions which required regular medication to control. *Id.* Despite repeated requests for medical care from Molina herself, her mother, her lawyer, and others, officers did not transport Molina to a hospital or allow her to take her medications. *Id.* at 527-29. Molina died in her cell within twenty-four hours of her arrest. *Id.* at 529.

---

[22]When assessing the second factor, "[t]he severity of the medical condition . . . need not, on its own, rise to the level of objective seriousness required under the Eighth and Fourteenth Amendment[s]. Instead, the Fourth Amendment's reasonableness analysis operates on a sliding scale, balancing the seriousness of the medical need with the third factor—the scope of the requested treatment." *Williams*, 509 F.3d at 403. Though breathing problems may not always signal the direst of medical issues, when balanced against the desired treatment—taking a few seconds to activate a radio and call for an ambulance—a jury question arises.

The Court of Appeals held that summary judgment was improper in the officers' favor on Ortiz's (Molina's daughter) Fourth Amendment claim. *Id.* at 534. The evidence, viewed in Ortiz's favor, allowed at least an inference that each officer knew of Molina's deteriorating condition and did nothing. *Id.* at 532-34. The court observed:

> This is not a case where prison officials provided substandard medical care and we must decide whether they crossed the line from medical malpractice (negligence) to deliberate indifference (recklessness). Ortiz's claim is that each of the defendants knew that Molina suffered from a serious medical condition, yet they failed to take any step in response.

*Id.* at 538-39. In our case, if Plaintiffs' evidence is believed, the Officer Defendants did not simply fail to intervene earlier to help Williams. Instead, they were well aware that his condition was real and required immediate attention but consciously ignored him. In other words, Defendants' argument is turned on its head. Rather than supporting their assessment that Williams was malingering, the evidence that Cline and Ticcioni took limited actions to assuage Williams' distress (rolling down the car window and leaning off of Williams' back) supports the inference that they *knew* his condition was serious.

*Ortiz* offers additional relevant instruction. First, a jury is not required to believe the Officer Defendants' accounts of the night's events simply because there may be no direct contradictory evidence. *Id.* at 532. Williams was the person best situated to offer that evidence, but Plaintiffs allege that the Officer Defendants' inaction contributed to cause his death. In any event, there are ample contradictions even amongst the Officer

Defendants' own accounts, as well as testimony from citizen witnesses, to dispute Defendants' version of events.

Next, the Officer Defendants emphasize that they believed Williams was faking his distress. This too is answered by *Ortiz*. One of the *Ortiz* defendants, Ramirez, was working the front desk, answering incoming calls. *Id.* at 528-29. During her shift, Ramirez "received five to ten calls from a number of different people informing her that Molina needed to take her medications or go see a doctor." *Id.* at 529. Ramirez did nothing other than inform her supervisor of the calls. *Id.* Ramirez argued that the calls did not put her on notice of Molina's condition because the caller could have been lying. *Id.* at 533. The court found the argument "nonsensical." *Id.* "That explanation," it noted,

> may shed light on why Ramirez failed to act once she was on notice—because she thought the caller was lying—but it does not refute the receipt of notice. Was it reasonable to do nothing aside from notifying her supervisors after receiving the calls? That, in our view, is the very question that the jury should decide. So we conclude that there is a triable issue as to whether Ramirez was on notice that Molina needed medical care.

*Id.* In hindsight, we all know that Williams was not faking. Whether it was reasonable for the Officer Defendants to believe that at the time is for a jury to determine.

Finally, the Officer Defendants maintain that none of them knew that Williams was in the midst of a sickle cell crisis rather than simply being out of breath. This position is inconsistent with the standard of review; the precise cause of death is disputed. Further, the *Ortiz* factors merely require knowledge of the detainee's serious medical condition, not its precise origin. *Id.* ("The question is not whether a particular defendant knew what

was wrong with Molina, but rather whether the defendant, based on what she observed herself and learned from others, should reasonably have known that Molina needed medical care."). From Plaintiffs' perspective, the seriousness of the condition was obvious. The jury must be permitted to weigh the parties' evidence on this point.

*Florek* stands in stark contrast to both the instant case and *Ortiz*. Linda Florek ("Florek") was also arrested during execution of a search warrant. *Florek v. Vill. of Mundelein, Ill.*, 649 F.3d 594, 595-96 (7th Cir. 2011). While officers searched her apartment, Florek asked for some baby aspirin. *Id.* at 596. This request was denied. *Id.* Later, while being taken to a police van for transport to jail, Florek complained of chest pains. *Id.* at 597. Officers immediately requested paramedic assistance. *Id.* Florek was taken to the hospital and treated for a heart attack. *Id.*

Unlike *Ortiz*, the *Florek* court found that summary judgment was appropriate in the officers' favor. The court stressed that "[o]ne should not fixate on [the *Williams*] factors." *Id.* at 600. Instead, "the intuitive, organizing principle is that police must do more to satisfy the reasonableness inquiry when the medical condition they confront is apparent and serious and the interests of law enforcement in delaying treatment are low." *Id.* "That is not the situation here," the court held, and it proceeded to analyze the *Williams* factors. *Id.* Prior to informing officers that she had chest pains, it was reasonable for them to deny Florek baby aspirin. *Id.* Once the chest pains were known to officers, they responded appropriately by seeking medical assistance. *Id.* at 600-01.

The *Florek* officers made no credibility determination with regard to Florek's statement that she was experiencing chest pains. The Officer Defendants, by contrast, chose to do so with Williams' complaints of

respiratory distress. They did so at the peril of their conduct later being found unreasonable by a jury. Further, "the medical condition [the Officer Defendants] confront[ed] [was] apparent and serious," while "the interests of law enforcement in delaying treatment" appeared low. *Id.* at 600. Indeed, whatever law enforcement interests may have been served by delaying Williams' treatment, they were not even advanced by Defendants in their motion. In light of *Ortiz* and *Florek*, the Court must deny Defendants' request for summary judgment on this claim.[23]

### 4.3    *Monell* Liability

Local government entities, such as municipalities and counties, cannot be held vicariously liable for constitutional violations committed by their employees. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). Such entities can, nevertheless, be liable under Section 1983 if "the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009) (citing *Monell*, 436 U.S. at 690). These are colloquially referred to as "*Monell*" claims.

---

[23]Neither in their opening brief nor in their reply do Defendants analogize to any case holding that a police officer (or other government agent) can defeat a Fourth Amendment medical care claim by asserting that they knew a detainee was suffering a medical emergency but were unaware of their true medical condition. In fact, a lack of legal authority plagues all of Defendants' argument on the Fourth Amendment claim. They cite three cases in the entirety of that argument, and all merely for general legal propositions, not for analogy. On summary judgment, Defendants bore the burden of not only presenting adequate undisputed evidence, but also supplying the law which warranted judgment in their favor on that evidence. *See Florek*, 649 F.3d at 601. They have failed to do either.

The City will bear liability for its relevant policies if those policies caused the unconstitutional harm Williams suffered, or in other words, if the policies were the "moving force" behind the constitutional violation. *Id.* at 303; *Estate of Sims v. County of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007). Causation may be shown directly, "by demonstrating that the policy is itself unconstitutional," or indirectly, for instance when "a plaintiff cannot identify any formal policy that is unconstitutional," by pointing to "a series of bad acts creating an inference that municipal officials were aware of and condoned the misconduct of their employees." *Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir. 2010) (quotations omitted).

Plaintiffs present two variants of a *Monell* claim. The first is that the City's training regarding suspects presenting respiratory distress was "woefully insufficient." (Docket #55 at 43). Second, the City's "inadequate discipline and code of silence created an environment where police misconduct was not adequately scrutinized and a resultant attitude of impunity, particularly with regard to District 5 and its Late Power Shift officers, . . . was a moving force behind Derek Williams' unconstitutional treatment." *Id.* at 43-44. Though this second claim seems to be an amalgamation of other recognized *Monell* theories, such as failure to investigate, discipline, or supervise, Defendants take no issue with it on a theoretical level. (Docket #36 at 46-51; Docket #60 at 17-18).

Each of Plaintiffs' *Monell* theories must be viewed through the lens of "deliberate indifference." *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 381-82 (7th Cir. 2017). As described by the Supreme Court, "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons

with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). The *Dunn* court explained:

> Deliberate indifference may be shown in one of two ways. First, a municipality shows deliberate indifference when it fails to train its employees to handle a recurring situation that presents an obvious potential for a constitutional violation and this failure to train results in a constitutional violation. Second, a municipality shows deliberate indifference if it fails to provide further training after learning of a pattern of constitutional violations by the police.

*Dunn v. City of Elgin, Ill.*, 347 F.3d 641, 646 (7th Cir. 2003) (citations omitted). In other words, "'[i]t may happen that . . . the need for enhanced training is so obvious, and the inadequacy of training is so likely to result in the violation of constitutional rights, that a jury could reasonably attribute to the policymakers a deliberate indifference to those training needs.'" *Tapia v. City of Greenwood*, 965 F.2d 336, 338 (7th Cir. 1992) (quoting *Erwin v. County of Manitowoc*, 872 F.2d 1292, 1298 (7th Cir. 1989)). If that were true, "the failure to offer proper training constitutes a policy for which a city is liable when improper training actually imposes injury." *Id.* Further "[Plaintiffs] must show that the failure to train reflects a conscious choice among alternatives that evinces a deliberate indifference[.]" *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012).

When viewing the evidence most favorably to Plaintiffs, the Court concludes that they have raised triable issues of fact as to both of their *Monell* theories. As with Plaintiffs' Fourth Amendment claim, the Court will not belabor the point. For the failure to train claim, Plaintiffs' evidence and Clark's opinions suggest a lack of adequate training on how to approach complaints of breathing difficulties. Plaintiffs have further shown that the

City knew or should have known that its training was deficient prior to the Williams incident. For the code of silence claim, Plaintiffs' evidence admittedly appears scattershot. Nevertheless, Plaintiffs have woven at least a tenuous thread through the history of alleged MPD misconduct, including the strip search scandal, as well as Clark's opinions, the various studies, and the Williams incident itself, showing that the code existed with Flynn's knowledge and approval, and that this is what motivated Defendants' inactions on the morning of July 6, 2011. Whether the thread will snap under the strain of the City's opposing evidence is for the jury to decide.

The City's arguments to the contrary lack merit. First, the City maintains that it provided at least *some* medical training to MPD officers, defeating any assertion of indifference. It is for a jury, however, to determine whether this is sufficient to disprove the City's alleged indifference. Second, the City contends that it could not be expected to train its officers, who were given limited first responder training, to recognize that Williams was suffering from a sickle cell crisis. Not only does this assume that Williams was in such a crisis—a matter in dispute—but it also mischaracterizes Plaintiffs' failure to train claim. Plaintiffs assert that the City's training on respiratory distress was not only inadequate, but entirely incorrect; the "if you can talk you can breathe" principle was taught even though the MPD should have known it was wrong. Further, MPD policy allowed officers to exercise discretion to determine whether a breathing

complaint was genuine.[24] Flynn later acknowledged that the training was mistaken by changing the policy.[25]

Third, the City attacks Plaintiffs' code of silence evidence by showing that nothing prior to the Williams incident involved sickle cell crisis. In the same vein, the City asserts that circumstances of the strip search cases are factually distinguishable, and thus offer no support for a purported code of silence or lack of discipline. Plaintiffs' theory is not so narrow. They argue that the code of silence and lack of discipline enabled Defendants to treat Williams callously, as they believe occurred in prior incidents like those involving Perry and Jude. Finally, the City argues that the code of silence theory fails because the moving force behind Williams' death was the Officer Defendants' failure to recognize the seriousness of his medical condition, not some underlying, institutionalized freedom to

---

[24]The City's position is that "[Defendants] did not believe that [Williams] was truly experiencing a medical emergency. This conclusion on their part was not the result of any failure in their training. Rather, it was based upon their discretionary application of their training[.]" (Docket #60 at 21). This discretion is one of the very failings Plaintiffs attribute to the City's training scheme.

[25]In its reply, the City contends that Flynn's policy changes are inadmissible pursuant to FRE 407 as subsequent remedial measures. (Docket #60 at 21-22). A potential problem underlies this argument: waiver. The City of course participated in discovery and knew that this evidence, and the instant FRE 407 argument, were relevant to its motion for summary judgment. Its opening brief, however, makes no mention of the argument. *See generally* (Docket #36). Thus, the Court might deem the argument waived at this stage. *See Hernandez v. Cook County Sheriff's Office*, 634 F.3d 906, 913-14 (7th Cir. 2011); *Kenall Mfg. Co. v. H.E. Williams, Inc.*, No. 09-C-1284, 2012 WL 4434370, at *3 (N.D. Ill. Sept. 24, 2012) ("[A]rguments and evidence that could have been raised in the opening brief but are first raised in a reply brief are generally deemed waived.") (citing *Judge v. Quinn*, 612 F.3d 537, 542 (7th Cir. 2010)). Nevertheless, even without this evidence, Plaintiffs' submissions would still raise viable jury questions. Defendants may interpose a FRE 407 objection to the policy change evidence, if they still deem it appropriate, prior to trial.

mistreat African-American men. The parties' positions are, unsurprisingly, diametrically opposed on this point and a jury must be called upon to find the truth.

### 4.4 Qualified Immunity

The Officer Defendants assert that even if their actions violated Williams' constitutional rights, they are shielded by qualified immunity. That doctrine protects government officials from civil liability when they perform discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Put simply," says the Supreme Court, "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Once the defense is raised, the plaintiff bears the burden to defeat it. *Weinmann v. McClone*, 787 F.3d 444, 450 (7th Cir. 2015).

To overcome an assertion of qualified immunity, the plaintiff must first proffer facts which, if believed, amount to an actual violation of his constitutional rights. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Easterling v. Pollard*, 528 F. App'x 623, 656 (7th Cir. 2013). As the above discussion shows, Plaintiffs have achieved this. Next, the plaintiff must show that the violation of his constitutional rights was "clearly established under applicable law at the time and under the circumstances that the defendant official acted." *Easterling*, 528 F. App'x at 656 (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). A right is clearly established when its contours are "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (internal quotation marks and alterations omitted). Courts

should "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011). In January of this year, the Supreme Court emphasized "the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'" *White v. Pauly*, 137 S. Ct. 548, 552 (2017). The "clearly established law" must instead "be particularized to the facts of the case." *Id.*

To evaluate the "clearly established law" element, the Court must define the relevant constitutional right at issue as framed by the facts presented. The Officer Defendants initially describe the right as this: "[N]o caselaw requires officers to provide access to emergency medical care for a prisoner, when they do not perceive that the prisoner is experiencing a medical emergency." (Docket #36 at 40). In their reply, the Officer Defendants expound on the point:

> [N]one of [the cases cited by Plaintiffs] put any of the defendants [sic] officers in the instant case on notice that a complaint of being unable to breathe, made by a person who had just been taken into custody, and who had been caught attempting an armed robbery of a couple and had run 250-300 yards from the police on a hot, humid night, was experiencing a medical situation which required them to obtain emergency medical help. None of these cases indicated that upon receiving a complaint of being unable to breathe or having difficulty breathing, officers are required to immediately call for emergency medical personnel to respond to the scene. Additionally, none of these cases advised that any police department was required to disallow its officer's use of discretion, in evaluating the complaint of an arrestee and determining whether or not the arrestee is experiencing an emergency medical situation, which requires calling for the response of emergency medical personnel.

(Docket #60 at 13). Unfortunately for the Officer Defendants, the Court cannot accept any of their formulations of the right. Their descriptions do not coincide with the evidence as construed in Plaintiffs' favor. *See Mordi v. Ziegler*, 770 F.3d 1161, 1164 (7th Cir. 2014). Rather, when taking the inferences from Plaintiffs' evidence to their fullest extent, one can conclude that the Officer Defendants *knew* that Williams' breathing complaints stemmed from a serious medical condition and that they *intentionally* did nothing (until it was too late) because they were confident that they would suffer no discipline and that their mistreatment would not come to public light.

Thus, the tailoring exercise required by *White* becomes quite limited in this case. The relevant legal question is whether the Officer Defendants could have reasonably believed that intentionally refusing to take a few seconds to call for paramedics for a suspect they knew was in serious medical distress would not violate that suspect's constitutional rights. The answer is, of course, no. An arrestee's right to "objectively reasonable" medical attention has been established since at least 2007. *Williams*, 509 F.3d at 403-04; *Sides v. City of Champaign*, 496 F.3d 820, 828 (7th Cir. 2007). Attempting to find a factually analogous case is therefore purposeless. No police officer could ever reasonably conclude that deliberately ignoring an arrestee's genuine and severe medical emergency would satisfy the *Williams* factors described above, regardless of the particular factual scenario presented. *See supra* Part 4.2.[26]

_____

[26]Both parties cite cases addressing the right to medical care in the face of varying medical complaints, including those of respiratory distress. None of these cases are apposite in light of the true question presented. When the question is framed as stated by the Court, the precise nature of the malady or care needed becomes almost entirely irrelevant. Though it was handed down after the Williams

Given this controlling precedent, and an assessment of the relevant right in accordance with the standard of review, it was "beyond debate" at the time the Officer Defendants acted (or failed to act), their conduct violated Williams' Fourth Amendment rights. *al-Kidd*, 563 U.S. at 741. In other words, if Plaintiffs' version of events is true, the Officer Defendants did indeed "knowingly violate the law." *Mullenix*, 136 S. Ct. at 308 (quotation omitted). The Officer Defendants cannot, therefore, find shelter in qualified immunity at this stage of the litigation. After the jury determines the ultimate facts underlying the defense, however, the Officer Defendants may revisit it.

---

incident, and thus provided no direct guidance to the Officer Defendants, *Ortiz* confirms the propriety of this approach:

> But even if we were to assume that the [Fourth Amendment's reasonableness] standard we have applied in this case was not clearly established at the time Molina died, the outcome of this case would be unaffected. To survive summary judgment, Ortiz would then be required to satisfy the more stringent deliberate indifference standard. This, however, is not a case that turns on the difference between the two standards. Ortiz's argument, if credited by a jury, satisfies the deliberate indifference standard *because she argues that defendants were subjectively aware that Molina had a serious medical condition that needed care and they failed to respond adequately. See Sherrod v. Lingle*, 223 F.3d 605, 610 (7th Cir. 2000). . . . The question is only whether the officers' failure to act was not only negligent, but deliberately indifferent. *Yet it is well settled that providing no medical care in the face of a serious health risk constitutes deliberate indifference. See Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002).

*Ortiz*, 656 F.3d at 538 (emphasis added). Like *Ortiz*, the Officer Defendants' conduct would satisfy the deliberate indifference standard, and must have therefore infringed on Williams' right to reasonable medical attention.

### 4.5 Causation

Defendants argue that Williams' own conduct was the cause of his death. They believe that Williams died of sickle cell crisis, brought on primarily by Williams' drug use, dehydration, wearing the joker mask, flight from police, and the heat that night. As noted above, Jacob opined that there was little that could have been done to save Williams' life once he was in custody; the sickling process had already begun. Thus, in Defendants' view, nothing they did or did not do would have changed the outcome of their interaction with Williams.

Like any civil action, those pursued under Section 1983 require a plaintiff to show causation. *Whitlock v. Brueggemann*, 682 F.3d 567, 582 (7th Cir. 2012). Causation is further divided into two elements: 1) but-for causation, "i.e., the injury would not have occurred absent the conduct," and 2) proximate causation, "i.e., the injury is of a type that a reasonable person would see as a likely result of his or her conduct." *Id.* Defendants' argument goes to the second element, proximate cause. The causal chain between an unlawful act and the injury complained of may be broken by an intervening or superseding cause. *Shick v. Ill. Dep't of Human Servs.*, 307 F.3d 605, 615 (7th Cir. 2002). To make this determination, the Court weighs a number of factors, including the nature of the intervening force, whether the resulting harm is different than what was expected prior to the intervention, whether it was normal to expect such intervention, and whether the intervention was wrongful. *See* Restatement (2d) of Torts § 442 (1965).

The Court must nevertheless remember that causation is generally a question of fact for the jury to decide. *Shick*, 307 F.3d at 615 ("While generally the issue of proximate cause is a jury question, in extreme

circumstances . . . the question of proximate cause is an issue of law properly resolved by a court."); *Gayton v. McCoy*, 593 F.3d 610, 624 (7th. Cir. 2010) (in addressing a claim for deliberate indifference to an inmate's medical needs under the Eighth Amendment, "[p]roximate cause is a question to be decided by a jury, and only in the rare instance that a plaintiff can proffer no evidence that a delay in medical treatment exacerbated an injury should summary judgment be granted on the issue of causation."). The issue may only be resolved on summary judgment "when there is no evidence from which a jury could reasonably find the required proximate, causal nexus between the careless act and the resulting injuries." *Johnson v. City of Philadelphia*, 837 F.3d 343, 352 (3d Cir. 2016).

With these principles in mind, the Court cannot agree with Defendants that no reasonable jury could find proximate causation between Defendants' actions and Williams' death. Defendants' position again fails to accept the evidence and reasonable inferences in Plaintiffs' favor. According to Thompson, it was not only possible but likely that Williams could have been saved if paramedics had been summoned earlier. If this is true, Defendants were certainly responsible for failing to act. Neither Williams nor anyone else intervened to prevent them from calling for medical assistance, and Williams in fact begged for it repeatedly.

This case is thus unlike Defendants' citation, *Gant v. City of Chicago*, No. 13-CV-6231, 2017 WL 590279 (N.D. Ill. Feb. 14, 2017). There, prior to being arrested, Gant was stabbed in the eye, requiring treatment by surgery, medication, and eye drops. *Id.* at *1-2. Police refused to let him use his eye drops while he was in custody, which was about 24 hours. *Id.* at *2. A few weeks later, a second eye surgery was unsuccessful at restoring Gant's vision. *Id.* The court found causation lacking between Gant's eye injury and

the officers' alleged failure to provide him adequate medical care. *Id.* The court held that "[n]o reasonable jury could find that the defendants' failure to respond to Plaintiff's request for treatment caused or exacerbated the damage to his eye; there is simply no evidence that Plaintiff's condition worsened after missing his eye drops while in police custody." *Id.* at *3. The court noted that although Gant had a "serious medical condition, he had no serious *need* for the prescribed medication during the relatively limited period of time he was in lockup." *Id.* (emphasis added). In Williams' case, the opposite is true. A jury could conclude not only that Williams had a serious medical condition, but that the need for treatment was exceedingly urgent and was ignored by Defendants.[27] Summary judgment is therefore not warranted on the issue of causation.

### 4.6   Wrongful Death

Plaintiffs' wrongful death claim is made pursuant to Wisconsin Statute § 895.03. As explained by the Wisconsin Supreme Court,

> [a] wrongful death action is a cause of action for the benefit of designated classes of relatives, enabling them by statute to recover their own damages caused by the wrongful death of the decedent. It is a new action. However, the plaintiff in a wrongful death action has no claim if the

---

[27]Williams' situation is also different than that of the late Dontre Hamilton, whose death also involved the MPD. Hamilton was shot and killed by an MPD officer after a struggle between the two. *J.M. v. City of Milwaukee*, No. 16-CV-507-JPS, 2017 WL 1364971, at *9-13 (E.D. Wis. Apr. 12, 2017). The parties disputed whether Hamilton's alleged aggression during the incident functioned as a superseding cause of his death. *Id.* at *18-20. This Court held that it could not find a break in causation as a matter of law in light of that factual dispute. *Id.* Here, there is no suggestion that Williams fought with Defendants with anything close to the violence of the altercation involving Hamilton. At best for Defendants, Williams dragged his feet and otherwise engaged in petty obstruction to prevent them from taking him to jail. This in no way prevented them from calling for medical help on their radios.

decedent would not have been able to "maintain an action and recover damages" in his own right if he had not died. Wis. Stat. § 895.03. What this means is that "if death had not ensued," a deceased person would still have been alive and able to discover all the elements of the tort that resulted in his death. Thus, the beneficiary in a wrongful death action is simply recognizing and establishing a claim that is based on the claim that the decedent would have made if the decedent were still alive.

*Christ v. Exxon Mobil Corp.*, 866 N.W.2d 602, 690-91 (Wis. 2015) (citations and quotations omitted).

Defendants argue that even if the other claims in this lawsuit survive (which they do), Wisconsin law affords them immunity from Plaintiffs' wrongful death claim. Wisconsin municipalities and their agents are immune from civil suit when their actions "involve[] the exercise of discretion and judgment." Wis. Stat. § 893.80(4); *Lodl v. Progressive N. Ins. Co.*, 646 N.W.2d 314, 335 (Wis. 2002). An act is ministerial, and thus not discretionary and entitled to immunity, "only when it is absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance." *Lister v. Bd. of Regents of Univ. Wis. Sys.*, 240 N.W.2d 610, 622 (Wis. 1976). Defendants assert that the provision of medical care to a person in custody falls outside this narrow definition of ministerial acts.[28]

---

[28]The Court is compelled to note that nearly all of this section of Defendants' opening brief is lifted, verbatim, from the late Judge Rudolph T. Randa's opinion on summary judgment in *Estate of Perry v. Wenzel* from May of last year. *Compare* 185 F. Supp. 3d 1087, 1099-1100 (E.D. Wis. 2016), *with* (Docket #36 at 51-52). Judge Randa's opinion, however, is not cited anywhere in the brief. The Court expects that in this and any future litigation in this Court, Defendants' counsel will provide proper attribution for the analysis of others. *See Consol. Paving, Inc. v. County of Peoria, Ill.*, No. 10-CV-1045, 2013 WL 916212, at *5-6 (C.D.

Plaintiffs counter with the "known danger" exception to discretionary immunity. *Scott v. Savers Prop. & Cas. Ins. Co.*, 663 N.W.2d 715, 721 (Wis. 2003). This exception applies when "a danger known to a public officer or employee is of such a compelling force, it strips that person of discretion or judgment and creates an absolute, certain and imperative duty to act." *Dargenio v. Comm. Ins. Corp.*, No. 2015-AP-809, 2016 WL 3619365, at *7 (Wis. Ct. App. July 7, 2016) (quotation omitted). In other words, a known danger transforms a potential act from discretionary to ministerial, removing the protection of Section 893.80(4). *Id.* Plaintiffs believe that Williams' obvious respiratory distress and erratic movements could support a jury finding that Defendants knew of a serious medical danger to Williams.

Defendants offer little in response to the invocation of the known danger exception. They simply reiterate that they did not know that Williams was suffering from a sickle cell crisis and that they believed he was faking his distress. Again, these are the facts viewed in Defendants' favor, not Plaintiffs'. From the correct vantage point, a jury could reasonably infer that Defendants knew Williams' medical condition was quite serious. Further, "Wisconsin law does not require knowledge of the specific cause of the injury; it determines knowledge from the general danger of the circumstances." *Id.* at *8. It is therefore irrelevant that Defendants did not know of Williams' correct diagnosis. Defendants are not entitled to summary judgment as to Section 893.80(4) immunity because a jury could find that they knew of circumstances "sufficiently dangerous

---

Ill. Mar. 8, 2013) ("Plagiarism is a serious issue, and several courts have found such behavior unacceptable and a violation of the Rules of Professional Conduct that govern attorneys' behavior[;]" also collecting cases in agreement).

to require an explicit, non-discretionary municipal response," namely calling for medical help. *Id.* at *7.

**5.    CONCLUSION**

Disputes of material fact preclude summary judgment as requested by Defendants. The issues in this case must await resolution by the jury at the end of August.[29]

Accordingly,

**IT IS ORDERED** that Defendants' motion for summary judgment (Docket #35) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Defendants' motion to strike (Docket #67) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Defendants' motion to file an oversized reply brief (Docket #59) be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that the following be and the same are hereby **DISMISSED** from this action **with prejudice**:

  i)     Count One of the Complaint; and

  ii)    Defendant Chad Boyack.

**IT IS FURTHER ORDERED** that Plaintiff's motion to seal (Docket #22) be and the same is hereby **GRANTED**.

---

[29]Upon its review of the docket, the Court notes that it inadvertently failed to grant a motion to seal filed by Plaintiffs back on February 14, 2017. (Docket #22). The motion to seal relates to a confidential document Plaintiffs attached to a motion to compel. *Id.* The Court will belatedly grant the motion.

Dated at Milwaukee, Wisconsin, this 4th day of August, 2017.

BY THE COURT:

_____
J. P. Stadtmueller
U.S. District Judge