# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| ESTATE OF DEREK WILLIAMS, JR., TANIJAH WILLIAMS, DEREK WILLIAMS III, and TALIYAH S. WILLIAMS,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF MILWAUKEE, JEFFREY CLINE, RICHARD TICCIONI, PATRICK COE, JASON BLEICHWEHL, ROBERT THIEL, TODD KAUL, ZACHARY THOMS, GREGORY M. KUSPA, CRAIG THIMM, and DAVID LETTEER,<br><br>Defendants. | Case No. 16-CV-869-JPS<br><br>**ORDER** |

### 1.     BACKGROUND

This action arises from the death of Derek Williams, Jr. ("Williams") on July 6, 2011 while in the custody of the City of Milwaukee Police Department. *See* (Docket #1). Plaintiffs, Williams' estate and surviving minor children, have sued the City of Milwaukee and various police officers (collectively, the "Officer Defendants") whom they contend violated Williams' constitutional rights during the events leading to his death. *Id.* Summarized, they allege that in the course of being arrested and detained, Williams demonstrated obvious respiratory distress and a need for medical attention. *Id.* The Officer Defendants ignored him and refused to call for medical assistance until after Williams had died in the back seat of a police vehicle. *Id.*

On August 4, 2017, the Court denied Defendants' motion for summary judgment, including their assertion of the defense of qualified immunity (the "Order"). (Docket #74). Defendants took an interlocutory appeal of the denial of qualified immunity. (Docket #75); *see Gutierrez v. Kermon*, 722 F.3d 1003, 1009 (7th Cir. 2013) ("[A]n order denying qualified immunity on summary judgment often is immediately appealable on the basis that it is a final decision on the defendant's right not to stand trial[.]"). The appeal was pending in the Court of Appeals for over a year. Finally, on October 23, 2018, the Circuit court's mandate issued. (Docket #89). The Court of Appeals reversed this Court's denial of qualified immunity and remanded for further analysis of the issue. *Id.* at 14–15. The Court provides that analysis herein.

2. **ISSUES OTHER THAN QUALIFIED IMMUNITY**

Defendants' appeal was expressly limited to the part of the Order which denied them summary judgment on the basis of qualified immunity. (Docket #75 at 2). The appeal did not question any other part of the Order and so those parts were not before the Court of Appeals. To avoid any confusion, however, the Court will expressly reinstate and incorporate by reference each aspect of the Order other than the portion addressing qualified immunity. *See* (Docket #74 at 48–51) (Part 4.4 of the Order). The Court will also adopt the parties' recent stipulation for the dismissal of Defendants Craig Thimm and David Letteer as defendants. (Docket #91).

3. **QUALIFIED IMMUNITY**

    3.1 **General Principles**

Qualified immunity protects government officials from civil liability when they perform discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Put simply," says the Supreme Court, "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). It is a defense available to each of the Officer Defendants in his individual capacity, and not available to municipal defendants such as the City of Milwaukee. (Docket #89 at 13). Qualified immunity is a defense only to claims grounded in federal law. *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) ("Under our precedents, [police] officers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time.") (quotation omitted).

Plaintiffs bear the burden to defeat the defense once raised, and must prove two elements to do so. *Weinmann v. McClone*, 787 F.3d 444, 450 (7th Cir. 2015). First, Plaintiffs must proffer facts which, if believed, amount to a violation of constitutional rights. *Id.* Second, they needed to show that this right to medical care was "clearly established under applicable law at the time and under the circumstances that the defendant official acted." *Easterling v. Pollard*, 528 F. App'x 623, 656 (7th Cir. 2013) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). Earlier this year, the Supreme Court offered this concise statement of the rule:

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be settled law, . . . which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority[.] It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.

> . . .
>
> The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted. . . . We have repeatedly stressed that courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.

*Wesby*, 138 S. Ct. at 589–90 (citations and quotations omitted).

### 3.2 The Order

At the outset of the Order, the Court set forth in detail the material facts and the parties' disputes thereof. (Docket #74 at 3–26). This included a timeline of the events describing each of the Officer Defendants' involvement in the incident. *Id.* at 3–12. Because it was Defendants who presented the motion for summary judgment, all of the evidence and inferences therefrom was construed in Plaintiffs' favor. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016).

Later in the Order, the Court turned to the qualified immunity defense. (Docket #74 at 48–51). The Court determined that the first element—a violation of Williams' constitutional rights—was easily met. Refusing to obtain medical care for an arrestee who obviously needs it, and whom the Officer Defendants in fact knew needed such care, violates the arrestee's Fourth Amendment right to reasonable medical care. (Docket #74 at 38–43); *Ortiz v. City of Chi.*, 656 F.3d 523, 530 (7th Cir. 2011).

In addressing the second issue—whether this constitutional right was clearly established at the time of the incident—the Court first held that

Defendants improperly relied on their own version of the facts. (Docket #74 at 49–50). Viewing the facts in a light favorable to Plaintiffs, "one can conclude that the Officer Defendants knew that Williams' breathing complaints stemmed from a serious medical condition and that they intentionally did nothing (until it was too late) because they were confident that they would suffer no discipline and that their mistreatment would not come to public light." *Id.* at 50.

Second, the Court found that it was "purposeless" to search out a factually analogous case which would clearly establish the relevant constitutional right. The Officer Defendants' conduct was so egregious that they could never have reasonably concluded that deliberately ignoring Williams' medical needs was consistent with his Fourth Amendment rights. *Id.* Indeed, if Plaintiffs' version of events were true, the Officer Defendants had knowingly violated the law. *Id.* at 51 (citing *Mullenix*, 136 S. Ct. at 308).

### 3.3 The Appeal

On appeal, Defendants questioned the Court's analysis as to both elements of qualified immunity. The Court of Appeals held that it lacked jurisdiction to review this Court's determination on the first because it rested on disputes of fact. (Docket #89 at 6–12). Thus, the Court of Appeals could not overturn this Court's conclusion that the Officer Defendants had, viewing the facts in Plaintiffs' favor, violated Williams' constitutional rights. *Id.* at 10 ("[W]e conclude that this court lacks jurisdiction to decide whether a constitutional violation occurred, that is, prong one of the qualified immunity inquiry."). As to the second element, however, the Court of Appeals found that it could properly exercise jurisdiction over the legal question of whether the right to reasonable medical care was clearly established at the time of Williams' death. *Id.* at 1213.

The Court of Appeals then explained that because qualified immunity is a defense available to each individual Officer Defendant, this Court erred in failing to assess each officer's conduct separately and in detail. Namely, the Court of Appeals held that this Court "had the duty to determine whether each defendant violated Williams' Fourth Amendment rights and, if so, whether that right, defined at an appropriate level of specificity, was clearly established at the time that Williams was in custody." *Id.* at 13. The dissenting opinion put it more bluntly, stating that this Court failed to follow the "elemental step" of conducting an individual qualified immunity analysis and provided only a "vague, amorphous determination" which stumped both the panel and the parties' counsel. (Docket #89 at 16–17). The dissent declined to undertake a "cumbersome review of the record" and agreed with the majority that this Court must do so. *Id.* at 19.

This Court had, however, already conducted a review of the record and set forth the material facts in the appropriate section of the Order. (Docket #74 at 3–12). Neither the Court of the Appeals nor the parties were saddled with any burden to undertake this review themselves. In the qualified immunity section of the Order, the Court did not laboriously recount each of the Officer Defendants' actions because it had already done so. More to the point, this exercise would have been nothing more than make-work. When taking all reasonable factual inferences in Plaintiffs' favor, there was little material difference between what each officer did and said during the events leading to Williams' death. What mattered then, and what matters now, is that they all heard Williams cry out for help repeatedly and ignored him.

With this in mind, the Court questions the value of the Court of Appeals' demand for an express officer-by-officer report of the facts and the outcome of the qualified immunity analysis. Whatever this Court's feelings are on this issue, it is bound by the higher court's decision. That it took a year for the Seventh Circuit to direct the completion of this exercise is at best inexplicable.

### 3.4 Qualified Immunity Revisited

The Court now proceeds to separately discuss the facts relevant to each officer's claim of qualified immunity. In the interest of brevity, the evaluation below assumes familiarity with the relevant facts as recited in the Order as well as the evidence underlying them. *See* (Docket #74 at 3–12). In contrast to its lengthy and detailed discussion of the facts in the Order, the Court will now dispense with any further discussion of the parties' factual disputes; below are the facts and inferences taken in a light most favorable to Plaintiffs.

#### 3.4.1 Jeffrey Cline

Jeffrey Cline ("Cline") initially chased Williams to the alley and responded when Richard Ticcioni ("Ticcioni") and Patrick Coe ("Coe") found Williams hiding in the backyard. Cline was present during the handcuffing and then followed Williams to the squad car. During this time, Williams complained about respiratory distress and was sometimes limp and unresponsive. Though Cline denies hearing Williams, a jury could find the denial not credible. Williams was so loud that neighbors far away could hear his cries, and other officers in the area have admitted that they heard Williams. Cline also sat in the squad car with Williams while Williams continued to complain, rock around in distress, and say that he was dying. Though he never looked at Williams, Cline seemed to acknowledge

Williams' distress by rolling down the window and turning on the air conditioning. At no point did Cline radio for medical assistance, though it would have taken a matter of seconds.

The Court considers four factors to determine whether an arrestee's Fourth Amendment right to medical care was violated: "(1) whether the officer has notice of the detainee's medical needs; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) police interests, including administrative, penological, or investigatory concerns." *Ortiz*, 656 F.3d at 530. The Officers Defendants have conceded the last two factors; calling an ambulance was easy and would not have hindered any police interests. (Docket #89 at 10). As to the first two factors, a jury could reasonably infer that Cline knew Williams was experiencing a medical emergency and nevertheless refused to call for medical assistance.

At the time Cline acted, it was clearly established that deliberately ignoring Williams' serious medical need would violate his constitutional rights. *Williams v. Rodriguez*, 509 F.3d 392, 403–04 (7th Cir. 2007); *Sides v. City of Champaign*, 496 F.3d 820, 828 (7th Cir. 2007); *Egebergh v. Nicholson*, 272 F.3d 925, 928 (7th Cir. 2001) (officers violated an arrestee's constitutional rights when they "knowingly exposed [him] to a substantial danger to his health for no good reason," namely by denying the diabetic arrestee an insulin shot); *Walker v. Benjamin*, 293 F.3d 1030, 1040 (7th Cir. 2002) (when medical personnel refused to give a prisoner his pain medication, whether they were credible in stating that they thought he was malingering simply to get narcotics was an issue for the jury); *Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996) ("Deliberately to ignore a request for medical assistance has long been held to be a form of cruel and unusual punishment," which is a more onerous standard the mere objective reasonableness).

### 3.4.2 Richard Ticcioni

Ticcioni found Williams hiding in the backyard. In the course of arresting and handcuffing Williams, Ticcioni found himself resting his knee (and bodyweight) on Williams' back. After hearing Williams' breathing complaints, Ticcioni shifted his weight to reduce the pressure. Ticcioni's behavior, like that of Cline, tacitly admits knowledge of Williams' medical need. During Ticcioni's radio message which informed dispatch that Williams had been captured, Williams can be heard stating that he could not breathe. Ticcioni has further admitted hearing Williams' complaints of respiratory distress. He also carried Williams out of the backyard and to the squad car, during which Williams fell limply to the ground. Ticcioni then threw Williams into the back seat of the squad car. Finally, he stood beside the squad car for a time as Williams continued to cry out in distress. At no point did Ticcioni radio for medical assistance, though it would have taken a matter of seconds.

A jury could reasonably infer that Ticcioni knew Williams was experiencing a medical emergency and nevertheless refused to call for medical assistance. *Ortiz*, 656 F.3d at 530. At the time Ticcioni acted, it was clearly established that deliberately ignoring Williams' serious medical need would violate his constitutional rights. *Williams*, 509 F.3d at 403–04; *Sides*, 496 F.3d at 828; *Egebergh*, 272 F.3d at 928; *Walker*, 293 F.3d at 1040; *Cooper*, 97 F.3d at 916.

### 3.4.3 Patrick Coe

Coe found Williams hiding in the backyard and assisted Ticcioni in the initial arrest. During Ticcioni's radio message which informed dispatch that Williams had been captured, Williams can be heard stating that he could not breathe. Coe has further admitted hearing Williams' complaints.

He also carried Williams out of the backyard and to the squad car, during which Williams fell limply to the ground. Coe then threw Williams into the back seat of the squad car. At no point did Coe radio for medical assistance, though it would have taken a matter of seconds.

A jury could reasonably infer that Coe knew Williams was experiencing a medical emergency and nevertheless refused to call for medical assistance. *Ortiz*, 656 F.3d at 530. At the time Coe acted, it was clearly established that deliberately ignoring Williams' serious medical need would violate his constitutional rights. *Williams*, 509 F.3d at 403–04; *Sides*, 496 F.3d at 828; *Egebergh*, 272 F.3d at 928; *Walker*, 293 F.3d at 1040; *Cooper*, 97 F.3d at 916.

### 3.4.4 Jason Bleichwehl

Jason Bleichwehl ("Bleichwehl") was part of the group who first encountered Williams on the street. He then responded when Ticcioni and Coe found Williams hiding in the backyard. He arrived after Williams had been handcuffed. Bleichwehl has admitted to hearing Williams' breathing complaints. He followed as Williams was taken to the squad car. During this time, Williams complained loudly about his respiratory distress such that neighbors far away could hear his cries, and he was sometimes limp and unresponsive. Bleichwehl also stood near the squad car as Cline spoke to Williams, and then took Cline's spot in the driver's seat for a time. Bleichwehl did not turn to look at Williams until he was already unresponsive. He then went to get help from other officers before medical assistance was finally called for. At no point did Bleichwehl radio for medical assistance, though it would have taken a matter of seconds.

A jury could reasonably infer that Bleichwehl knew Williams was experiencing a medical emergency and nevertheless refused to call for

medical assistance. *Ortiz*, 656 F.3d at 530. At the time Bleichwehl acted, it was clearly established that deliberately ignoring Williams' serious medical need would violate his constitutional rights. *Williams*, 509 F.3d at 403–04; *Sides*, 496 F.3d at 828; *Egebergh*, 272 F.3d at 928; *Walker*, 293 F.3d at 1040; *Cooper*, 97 F.3d at 916.

### 3.4.5 Robert Thiel

Robert Thiel ("Thiel") initially assisted in forming a perimeter around the block where Williams was hiding. He then responded when Ticcioni and Coe found Williams hiding in the backyard. He was present during the handcuffing, saw Williams in a limp and unresponsive state, and performed some sternum rubs on Williams. Thiel told Ticcioni and Coe to take Williams to the street. During this time, Williams complained of respiratory distress and was sometimes limp and unresponsive. Though Thiel denies hearing Williams, a jury could find the denial not credible. Williams was so loud that neighbors far away could hear his cries, and other officers in the area have admitted that they heard Williams. At no point did Thiel radio for medical assistance, though it would have taken a matter of seconds.

A jury could reasonably infer that Thiel knew Williams was experiencing a medical emergency and nevertheless refused to call for medical assistance. *Ortiz*, 656 F.3d at 530. At the time Thiel acted, it was clearly established that deliberately ignoring Williams' serious medical need would violate his constitutional rights. *Williams*, 509 F.3d at 403-04; *Sides*, 496 F.3d at 828; *Egebergh*, 272 F.3d at 928; *Walker*, 293 F.3d at 1040; *Cooper*, 97 F.3d at 916.

### 3.4.6 Todd Kaul

Todd Kaul ("Kaul") initially assisted in forming a perimeter around the block where Williams was hiding. He then responded when Ticcioni and Coe found Williams hiding in the backyard. He arrived after Williams had been handcuffed. Kaul then proceeded to search for a gun. During this time, Williams complained about his respiratory distress and was sometimes limp and unresponsive. Though Kaul denies hearing Williams, a jury could find the denial not credible. Williams was so loud that neighbors far away could hear his cries, and other officers in the area have admitted that they heard Williams. Kaul was later present when Williams was thrown into the squad car. At no point did Kaul radio for medical assistance, though it would have taken a matter of seconds.

A jury could reasonably infer that Kaul knew Williams was experiencing a medical emergency and nevertheless refused to call for medical assistance. *Ortiz*, 656 F.3d at 530. At the time Kaul acted, it was clearly established that deliberately ignoring Williams' serious medical need would violate his constitutional rights. *Williams*, 509 F.3d at 403–04; *Sides*, 496 F.3d at 828; *Egebergh*, 272 F.3d at 928; *Walker*, 293 F.3d at 1040; *Cooper*, 97 F.3d at 916.

### 3.4.7 Zachary Thoms

Zachary Thoms ("Thoms") was part of the group who first encountered Williams on the street. He then responded when Ticcioni and Coe found Williams hiding in the backyard. He was present during the handcuffing. Thoms proceeded to search for a gun, and then followed Williams out to the squad car. During this time, Williams complained about his respiratory distress and was sometimes limp and unresponsive. Though Thoms denies hearing Williams, a jury could find the denial not credible.

Williams was so loud that neighbors far away could hear his cries, and other officers in the area have admitted that they heard Williams. At no point did Thoms radio for medical assistance, though it would have taken a matter of seconds.

A jury could reasonably infer that Thoms knew Williams was experiencing a medical emergency and nevertheless refused to call for medical assistance. *Ortiz*, 656 F.3d at 530. At the time Thoms acted, it was clearly established that deliberately ignoring Williams' serious medical need would violate his constitutional rights. *Williams*, 509 F.3d at 403–04; *Sides*, 496 F.3d at 828; *Egebergh*, 272 F.3d at 928; *Walker*, 293 F.3d at 1040; *Cooper*, 97 F.3d at 916.

### 3.4.8 Gregory Kuspa

Gregory Kuspa ("Kuspa") was part of the group who first encountered Williams on the street. He then responded when Ticcioni and Coe found Williams hiding in the backyard. He was present during the handcuffing. Kuspa proceeded to search for a gun. During this time, Williams complained loudly about his respiratory distress such that neighbors far away could hear his cries, and he was sometimes limp and unresponsive. Kuspa has further admitted to hearing Williams' breathing complaints. At no point did Kuspa radio for medical assistance, though it would have taken a matter of seconds.

A jury could reasonably infer that Kuspa knew Williams was experiencing a medical emergency and nevertheless refused to call for medical assistance. *Ortiz*, 656 F.3d at 530. At the time Kuspa acted, it was clearly established that deliberately ignoring Williams' serious medical need would violate his constitutional rights. *Williams*, 509 F.3d at 403–04;

*Sides*, 496 F.3d at 828; *Egebergh*, 272 F.3d at 928; *Walker*, 293 F.3d at 1040; *Cooper*, 97 F.3d at 916.

**4.	CONCLUSION**

As was readily apparent when the Court issued the Order more than one year ago, the material facts of this case are deeply disputed. When viewing those facts most favorably to Plaintiffs, and making all reasonable inferences in their favor, none of the Officer Defendants come close to an entitlement to the qualified immunity defense. Though each had slight variances in their roles during the incident, crucially, each was present long enough to hear Williams' loud, repeated cries of respiratory distress, but none even attempted to obtain medical assistance for him.

At best, the Officer Defendants ignored Williams because they believed he was a malingerer. This sort of behavior has long been prohibited. *Walker*, 293 F.3d at 1040. At worst, the Officer Defendants intentionally allowed Williams to die because of their animus toward African-Americans, combined with the belief that they could get away with it. Such obviously unlawful conduct does not enjoy any form of immunity. The Officer Defendants' request for summary judgment on the basis of qualified immunity must, therefore, be again rejected.[1]

Accordingly,

**IT IS ORDERED** that the parties' stipulation of dismissal as to Defendants Craig Thimm and David Letteer (Docket #91) be and the same is hereby **ADOPTED**;

---

[1] With this ruling, Plaintiffs' request for further briefing on the issue of qualified immunity becomes moot. (Docket #90).

**IT IS FURTHER ORDERED** that Defendants Craig Thimm and David Letteer be and the same are hereby **DISMISSED** from this action **with prejudice**;

**IT IS FURTHER ORDERED** that Plaintiffs' motion for leave to file supplemental proposed findings of fact and conclusions of law (Docket #90) be and the same is hereby **DENIED as moot**; and

**IT IS FURTHER ORDERED** that, except as modified herein, the balance of the Court's August 4, 2017 Order (Docket #74) be and the same is hereby **REINSTATED** in its entirety.

Dated at Milwaukee, Wisconsin, this 15th day of November, 2018.

BY THE COURT:

_____
J. P. Stadtmueller
U.S. District Judge